UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



10 CIV 3461

---------------------------------------------- x

ILENE RICHMAN, Individually and on Behalf
of All Others Similarly Situated,

                         Plaintiff,

    vs.

GOLDMAN SACHS GROUP, INC., LLOYD
C. BLANKFEIN, DAVID A. VINIAR and
GARY D. COHN,

                       Defendants.

---------------------------------------------- x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who were damaged in connection with their purchases of Goldman Sachs Group, Inc. ("Goldman" or the "Company") common stock between October 15, 2009 and the time it was publicly revealed on April 16, 2010 that the Securities and Exchange Commission ("SEC") had sued Goldman (the "Class Period") in connection with its misconduct relating to the formation and sale of ABACUS 2007-AC1.  This action is brought against Goldman, its Chairman and CEO, Lloyd C. Blankfein ("Blankfein"), its CFO David A. Viniar ("Viniar") and its President and COO Gary D. Cohn ("Cohn") (collectively, "defendants") and seeks remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2.      During the Class Period, defendants issued materially false and misleading statements with respect to events surrounding the Company's principal U.S. broker-dealer, Goldman, Sachs & Co.'s ("GS&C"), sale in early 2007 of a Collateralized Debt Obligation ("CDO") security named ABACUS 2007-AC1.   Defendants omitted and/or misrepresented material facts concerning Goldman's participation in structuring the CDO to help one client who was short the CDO while simultaneously selling the CDO to another client.  In or around July 2009, Goldman received a Wells Notice from the SEC relating to the ABACUS 2007-AC1 transaction.  Even as it responded to the SEC in the fall of 2009, Goldman continued to conceal from investors that it had received such a notice and was being investigated by the SEC in connection with events and practices surrounding ABACUS.

3.      In October 2009, Goldman reported a 190% increase in year-over-year quarterly earnings.  At about the same time it came under intense scrutiny about the more than $16 billion in bonuses it was scheduled to pay to Goldman's executives and employees.  To combat this negative publicity, the Company made a concerted effort to effect public opinions, instigating a full fledged PR campaign which included many interviews with several Goldman executives discussing the

Company's responsible business practices and its $200 million donation to promote education. However, throughout 2009 Goldman continued to conceal that it had received a Wells Notice concerning the ABACUS and issues relating to its practices in the mortgage markets. On December 24, 2009, *The New York Times* published an article discussing the ABACUS 2007-AC1 transaction, noting Goldman employees *"were aggressive from the start in trying to make the assets in Abacus deals look better than they were"* and the employees *"structured some Abacus deals in a way that enabled those betting on a mortgage-market collapse to multiply the value of their bets… bigger profits for Goldman and other short sellers — and bigger losses for other investors."* Rather than acknowledge its conduct relating to the ABACUS transaction *or* that it had received a Wells Notice related thereto and was the subject of an SEC investigation, defendants claimed that Goldman's clients were well aware about many of the questionable aspects of the ABACUS transaction and that the creation of ABACUS was driven by client demand. As a result of defendants' false statements, Goldman stock traded at artificially inflated prices during the Class Period, reaching highs of $188.63 per share on October 15, 2009 and rebounded to $184.92 per share on April 14, 2010.

4.      After the market opened on April 16, 2010, it was revealed that Goldman's U.S. broker-dealer, GS&C, had been sued by the SEC "for making materially misleading statements and omissions in connection" with ABACUS 2007-AC1. As news of Goldman's misconduct reached the market, Goldman stock immediately plummeted $24.05, declining from $184.27 per share on April 15, 2010 to close at $160.70 per share on April 16, 2010.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5.

6.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act.

7.     Venue is proper in this District pursuant to §27 of the 1934 Act.   Acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## THE PARTIES

8.     Plaintiff Ilene Richman purchased Goldman common stock as described in the attached certification and was damaged thereby.

9.     Defendant Goldman is a financial holding company that provides global banking, securities and investment management services in the United States and internationally.  GS&C is Goldman's principal broker-dealer in the United States.  Goldman is headquartered in New York, New York.

10.     Defendant Lloyd C. Blankfein ("Blankfein") is Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Goldman.  Blankfein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings.

11.     Defendant David A. Viniar ("Viniar") is Chief Financial Officer ("CFO") of Goldman.  Viniar participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings.

12.     Defendant Gary D. Cohn ("Cohn") is President of and Chief Operating Officer and a director of Goldman.  Cohn participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings.

13.     The defendants referenced above in ¶¶10-12 are referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who purchased or otherwise acquired Goldman common stock during the Class Period and who were damaged thereby

(the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Goldman has over 525 million shares of common stock outstanding, owned by thousands of persons.

16. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business and management of Goldman;

(c)     whether the price of Goldman common stock was artificially inflated; and

(d)     to what extent the members of the Class have sustained damages and the appropriate measure of damages.

17. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

18. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

19.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Goldman and the ABACUS 2007-AC1 transaction. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Goldman common stock was a success, as it: (i) deceived the investing public regarding Goldman's prospects and business; (ii) artificially inflated the price of Goldman common stock; and (iii) caused plaintiff and other members of the Class to purchase Goldman common stock at inflated prices.

## BACKGROUND

21.     Goldman is a global investment banking, securities and investment management firm that provides a range of financial services to a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals. On May 7, 1999, Goldman converted from a partnership to a corporation and completed an initial public offering of common stock. Goldman is a bank holding company and a financial holding company regulated by the Board of Governors of the Federal Reserve System under the U.S. Bank Holding Company Act of 1956. Goldman's subsidiary, Goldman Sachs Bank USA, is a New York State-chartered bank. GS&C is Goldman's principal broker-dealer in the United States. Goldman's activities are divided into three segments: (i) Investment Banking, (ii) Trading and Principal Investments, and (iii) Asset Management and Securities Services.

22.     Part of Goldman's business included packaging mortgage backed securities ("MBS") into collateralized debt obligations ("CDOs") which allowed them to sell investments containing lower quality MBS to be at least partially rated investment grade. This packaging and repackaging was highly profitable for Goldman due to the fees generated.

- 5 -

23.     In late 2006/early 2007, Goldman structured ABACUS 2007-AC1 in conjunction with ACA Management. The deal was sold to investors who were long the housing market but was created to allow a key client, Paulson & Co. Inc. ("Paulson"), to short the housing market. Bear Stearns & Co. had turned down Paulson for such a deal. Not only did Goldman agree to do ABACUS 2007-AC1, it allowed Paulson to suggest securities to be included in ABACUS 2007-AC1.

24.     ABACUS 2007-AC1 turned out to be one of the worst, if not the very worst, of hundreds of CDOs issued in 2006-2007. By October 24, 2007, six out of seven of the mortgage securities underlying ABACUS 2007-AC1 had been downgraded. Three months later, almost all had been downgraded. This was, of course, very profitable to Goldman's client Paulson, which was short the security, but was devastating to investors in ABACUS 2007-AC1.

25.     Due to this spectacular collapse, at some point in the summer or fall of 2009, (according to *The Wall Street Journal* it was in July 2009), Goldman received a Wells Notice from the SEC regarding ABACUS 2007-AC1. A Wells Notice is a notification from a securities regulator that it intends to recommend enforcement action and affords the respondent an opportunity to explain why such an action is not appropriate. Goldman had included an extensive description of legal proceedings in its 2008 Form 10-K, even discussing unrelated investigations. For example, with respect to  initial public offering ("IPO") practices, Goldman's 10-K stated:

> Group Inc. and certain of its affiliates have, together with various underwriters in certain offerings, received subpoenas and requests for documents and information from various governmental agencies and self-regulatory organizations in connection with investigations relating to the public offering process. Goldman Sachs has cooperated with these investigations.

26.     Notwithstanding the seriousness of receiving a Wells Notice with respect to Goldman's CDO practices, Goldman chose not to issue a Form 8-K alerting investors to this event and later even omitted this information from its Form 10-Qs, while updating "Legal Proceedings" as

- 6 -

to other cases. As a result, investors were unaware the SEC was even investigating ABACUS 2007-AC1.

27.     In the fall of 2009, Goldman had launched a $500 million public relations campaign to counteract negative publicity about Goldman's dealings with AIG and its large bonuses while millions of Americans faced foreclosure. Disclosing an investigation into Goldman's dealings with respect to residential mortgages obviously would have undermined the campaign.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

28.     On October 15, 2009, Goldman reported its third quarter 2009 results in a release which stated in part:

> Diluted earnings per common share were $5.25 compared with $1.81 for the third quarter ended August 29, 2008 and $4.93 for the second quarter ended June 26, 2009. Annualized return on average common shareholders' equity (ROE) was 21.4% for the third quarter of 2009 and 19.2% for the first nine months of 2009.

> *     *     *

> "Although the world continues to face serious economic challenges, we are seeing improving conditions and evidence of stabilization, even growth, across a number of sectors," said Lloyd C. Blankfein, Chairman and Chief Executive Officer. "Our client franchise businesses – advisory, financing, market making and asset management – contribute to and benefit from the overall improvement in conditions. Because the job market, and growth more generally, remain under stress, we continue to be focused on actively helping our clients in order to promote greater economic activity."

