## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ILENE RICHMAN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | Civil Action No.  1:10 CIV 3461 |
| v. | |
| GOLDMAN SACHS GROUP, INC., LLOYD C. BLANKFEIN, DAVID A. VINIAR and GARY D. COHN, | |
| Defendants. | |

(caption continued on subsequent pages)

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE INSTITUTIONAL INVESTOR GROUP FOR APPOINTMENT AS LEAD PLAINTIFF AND IN OPPOSITION TO ALL COMPETING MOTIONS

HOWARD SORKIN, Individually and on Behalf
of All Others Similarly Situated,

          Plaintiffs,

       v.

GOLDMAN SACHS GROUP, INC., LLOYD C.
BLANKFEIN, DAVID A. VINIAR and GARY D.
COHN,

          Defendants.

Civil Action No.  1:10 CIV 3493

---

DR. EHSAN AFSHANI, On Behalf of Himself and
All Others Similarly Situated,

          Plaintiffs,

       v.

GOLDMAN SACHS GROUP, INC., LLOYD C.
BLANKFEIN, DAVID A. VINIAR and GARY D.
COHN,

          Defendants.

Civil Action No. 1:10 CIV 3616

LOUIS GOLD, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiffs,

    v.

GOLDMAN SACHS GROUP, INC., LLOYD C.
BLANKFEIN, DAVID A. VINIAR and GARY D.
COHN,

                Defendants.

No. 1:10 CV 4786

---

THOMAS DRAFT, Individually and on Behalf of
All Others Similarly Situated,

                Plaintiffs,

    v.

GOLDMAN SACHS GROUP, INC., LLOYD C.
BLANKFEIN, DAVID A. VINIAR, GARY D.
COHN and SARAH E. SMITH,

                Defendants.

No. 1:10 CV 4812

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ........................................................................................................................... 5

I.     The Institutional Investor Group Has The Largest Financial Interest In The Relief Sought By The Class ...................................................................................................... 5

     a.    West Virginia Is An Unsuitable Net Seller Of Goldman Securities ...................... 7

     b.    The Institutional Investor Group Has A Significantly Larger Financial Interest In The Litigation Than The Public Pension Fun Group Even If The Court Counts West Virginia's Losses ........................................................... 10

II.    The Institutional Investor Group Satisfies The Relevant Requirements Of Rule 23 ........ 13

     a.    The Institutional Investor Group Is A Cohesive Group ........................................ 13

     b.    Potential Challenges To The Institutional Investor Group's Non-U.S. Members Are Baseless And Do Not Overcome The Presumption ........................ 15

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Borochoff v. GlaxosmithKline PLC,*
246 F.R.D. 201 (S.D.N.Y. 2007) .................................................................1, 17

*Boyd v. NovaStar Fin.,*
No. 07-0139-CV-W-ODS, 2007 WL 2026130 (W.D. Mo. July 9, 2007) ...............................6

*Brown v. Medtronic, Inc.,*
619 F. Supp. 2d 646 (D. Minn. 2009).................................................................8

*City of Brockton Ret. Sys. v. Shaw Group, Inc.,*
No. 06 Civ. 8245, 2007 U.S. Dist LEXIS 72745 (S.D.N.Y. Sept. 26, 2007) .........................15

*Constance Sczesny Trust v. KPMG LLP,*
223 F.R.D. 319 (S.D.N.Y. 2004) .....................................................................7

*Conway Inv. Club v. Corinthian Colls., Inc.,*
No. 2:04-cv-05025, slip op. (C.D. Cal. Nov. 1, 2004).............................................16

*Fishbury, Ltd. v. Connetics Corp.,*
No. 06 Civ. 11496(SWK), 2006 WL 3711566 (S.D.N.Y. Dec. 14, 2006) ...............................7

*Frank v. Dana Corp.,*
237 F.R.D. 171 (N.D. Ohio 2006) .....................................................................8

*Hevesi v. Citigroup, Inc.,*
366 F.3d 70 (2d Cir. 2004)...........................................................................7

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.,*
258 F.R.D. 260 (S.D.N.Y. 2009) .................................................................15, 16

*In re Bausch & Lomb Inc. Sec. Litig.,*
244 F.R.D. 169 (W.D.N.Y. 2007).....................................................................7

*In re Boston Scientific Corp. ERISA Litig.,*
254 F.R.D. 24 (D. Mass. 2008)........................................................................8

*In re Cable & Wireless, PLC Sec. Litig.,*
217 F.R.D. 372 (E.D. Va. 2003) ...........................................................2, 9, 10, 11

*In re Comdisco Sec. Litig.,*
150 F. Supp. 2d 943 (N.D. Ill. 2001) .................................................................7

*In re Critical Path, Inc. Sec. Litig.*,
  156 F. Supp. 2d 1102 (N.D. Cal. 2001) ..................................................6, 10, 11

*In re Delphi Corp. Sec. Litig.*,
  No. 1:05-cv-2637(NRB), slip op. (S.D.N.Y. June 27, 2005)...................................16

*In re Doral Fin. Corp. Sec. Litig.*,
  414 F. Supp. 2d 398 (S.D.N.Y. 2006)..........................................................5, 11, 12

*In re eSpeed, Inc. Sec. Litig.*,
  232 F.R.D. 95 (S.D.N.Y. 2005) ..........................................................................12