29.     Viniar also told reporters that Goldman was donating $200 million to its foundation to promote education.

30.     Blankfein told reporters the next day (October 16, 2009) that: "Our business correlates with growth. Once it starts to turn, we get very involved in that process. We benefit from it. . . . Behind that investment is wealth creation and jobs." When asked about credit default swaps,

Blankfein said, "I think they serve a real social purpose."  No mention was made of a Wells Notice investigating a transaction dealing with credit default swaps.

31.      On November 4, 2009, Goldman filed its third quarter 2009 Form 10-Q, which was signed by defendant Viniar and included certifications by Blankfein and Viniar.  The Form 10-Q included a section entitled "Legal Proceedings" wherein it discussed recent events in the IPO investigation as well as other ongoing investigations, such as the Specialists litigation and Treasury Matters and Mortgage-Related Matters, among other items.  The Legal Proceedings section was represented to

> amend[] our discussion set forth under Item 3 "Legal Proceedings" in our Annual Report on Form 10-K for the fiscal year ended November 28, 2008, as updated by our Quarterly Reports on Form 10-Q for the quarters ended March 27, 2009 and June 26, 2009.

32.      These statements were false, however, because, despite the Wells Notice and the ongoing investigation into ABACUS 2007-AC1, the Legal Proceedings section made no mention of that investigation.

33.      On November 8, 2009, *The Sunday Times* in London published an extensive interview with Blankfein which stated in part:

> "We're very important . . . .  We help companies to grow by helping them to raise capital.  Companies that grow create wealth.  This, in turn, allows people to have jobs that create more growth and more wealth.  It's a virtuous cycle. . . . We have a social purpose."

> \*       \*       \*

> Call him what you will.  He is, [Blankfein] says, just a banker "doing God's work."

34.      On December 24, 2009, *The New York Times* ran a 3,000 word article on Goldman's CDO practices, which were taking place just as residential home prices were deteriorating and MBS were becoming unattractive.  The article, by Gretchen Morgenson and Louise Story, stated in part:

In late October 2007, as the financial markets were starting to come unglued, a Goldman Sachs trader, Jonathan M. Egol, received very good news. At 37, he was named a managing director at the firm.

Mr. Egol, a Princeton graduate, had risen to prominence inside the bank by creating mortgage-related securities, named Abacus, that were at first intended to protect Goldman from investment losses if the housing market collapsed. As the market soured, Goldman created even more of these securities, enabling it to pocket huge profits.

Goldman's own clients who bought them, however, were less fortunate.

Pension funds and insurance companies lost billions of dollars on securities that they believed were solid investments, according to former Goldman employees with direct knowledge of the deals who asked not to be identified because they have confidentiality agreements with the firm.

Goldman was not the only firm that peddled these complex securities — known as synthetic collateralized debt obligations, or C.D.O.'s — and then made financial bets against them, called selling short in Wall Street parlance. Others that created similar securities and then bet they would fail, according to Wall Street traders, include Deutsche Bank and Morgan Stanley, as well as smaller firms like Tricadia Inc., an investment company whose parent firm was overseen by Lewis A. Sachs, who this year became a special counselor to Treasury Secretary Timothy F. Geithner.

How these disastrously performing securities were devised is now the subject of scrutiny by investigators in Congress, at the Securities and Exchange Commission and at the Financial Industry Regulatory Authority, Wall Street's self-regulatory organization, according to people briefed on the investigations.

\*       \*       \*

Goldman and other Wall Street firms maintain there is nothing improper about synthetic C.D.O.'s, saying that they typically employ many trading techniques to hedge investments and protect against losses. They add that many prudent investors often do the same. Goldman used these securities initially to offset any potential losses stemming from its positive bets on mortgage securities.

But Goldman and other firms eventually used the C.D.O.'s to place unusually large negative bets that were not mainly for hedging purposes, and investors and industry experts say that put the firms at odds with their own clients' interests.

"The simultaneous selling of securities to customers and shorting them because they believed they were going to default is the most cynical use of credit information that I have ever seen," said Sylvain R. Raynes, an expert in structured finance at R & R Consulting in New York. "When you buy protection against an

event that you have a hand in causing, you are buying fire insurance on someone else's house and then committing arson."

\*        \*        \*

Goldman Saw It Coming

Before the financial crisis, many investors — large American and European banks, pension funds, insurance companies and even some hedge funds — failed to recognize that overextended borrowers would default on their mortgages, and they kept increasing their investments in mortgage-related securities. As the mortgage market collapsed, they suffered steep losses.