*In re GMC Sec. Litig.*,
  No. 05-CV-8088 (RMB), slip op. (S.D.N.Y. Feb. 6, 2006)....................................16

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
  No. 5:03 CV 2166, 2004 WL 3314943 (N.D. Ohio May 12, 2004) .........................8

*In re Lernout & Hauspie Sec. Litig.*,
  138 F. Supp. 2d (D. Mass. 2001) .........................................................................16

*In re McDermott Int'l, Inc. Sec. Litig.*,
  No. 08 Civ. 9943 (DC), 2009 WL 579502 (S.D.N.Y. Mar. 6, 2009) .....................13

*In re McKesson HBOC, Inc. Sec. Litig.*,
  97 F. Supp. 2d 993 (N.D. Cal. 1999) .................................................................6, 7

*In re the Mills Corp. Sec. Litig.*,
  No. Civ.A., 1:06-77(GEL), 2006 WL 2035391 (E.D. Va. May 30, 2006).................... *passim*

*In re Molson Coors Brewing Co. Sec. Litig.*,
  233 F.R.D. 147 (D. Del. 2005) .......................................................................16, 17

*In re Network Assocs., Inc., Sec. Litig.*,
  76 F. Supp. 2d 1017 (N.D. Cal. 1999) .............................................................6, 10, 11

*In re NPS Pharms., Inc. Sec. Litig.*,
  No. 2:06-cv-00570-PGG-PMW, 2006 U.S. Dist. LEXIS 87231 (D. Utah Nov. 17,
  2006) .....................................................................................................................17

*In re Pfizer Inc. Sec. Litig.*,
  233 F.R.D. 334 (S.D.N.Y. 2005) ........................................................................11

*In re Tronox, Inc. Sec. Litig.*,
  262 F.R.D. 338 (S.D.N.Y. 2009) ........................................................................16

*Kuriakose v. Federal Home Mortg. Co.*,
  No. 08-cv-7281 (JFK), 2008 WL 4974839 (S.D.N.Y. Nov. 24, 2008) ...................12

iii

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   256 F.R.D. 586 (N.D. Ill. 2009)..................................................................8

*Marsden v. Select Medical Corp.*,
   246 F.R.D. 480 (E.D. Pa. 2007)................................................................17

*Mirco Investors, LLC v. Inspire Pharms., Inc.*,
   No. 1:05CV00118, slip op. (M.D.N.C. Mar. 1, 2006)...........................16

*Morrison v. National Australia Bank, Ltd.*,
   -- S. Ct. --, 2010 WL 2518523 (June 24, 2010)....................................17

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
   06-cv-5797, 2007 U.S. Dist. LEXIS 97959 (S.D.N.Y. Feb. 21, 2007) (Crotty, J.)......... *passim*

*Reimer v. Ambac Fin. Group, Inc.*,
   No. 08 Civ. 411 (NRB), 2008 WL 2073931 (S.D.N.Y. May 9, 2008)..................................15

*Ruland v. InfoSonics Corp.*,
   No. 06CV1231, 2006 WL 3746716 (S.D. Cal. Oct. 23, 2006).....................................6, 10, 11

*Sgalambo v. McKenzie*,
   -- F.R.D. --, No. 09 Civ. 10087(SAS), 2010 WL 1222062 (S.D.N.Y. Mar. 29, 2010) ..........17

*Weisz v. Calpine Corp.*,
   No. 4:02-CV-1200, 2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) ............................. *passim*

## STATUTES

15 U.S.C. § 78u-4(a)(3)(B)(i) ...................................................................5

15 U.S.C. § 78u-4(a)(3)(B)(iii) ................................................................6

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ...........................................................1

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)........................................................13

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ..............................................................................6, 12

The Montana Board of Investments ("Montana BOI"), Metzler Investment GmbH ("Metzler"), and Sampension KP Livsforsikring A/S ("Sampension") (collectively, the "Institutional Investor Group"), respectfully submit this memorandum in further support of their motion to be appointed Lead Plaintiff and in opposition to all competing motions.

## PRELIMINARY STATEMENT

The Institutional Investor Group asserts the largest financial interest in the above-captioned actions on behalf of investors in Goldman Sachs Group, Inc. ("Goldman" or the "Company") under the well-defined standards of the Private Securities Litigation Reform Act ("PSLRA") and this Court's holding in *Police & Fire Retirement System of the City of Detroit v. SafeNet, Inc.* ("*SafeNet*"). *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). As set forth in the accompanying Joint Declaration ("Joint Decl."), attached as Ex. A to the Supplemental Declaration of Salvatore J. Graziano ("Supp. Graziano Decl."), the members of the Institutional Investor Group are sophisticated and experienced fiduciaries who have been actively supervising the litigation separate and apart from their attorneys, have taken measures to ensure their counsel's prosecution of this action will be effective and efficient and have otherwise demonstrated their commitment to ensure this action is prosecuted in the best interests of the Class.

The only movant to claim a financial interest that comes close to that of the Institutional Investor Group is the Pension Fund Group, which is likewise comprised of three institutional investors.[1] However, one member of the Pension Fund Group—West Virginia—is a ***net seller*** of Goldman securities during the Class Period, and is thus inadequate and atypical of the Class and cannot be appointed as Lead Plaintiff. *See, e.g., Borochoff v. GlaxosmithKline PLC,* 246 F.R.D.