A handful of investors and Wall Street traders, however, anticipated the crisis. In 2006, Wall Street had introduced a new index, called the ABX, that became a way to invest in the direction of mortgage securities. The index allowed traders to bet on or against pools of mortgages with different risk characteristics, just as stock indexes enable traders to bet on whether the overall stock market, or technology stocks or bank stocks, will go up or down.

Goldman, among others on Wall Street, has said since the collapse that it made big money by using the ABX to bet against the housing market. Worried about a housing bubble, top Goldman executives decided in December 2006 to change the firm's overall stance on the mortgage market, from positive to negative, though it did not disclose that publicly.

\*        \*        \*

Mr. Egol was a prime mover behind these securities. Beginning in 2004, with housing prices soaring and the mortgage mania in full swing, Mr. Egol began creating the deals known as Abacus. From 2004 to 2008, Goldman issued 25 Abacus deals, according to Bloomberg, with a total value of $10.9 billion.

Abacus allowed investors to bet for or against the mortgage securities that were linked to the deal. The C.D.O.'s didn't contain actual mortgages. Instead, they consisted of credit-default swaps, a type of insurance that pays out when a borrower defaults. These swaps made it much easier to place large bets on mortgage failures.

Rather than persuading his customers to make negative bets on Abacus, Mr. Egol kept most of these wagers for his firm, said five former Goldman employees who spoke on the condition of anonymity. On occasion, he allowed some hedge funds to take some of the short trades.

Mr. Egol and Fabrice Tourre, a French trader at Goldman, were aggressive from the start in trying to make the assets in Abacus deals look better than they were, according to notes taken by a Wall Street investor during a phone call with Mr. Tourre and another Goldman employee in May 2005.

- 10 -

On the call, the two traders noted that they were trying to persuade analysts at Moody's Investors Service, a credit rating agency, to assign a higher rating to one part of an Abacus C.D.O. but were having trouble, according to the investor's notes, which were provided by a colleague who asked for anonymity because he was not authorized to release them. Goldman declined to discuss the selection of the assets in the C.D.O.'s, but a spokesman said investors could have rejected the C.D.O. if they did not like the assets.

Goldman's bets against the performances of the Abacus C.D.O.'s were not worth much in 2005 and 2006, but they soared in value in 2007 and 2008 when the mortgage market collapsed. The trades gave Mr. Egol a higher profile at the bank, and he was among a group promoted to managing director on Oct. 24, 2007.

"Egol and Fabrice were way ahead of their time," said one of the former Goldman workers. "They saw the writing on the wall in this market as early as 2005." By creating the Abacus C.D.O.'s, they helped protect Goldman against losses that others would suffer.

As early as the summer of 2006, Goldman's sales desk began marketing short bets using the ABX index to hedge funds like Paulson & Company, Magnetar and Soros Fund Management, which invests for the billionaire George Soros. John Paulson, the founder of Paulson & Company, also would later take some of the shorts from the Abacus deals, helping him profit when mortgage bonds collapsed. He declined to comment.

A Deal Gone Bad, for Some

The woeful performance of some C.D.O.'s issued by Goldman made them ideal for betting against. As of September 2007, for example, just five months after Goldman had sold a new Abacus C.D.O., the ratings on 84 percent of the mortgages underlying it had been downgraded, indicating growing concerns about borrowers' ability to repay the loans, according to research from UBS, the big Swiss bank. Of more than 500 C.D.O.'s analyzed by UBS, only two were worse than the Abacus deal.

*     *     *

At Goldman, Mr. Egol structured some Abacus deals in a way that enabled those betting on a mortgage-market collapse to multiply the value of their bets, to as much as six or seven times the face value of those C.D.O.'s. When the mortgage market tumbled, this meant bigger profits for Goldman and other short sellers — and bigger losses for other investors.

35.     In the December 24, 2009 *New York Times* article, Goldman denied that it did anything improper and claimed that its clients knew about its positions:

Michael DuVally, a Goldman Sachs spokesman, declined to make Mr. Egol available for comment. But Mr. DuVally said many of the C.D.O.'s created by Wall Street were made to satisfy client demand for such products, which the clients thought would produce profits because they had an optimistic view of the housing market. In addition, he said that clients knew Goldman might be betting against mortgages linked to the securities, and that the buyers of synthetic mortgage C.D.O.'s were large, sophisticated investors, he said.

36.    On the same day, December 24, 2009, Goldman issued a release claiming all these

issues were fully disclosed to investors:

Background: The New York Times published a story on December 24th primarily focused on the synthetic collateralized debt obligation business of Goldman Sachs. In response to questions from the paper prior to publication, Goldman Sachs made the following points.