---

[1] The Pension Fund Group consists of the West Virginia Investment Management Board ("West Virginia"), Arkansas Teachers Retirement System ("Arkansas Teachers"), and Plumbers and Pipefitters National Pension Fund.

201, 205 (S.D.N.Y. 2007) (refusing to appoint movant that was a "net seller" because "although it nevertheless may have sustained a small loss…it does not adequately represent the proposed class of purchasers").  Indeed, West Virginia's petition as a net seller in this action—and the Pension Fund Group's attempt to bolster its financial interest by proffering an unsuitable Lead Plaintiff candidate—is especially striking given the fact that West Virginia had been previously rejected as an unsuitable lead plaintiff applicant on the very same grounds.  *See In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 375 (E.D. Va. 2003) (rejecting West Virginia on the grounds that it was a member of a group that was a net seller).

When West Virginia is removed from the Pension Fund Group, the Institutional Investor Group's financial interest is much larger than that of the Pension Fund Group under all of the measures used by courts to assess financial interest.  Specifically, as demonstrated below, under each of the so-called "*Lax* factors"—(1) the number of shares purchased during the class period, (2) the number of net shares purchased during the class period, (3) the total net funds expended during the class period, and (4) approximate losses—the Institutional Investor Group has a financial interest that is substantially greater than the Pension Fund Group.  *See Police & Fire Ret. Sys. v. SafeNet, Inc.,* 06-cv-5797, 2007 U.S. Dist. LEXIS 97959, at *6 (S.D.N.Y. Feb. 21, 2007) (Crotty, J.) (discussing the so-called "*Lax* factors" set forth in *Lax v. First Merchants Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).



Moreover, even if West Virginia's defective losses were to be considered, the Institutional Investor Group *still* has a financial interest that is over *33%* greater than that of the Pension Fund Group with respect to two of the critical *Lax* factors—(1) net shares purchased and (2) net funds expended.[2]  Specifically, even when including West Virginia in the Pension Fund Group's totals, the Institutional Investor Group purchased over 36,000 more Goldman shares on a net basis than the Pension Fund Group during the Class Period, and made net expenditures that are more than $8.6 million greater than those claimed by the Pension Fund Group.  Under these two metrics—considered by many courts to be the most important measure of financial interest—the Institutional Investor Group's financial interest in this litigation exceeds that claimed by the Pension Fund Group *by over 33%*:

---

[2]  The figures presented in this brief correct an error in the Pension Fund Group's opening motion.  Although Arkansas Teachers originally reported net expenditures of $55,683,299, the correct figure is $15,019,839, as calculated using the transaction information provided in the Arkansas Teachers' PSLRA certification.  The figures presented in this brief also correct an inadvertent error in the Institutional Investor Group's opening motion.  While Montana BOI originally reported a LIFO loss of $5,906,755, the correct LIFO loss is $5,678,782.



Net shares purchased and net expenditures of financial interest are important indicators of financial interest and are particularly relevant here because, even if West Virginia is included, the difference between the losses incurred by the movants when calculated on a last-in, first-out ("LIFO") basis is a negligible 7%:



As this Court held in *SafeNet*, when there is only a negligible difference in losses between two movants—such as the marginal 7% difference between the Institutional Investor Group's and Pension Fund Group's LIFO loss—consideration of the other *Lax* factors is determinative. *See SafeNet, Inc.,* 2007 U.S. Dist. LEXIS 97959, at *6 (Crotty, J.) (holding that small difference in losses between groups "cannot dictate such an important result" and appointing group with largest net shares purchased and largest net expenditures).[3]   As in *Safenet*, the two movants' approximate LIFO losses here are "roughly equal" and inconclusive of their true financial interest in the litigation.  *See, e.g., In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 403 (S.D.N.Y. 2006) (holding 17% difference between loss amounts to be "roughly equal").   Accordingly, the Court should look to the Institutional Investor Group's substantially larger financial interest as measured under the critical net shares purchased and net expenditure metrics—a difference of more than 33% that, under this Court's precedent, strongly favors the Institutional Investor Group's appointment as Lead Plaintiff.

## ARGUMENT

I. <u>The Institutional Investor Group Has The Largest Financial Interest In The Relief Sought By The Class</u>

The PSLRA directs that the Court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be…the 'most adequate plaintiff'"—*i.e.*, the movant that the Court determines is "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The PSLRA requires further that the Court "shall adopt a presumption that the most adequate plaintiff…is the person or group of persons" that "has the largest financial interest in the relief sought by the class" and "otherwise

---

[3] *See also Weisz v. Calpine Corp.*, No. 4:02-CV-1200, 2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) (appointing candidate with largest number of net shares purchased after rejecting net seller as inadequate).

satisfies the [adequacy and typicality] requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii); *SafeNet, Inc.,* 2007 U.S. Dist. LEXIS 97959, at *6.