As reporters and commentators examine some of the aspects of the financial crisis, interest has gravitated toward a variety of products associated with the mortgage market. One of these products is synthetic collateralized debt obligations (CDOs), which are referred to as synthetic because the underlying credit exposure is taken via credit default swaps rather than by physically owning assets or securities. The following points provide a summary of how these products worked and why they were created.

Any discussion of Goldman Sachs' association with this product must begin with our overall activities in the mortgage market. Goldman Sachs, like other financial institutions, suffered significant losses in its residential mortgage portfolio due to the deterioration of the housing market (we disclosed $1.7 billion in residential mortgage exposure write-downs in 2008). These losses would have been substantially higher had we not hedged. We consider hedging the cornerstone of prudent risk management.

Synthetic CDOs were an established product for corporate credit risk as early as 2002. With the introduction of credit default swaps referencing mortgage products in 2004-2005, it is not surprising that market participants would consider synthetic CDOs in the context of mortgages. Although precise tallies of synthetic CDO issuance are not readily available, many observers would agree the market size was in the hundreds of billions of dollars.

***Many of the synthetic CDOs arranged were the result of demand from investing clients seeking long exposure.***

Synthetic CDOs were popular with many investors prior to the financial crisis because they gave investors the ability to work with banks to design tailored securities which met their particular criteria, whether it be ratings, leverage or other aspects of the transaction.

- 12 -

The buyers of synthetic mortgage CDOs were large, sophisticated investors. These investors had significant in-house research staff to analyze portfolios and structures and to suggest modifications. They did not rely upon the issuing banks in making their investment decisions.

For static synthetic CDOs, reference portfolios were fully disclosed. Therefore, potential buyers could simply decide not to participate if they did not like some or all the securities referenced in a particular portfolio.

Synthetic CDOs require one party to be long the risk and the other to be short so without the short position, a transaction could not take place.

**It is fully disclosed and well known to investors that banks that arranged synthetic CDOs took the initial short position and that these positions could either have been applied as hedges against other risk positions or covered via trades with other investors.**

Most major banks had similar businesses in synthetic mortgage CDOs.

As housing price growth slowed and then turned negative, the disruption in the mortgage market resulted in synthetic CDO losses for many investors and financial institutions, including Goldman Sachs, effectively putting an end to this market.

37.     These statements were misleading in that it was not demand by investors who wanted to be long the housing market which drove the deal so much as demand by Paulson to be short the residential real estate market. In fact, Goldman was not able to fully sell ABACUS 2007-AC1 and had to step in with its own money when sales did not pan out. As a result, any losses Goldman had from this deal were the result of this forced investment as opposed to any belief by Goldman in the strength of the housing market.

38.     On January 21, 2010, Goldman reported its fourth quarter and year end December 31, 2009 results in a press release which emphasized the Company's focus on its clients:

"Throughout the year, particularly during the most difficult conditions, Goldman Sachs was an active adviser, market maker and asset manager for our clients," said Lloyd C. Blankfein, Chairman and Chief Executive Officer. "Our strong client franchise across global capital markets, along with the commitment and dedication of our people drove our strong performance. That performance, as well as recognition of the broader environment, resulted in our lowest ever compensation to net revenues ratio. Despite significant economic headwinds, we are seeing signs of

- 13 -

growth and remain focused on supporting that growth by helping companies raise capital and manage their risks, by providing liquidity to markets and by investing for our clients."

39.     These statements were materially false and misleading because no disclosure was included in the release regarding the SEC investigation into ABACUS 2007-AC1.

40.     On or about March 1, 2010, Goldman filed its Form 10-K for the year ended December 31, 2009, signed by all three Individual Defendants, which emphasized Goldman's client focus:

> In our client-driven businesses, FICC [Fixed Income, Currency and Commodities] and Equities strike to deliver high-quality service by offering broad market-making and market knowledge to our clients on a global basis.  In addition, we use our expertise to take positions in markets, by committing capital and taking risk, to facilitate client transactions and to provide liquidity.  Our willingness to make markets, commit capital and take risk in a broad range of fixed income, currency, commodity and equity products and their derivatives is crucial to our client relationships and to support our underwriting business by providing secondary market liquidity.

41.     The statements in the 2009 Form 10-K were false in that the document concealed the SEC investigation into the ABACUS 2007-AC1 CDO.  Conversely, the Form 10-K did include references to IPO investigations from practices many years earlier:

> Group Inc. and certain of its affiliates have, together with various underwriters in certain offerings, received subpoenas and requests for documents and information from various governmental agencies and self-regulatory organizations in connection with investigations relating to the public offering process. Goldman Sachs has cooperated with these investigations.

42.     The Form 10-K also mention certain "inquiries" into derivatives:

*Credit Derivatives*

> Group Inc. and certain of its affiliates have received inquiries from various governmental agencies and self-regulatory organizations regarding credit derivative instruments. The firm is cooperating with the requests.