While the PSLRA does not prescribe any particular method for measuring financial interest, courts, including this one, have repeatedly looked to the following four factors: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered. *See SafeNet, Inc.,* 2007 U.S. Dist. LEXIS 97959, at *6. Of these, the first factor—total shares purchased—is considered the least important,[4] while net shares purchased and net expenditures are given greater weight.[5]

As demonstrated above, the Institutional Investor Group has a financial interest that is greater than that of the Pension Fund Group regardless of whether West Virginia—an atypical and inadequate net seller of Goldman shares during the Class Period—is disqualified or not. When West Virginia is properly excluded as a net seller, the Institutional Investor Group's interest is substantially larger under every single one of the so-called *Lax* factors. Even if West Virginia is included, however, the Institutional Investor Group **still** has a substantially larger financial interest in this action. As in *SafeNet*, the negligible difference between the movants'

---

[4] *See, e.g., Boyd v. NovaStar Fin.*, No. 07-0139-CV-W-ODS, 2007 WL 2026130, at *3 (W.D. Mo. July 9, 2007) ("the number of shares purchased during the class period is less relevant than the ***net*** number of shares purchased during the class period, as the latter figure will represent the number of shares purchased after the fraud and held when the fraud was revealed"); *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996 (N.D. Cal. 1999) (noting that total shares purchased "provides little insight" into financial interest).

[5] *See, e.g., In re the Mills Corp. Sec. Litig.*, No. Civ.A., 1:06-77(GEL), 2006 WL 2035391, at *3 (E.D. Va. May 30, 2006) (considering net funds expended in determining financial interest); *Weisz,* 2002 WL 32818827 (same); *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999) (concluding net shares purchased should be used to determine financial interest); *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1108 (N.D. Cal. 2001) (number of net shares purchased "determinative" of financial interest); *Ruland v. InfoSonics Corp.*, No. 06CV1231 BTMWMC, 2006 WL 3746716, at *6 (S.D. Cal. Oct. 23, 2006) (same).

LIFO loss dictates that the Court should look to the Institutional Investor Group's net purchases and net expenditures—both of which are over *33%* greater than Pension Fund Group's even when including West Virginia. *See SafeNet, Inc.*, 2007 U.S. Dist. LEXIS 97959, at *6. Accordingly, the Institutional Investor Group has the largest financial interest in this action and should be appointed Lead Plaintiff.[6]

### a.   West Virginia Is An Unsuitable Net Seller Of Goldman Securities

West Virginia is ineligible to serve as Lead Plaintiff and its transactions in Goldman stock should not be considered as part of the Pension Fund Group's financial interest. Specifically, West Virginia is a so-called "net seller" because it sold 7,700 more Goldman shares at artificially inflated prices than it purchased during the Class Period. Courts routinely reject net sellers from serving as Lead Plaintiff. *See, e.g., Weisz*, 2002 WL 32818827, at *7; *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 946 (N.D. Ill. 2001) (holding that a net seller was "totally out of the running for designation as lead plaintiff"); *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 174 (W.D.N.Y. 2007) (rejecting net seller as subject to unique defenses, agreeing "with the rationale of those courts finding that net sellers…are ill-suited to serve as lead

---

[6] The motions by the two remaining movants, which each assert a *de minimus* financial interest in this action, should also be denied. Pablo Elizondo concedes that he does not have the largest financial interest in this action. (Dkt. #21). Tikva Bochner likewise acknowledges that she does not have the largest financial interest, but instead seeks to represent a "niche" subset of investors who purchased and sold Goldman put and call options. This argument contradicts the overwhelming weight of authority holding that a single Lead Plaintiff should be appointed to represent the Class "as a whole," and should be rejected. *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 n.13 (2d Cir. 2004); *see also Fishbury, Ltd. v. Connetics Corp.*, No. 06 Civ. 11496(SWK), 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006) (rejecting motion by options purchaser that presumptive lead plaintiff lacked standing to assert options claims, holding that is "well settled law in this Circuit that the lead plaintiff in a securities class action need not have standing to sue on all causes of action raised in the underlying class complaint" and citing *Hevesi*); *Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 325 (S.D.N.Y. 2004) ("the interests of [] option investors and shareholders are not sufficiently differentiated to require the appointment of a 'niche' lead plaintiff at this time").

plaintiffs."); *In re McKesson*, 97 F. Supp. 2d at 996-97 (rejecting net seller because it "arguably **profited** more from the fraud than it has been injured, possibly reducing its incentive to litigate").

Indeed, courts are in near unanimous agreement that net sellers cannot represent the claims of other class members due to the difficulties in proving loss and damages based on such a trading pattern. *See also Frank v. Dana Corp.*, 237 F.R.D. 171, 172 (N.D. Ohio 2006) ("Because parties which are net sellers and net gainers, with respect to the relevant securities transactions during the class period, may have more trouble proving damages at trial, courts frequently reject their applications to serve as lead plaintiffs"); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *4 (N.D. Ohio May 12, 2004) (rejecting application to serve as lead plaintiff where funds had net sales during class period); *In re Boston Scientific Corp. ERISA Litig.*, 254 F.R.D. 24, 31 (D. Mass. 2008) (holding net sellers could not establish Article III standing in ERISA case because any loss the proposed class representatives suffered by purchasing inflated shares during the class period "was more than made up for by the artificially high return on [the] investment in units purchased before the Class Period began.").[7]

Even investors who have incurred losses cannot serve as Lead Plaintiffs if they sold more shares during the class period than they purchased. For example, in *In re the Mills Corporation*

---

[7]  As seen in a number of cases, appointing a net seller as lead plaintiff can pose severe risks to the Class in later stages of the litigation. For example, at the class certification stage in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586 (N.D. Ill. 2009), the court found that a proposed class representative's status as a net seller subjected it to unique defenses and rendered it both atypical and inadequate to represent the Class, noting that "the issue of standing is likely to consume [its] time, raising the potential for conflict with his duty to represent the class." *Id.* at 600. Similarly, a class action brought under the Employee Retirement Income Security Act ("ERISA") was dismissed because the plaintiff, as a net seller of the shares in his ERISA plan during the class period, lacked Article III standing. *See Brown v. Medtronic, Inc.*, 619 F. Supp. 2d 646 (D. Minn. 2009). Analogizing to PSLRA cases, the court explained that the "Plaintiff **benefited** from the artificial inflation because he sold his shares at prices he claims were **higher** than they should have been," and therefore could not establish an injury-in-fact. *Id.* at 650.