43.     However, the Form 10-K concealed the Wells Notice and Goldman's responses to such notice regarding ABACUS 2007-AC1.

- 14 -

44.     On or about April 7, 2010, Goldman issued its 2009 Annual Report to Shareholders.

Included in the 2009 Annual Report was a letter to shareholders signed by Blankfein and Cohn

which stated in part:

> Through the end of 2006, Goldman Sachs generally was long in exposure to residential mortgages and mortgage-related products, such as residential mortgage-backed securities (RMBS). CDOs backed by residential mortgages and credit default swaps referencing residential mortgage products. In late 2006, we began to experience losses in our daily residential mortgage-related products P&L as we market downed the value of our inventory of various residential mortgage-related products to reflect lower market prices.

> In response to those losses, we decided to reduce our overall exposure to the residential housing market, consistent with our risk protocols – given the uncertainty of the future direction of prices in the housing market and the increased market volatility. ***The firm did not generate enormous net revenues or profits by betting against residential mortgage-related products, as some have speculated; rather, our relatively early risk reduction resulted in our losing less money than we otherwise would have when the residential housing market began to deteriorate rapidly.***

> The markets for residential mortgage-related products, and subprime mortgage securities in particular, were volatile and unpredictable in the first half of 2007. Investors in these markets held very different views of the future direction of the U.S. housing market based on their outlook on factors that were equally available to all market participants, including housing prices, interest rates and personal income and indebtedness data. . . .

> The investors who transacted with Goldman Sachs in CDOs in 2007, as in prior years, were primarily large, global financial institutions, insurance companies and hedge funds (no pension funds invested in these products, with one exception: a corporate-related pension fund that had long been active in this area made a purchase of less than $5 million). These investors had significant resources, relationship with multiple financial intermediaries and access to extensive information and research flow, performed their own analysis of the data, formed their own views about trends, and many actively negotiated at arm's length the structure and terms of transactions.

> \*     \*     \*

> Although Goldman Sachs held various positions in residential mortgage-related products in 2007, ***our short positions were not a "bet against our clients."*** Rather, they served to offset our long positions. Our goal was, and is, to be in a position to make markets for our clients while managing our risk within prescribed limits.

45.     On April 15, 2010, Goldman's stock closed at $184.27 per share.  It opened on April 16, 2010 at $183.62 per share and held that range until the SEC complaint was publicly released.

## THE TRUTH BEGINS TO COME TO LIGHT

46.     On April 16, 2010, shortly after the market opened, the SEC filed and publicly disseminated a complaint against GS&C in which it alleged GS&C had made "*materially misleading statements and omissions in connection* with [ABACUS2007-AC1]".  The complaint stated in part:

> 1.      The Commission brings this securities fraud action against Goldman, Sachs & Co. ("GS&Co") and a GS&Co employee, Fabrice Tourre ("Tourre"), for making *materially misleading statements and omissions in connection with a synthetic collateralized debt obligation* ("CDO") GS&Co structured and marketed to investors. This synthetic CDO, ABACUS 2007AC1, was tied to the performance of subprime residential mortgage-backed securities ("RMBS") and was structured and marketed by GS&Co in early 2007 when the United States housing market and related securities were beginning to show signs of distress. Synthetic CDOs like ABACUS 2007-AC1 contributed to the recent financial crisis by magnifying losses associated with the downturn in the United States housing market.

> 2.      GS&Co marketing materials for ABACUS 2007-AC1 – including the term sheet, flip book and offering memorandum for the CDO – *all represented that the reference portfolio of RMBS underlying the CDO was selected by ACA Management LLC* ("ACA"), a third-party with experience analyzing credit risk in RMBS. *Undisclosed* in the marketing materials and *unbeknownst to investors*, a large hedge fund, Paulson & Co. Inc. ("Paulson"), with economic interests directly adverse to investors in the ABACUS 2007-AC1 CDO, played a significant role in the portfolio selection process.  After participating in the selection of the reference portfolio, Paulson effectively shorted the RMBS portfolio it helped select by entering into credit default swaps ("CDS") with GS&Co to buy protection on specific layers of the ABACUS 2007-AC1 capital structure.  Given its financial short interest, Paulson had an economic incentive to choose RMBS that it expected to experience credit events in the near future.  *GS&Co did not disclose Paulson's adverse economic interests or its role in the portfolio selection process in the term sheet, flip book, offering memorandum or other marketing materials provided to investors.*

> *           *           *

> 6.      By engaging in the misconduct described herein, GS&Co and Tourre directly or indirectly engaged in transactions, acts, practices and a course of business that violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. §77q(a) ("the

Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b)("the Exchange Act") and Exchange Act Rule 10b-5, 17 C.F.R. §240.10b-5. The Commission seeks injunctive relief, disgorgement of profits, prejudgment interest, civil penalties and other appropriate and necessary relief from both defendants.