*Securities Litigation*, the court rejected a net seller that asserted a multi-million dollar loss, reasoning that "[c]ourts generally reject a party's motion for lead plaintiff if the party is a net seller of shares during the class period." *In re the Mills Corp.*, 2006 WL 2035391, at *3. The court instead appointed the group of investors that—like the Institutional Investor Group here— had the largest net expenditures. *Id.*

This jurisprudence should not come as a surprise to West Virginia, as it was previously disqualified as a member of group that was a net seller. Specifically, in *In re Cable & Wireless,* 217 F.R.D. at 375, West Virginia moved with another investor that was a net seller during the class period. Even though West Virginia's group collectively asserted multi-million dollar losses, the court denied the motion, relying on the vast case law rejecting net sellers as inadequate and atypical of the members of the class. *Id.* at 378 (citations omitted). The *In re Cable & Wireless* court instead appointed the movant that, like the Institutional Investor Group here, had the largest net shares purchased and net expenditures during the class period. *See id.* at 376.

Accordingly, West Virginia should be rejected as an inappropriate net seller, and only the financial interest of the remaining members of the Pension Fund Group should be considered. When the qualified movants among the two groups are compared, the Institutional Investor Group has an indisputably larger financial interest than the Pension Fund Group as measured by every single metric considered by courts:

| Movant | Shares Purchased | Net Shares Purchased | Net Expenditures | FIFO Loss | LIFO Loss |
|---|---|---|---|---|---|
| **Institutional Investor Group** | 581,054 | 149,078 | $33,653,246 | ($14,272,948) | ($13,406,640) |
| **Pension Fund Group** (w/o West Virginia) | 531,015 | 120,188 | $24,991,337 | ($12,697,055) | ($11,310,522) |

**b.      The Institutional Investor Group Has A Significantly Larger Financial Interest In The Litigation Than The Public Pension Fun Group Even If The Court Counts West Virginia's Losses**

Even if this Court were to consider West Virginia—which it should not—the Institutional Investor Group still has the largest financial interest as measured under the *Lax* factors considered by courts across the country, and previously applied by this Court.  During the Class Period, the Institutional Investor Group purchased over 36,000—or *33%*—more shares and expended over $8 million—or *35%*—more on a net basis than the Pension Fund Group.  Given this disparity, it is clear that the Institutional Investor Group has larger financial interest in the action and should be appointed as Lead Plaintiff:

| Movant | Net Shares | Net Expenditures |
|---|---|---|
| **Institutional Investor Group** | 149,078 | $33,653,246 |
| **Pension Fund Group** | 112,488 | $25,050,971 |

In fact, many courts have held that net shares purchased and net expenditures provide a more objective assessment of the movant's financial interest than losses.  *See, e.g., In re Cable & Wireless,* 217 F.R.D. at 375 n.4 (considering net shares purchased in assessing financial interest and appointing movant with largest net funds expended); *In re the Mills Corp.*, 2006 WL 2035391, at *3 (appointing as lead plaintiff the movant that asserted the largest net funds expended over objection of movant that asserted larger FIFO and LIFO losses); *Weisz*, 2002 WL 32818827, at *7 (same); *In re Network Assocs.,*76 F. Supp. 2d at 1027 (concluding net shares purchased should be used to determine financial interest as "the candidate with the most net shares purchased will normally have the largest potential damage recovery"); *In re Critical Path, Inc*, 156 F. Supp. 2d at 1108 (number of net shares purchased "determinative" of financial interest); *Ruland v. InfoSonics*, No. 06-cv-1231 BTMWMC, 2006 WL 3746716, at *6 (same).

As these courts have recognized, unlike loss estimates—which can be heavily impacted by an investor's pre-class transactions and holdings—both the net shares purchased and net expenditures metrics focus *exclusively* on an investor's transactions *during* the class period.  In each of these cases, the court rejected evaluating financial interest based on "investment losses" and instead appointed movants which either had the largest number of net shares purchased or had the greatest net expenditures.  For the same reasons the courts in *Cable & Wireless, In re the Mills Corporation*, *Weisz*, *Critical Path*, *Network Assocs. Sec. Litig.* and *InfoSonics* turned to factors other than investment losses, the Institutional Investor Group's substantially larger net shares purchased and net funds expended confirm that it has the largest financial interest in the action here and should be appointed as Lead Plaintiff.