*     *     *

17.     A Paulson employee explained the investment opportunity as of January 2007 as follows:

> "It is true that the market is not pricing the subprime RMBS wipeout scenario. In my opinion this situation is due to the fact that rating agencies, CDO managers and underwriters have all the incentives to keep the game going, while 'real money' investors have neither the analytical tools nor the institutional framework to take action before the losses that one could 'anticipate based [on] the 'news' available everywhere are actually realized."

18.     At the same time, GS&Co recognized that market conditions were presenting challenges to the successful marketing of CDO transactions backed by mortgage-related securities. For example, portions of an email in French and English sent by Tourre to a friend on January 23, 2007 stated, in English translation where applicable: "***More and more leverage in the system, The whole building is about to collapse anytime now***...Only potential survivor, the fabulous Fab[rice Tourre] ... standing in the middle of all these complex, highly leveraged, exotic trades he created without necessarily understanding all of the implications of those monstruosities!!!" Similarly, an email on February 11, 2007 to Tourre from the head of the GS&Co structured product correlation trading desk stated in part, "***the cdo biz is dead we don't have a lot of time left***."

*     *     *

24.     Likewise, an internal GS&Co memorandum to the Goldman Sachs MCC dated March 12, 2007 described the marketing advantages of ACA's "brand-name" and "credibility":

> "We expect the strong brand-name of ACA as well as our market-leading position in synthetic CDOs of structured products to result in a successful offering."

> "We expect that the role of ACA as Portfolio Selection Agent will broaden the investor base for this and future ABACUS offerings."

> "We intend to target suitable structured product investors who have previously participated in ACA-managed cashflow CDO transactions or who have previously participated in prior ABACUS transactions."

- 17 -

"We expect to leverage ACA's credibility and franchise to help distribute this Transaction."

\*       \*       \*

**F.    GS&CO MISLED INVESTORS BY REPRESENTING THAT ACA SELECTED THE PORTFOLIO WITHOUT DISCLOSING PAULSON'S SIGNIFICANT ROLE IN DETERMINING THE PORTFOLIO AND ITS ADVERSE ECONOMIC INTERESTS**

36.    GS&Co's marketing materials for ABACUS 2007-AC1 were false and misleading because they represented that ACA selected the reference portfolio while omitting any mention that Paulson, a party with economic interests adverse to CDO investors, played a significant role in the selection of the reference portfolio.

37.    For example, a 9-page term sheet for ABACUS 2007-AC1 finalized by GS&Co on or about February 26, 2007, described ACA as the "Portfolio Selection Agent" and stated in bold print at the top of the first page that the reference portfolio of RMBS had been "selected by ACA." This document contained no mention of Paulson, its economic interests in the transaction, or its role in selecting the reference portfolio.

\*       \*       \*

41.    On or about April 26, 2007, GS&Co finalized a 178-page offering memorandum for ABACUS 2007-AC1. The cover page of the offering memorandum included a description of ACA as "Portfolio Selection Agent." The Transaction Overview, Summary and Portfolio Selection Agent sections of the memorandum all represented that the reference portfolio of RMBS had been selected by ACA. This document contained no mention of Paulson, its economic interests in the transaction, or its role in selecting the reference portfolio.

\*       \*       \*

64.    GS&Co sent ABN copies of the ABACUS 2007-AC1 terms sheet, flip book and offering memorandum, all of which represented that the RMBS portfolio had been selected by ACA and omitted any reference to Paulson's role in the collateral selection process and its adverse economic interest. Tourre also told ABN in emails that ACA had selected the portfolio. These representations and omissions were materially false and misleading because, unbeknownst to ABN, Paulson played a significant role in the collateral selection process and had a financial interest in the transaction that was adverse to ACA Capital and ABN.

47.    Upon this news, Goldman stock immediately declined, ultimately falling from $184.27 per share on April 15, 2010 to $160.70 per share on April 16, 2010, a decline of 13% on extremely high volume of 101.9 million shares.

48.     This was major news, and was largely responsible for a decline in the major stock indices. As Jonathan Weil of *Bloomberg* commented on April 16, 2010:

> As Wall Street bombshells go, the lawsuit that the Securities and Exchange Commission filed against Goldman Sachs Group Inc. is about as big as it gets.