Indeed, the negligible difference between the movants' losses here supports giving that factor less weight than the other *Lax* factors.  Specifically, when measured on a last-in, first out ("LIFO") basis, the losses of the Institutional Investor Group are just 7% smaller than the LIFO losses of the Pension Fund Group when including West Virginia.  Such a *de minimus* difference should not dictate the outcome of this motion.  *See SafeNet, Inc.,* 2007 U.S. Dist. LEXIS 97959, at *6 (holding that opposing movant's slightly larger loss could not "dictate" result given that the other movant group had substantially larger financial interest as measured under remaining *Lax* factors); *In re Doral Fin. Corp.*, 414 F. Supp. 2d at 403 (holding 17% difference between loss amounts to be "roughly equal").[8]  In such circumstances, courts turn to the remaining *Lax* factors, and in particular net shares purchased and net funds expended, to determine financial

---

[8] *See also In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 338 (S.D.N.Y. 2005) (a movant with $22.5 million in alleged losses and another $22.8 million in alleged losses have roughly equal damages "[g]iven the probable margin of error involved in the damage estimates").

interest.  *See SafeNet, Inc.,* 2007 U.S. Dist. LEXIS 97959, at *6 (appointing group that asserted

smaller losses but had substantially larger net shares purchased and net funds expended).[9]

The facts here are thus strikingly similar to those presented in *SafeNet.  See SafeNet, Inc.,*

2007 U.S. Dist. LEXIS 97959, at *6.  In *SafeNet*, the Court declined to appoint the movant that

claimed the largest loss because an opposing group asserted substantially larger financial interest

on the remaining *Lax* factors.  Concluding that the "slight difference" between the movants

losses "cannot dictate such an important result," the Court held that the movant group that

asserted smaller losses but greater net shares purchased and net funds expended was entitled to

the presumption as the most adequate plaintiff.  *Id.*

Here, the facts entitling the Institutional Investor Group to the presumption as the most

adequate plaintiff are even stronger than in *SafeNet*, as the Pension Fund Group's loss is inflated

by the inclusion of trades made by West Virginia, a net seller.  Unlike in *SafeNet*, the question

here is not even close.  When excluding West Virginia from the Pension Fund Group, the

Institutional Investor Group has an indisputably larger financial interest on every single metric,

and should be appointed as Lead Plaintiff.

---

[9] The movants' losses here should be compared using LIFO.  Courts in this District have
repeatedly and overwhelmingly rejected the first-in, first-out ("FIFO") methodology as an
unsuitable measure of financial interest.  *See, e.g., In re Doral Fin. Corp.,* 414 F. Supp. 2d at 403
n.7 (explaining that FIFO "has fallen out of favor in this District"); *Kuriakose v. Federal Home
Mortg. Co.,* No. 08-cv-7281 (JFK), 2008 WL 4974839, at *3 (S.D.N.Y. Nov. 24, 2008) ("To
calculate losses, courts favor the LIFO accounting method over FIFO."); *In re eSpeed, Inc. Sec.
Litig.,* 232 F.R.D. 95, 101 (S.D.N.Y. 2005) ("The main advantage of LIFO is that, unlike FIFO,
it takes into account gains that might have accrued to plaintiffs during the class period due to the
inflation of the stock price.  FIFO…ignores sales occurring during the class period and hence
may exaggerate losses.").  Accordingly, any assertion by the Pension Fund Group that its losses
are larger if measured under FIFO—$18.5 million (with West Virginia) versus the Institutional
Investor Group's $14.3 million FIFO loss—should be disregarded.  In any event, the Institutional
Investor Group's $14.3 million FIFO loss is over $1.5 million greater than the Public Pension
Fund Group's $12.7 million FIFO loss when West Virginia is excluded.

**II.**      **The Institutional Investor Group Satisfies The Relevant Requirements Of Rule 23**

Recognizing the clear result compelled by the above analysis of the Institutional Investor Group's financial interest in this action, the Pension Fund Group may attempt to rebut the strong presumption entitling the Institutional Investor Group to appointment as Lead Plaintiff.  In light of the demonstrated adequacy and typicality of the sophisticated and experienced institutions which comprise the Institutional Investor Group, any such conjecture should be rejected.  To overcome the presumption entitling the Institutional Investor Group to appointment as Lead Plaintiff, the PSLRA requires the Pension Fund Group to offer ***proof*** that it is inadequate to serve as Lead Plaintiff.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *SafeNet*, 2007 U.S. Dist. LEXIS 97959, at *7-8 (presumption "may be rebutted only upon proof" that presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses").   No such proof exists in this case, and any arguments to the contrary should be rejected out of hand.

**a.**      **The Institutional Investor Group Is A Cohesive Group**

Recognizing the Institutional Investor Group's superior financial interest under the factors described above, opposing movants may attempt to speculate that its members are not sufficiently cohesive to manage the litigation.  Such an argument can find no support in the record, but to erase any doubt—and there should be none—the Institutional Investor Group has submitted a Joint Declaration herewith that more than satisfies the evidentiary standard courts have adopted in approving groups under the PSLRA.

As reflected in the Joint Declaration, the Institutional Investor Group is comprised entirely of sophisticated institutional investors that are the prototypical plaintiffs envisioned by Congress to serve as Lead Plaintiff and supervise class counsel.  *See In re McDermott Int'l, Inc. Sec. Litig.*, No. 08 Civ. 9943 (DC), 2009 WL 579502, at *6 (S.D.N.Y. Mar. 6, 2009).