> *        *        *

> To recap, the SEC's complaint accuses Goldman and one of its vice presidents of selling subprime mortgage-backed securities to institutional investors, without disclosing that one of its clients, the giant hedge fund Paulson & Co., had paid Goldman to structure these securities so that they would be the world's perfect short – at least from Paulson's point of view.

> The securities, called Abacus 2007-AC1, became worthless within months, showing that Paulson had done its homework. The SEC said Paulson paid Goldman a $15 million fee.

> *        *        *

> It's hard to imagine an allegation by the government that could be more damaging to Goldman's reputation. This wasn't the American public at large that Goldman supposedly ripped off, which might be forgivable or even praiseworthy from the view of Goldman's shareholders. These were Goldman clients that Goldman allegedly ripped off, in an effort to please another Goldman client.

> Throughout the aftermath of the financial crisis, Goldman and its chief executive officer, Lloyd Blankfein, have consistently stuck to the same story when asked why the bank had crated and sold to its clients subprime mortgage-backed securities that quickly became worthless: The firm was merely giving those clients what they wanted.

> What They Do

> That's what the market makers do, Blankfein told the Financial Crisis Inquiry Commission last January. "What we did in that business was to underwrite to, again, the most sophisticated investors who sought the exposure," he testified.

> That may have been true when it came to the Goldman client Paulson & Co., which made $1 billion shorting these allegedly custom-made CDOs by buying credit-default swaps on them. If we are to believe the SEC's claims, though, it wasn't true for the Goldman clients that lost $1 billion on the CDOs, including the chumps at IKB, which lost $150 million.

> *        *        *

Their eyes must have been burning, too, when they saw some of the e-mails that the SEC quoted in its suit, portions of which the SEC translated from French. (The spellings and punctuation are as they appear in the SEC's complaint.)

"More and more leverage in the system. The whole building is about to collapse anytime now," Fabrice Tourre, the Goldman Sachs vice president who was sued for his role in putting together the deal, wrote on Jan. 23, 2007.

"Only potential survivor, the fabulous Fab … standing in the middle of all these complex, highly leveraged exotic trades he created without necessarily understanding all of the implications of those monstruosities!!!"

\*      \*      \*

Those statements bring to mind a well-known quote from Warren Buffett, who invested $5 billion in Goldman back in September 2008 near the peak of the financial crisis: "It takes 20 years to build a reputation and five minutes to ruin it."

Can't wait to see how Goldman tries to talk its way out of this one.

49.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company had, in violation of applicable law, not fully disclosed the facts and circumstances concerning the formation and sale of the ABACUS 2007-AC1 deal to investors such that it had engaged in misleading conduct;

(b)     The Company had, in fact, bet against its clients and constructed CDOs that were likely, if not designed, to fail; and

(c)     The Company had received a Wells Notice from the SEC about the ABACUS transaction but failed to inform shareholders of this fact.

50.     As a result of defendants' false statements, Goldman stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 13% from their price before these disclosures, on huge volume.

- 20 -

## LOSS CAUSATION/ECONOMIC LOSS

51.     Instead of truthfully disclosing during the Class Period that the GS&C was being investigated about whether ABACUS 2007-AC1 transaction documents had in fact misled clients, Goldman made misrepresentations and concealed such investigation.

52.     Defendants' false and misleading statements had the intended effect and caused Goldman stock to trade at artificially inflated levels throughout the Class Period, reaching highs of $188.63 per share on October 15, 2009 and $184.92 per share on April 14, 2010.

53.     As a result of defendants' false statements, Goldman stock traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares reacted swiftly, declining $24 per share, or 13% from their price before these disclosures.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

54.     Plaintiff incorporates ¶¶1-53 by reference.

55.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

        (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 21 -

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Goldman common stock during the Class Period.

57.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Goldman common stock.  Plaintiff and the Class would not have purchased Goldman common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

58.      Plaintiff incorporates ¶¶1-57 by reference.

59.      The Individual Defendants acted as controlling persons of Goldman within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Goldman stock, the Individual Defendants had the power and authority to cause Goldman to engage in the wrongful conduct complained of herein.  Goldman controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 26, 2010                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD

                                         SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)

                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         DARREN J. ROBBINS
                                         DAVID C. WALTON
                                         CATHERINE J. KOWALEWSKI
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-3301
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ILENE RICHMAN ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel, or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Acquisitions:

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 4/5/2010 | 200 | 172.5099 |
| | | |
| | | |

Sales:

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 4/16/2010 | 100 | 162.31 |
| 4/16/2010 | 100 | 162.2301 |
| | | |

5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery.

GOLDMAN SACHS

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24 day of April , 2010.

_____
ILENE RICHMAN

-2-

GOLDMAN 56615