Specifically, the members of the Institutional Investor Group decided to jointly prosecute this action for reasons entirely independent of the involvement of their counsel. *See* Joint Decl. ¶7. The members of the group were motivated to work together based on their shared interest in seeking corporate governance reforms that promote sound, ethical, and responsible business practices at financial institutions like Goldman, as well as their shared commitment to address the serious public policy concerns implicated by Goldman's misconduct that lie at the heart of the recent financial crisis. *See* Joint Decl. ¶¶5-6. Out of the shared belief that their collaboration would benefit the Class and maximize the Class's recovery, the Institutional Investor Group joined forces to ensure the efficient and effective prosecution of this important action. *See* Joint Decl. ¶¶5-6.

The members of the Institutional Investor Group have been working diligently to implement procedures that ensure the active and effective oversight of counsel, and, through their Joint Declaration, have reaffirmed their commitment to vigorously prosecute this action against all culpable parties. *See* Joint Decl. ¶¶8-11. Indeed, the members of the Institutional Investor Group have discussed with each other and with counsel measures to ensure that this action is prosecuted efficiently and effectively and, in furtherance of this goal, have instructed counsel to enter into a joint prosecution agreement, which can be submitted to the Court for *in camera* review upon request. *See* Joint Decl. ¶10. Among other things, the joint prosecution agreement delineates responsibilities among counsel to avoid any duplication of effort and sets forth communication mechanisms, including regular conference calls, through which counsel and members of the Institutional Investor Group intend to discuss the status and developments in the litigation. *See* Joint Decl. ¶10. In light of the foregoing, it is difficult to conceive that the members of the Institutional Investor Group—three sophisticated institutional investors with tens

of billions of dollars under management, each with its own independent boards of directors, legal counsel and advisory staff—would permit outside counsel to act without their approval or direction.

The Joint Declaration clearly establishes that the Institutional Investor Group has functioned (and will continue to function) cohesively to effectively manage the litigation, and therefore, supports the aggregation of members' losses and the appointment of the group as Lead Plaintiff. *See, e.g., Reimer v. Ambac Fin. Group*, *Inc.*, No. 08 Civ. 411 (NRB), 2008 WL 2073931, at *3 (S.D.N.Y. May 9, 2008) (appointing group of institutional investors whose joint declaration established that the group was "cooperating and pursuing the litigation separately and apart from their lawyers"); *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 258 F.R.D. 260, 270 (S.D.N.Y. 2009) (appointing group, noting that the "demonstrated cooperation" among "sophisticated institutional investors[] satisfies concerns about designating groups as lead plaintiffs that are in fact dominated by counsel"); *City of Brockton Ret. Sys. v. Shaw Group, Inc.*, No. 06 Civ. 8245, 2007 U.S. Dist LEXIS 72745 (S.D.N.Y. Sept. 5, 2007) (noting that sophistication of institutional group members negated "legislative concern that class actions not be controlled by counsel," and group "plainly satisfied" PSLRA "regardless of how close or attenuated" the relationship between its members). Because the Institutional Investor Group has amply demonstrated its adequacy, the group respectfully submits that it be appointed as Lead Plaintiff in this action.

**b.** **Potential Challenges To The Institutional Investor Group's Non-U.S. Members Are Baseless And Do Not Overcome The Presumption**

The Pension Fund Group may also attempt to suggest that Sampension's and Metzler's status as foreign investors somehow disqualifies them from serving as a Lead Plaintiff in this case. Such an argument, however, has been repeatedly rejected and ignores the extensive

precedent appointing foreign investors as Lead Plaintiff. *See, e.g., In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 347 (S.D.N.Y. 2009) (appointing foreign investment firm, noting that "courts routinely appoint hedge funds, foreign investors, and even foreign hedge funds, as lead plaintiffs," and citing cases); *In re Delphi Corp. Sec. Litig.*,  No. 1:05-cv-2637(NRB) (S.D.N.Y. June 27, 2005) (appointing group consisting of a German fund manager and a Dutch and two United States pension funds as lead plaintiff) (attached as Ex. B to the Supp. Graziano Decl.); *Mirco Investors, LLC v. Inspire Pharms., Inc.*, No. 1:05CV00118 (M.D.N.C. Mar. 1, 2006) (appointing group including a German fund manager as lead plaintiff) (attached as Ex. C to the Supp. Graziano Decl.); *In re GMC Sec. Litig.*, No. 05-CV-8088 (RMB) (S.D.N.Y. Feb. 6, 2006) (appointing group consisting of German and Luxembourgian fund managers as lead plaintiff) (attached as Ex. D to the Supp. Graziano Decl.); *Conway Inv. Club v. Corinthian Colls., Inc.*, No. 2:04-cv-05025 (C.D. Cal. Nov. 1, 2004) (appointing German fund manager as lead plaintiff) (attached as Ex. E to the Supp. Graziano Decl.); *In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d at 45 (D. Mass. 2001) (appointing group of foreign investors from Germany, Netherlands and Italy as Lead Plaintiff).

Indeed, some of the largest and most important securities class actions pending in courts today are being prosecuted by foreign institutions, *see, e.g., In re Bank of America Corp.*, 258 F.R.D. at 266 (appointing group of institutions consisting of U.S., Dutch and Swedish investors as lead plaintiff), and Metzler itself has been appointed as Lead Plaintiff in numerous securities class actions, and has achieved impressive results serving in that role. *See, e.g., In re Molson Coors Brewing Co. Sec. Litig.*, C.A. No. 05-cv-294(GMS) (D. Del.) (Metzler successfully prosecuted a case as member of a Lead Plaintiff group consisting of non-U.S. and U.S. institutions); *Welmon v. Chicago Bridge & Iron Co. N.V*, Case No. 06-CV-01283 (S.D.N.Y.)

(Metzler successfully prosecuted action as member of a Lead Plaintiff group).

Moreover, any such challenge to Metzler's and Sampension's status as foreign investors would be particularly misplaced here as there can no longer be any question as to the ability of foreign investors to assert cognizable claims under Section 10(b) of the Securities Exchange Act against Goldman—a U.S. company whose stock trades in the U.S.  Under the Supreme Court's recent decision in *Morrison v. National Australia Bank, Ltd.*, -- S. Ct. --, 08-1191, 2010 WL 2518523 (June 24, 2010), the claims of the investors in Goldman's U.S.-listed securities undoubtedly have cognizable claims under the federal securities laws, rendering any prior cases that had questioned the ability of foreign investors to seek lead plaintiff status utterly inapplicable to the facts here.[10]  Moreover, as Sampension and Metzler have submitted to the jurisdiction of this Court and will be bound by its rulings, *see* Joint Decl. ¶¶3-4, any speculation regarding the preclusive effect of any judgment in this litigation in a foreign country does not in any way impact their adequacy to represent the Class.  *See, e.g., In re Molson Coors*, 233 F.R.D. 147, 153 (D. Del. 2005) (describing competing movant's claim that Metzler's home country

---

[10] For this reason, among others, the holding in *Borochoff v. GlaxosmithKline PLC*, 246 F.R.D. 201, 205—a case in which opposing movants argued that the court lacked jurisdiction over the claims of German investors who purchased their securities overseas—is entirely inapposite. Indeed, as Judge Scheindlin held in rejecting identical arguments against foreign movants in *Sgalambo v. McKenzie*, -- F.R.D. --, No. 09 Civ. 10087(SAS), 2010 WL 1222062, at *4 (S.D.N.Y.  Mar. 29, 2010), "courts routinely appoint foreign investors as lead plaintiffs." According to Judge Scheindlin, reliance on *GlaxosmithKline PLC* was "misplaced" because in *Sgalambo*, as here, there was no question as to the court's subject matter jurisdiction or the ability of foreign investors to assert Section 10(b) claims arising from their purchases of U.S.-listed securities.  *Id.  See also In re NPS Pharms., Inc. Sec. Litig.*, No. 2:06-cv-00570-PGG-PMW, 2006 U.S. Dist. LEXIS 87231, at *13 (D. Utah Nov. 17, 2006) (rejecting argument that foreign institutional investor that bought shares of a U.S. company on a U.S. exchange was subject to the unique defenses of subject matter jurisdiction or *res judicata*); *Marsden v. Select Medical Corp.*, 246 F.R.D. 480, 486 (E.D. Pa. 2007) (certifying class and rejecting *res judicata* arguments, explaining foreign investor was adequate plaintiff and proposed class satisfied superiority requirement because the fraud was "based on alleged misrepresentations made in the U.S. by an American company whose shares traded on an American stock exchange").

would not give *res judicata* effect to a class action judgment as a "red herring," noting that the "preclusive effect in Germany of a judgment here is not a question unique to" Metzler, but "would apply to any and all members of the putative class").

In short, there are no legitimate grounds to challenge Sampension's and Metzler's adequacy, let alone the kind of "proof" required to rebut the presumption entitling them to appointment as Lead Plaintiff.  Rather, the Institutional Investor Group asserts a superior financial interest, has amply demonstrated its ability to adequately and vigorously prosecute the claims against Goldman, and is committed to diligently and faithfully performing its duties as Lead Plaintiff in the best interests of the Class.  Accordingly, the Institutional Investor Group respectfully submits that it should be appointed as Lead Plaintiff, and its motion should otherwise be granted.

## CONCLUSION

For the above reasons, the Institutional Investor Group respectfully requests that the Court: (i) appoint the Institutional Investor Group as the Lead Plaintiff; (ii) approve its choice of Lead Counsel for the Class; (iii) consolidate the above-captioned actions; and (iv) grant such further relief as the Court may deem just and proper.

Dated: July 12, 2010
        New York, New York

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

By:     /s/ Salvatore J. Graziano
Salvatore J. Graziano
Gerald H. Silk
Avi Josefson
Michael D. Blatchley
1285 Avenue of the Americas
New York, NY 10019

Telephone: (212) 554 1400
Facsimile:  (212) 554 1444

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Blair A. Nicholas
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile:  (858) 793-0323

*Counsel for the Institutional Investor Group*
*and Proposed Co-Lead Counsel for the Class*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Geoffrey C. Jarvis
Hung G. Ta
485 Lexington Ave 29th Floor
New York, New York 10017
Tel: (646) 722-8500
Fax:  (646) 722-8501

*Counsel for the Institutional Investor Group*
*and Proposed Co-Lead Counsel for the Class*

**BARRACK, RODOS & BACINE**
Leonard Barrack
Daniel E. Bacine
M. Richard Komins
Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile:   (212) 963-0838

**BARRACK, RODOS & BACINE**
Arnold Gershon
William J. Ban
1350 Broadway
Suite 1001
New York, NY 10018
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

19

*Additional Counsel for Montana Board of
Investments*

**BARROWAY TOPAZ KESSLER
  MELTZER & CHECK, LLP**
Sean M. Handler
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Additional Counsel for Sampension KP
Livsforsikring A/S*