

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

In re GOLDMAN SACHS GROUP, INC.
SECURITIES LITIGATION

———————————————————————

This Document Relates To:

     ALL ACTIONS.

——————————————————————— x

:   Master File No. 1:10-cv-03461-PAC

:   CLASS ACTION

:   JURY TRIAL DEMANDED

:   ECF CASE

# CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     NATURE AND SUMMARY OF THE ACTION ...............................................1

III.    JURISDICTION AND VENUE .........................................................................10

IV.     THE PARTIES.....................................................................................................10

       A.      Plaintiffs ...................................................................................................10

       B.      Defendants ................................................................................................10

       C.      Relevant Non-Defendant Goldman Personnel........................................12

V.      CLASS ACTION ALLEGATIONS ..................................................................14

VI.     FACTS SUPPORTING DEFENDANTS' FALSE AND MATERIAL
        MISSTATEMENTS AND OMISSIONS AND SCIENTER AFTER THE SEC
        NOTIFIED GOLDMAN IN JULY 2009 THAT IT HAD RECOMMENDED
        FILING SECURITIES FRAUD CHARGES ...................................................15

       A.      Goldman's Undisclosed Conduct in Connection with Abacus.............16

       B.      The SEC Files Securities Fraud Charges that Goldman Settled for $550
           Million......................................................................................................26

       C.      Goldman's Receipt of the Wells Notice in July 2009...........................27

       D.      Goldman Admitted that It Violated the Rules of Its Securities Regulators
           by Failing to Disclose Its Receipt of Wells Notices Relating to Abacus..............30

       E.      Goldman's False and Misleading Statements and Omissions Post-Receipt
           of the Wells Notice in July 2009...........................................................36

              1.      The False and Misleading Statements in SEC Filings and Public
                   Announcements from August 2, 2009 to November 10, 2009 .................36

              2.      The False and Misleading Statements in Response to the *New York
                   Times* Article ...........................................................................................40

              3.      The False and Misleading Statements in SEC Filings from January
                   21, 2010 to March 1, 2010 ......................................................................42

Page

VII.   FACTS SUPPORTING DEFENDANTS' FALSE AND MATERIAL
       MISSTATEMENTS AND OMISSIONS AND SCIENTER CONCERNING
       THEIR IMPROPER BUSINESS PRACTICES AND CLIENT CONFLICTS OF
       INTEREST RELATED TO ABACUS ...............................................................................44

VIII.  FACTS SUPPORTING DEFENDANTS' FALSE AND MATERIAL
       MISSTATEMENTS AND OMISSIONS AND SCIENTER REGARDING
       GOLDMAN'S FAILURE TO DISCLOSE ITS CONFLICTS OF INTEREST
       WITH ITS CLIENTS AND THE IMPACT ON GOLDMAN'S CLIENT
       FRANCHISE AND REPUTATION .................................................................................49

       A.     Goldman's Financial Success Has Been Driven by Its Reputation, Client
              Franchise and Commitment to Put Its Clients First Above All Else ....................50

       B.     Goldman's Undisclosed Fraudulent Conduct in 2006-2007 in Connection
              with the Hudson, Anderson and Timberwolf CDOs .............................................55

              1.     Hudson CDO ................................................................................................56

              2.     Anderson .....................................................................................................65

              3.     Timberwolf I ................................................................................................72

       C.     The Findings of the Senate Subcommittee ...........................................................88

       D.     Defendants' False and Material Misstatements and Omissions Which
              Failed to Disclose Goldman's Conflicts of Interest with Its Clients and the
              Impact on Goldman's "Best in Class Franchise" ..................................................89

IX.    THE TRUTH REGARDING GOLDMAN'S FRAUDULENT CONDUCT IS
       REVEALED .................................................................................................................100

X.     LOSS CAUSATION/ECONOMIC LOSS ....................................................................105

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE
       MARKET DOCTRINE ................................................................................................108

COUNT I ................................................................................................................................109

       For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All
              Defendants ..........................................................................................................109

COUNT II ...............................................................................................................................110

- ii -

**Page**

For Violation of §20(a) of the Exchange Act Against All Defendants............................110

PRAYER FOR RELIEF ...........................................................................................................110

JURY DEMAND .......................................................................................................................111

625194_1

## I.    INTRODUCTION

Court appointed Lead Plaintiffs, the Arkansas Teacher Retirement System, the West Virginia Investment Management Board, and Plumbers and Pipefitters National Pension Fund (collectively, "Lead Plaintiffs"), by their undersigned attorneys, bring this action on behalf of themselves and all other similarly situated purchasers of the securities of The Goldman Sachs Group, Inc. ("Goldman" or "the Company") between February 5, 2007, and June 10, 2010, inclusive (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based on the investigation of counsel.  The investigation of counsel is predicated upon, among other things, review and analysis of: (i) documents filed publicly by Goldman with the Securities and Exchange Commission (the "SEC"); (ii) press releases, new articles, and other public statements issued by or concerning Goldman and other defendants named herein; (iii) research reports issued by financial analysts concerning Goldman's securities and business; and (iv) other publicly available information and data concerning Goldman and its securities, including information concerning investigations of Goldman and its affiliates by, among others: the United States Senate Permanent Subcommittee on Investigations ("Senate Subcommittee"); the SEC, including the investigation leading to the Complaints brought by the SEC against Goldman and one of its employees, Fabrice Tourre; the Financial Industry Regulatory Authority ("FINRA"); and the Financial Services Authority ("FSA") in the U.K., including the investigation leading to a substantial financial penalty on Goldman Sachs International ("GSI").

## II.    NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Goldman from February 5, 2007 through June

10, 2010, inclusive and certain of its officers and directors for violations of the Securities Exchange Act of 1934 ("the Exchange Act").

2.      On April 16, 2010, the SEC charged Goldman with securities fraud for collaborating with Paulson & Co., Inc. ("Paulson"), an important Goldman client, to create a portfolio of securities titled Abacus AC-1 ("Abacus") that was designed to fail, and for selling this toxic collateralized debt obligation ("CDO") to other Goldman clients without telling them of Paulson's role in creating Abacus or his massive short position on the CDO.  In less than a year, Paulson earned more than $1 billion from shorting Abacus with Goldman's assistance.  Goldman's clients, from whom Goldman concealed Paulson's key role in creating Abacus and his short position in the CDO, lost approximately $1 billion.

3.      Following the SEC's announcement of securities fraud charges against Goldman, the Company's stock immediately plummeted from $184.27 to $160.70 per share, a loss of approximately $13 billion in shareholder value.

4.      The next day, investors discovered that Goldman had concealed from the public that it had been under investigation by the SEC in connection with Abacus since August 2008, and that the SEC told Goldman in July 2009 via a formal Wells Notice that the SEC was recommending the filing of securities fraud charges.

5.      On April 25-26, 2010, the Senate Subcommittee released Goldman internal emails showing that, beginning in late 2006 through early 2008, Goldman made billions by betting against the very mortgage-related CDOs it sold to its clients, and structured and underwrote Abacus to fail – allowing one of its most important clients to reap billions at the expense of Goldman's other clients who bought Abacus.

- 2 -

6.      On April 29, 2010, the *Wall Street Journal* revealed that Goldman was under investigation by the Department of Justice.  On June 10, 2010, it was reported that in addition to Goldman's conduct in connection with Abacus, the SEC was investigating Goldman's conduct in the Hudson CDO, specifically whether Goldman rid itself of mortgage-backed securities and related CDOs on Goldman's books that it knew were going to decline by selling these securities to Goldman's clients who suffered billions in losses.

7.      On July 15, 2010, Goldman agreed to pay the SEC $550 million for its conduct in the Abacus CDO.  In connection with the settlement, Goldman acknowledged:

> [T]he marketing materials for the ABACUS 2007-AC1 transaction contained incomplete information.  In particular, it was a mistake for the Goldman marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.

8.      On April 13, 2011, the Senate Subcommittee issued a bi-partisan report authored by Senator Carl Levin and Senator Tom Coburn which concluded that Goldman had engaged in pervasive conflicts of interest with its clients.  The Report issued formal findings of fact including that from 2006 through 2007, Goldman (i) identified toxic mortgage-backed securities and CDOs held on its books that Goldman believed would significantly decline in value and cause the Company to lose billions; (ii) packaged and sold these securities to Goldman's own clients; (iii) hid and made affirmative misrepresentations to hide the fact that Goldman had bet against these securities; and (iv) made billions at its own clients' expense when the value of these securities plummeted, just as Goldman anticipated they would.

9.      The Senate identified four particular CDO deals in 2006-2007, Abacus, "Hudson," "Timberwolf," and "Anderson" in which Goldman engaged in the improper practice of

- 3 -

recommending and selling securities to its clients while affirmatively hiding the fact it (or Paulson, a favored client) was placing bets that those same securities would significantly decline in value.[1]

10.     During the Class Period, defendants made three categories of materially false and misleading statements and omissions.

11.     First, beginning in July 2009, Goldman concealed from its quarterly and year-end SEC filings, press releases and investor conference calls that the Company had been notified in July 2009, via a formal Wells Notice, that the SEC had recommended filing securities fraud charges relating to Goldman's conduct in connection with Abacus.  By failing to disclose the Wells Notice, Goldman hid its improper conduct of betting against (or allowing a favored client to bet against) the very toxic securities that Goldman designed to fail and packaged and sold to its clients.

12.     Goldman also concealed from shareholders two additional Wells Notices received by Goldman employees on September 28, 2009 and January 29, 2010, that were also related to Abacus.

13.     In October 2009, Goldman came under intense scrutiny about the more than $16 billion in bonuses it was scheduled to pay to Goldman's executives and employees.  The Company embarked on a full fledged public relations campaign to promote its reputation as the preeminent Wall Street bank focused first and foremost on responsible business practices that placed their clients' needs paramount to all else.  Goldman highlighted its $200 million donation to promote education, and CEO Blankfein even went so far as to claim that Goldman was doing "God's work" –

---

[1]     On May 11, 2011, the Senate Subcommittee referred its report to the Department of Justice and SEC for review and determination as to whether Goldman defrauded its clients, and whether the Company's executives, including CEO Blankfein committed perjury before Congress.  Additionally, on May 16, 2010, the New York Attorney General demanded documents from Goldman in connection with an investigation into Goldman's mortgage-related CDO securities practices.

625194_1

all while concealing the fact that the SEC had told Goldman that it had recommended the filing of securities fraud charges against the Company.

14.     On December 24, 2009, the *New York Times* disclosed that Goldman had created and sold mortgage-related debts in CDOs, bet against these securities and made billions.  Goldman immediately issued a public denial defending its CDO practices as necessary to meet "client demand."  In doing so, Goldman again hid the fact that the SEC had already notified the Company that the SEC had recommended filing charges based on Goldman's fraudulent conduct that hurt – not benefited – Goldman's clients.  Goldman also failed to disclose that the CDOs it sold were not in response to "client demand," but were designed to allow Goldman to rid itself of mortgage-related securities that it wanted off its books and sold to its clients to make billions.

15.     Goldman also lied to the market on April 2, 2010, when it issued its 2009 Annual Report.  In a letter to "Fellow Shareholders," the Company again defended its mortgage securitization practices, stating that "our short positions were not a 'bet against our clients.'" Goldman again omitted that it had known since July 2009 that the SEC had recommended filing securities fraud charges, and that the Company had engaged in the fraudulent conduct of profiting at the expense of its own clients.

16.     In addition, Goldman concealed information about the Wells Notices from both its domestic and international securities regulators, FINRA and the FSA in the U.K., which ultimately fined Goldman $650,000 and approximately $27 million, respectively, for Goldman's failure to report the Wells Notices.

17.     Had Goldman disclosed and not affirmatively concealed its receipt of the Wells Notices, the public would have learned of Goldman's fraudulent conduct, which when disclosed

between April 16, 2010 and June 10, 2010, caused severe damage to Goldman's stock price and caused Goldman's shareholders to lose billions.

18.     The second category of false and misleading statements and omissions during the Class Period is comprised of those statements by Goldman beginning on February 7, 2007 in which the Company reassured investors that "*[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest* . . . ."  These include statements in which Goldman specified that "we increasingly have to address potential conflicts of interest, *including situations where our services to a particular client or our own proprietary investments or other investments conflict, or are perceived to conflict, with the interests of another client* . . . ."[2]

19.     Goldman's warnings to shareholders regarding potential conflicts of interest omitted the fact that it was indeed aware of the existence of such conflicts at the time.  Unbeknownst to Goldman's clients and shareholders, at the behest of Goldman senior management, Goldman had designed the Abacus deal from the outset to allow the Paulson hedge fund to short more than $1 billion worth of Abacus securities at the direct expense of its other clients to whom Goldman had recommended and sold those same securities.

20.     The above statements were materially false and misleading because they failed to disclose that Goldman had deliberately created actual conflicts of interest by engaging in transactions that were designed from the outset by the Company to allow a favored client to benefit at the expense of its other clients.

21.     The third category of false and misleading statements and omissions during the Class Period is comprised of those statements by Goldman beginning in February 2007 in which the

---

[2]     All emphasis is added unless otherwise indicated.

Company repeatedly told the public that its "best in class" franchise and continued success depended

on the Company's reputation, honesty, integrity and commitment to put its clients' interests first

above all else.

22.     These statements failed to disclose Goldman's clear conflicts of interest with its own

clients, whereby Goldman intentionally packaged and sold to its clients billions in securities that

were designed to fail, while at the same time reaping billions for itself or its favored clients by taking

massive short positions on these securities.  The Senate Subcommittee concluded that Goldman's

undisclosed conduct constituted a clear conflict of interest, finding:

> **Conflict Between Client Interests and Proprietary Trading**. In 2007, Goldman
> Sachs went beyond its role as market maker for clients seeking to buy or sell
> mortgage related securities, traded billions of dollars in mortgage related assets for
> the benefit of the firm without disclosing its proprietary positions to clients, and
> instructed its sales force to sell mortgage related assets, including high risk RMBS
> and CDO securities that Goldman Sachs wanted to get off its books, and utilizing key
> roles in CDO transactions to promote its own interests at the expense of investors,
> ***creating a conflict between the firm's proprietary interests and the interests of its
> clients***.

23.     The then-chair of the Senate Subcommittee stated that:

> Investment banks such as Goldman Sachs were not simply market-makers, they were
> self-interested promoters of risky and complicated financial schemes that helped
> trigger the [financial] crisis[.]  They bundled toxic mortgages into complex financial
> instruments, got the credit rating agencies to label them as AAA securities, and sold
> them to investors, magnifying and spreading risk throughout the financial system,
> and all too often betting against the instruments they sold and profiting at the expense
> of their clients.

24.     The following are examples of the third category of Goldman's false and misleading

statements and omissions.  In every Annual Report from 2006-2010, Goldman emphasized The

Goldman Sachs Business Principles, including:

> 1 ***Our clients' interests always come first***.  Our experience shows that if we
> serve our clients well, our own success will follow.

<u>2</u>  Our assets are our people, capital and ***reputation.  If any of these is ever diminished, the last is the most difficult to restore.  We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us***.  ***Our continued success depends upon unswerving adherence to this standard***.

\*        \*        \*

<u>14</u>  ***Integrity and honesty are at the heart of our business***.

25.     Goldman also repeatedly made specific statements and omissions in its SEC filings indicating that its undisclosed fraudulent conduct was not occurring – when in fact it was.  Goldman warned its shareholders about the dangers posed by client conflicts of interest – all while omitting the fact that the Company was engaged in pervasive conflicts of interest by selling its clients securities that were designed to fail and profiting at their clients' expense.  These include statements in which Goldman stressed:

As we have expanded the scope of our businesses and our client base, we increasingly [must] address potential conflicts of interest***, including situations where our services to a particular client or our own [proprietary] investments or other interests conflict, or are perceived to conflict, with the interests of another client*** . . . .

Indeed, Goldman specifically identified the precise risks posed by client conflicts of interest and securities fraud violations that subsequently materialized when Goldman was sued by the SEC, stating that "conflicts could give rise to ***litigation or [regulatory] enforcement actions***."  However, Goldman reassured investors, stating, ***"[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest . . . ."***

26.     Goldman's so-called "warnings" to shareholders regarding potential conflicts of interest created the false impression that it was unaware of the existence of any such conflicts at the time.  At the same exact time that it was issuing these warnings about potential conflicts, senior Goldman management was well-aware of the clear, direct, massive, but undisclosed conflicts created

- 8 -

when Goldman shifted the risks of billions of dollars in toxic mortgage-backed securities from its books to its clients' books and made billions at its clients' expense.

27.     Goldman publicly conveyed numerous other times during the Class Period the false and misleading message that it had placed its clients' interests paramount above all else, stating in form or substance what Goldman CEO Lloyd Blankfein stated in November 2009: "During our history, our Firm has been guided by three tenets – the needs and objectives of our clients, attracting talented and long term oriented people and ***our reputation and client franchise***."

28.     As detailed in the SEC Complaint and settlement, the Senate Subcommittee Report, Goldman internal documents, and herein, Goldman's statements were false and misleading because Goldman purposefully failed to disclose its conduct whereby the Company packaged toxic securities that it wanted to clear from its books, sold them to its clients, and placed short bets against these securities, allowing Goldman to reap billions of dollars in profits at the direct expense of its clients.

29.     Goldman's materially false and misleading statements and omissions caused Goldman's stock to trade at artificially inflated levels during the Class Period.  When the SEC filed its securities fraud complaint against Goldman on April 16, 2010, the market learned that, contrary to Goldman's public representations, the Company had known that since late July 2009 that the SEC intended to bring formal securities fraud charges based on Goldman's conduct in connection with Abacus, and that the Company had engaged in undisclosed conduct in which it profited at the direct expense of its clients who sustained severe losses.  Goldman's stock plummeted from $184.27 to $160.70 per share, causing over a $13 billion loss in shareholder value.

30.     The artificial inflation continued to dissipate from Goldman's stock price between April 16, 2010 and June 10, 2010, when the Senate Subcommittee released internal e-mails providing new details of Goldman's conduct in connection with Abacus, and the public learned that

the SEC and Department of Justice were investigating Goldman's mortgage securitization practices beyond just the Abacus deal. On each of these dates, Goldman suffered a corresponding significant stock price decline, causing investors to suffer additional billions in damage.

## III.   JURISDICTION AND VENUE

31.   The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5.

32.   This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act.

33.   Venue is proper in this District pursuant to §27 of the Exchange Act. Acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## IV.   THE PARTIES

### A.   Plaintiffs

34.   Lead Plaintiffs Arkansas Teacher Retirement System, the West Virginia Investment Management Board, and Plumbers and Pipefitters National Pension Fund each purchased Goldman common stock during the Class Period and was damaged thereby.

### B.   Defendants

35.   Defendant Goldman is a financial holding company, headquartered in New York, New York, that provides global banking, securities and investment management services in the United States and internationally.

36.   With respect to the CDO transactions underlying the allegations of this Complaint, Goldman senior management coordinated the activities of several Goldman subsidiaries, which acted in a collective and coordinated manner in a concerted effort to seek out customers and sell CDO securities, thereby transferring risks posed by the collapsing CDO market from Goldman to its clients. These Goldman subsidiaries include:

- 10 -

Goldman Sachs & Co. ("GS&Co") a registered as a United States broker-dealer and is engaged in global investment banking, securities and investment management. GS&Co is Goldman's principal broker-dealer in the United States. Its principal executive offices are located in New York, New York; and

Goldman Sachs International ("GSI"), which is engaged in global investment banking, securities and investment management. GSI has offices in London and New York, and operates in the United States in conjunction with Goldman and GS&Co.

37.     Because these Goldman subsidiaries were all acting in concert under common direction from Goldman senior management and for a common purpose, or, in the alternative, they were acting as agents of The Goldman Sachs Group, Inc. and they are referred to collectively herein as "Goldman," except where necessary to specify the particular entity.

38.     Defendant Lloyd C. Blankfein ("Blankfein") is Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Goldman. Blankfein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings.

39.     Defendant David A. Viniar ("Viniar") is Chief Financial Officer ("CFO") of Goldman. Viniar participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings.

40.     Defendant Gary D. Cohn ("Cohn") is President of and Chief Operating Officer and a director of Goldman. Cohn participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings.

41.     The defendants referenced above in ¶¶38-40 are referred to herein as the "Individual Defendants."

C.     **Relevant Non-Defendant Goldman Personnel**

42.     The following Goldman employees were involved in planning, creating, recommending and/or selling the CDO securities at issue in this Complaint:

(a)     Daniel Sparks ("Sparks") was, at relevant times, Head of Goldman's Mortgage Department and a Partner in The Goldman Sachs Group, Inc.

(b)     Jonathan Egol ("Egol") was, at relevant times, Head of Goldman's Correlation Trading Desk.  On October 24, 2007, Egol was named a Managing Director of The Goldman Sachs Group, Inc.

(c)     David Lehman ("Lehman") was, at relevant times, Head of the Goldman Commercial Mortgage Backed Securities Desk and Head of the CDO Origination Desk.  Lehman was also a senior member of the Structured Products Group.  On October 26, 2006, Lehman was named a Managing Director of The Goldman Sachs Group, Inc.

(d)     Michael Swenson ("Swenson"), was, at relevant times, a Managing Director in the Structured Products Group Trading for The Goldman Sachs Group, Inc.

(e)     Peter Ostrem ("Ostrem"), was, at relevant times, Head of Goldman's CDO Origination Desk.  On October 26, 2007, Ostrem was named a Managing Director in The Goldman Sachs Group, Inc.

(f)     Joshua Birnbaum ("Birnbaum") was, at relevant times, a Managing Director in the Structured Products Group Trading for The Goldman Sachs Group, Inc.  He was among the Mortgage Department's top traders in ABX assets.

(g)     Fabrice Tourre ("Tourre"), was, at relevant times, an Executive Director in the Structured Products Group Trading for The Goldman Sachs Group, Inc.  Tourre also worked at the Correlation Desk and was principally involved as a lead salesman in the Abacus CDO transaction.

- 12 -

(h)     Jonathan Sobel ("Sobel") was, at relevant times, Head of Goldman's Mortgage Department.  Sobel is also a Managing Director for The Goldman Sachs Group, Inc.

(i)     Benjamin Case ("Case"), was, at relevant times, employed as a trader by Goldman Sachs & Co. on the CDO Origination Desk.  Case was assigned lead responsibility for carrying out Goldman's liquidation agent functions.

(j)     Matthew Bieber ("Bieber") was, at relevant times, employed on the CDO Origination Desk by Goldman Sachs & Co.  Bieber was the assigned Deal Captain for the Anderson CDO.

(k)     J. Michael Evans ("Evans"), was, at relevant times, Vice Chairman of The Goldman Sachs Group, Inc.

(l)     Jon Winkelried ("Winkelried"), was, at relevant times, Co-President of The Goldman Sachs Group, Inc.

(m)     Harvey Schwartz ("Schwartz"), was, at relevant times, Managing Director, Head of Global Sales and a Co-Head of the Securities division at The Goldman Sachs Group, Inc.

(n)     Tom Montag ("Montag"), was, at relevant times, a Member of the Management Committee and Equities/FICC Executive Committee, and Co-Head of Global Securities at The Goldman Sachs Group, Inc.

(o)     David Solomon ("Solomon"), was, at relevant times, Head of Investment Banking at The Goldman Sachs Group, Inc.

(p)     Craig Broderick ("Broderick"), was, at relevant times, Chief Credit Officer of The Goldman Sachs Group, Inc.

(q)     Melanie Herald-Granoff ("Herald-Granoff"), was, at relevant times, Vice-President of the Mortgage Bond-Trading Department at The Goldman Sachs Group, Inc.

- 13 -

(r)     Mehra Cactus Raazi ("Raazi"), was, at relevant times, a Broker at The Goldman Sachs Group, Inc.

## V.     CLASS ACTION ALLEGATIONS

43.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who purchased or otherwise acquired Goldman common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Goldman has over 525 million shares of common stock outstanding, owned by hundreds if not thousands of persons.

45.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the Exchange Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business and management of Goldman;

(c)     whether the price of Goldman common stock was artificially inflated; and

(d)      to what extent the members of the Class have sustained damages and the appropriate measure of damages.

46.      Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

47.      Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

48.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**VI.    FACTS SUPPORTING DEFENDANTS' FALSE AND MATERIAL MISSTATEMENTS AND OMISSIONS AND SCIENTER AFTER THE SEC NOTIFIED GOLDMAN IN JULY 2009 THAT IT HAD RECOMMENDED FILING SECURITIES FRAUD CHARGES**

49.      The first category of false and misleading statements and omissions are those from July 2009 until June 2010, in which Goldman concealed from its quarterly and year-end SEC filings, press releases and investor conference calls that the Company had been notified in July 2009, via a formal Wells Notice, that the SEC had recommended filing securities fraud charges relating to Goldman's conduct in connection with Abacus.  By failing to disclose the Wells Notice, Goldman hid its improper conduct of betting against (or allowing a favored client to bet against) the very toxic securities that Goldman designed to fail and packaged and sold to its clients.

A.      **Goldman's Undisclosed Conduct in Connection with Abacus**

50.      Abacus 2007-AC1 was a $2 billion synthetic CDO[3] whose reference obligations were BBB rated mid and subprime RMBS securities issued in 2006 and early 2007.  It was the last in a series of 16 Abacus CDOs referencing residential mortgage backed securities ("RMBS") designed by Goldman.  Goldman served as the underwriter or placement agent, the lead manager, and the protection buyer, and also acted in other roles related to the CDO.

51.      In mid-to-late 2006, Goldman was approached by the hedge fund Paulson, and asked to structure a transaction that would enable the hedge fund to short multiple RMBS securities.  Goldman had previously worked with Paulson and was aware that Paulson held strong negative views of the residential mortgage market and was making investments based on that view.  The Goldman Mortgage Capital Committee Memorandum seeking approval of Abacus 2007-AC1, for example, stated:

> Paulson is a large macro hedge fund that has taken directional views on the subprime RMBS market for the past few months.  In 2006 the Desk worked an order for Paulson to buy protection on a supersenior tranche off a portfolio similar to the Reference Portfolio selected by ACA, and the AC1 Transaction is another mean[s]

---

[3]      A synthetic CDO such as Abacus combines a CDO and CDS.  A CDO is an asset-backed security based on a portfolio of fixed-income collateral or notes, such as RMBS.  To establish a CDO, an investment bank, such as Goldman, incorporates a special purpose vehicle ("SPV") to which equity investors contribute capital.  A credit default swap ("CDS") is an over-the-counter (*i.e.*, not traded on formal exchange) derivative contract referencing a bond or other financial obligation (the "reference obligation").  The parties to a CDS are referred to as the protection buyer and the protection seller.  The protection buyer makes fixed periodic payments, commonly referred to as premiums, to the protection seller.  In exchange, the protection seller agrees to make a "contingent payment" to the protection buyer if the reference obligation experiences a defined credit event, such as a default.  In the Abacus transaction, the sellers of protection and the noteholders take the long position – meaning they both take the position that the reference portfolio will perform – while the buyers of protection take the short position – meaning they take the position that the reference portfolio will default.

for Paulson to accomplish their trading objective: buying protection in tranched format on the subprime RMBS market.

52.     An email sent to Daniel Sparks, head of the Mortgage Department, by Fabrice Tourre, a Correlation Trading Desk employee who led the effort on the Abacus CDO for Paulson, was even more blunt:

> Gerstie and I are finishing up engagement letters . . . for the large RMBS CDO ABACUS trade that will help Paulson short senior tranches off a reference portfolio of Baa2 subprime RMBS risk selected by ACA.

53.     These documents make it clear that Goldman knew Paulson's investment strategy was to identify a reference portfolio of assets for the Abacus CDO that Paulson believed would perform poorly or fail, so that its short position would profit at the expense of the long investors. In addition, during his Subcommittee interview, Tourre made it clear that he was aware of the Paulson investment strategy.

54.     Out of concern for its reputation, at least one investment bank that Paulson approached prior to Goldman declined to assist Paulson in structuring what would eventually be called Abacus. Scott Eichel of Bear Stearns, who reportedly met with Paulson several times, has been quoted as saying that Paulson wanted: "especially ugly mortgages for the CDOs, like a bettor asking a football owner to bench a star quarterback to improve the odds of his wager against the team." According to Eichel, such a transaction "didn't pass [Bear's] ethics standards; it was a reputation issue, and it didn't pass our moral compass. We didn't think we should sell deals that someone was shorting on the other side."

55.     In response to the inquiry from Paulson, Goldman proposed structuring an Abacus CDO. Fabrice Tourre was given lead responsibility for organizing and structuring the Abacus transaction. Goldman's primary role was to act as an agent and administrator of the CDO, obtaining its profit from the fees it charged for the services rendered, rather than from any investment in the

- 17 -

CDO itself.  In effect, Goldman "rented" the Abacus platform to the Paulson hedge fund and served

as Paulson's agent in carrying out the hedge fund's investment objectives.

56.    Paolo Pellegrini, Paulson's Managing Director who led Paulson's selection of the

reference assets for the Abacus 2007-AC1 transaction, told the SEC that it was Goldman's idea to

have a portfolio selection agent.  At the same time, Goldman internal communications made it clear

that the objective was to select a portfolio selection agent that would comply with Paulson's

suggestions for the assets to be referenced in the CDO.  In an email to colleagues discussing the

matter, Tourre suggested finding a manager that:

> will be flexible w.r.t. [with respect to] portfolio selection (*i.e.*, ideally we will send
> them a list of 200 Baa2-rated 2006-vintage RMBS bonds that fit certain criteria, and
> the portfolio selection agent will select 100 out of the 200 bonds).

57.    In the early part of January 2007, Tourre sent an email to prospective selection agents

describing their anticipated role in the CDO.  One of his points was the following:

> Reference Portfolio: static, fully identified upfront, and consisting of approx 100
> equally-sized mezzanine subprime RMBS names issued between Q4 [the fourth
> quarter of] 2005 and today.  Starting portfolio would be ideally what the Transaction
> Sponsor shared, but there is flexibility around the names.

58.    Jonathan Egol, chief architect of the Abacus structure and head of the Correlation

Trading Desk, suggested that Goldman approach GSC Partners ("GSC"), a New York hedge fund

that Goldman had worked with on other CDOs, including Anderson.  Tourre sent an email to

colleagues asking:

> Do you think gsc is easier to work with than faxtor? They will never agree to the type
> of names paulson want[s] to use, I don't think steffelin [a senior trader at GSC] will
> be willing to put gsc's name at risk for small economics on a weak quality portfolio
> whose bonds are distributed globally.

A colleague replied:

> There are more managers out there than just GSC / Faxtor.  The way I look at it, the
> easiest managers to work with should be used for our own axes.  Managers that are a

- 18 -

bit more difficult should be used for trades like Paulson given how axed Paulson seems to be (i.e. I'm betting they can give on certain terms and overall portfolio increase).

59.     On January 4, 2007, on behalf of Paulson, Goldman approached GSC as well as two other companies to act as the portfolio selection agent for the Abacus CDO.  Shortly thereafter, Tourre reported to his colleagues that GSC had declined the offer to act as the Abacus portfolio selection agent due to its negative views of the assets Paulson wanted to include in the CDO:

> As you know, a couple of weeks ago we had approached GSC to ask them to act as portfolio selection agent for that Paulson-sponsored trade, and GSC had declined given their negative views on most of the credits that Paulson had selected.

60.     Later, when Goldman began to market Abacus 2007-AC1 securities, Edward Steffelin, a senior trader at GSC, sent an email to Peter Ostrem, head of Goldman's CDO Origination Desk saying: "I do not have to say how bad it is that you guys are pushing this thing."  When asked by the Subcommittee what he meant, Steffelin responded that he believed that particular Abacus CDO created "reputational risk" for GSC as the collateral manager and for the whole market.

61.     Without disclosing Paulson's intended role as the sole short party, Goldman and Paulson approached ACA Capital Management, LLC ("ACA"), a company with experience in selecting assets for CDOs.  ACA agreed to act as the portfolio selection agent and Goldman employees expressed hope that ACA's involvement would improve the sales of the Abacus securities.  In an internal memorandum seeking approval of the CDO, for example, Goldman personnel wrote: "We expect to leverage ACA's credibility and franchise to help distribute this Transaction."

62.     During January, February, and March 2007, the Abacus reference assets were selected.  The Paulson hedge fund initiated the asset selection process by providing Goldman with criteria for choosing RMBS securities for the CDO.  According to Tourre, Goldman's subsequent

- 19 -

identification of candidate assets was essentially ministerial, as Paulson's specified criteria had restricted the scope of the RMBS securities that could be proposed.  For example, Paulson wanted RMBS securities that had adjustable rate mortgages, low borrower FICO scores, and mortgages in states with slowing home price appreciation, like Arizona, California, Florida, and Nevada.  Paulson specifically required 2006-vintage or 2007-vintage subprime RMBS that were rated BBB by S&P or Baa2 by Moody's.  Goldman sent Paulson a database and spreadsheet listing the securities that met Paulson's criteria.  Paulson used that database to select 123 securities, and Goldman forwarded the resulting list to ACA.  Over the next two months, a series of negotiations and meetings took place to finalize selection of the reference assets and the structure of the CDO.

63.    On March 22, 2007, ACA and Paulson agreed on the final $2 billion reference portfolio for Abacus 2007-AC1.  The assets consisted of 90 Baa2 rated mid and subprime RMBS securities issued after January 1, 2006.

64.    Goldman characterized Paulson's participation in the asset selection process as one in which the hedge fund merely "express[ed] [its] views" about the reference portfolio, which often happens in synthetic CDO transactions.  The evidence indicates, however, that Paulson did more than express its views; it played an active and determinative role in the asset selection process.  Paulson established the criteria used to identify the initial list of RMBS securities, proposed a majority of the reference assets in the final portfolio, and approved 100% of the reference assets.

65.    Moreover, the "views" expressed by Paulson directly conflicted with the interests of the investors to whom Goldman was marketing the Abacus 2007-AC1 deal.  Pellegrini was quite clear about Paulson's intentions in a deposition with the SEC:

> Question: Your portfolio analysis was designed in large part to identify bonds that weren't going to perform, right?
>
> Answer: Right.

- 20 -

Question: Because you wanted to short those bonds?

Answer: Right.

66.     Notwithstanding Paulson's direct involvement in the asset selection process, the Abacus Marketing book falsely identified ACA as the only portfolio selection agent for the CDO, and stated that the portfolio selection agent had selected the reference assets.  The Abacus Offering Memorandum stated: "The Initial Reference Portfolio will be selected by ACA Management, L.L.C."

67.     Evidence obtained by the Senate Subcommittee indicates that Paulson's role in the Abacus asset selection process and its investment objectives for the CDO were not fully or accurately disclosed to key parties or investors at the time the CDO was being structured and sold.

68.     Moody's, one of the credit rating agencies asked to rate the Abacus securities, was not informed of Paulson's role or investment objectives.  At a Senate Subcommittee hearing on the role of the credit rating agencies in the financial crisis, Eric Kolchinsky, a former Moody's managing director who oversaw its CDO ratings and was familiar with Abacus 2007-AC1, provided sworn testimony that he had not known of Paulson's involvement with the CDO at the time it was rated, did not know of Paulson's role in selecting the referenced assets, and believed his staff did not know either.  He testified that allowing an entity that wants a CDO to "blow up" to pick its assets "changes the whole dynamic," and was information that he would have wanted to know when rating the securities:

> Senator Levin:  And were you or your staff aware at the time that Moody's was working on the ABACUS rating that Paulson was shorting the assets in Abacus and playing a role in selecting referenced assets expected to perform poorly?
>
> Mr. Kolchinsky: I did not know, and I suspect, I am fairly sure, that my staff did not know either.
>
> Senator Levin:  And are these facts that you or your staff would have wanted to know before rating ABACUS?

- 21 -

Mr. Kolchinsky:  From my personal perspective, it is something that I would have wanted to know because it is more of a qualitative not a quantitative assessment if someone who intends the deal to blow up is picking the portfolio.  But, yes, that is something that I would have personally wanted to know.  It changes the incentives in the structure.

Senator Levin:  Are people usually putting deals together that want the deal to succeed?  Isn't that the usual assumption?

Mr. Kolchinsky:  That is the basic assumption, yes.

Senator Levin:  And if the person wanting the deal to blow up is picking the assets, that would run counter to what the usual assumption is?

Mr. Kolchinsky:  It just changes the whole dynamic of the structure where the person who is putting it together, choosing it, wants it to blow up.

Moody's assigned AAA ratings to two tranches of the Abacus CDO.

69.     ACA told the Senate Subcommittee that, throughout the asset selection process, it was not informed and remained unaware of Paulson's true investment objective, which was to identify and short a set of assets that it believed would not perform and would lose value.  According to ACA, it believed that Paulson was going to be a long investor in the CDO through its purchase of the equity share that would incur the first losses in the CDO.

70.     Contemporaneous ACA documents support that position.   An internal ACA Commitments Committee Memorandum on Abacus 2007-AC1 dated February 12, 2007, for example, stated: "The hedge fund is taking the 0-9% tranche."  Ten days later, on February 23, 2007, the ACA Managing Director who worked on the Abacus transaction spoke with a Goldman representative, and took notes of the conversation which stated in part: "Paulson taking 0-10%."

71.     In April 2007, the same ACA Managing Director sent an email to the CEO and President of ACA's parent company, ACA Capital Holdings Inc., which was considering buying Abacus securities for itself.  Her email stated: "We did price $192 million in total of Class A1 and A2 today to settle April 26th.  Paulson took down a proportionate amount of equity (0-10% tranche)."

- 22 -

72.     In addition, on January 10, 2007, a few days after ACA was first approached by Goldman about working on the Abacus CDO, Tourre sent ACA a "Transaction Summary" describing the proposed transaction.  The Transaction Summary identified the Paulson hedge fund as the "Transaction Sponsor," described the "Contemplated Capital Structure" of the CDO, and indicated that the lowest tranche, "[0]%-[9]%," was "pre-committed first loss."  The ACA Managing Director told the Subcommittee that the "[0]%-[9]%" tranche identified in the Transaction Summary matched the general description of an equity tranche, and the wording suggested that someone had already committed to buy it.  She explained that it was typical for a CDO sponsor to purchase the equity tranche, and she believed that Paulson, as the Abacus "sponsor," had committed to buy that tranche.

73.     The Abacus Marketing book also specified that the "First Loss" tranche of the CDO, of a "[+10%]" size, was "Not Offered" for sale.  The ACA Managing Director declared in a statement to the SEC that she had interpreted the phrase, "Not Offered," to indicate the equity tranche had been "pre-placed" and "ha[d] already been committed to purchase by an investor and [would] not be marketed."  She thought that investor was the Paulson hedge fund.

74.     When asked about the Transaction Summary description of the lowest tranche in the Abacus CDO, Tourre told the Senate Subcommittee that the phrase "pre-committed first loss" normally indicated that the tranche had been sold.  He stated that he actually meant to communicate that the tranche had not been sold, and that portion of the Transaction Summary was poorly worded.

75.     ACA has since filed a civil lawsuit against Goldman asserting that Goldman did not inform ACA that "Paulson intended to take an enormous short position" in Abacus and is seeking compensatory damages and punitive damages for fraudulent inducement, fraudulent concealment, and unjust enrichment.

- 23 -

76.     Regardless of the communications between Goldman and ACA, it is clear that the Abacus marketing material and offering documents provided by Goldman to investors contained no mention of Paulson's short position in the CDO nor the significant role it played in the selection of the CDOs reference assets.  This was confirmed by Tourre at the Senate Subcommittee hearing:

> Senator Levin: And was it reflected in the Goldman Sachs security offering to investors that Paulson had been part of the selection process?  Was that represented in that document?
>
> Mr. Tourre: Paulson was not disclosed in the Abacus 07 AC-1 transaction, Mr. Chairman.
>
> Senator Levin: It was not?
>
> Mr. Tourre: No, it was not.

77.     Still another troubling omission was Goldman's failure to advise potential Abacus investors that the firm's own economic interests were aligned with those of the Paulson hedge fund. As part of the Abacus CDO arrangement, Paulson agreed to pay Goldman a higher fee if Goldman could provide Paulson with CDS contracts containing premium payments below a certain level.  The problem with the fee incentive offer was that, while lower premiums would result in lower costs to Paulson, it would also result in lower premium payments to the CDO, directly reducing the amount of cash available to the long investors.  The Paulson-Goldman compensation arrangement, thus, created a direct conflict of interest between Goldman and the investors to whom it was selling the Abacus securities.

78.     Abacus 2007-AC1 closed, and its securities were issued on April 26, 2007.  They were issued later than the securities from the Hudson, Anderson, and Timberwolf CDOs and hit the market as subprime mortgages were hitting record delinquency and default rates.  Goldman sold the Abacus 2007-AC1 securities to just three investors: IKB, the German bank; ACA, the portfolio selection agent; and ACA Financial Guaranty Corp., the owner of ACA and a wholly owned

subsidiary of ACA Capital Holdings Inc.  IKB bought $150 million of the AAA rated Abacus

securities.  ACA bought about $42 million in the AAA securities for placement in another CDO it

was managing.  ACA Financial Guaranty Corp. was by far the largest investor, taking the long side

of a $909 million CDS contract referencing the super senior portion of the CDO.  Goldman took the

short side of the CDS contract, which it then transferred to Paulson.

79.     Within months, the high risk subprime mortgages underlying the RMBS securities

referenced in the Abacus portfolio incurred steep rates of default, and the Abacus securities began to

lose value.  According to the SEC, by October 2007, six months after the securities were issued, 83%

of the underlying assets had received a credit rating downgrade and 17% of the underlying assets had

been placed on a negative credit watch.  On October 26, 2007, a Goldman employee sent an email

about Abacus 2007-AC1 with an assessment even more negative than that of the SEC:

> This deal was number 1 in the universe of CDO's that were downgraded by
> MOODY'S and S&P.  99.89% of the underlying assets were downgraded.

80.     While Sparks testified that, in 2007, the Mortgage Department expected its CDOs "to

perform," a contemporaneous draft presentation that he helped prepare in May 2007 stated that the

"desk expects [the CDOs] to underperform."  Many other emails provide his negative views of the

CDO market at the time, including emails in which Sparks described the subprime market as "bad

and getting worse," and directed Goldman's mortgage traders to "[g]et out of everything," and "stay

on the short side."  He wrote, among other things: "Game over," "bad news everywhere," and "the

business is totally dead."

81.     The three long investors in Abacus 2007-AC 1 together lost more than $1 billion.  As

the sole short investor, Paulson recorded a corresponding profit of about $1 billion.

82.     In addition to reaping the millions of dollars in fees for structuring the Abacus 2007-

AC 1 CDO, Goldman also profited by purchasing CDS protection or equity puts on ACA's stock,

essentially betting that the stock price would fall or the company would lose value.  Specifically,

after ACA Financial Guaranty Corp., the parent company of ACA Management which acted as the

collateral manager of Abacus 2007-AC1, purchased Abacus securities, Goldman purchased the short

side of a CDS contract that referenced ACA Financial Guaranty.  Once ACA Financial Guaranty

encountered extreme financial distress in late 2007, Goldman made millions of dollars from ACA's

misfortune – ironically, misfortune ultimately caused by Goldman.

### B.  The SEC Files Securities Fraud Charges that Goldman Settled for $550 Million

83.     On April 16, 2010, the SEC filed a complaint against Goldman and Tourre alleging

violations of Section 17(a) of the Securities Act of 1933, as well as Section 10(b) and Rule 10b-5 of

the Exchange Act.  The SEC contended that Goldman had failed to disclose to potential investors

materially adverse information to its clients, stating:

> In sum, GS&Co arranged a transaction at Paulson's request in which Paulson heavily influenced the selection of the portfolio to suit its economic interests, but failed to disclose to investors, as part of the description of the portfolio selection process contained in the marketing materials used to promote the transaction, Paulson's role in the portfolio selection process or its adverse economic interests.

84.     The day after the SEC filing, Lorin Reisner ("Reisner"), Deputy Director, Division of

Enforcement, wrote in an e-mail to John Nester ("Nester"), Director, Office of Public Affairs, and

Robert Khuzami ("Khuzami"), Deputy Director, Division of Enforcement:

> Goldman's counsel had numerous discussions with staff and a senior-level meeting in DC with Rob and me.  No mention of pursuing settlement by Goldman.  It was obvious that *we were serious and planned to pursue charges*.

85.     On April 18, 2010, Khuzami wrote in an e-mail to Nester, Reisner and others:

> [Goldman] attended a March mtg on [the Goldman Manager] and the *seriousness of the matter was quite apparent*.  Every other counsel we have been involved with in a Wells process *knows it is serious and conveys an intent to recommend charges* and thus lets us know that settlement is an option, or asks for that heads-up if charges are imminent.

- 26 -

86.     On July 14, 2010, Goldman reached a $550 million settlement with the SEC.  In connection with the settlement, Goldman acknowledged:

> [T]he marketing materials for the ABACUS 2007-AC1 transaction contained incomplete information.  In particular, it was a mistake for the Goldman marketing materials to state that the reference portfolio was "selected by" ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.

87.     In sum, Goldman failed to disclose to its own clients that it had engaged in fraudulent conduct which created clear conflicts of interest with its clients, including that it constructed Abacus to help Paulson, a favored client short multiple RMBS securities, and profit at the expense of other Goldman clients.  Goldman further failed to disclose that it allowed Paulson to play a significant role in the selection of the CDOs referenced assets, while employing an outside portfolio agent to give the impression that the CDO assets were selected by a disinterested third party.  Goldman also failed to disclose Paulson's investment objective and asset selection role to a credit rating agency that assigned AAA ratings to two tranches of the Abacus securities.  In addition, Goldman failed to disclose to the investors its compensation arrangement that provided incentives for Goldman to minimize the premium payments into the CDO.  Within six months, the Abacus securities began incurring losses and ratings downgrades.  Goldman watched its clients to whom it had sold the securities lose virtually all the funds they had invested, while its favored client Paulson walked away with a profit of approximately $1 billion.

### C.     Goldman's Receipt of the Wells Notice in July 2009

88.     In August 2008, the SEC notified Goldman that it was commencing an investigation into Abacus and served Goldman with a subpoena.  Goldman responded by producing approximately eight million pages of documents.  The SEC took five days of testimony from Goldman's most senior management with responsibility over the Abacus transaction.  Among others, the SEC took

testimony from Gail Kreitman, a managing director, Melanie Herald-Granoff, a vice-president in the mortgage bond-trading department, and Fabrice Tourre, the Goldman vice president with lead responsibility for structuring and marketing Abacus.

89.     In early February 2009, four senior personnel at Goldman were informed that Tourre and another Goldman employee (later identified as Jonathan Egol) had been asked to give testimony in connection with the SEC investigation.

90.     On July 29, 2009, the SEC issued a Wells Notice to Goldman.  A Wells Notice provides notice to a person or entity that the SEC intends to recommend an enforcement action and affords the respondent an opportunity to respond concerning the recommendation.

91.     Goldman provided written Wells submissions to the SEC Enforcement Staff on September 10 and September 25, 2009, formally met with the SEC Enforcement Staff on September 15, 2009, and Goldman senior management and counsel met with the SEC Enforcement Staff on a number of occasions up until the April 16, 2010 SEC fraud charge, even as it provided both formal and informal responses to the SEC.  Goldman hid existence of the Wells Notice, omitting any mention in its financial statements and public announcements.

92.     Top-level senior managers at Goldman were consulted with and made aware of the SEC investigation, including the Wells Notices.  Yet, during the Class Period, Goldman did not reveal any information pertaining to this investigation.  Nor was information about the SEC investigation available to the public.

93.     The SEC Enforcement Staff also issued a Wells Notice to Tourre on September 28, 2009.  Tourre made a written Wells submission on October 26, 2009, and met with the SEC Enforcement Staff on October 29, 2009.

94.     Additionally, on January 29, 2010, the SEC Enforcement Staff issued a Wells Notice to a "Goldman Manager" on the Abacus transaction, subsequently identified as Jonathan Egol who was head of Goldman's Correlation Trading Desk.  Egol provided a written Wells submission on February 24, 2010 and met with the Staff on March 4, 2010.

95.     In direct violation of long-standing rules set forth by its domestic and international regulators, FINRA and FSA, respectively, Goldman failed to timely report Wells Notices issued to Tourre and Egol, who played primary roles in Abacus.  Until the SEC filed its securities fraud complaint against Goldman on April 16, 2010, Goldman hid the Wells Notice received by the Company and the Wells Notices received by Tourre and Egol from its investors and regulators, as well as the existence of an SEC investigation.

96.     Had Goldman timely disclosed the Wells Notices served on the Company, or either of its two employees, the public would have discovered the SEC investigation of the Abacus transaction and Goldman's undisclosed fraudulent conduct.

97.     From the time Goldman received the first Wells Notice in July 2009 until the SEC filed its complaint on April 16, 2010, Goldman failed to disclose that it could potentially suffer corresponding material adverse effects, including:

(a)     the filing of a formal SEC complaint;

(b)     questions arising as to Goldman's integrity and the manner in which it conducts various lines of business;

(c)     the impairment of certain highly profitable lines of business as a result of any governmental investigations;

(d)     the impairment of certain highly profitable lines of business as a result of a loss of confidence in Goldman in the marketplace by clients that would normally do business with Goldman; and

(e)     the possibility of criminal prosecution arising as a result of the civil investigation that would further disrupt Goldman's lines of business and cause further long-term damage to its professional reputation.

98.     Additionally, Goldman's failure to disclose the SEC investigation and Wells Notices from both the investing public and from its foreign and domestic regulators strongly suggests a knowing effort to conceal rather than a mere failure of oversight.

99.     Goldman's failure to timely disclose any Abacus Wells Notice, rendered its statements from August 2009 through April 2010 false, incomplete, and misleading and caused its stock to trade at artificially inflated levels during the Class Period.   Upon news of the SEC complaint, on April 16, 2010 Goldman's stock plummeted from $184.27 to $160.70 per share, causing more than a $13 billion loss in shareholder value.

**D.     Goldman Admitted that It Violated the Rules of Its Securities Regulators by Failing to Disclose Its Receipt of Wells Notices Relating to Abacus**

100.     On May 10, 2010, Goldman disclosed that it had received notices of investigation from FINRA, the industry's self-regulator, and Britain's FSA relating to the Company's conduct in connection with Abacus.   On November 9, 2010, FINRA announced that it had fined Goldman $650,000 for failing to disclose that Fabrice Tourre, the trader primarily responsible for structuring and marketing Abacus, and another employee, had received a Wells notice in September 2009.

101.     Goldman admitted in its settlement with FINRA that it hid the Wells Notice received by Tourre from the investing public in violation of FINRA rules.   Specifically, under NASD Conduct Rule 3010 and FINRA Rule 2010, financial firms, like Goldman, are required to report a

Wells Notice to FINRA within 30 days.  The existence of the Wells Notice is then posted in a database that can be viewed by the public.  As explained in Goldman's Settlement with FINRA:

> In August 2008, the SEC began seeking information from Goldman regarding Abacus, including the names of the principal employees responsible for Abacus and emails related to the CDO offering.  Over the next year and a half, the SEC obtained documents and testimony from Goldman and a number of its employees related to the genesis, structuring and marketing of the Abacus transaction.

> Tourre had worked as a Vice President on the structured product correlation trading desk at Goldman's headquarters in New York City when Abacus was structured and marketed.  On March 3-4, 2009, Tourre, who at the time had become an Executive Director working in London for the firm's Goldman Sachs International ("GSI") affiliate, testified at the SEC in Washington, D.C. in connection with the Abacus investigation.[4]

> *Tourre's counsel received a written Wells Notice, dated September 28, 2009, stating that the staff of the SEC intended to recommend that the SEC file a civil action and institute a public administrative proceeding against Tourre alleging that he violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder in connection with the CDO offering*.  Tourre was registered with FINRA through Goldman at the time he received the Wells Notice.  *Tourre's counsel immediately informed Goldman's Legal Department that the Wells Notice had been received*.

> *          *          *

> *Thus, receipt of a written Wells notice clearly triggers a reporting obligation on a person's Form U4*.  Despite the fact that the reporting obligation clearly existed, Goldman failed to ensure that Tourre's Form U4 was amended within 30 days of its knowledge of the Wells Notice, as required under the By-Laws. *Tourre's Form U4 was not amended until May 3, 2010, more than seven months after Goldman learned of the Wells Notice, and only after the SEC filed its Complaint against Goldman and Tourre on April 16, 2010 (resulting in extensive news coverage.)*

---

[4]     GSI is a London-based wholly owned subsidiary of The Goldman Sachs Group, Inc.  GSI is not a FINRA member firm.  In a settlement with the United Kingdom's FSA announced on September 9, 2010, GSI paid a substantial fine in connection with the FSA's finding that GSI had failed to have proper and effective systems and controls in place to ensure that its Compliance department was apprised of information about the SEC's investigation of Goldman and Tourre.

625194_1

102.     As detailed in the FINRA Settlement, Goldman also hid receipt of an additional Wells Notice to another unidentified Goldman employee (later identified as Egol) from the investing public.

*Goldman's failure vis-à-vis Tourre's Form U4 was not an isolated incident*. Another Goldman employee in New York also received a written Wells Notice during the Relevant Period [Between November 2009 and May 2010], indicating that the staff of a regulatory agency had made a preliminary determination to recommend that disciplinary action be brought against him. The employee was registered with FINRA through Goldman at the time he received the Wells Notice. *In this instance, too, Goldman's Legal Department was promptly informed that a Wells Notice had been received*. Goldman, however, did not ensure that the Form U4 was amended within 30 days of its knowledge of the Wells Notice, as required under the By-Laws.

103.     In settling with FINRA, Goldman admitted:

Between November 2009 and May 2010 (the "Relevant Period"), in two instances Goldman failed to update Uniform Applications for Securities Industry Registration or Transfer ("Forms U4") to disclose investigations when it was required to do so by FINRA By-Laws, Article V, Section 2(c). In the first instance, Goldman failed to file an amendment to Form U4 to disclose that Fabrice Tourre had received a "Wells Notice" from the Securities and Exchange Commission ("SEC") in connection with the agency's investigation of an offering of a synthetic collateralized debt obligation ("CDO") called Abacus 2007-AC I ("Abacus"). In the second instance, Goldman failed to amend another employee's Form U4 to disclose that he had received a Wells Notice.

*            *            *

*By reason of the foregoing, Goldman violated NASD Conduct Rule 3010 and FINRA Rule 2010.*[5] **Goldman consents to the imposition of a censure and a fine of $650,000**, and an undertaking that it will certify that it has conducted a review of its procedures and systems concerning Form U4 amendments and compliance with FINRA By-Laws, Article V, Section 2(c) and implemented any necessary revisions.

Form U4 is used to register associated persons of broker-dealers with the appropriate jurisdiction(s) and/or self regulatory organization(s) ("SROs"). Disclosures made in response to the questions on Form U4 play a vital role in the securities industry. The disclosures are used to determine and monitor the fitness of

---

[5]     NASD Conduct Rule 3010 became FINRA Rule 2010 effective December 15, 2008.

securities professionals.  Timely, truthful, and complete answers on Form U4 are essential to meaningful regulation.

104.    The FINRA Settlement also details the fact that **Goldman actively hid the Wells Notices from its Global Compliance division**.  Senior executives and attorneys at Goldman had knowledge of the Tourre Wells Notice but **treated the information as confidential and shared it only on a "need to know" basis**:

> Global Compliance is the Division within Goldman that advises and assists the Firm's businesses to ensure compliance with applicable laws and regulations. . . . Global Compliance Employee Services ("GCES") manages registrations, outside interests and private investments.  The "Registrations Group" within GCES is responsible for filing initial Forms U4 and amendments thereto.

> For GCES to fulfill its responsibility, other sources within Goldman must identify and communicate reportable events to GCES.  In the two instances here, GCES was not timely informed of the Wells Notices.  **In the case of Tourre, knowledge that he had received a Wells Notice was limited to a small circle of people inside the firm, including certain senior staff and attorneys, who treated the information as confidential and shared it only on a "need to know" basis**.  The fact that a Wells Notice had been received was not communicated to GCES, and Tourre's Form U4 was not timely amended.

> The divisional compliance personnel embedded in the business units where Tourre worked in London (for GSI) and where the other individual worked in New York (for Goldman) were not informed when the firm learned about the Wells Notices.

*       *       *

> **By reason of the foregoing, Goldman violated NASD Conduct Rule 3010 and FINRA Rule 2010.**

105.    Goldman was also heavily fined by the United Kingdom's financial regulator, the FSA, for the same conduct – failing to disclose the Abacus-related Wells Notices.  On September 9, 2010, the FSA announced the **second largest fine in its history**, penalizing Goldman nearly $27 million for failing to disclose (a) the SEC's investigation, (b) the Goldman Wells Notice, and (c) the Tourre Wells Notice.

- 33 -

106.    The FSA stated in its September 9, 2010 Final Notice of Penalty ("FSA Notice") its

reasons for the substantial fine:

> The FSA imposes the financial penalty on GSI for breaches of Principles 2, 3 and 11 in relation to:
>
> (1) GSI's failure to inform the FSA, until 16 April 2010, that the staff of the United States Securities and Exchange Commission ("SEC") had indicated by a Wells Call on 28 September 2009 that it would serve, and then on 29 September 2009 served, a Wells Notice indicating the SEC staff's proposal to recommend an enforcement action for serious violations of US securities law by an approved person employed by GSI, Mr. Fabrice Tourre, relating to his prior activities when working in the US for Goldman, Sachs & Co. ("the Tourre Wells Notice");
>
> (2) GSI's failure to ensure that it had proper and effective systems and controls in place for the communication to GSI Compliance of information about regulatory investigations relating to other members of The Goldman Sachs Group, Inc. ("GS Group") that might affect GSI, as a result of which GSI failed to consider providing the FSA with information concerning the SEC's investigation ("the SEC Investigation") into the Abacus 2007-AC1 synthetic collateralised debt obligation ("Abacus" or "the Abacus transaction"), which Goldman, Sachs & Co. ("GSC") structured and which was marketed to sophisticated institutional investors, including by GSI from the UK. ***This could have been considered from February 2009 when approved persons at GSI were called to give testimony to the SEC regarding Abacus  and should have been considered at the latest in July 2009, when GSC received a Wells Notice from the SEC staff indicating the SEC staff's proposal to recommend an enforcement action against GSC for serious violations of US securities law relating to Abacus*** ("the GSC Wells Notice"); and
>
> (3) GSI's failure to conduct its business with due skill, care and diligence with respect to its regulatory reporting obligations.
>
> *            *            *
>
> During the Relevant Period, GSI breached Principle 2 by failing to conduct its business with due skill, care and diligence in relation to its regulatory reporting obligations.  Specifically, GSI failed to consider the regulatory implications for GSI of the SEC Investigation, including the GSC Wells Notice and the Tourre Wells Notice.

107.    The FSA viewed Goldman's failings as "***particularly serious***" because, *inter alia*:

> (2) Given GSI's sophistication and global operations and the operation of Goldman Sachs as an integrated global firm, it should have had in place systems and controls that were effective to ensure relevant information concerning the SEC Investigation (and the Wells Notices issued to GSC and Mr. Tourre) potentially affecting GSI was

- 34 -

communicated appropriately and, in particular, to its compliance department to enable it to consider whether it needed to make appropriate notifications to the FSA;

(3) In particular, throughout the Relevant Period, there were *a number of developments which either individually or cumulatively should have been brought to the attention of GSI's compliance function so that it could properly consider their impact on GSI's regulatory reporting obligations*. This, however, did not occur. These developments included the following:

(a)     when (from February 2009) the SEC staff indicated its intention to interview and subsequently (in March and May 2009) took testimony from certain GSI employees, who were holders of FSA-approved functions, for the purposes of its investigation;

(b)     when the SEC staff issued a Wells Notice to GSC in respect of the SEC staff's proposal to recommend an enforcement action for serious violations of US securities law relating to Abacus, which was marketed and sold by GSI from the UK to sophisticated institutional investors (on 28 July 2009); and

(c)     when the SEC staff indicated that it would recommend enforcement action against Mr. Tourre, a GSI employee and the holder of a controlled function, by a Wells Call on 28 September 2009 and subsequently issued a Wells Notice to Mr. Tourre indicating the SEC staff's proposal to recommend an enforcement action for serious violations of US securities law against him personally (on 29 September 2009);

(4) A number of *senior managers* and other GSI personnel, *including approved persons, were aware of certain aspects of the SEC Investigation*, including that Mr. Tourre had received a Wells Notice containing allegations of serious securities violations, well before 16 April 2010, but took no steps to ensure that GSI Compliance was made aware.  Whilst it was not in the circumstances unreasonable for those people to assume that the matter would be properly handled, the FSA is disappointed that none of them raised the matter directly with GSI Compliance.

108.     The FSA Notice made clear that Goldman senior managers had knowledge of the key

events:

From July 2009 onwards, a number of *senior managers within GSC were aware that a Wells Notice had been issued to GSC*.  From September 2009, certain senior managers at GSI also became aware of the GSC Wells Notice in the context of being made aware of the Tourre Wells Notice (as set out below).  It appears that none of these individuals, nor the personnel in New York who were managing or involved with GSC's engagement with the SEC Investigation, considered the potential impact of the GSC Wells Notice on GSI.  Consequently, relevant information relating to the GSC Wells Notice was not communicated to GSI Compliance.

- 35 -

109.    The FSA found that, "the seriousness of GSI's breach . . . merits a very substantial financial penalty."

110.    Consistent with its failure to inform shareholders about the SEC's Abacus-related investigation, Goldman did not disclose that it had received a notice of investigation from either FINRA or FSA until May 10, 2010, after the market had absorbed the April 16, 2010 SEC Complaint.

**E.    Goldman's False and Misleading Statements and Omissions Post-Receipt of the Wells Notice in July 2009**

111.    The first category of false and misleading statements and omissions consists of those by Goldman starting on August 2, 2009 in which Goldman hid from its investors, and its domestic and international financial regulators, the Company's knowledge that the SEC had issued a Wells Notice recommending the filing of securities fraud charges.  By failing to disclose the Wells Notice, Goldman hid its improper conduct of betting against (or allowing a favored client to bet against) the very toxic securities that Goldman designed to fail and packaged and sold to its clients.

**1.    The False and Misleading Statements in SEC Filings and Public Announcements from August 2, 2009 to November 10, 2009**

112.    On August 2, 2009, only two days after receiving the Wells Notice, Goldman filed its Second Quarter 2009 10-Q, which was signed by defendant Viniar and included certifications from defendants Blankfein and Viniar.  In the Legal Proceedings Section of the 10-Q, Goldman listed numerous proceedings including a section titled "mortgage related matters," but concealed the existence of the SEC Wells Notice or the investigation into Abacus.

113.    The Legal Proceedings section was represented to "amend[] our discussion set forth under Item 3 "Legal Proceedings" in our Annual Report on Form 10-K for the fiscal year ended November 28, 2008, as updated by our Quarterly Report on Form 10-Q for the quarter ended March

- 36 -

27, 2009." Regulation S-K Item 103 ("Legal Proceedings") requires the disclosure of "proceedings known to be contemplated by governmental authorities" and provides:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.  Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. ***Include similar information as to any such proceedings known to be contemplated by governmental authorities***.

114.    Goldman's August 2, 2009 10-Q was false and misleading and also violated Regulation S-K Item 103.  Goldman knew that the SEC had recommended the filing of securities fraud charges, and thus knew that a securities fraud "legal proceeding" was being "contemplated by governmental authorities."  Goldman's failure to disclose its receipt of the Wells Notice and SEC investigation prevented the public from discovering Goldman's fraudulent conduct, which when revealed on April 16, 2010 caused Goldman's stock to plummet, resulting in investors suffering billions in losses.  The above statement was also materially false and misleading for the reasons stated in ¶¶49-112.

115.    On October 15, 2009, Goldman issued a press release reporting its third quarter 2009 results, but again failed to disclose that it had received a Wells Notice or that it was under investigation by the SEC.  The above statement was materially false and misleading for the reasons stated in ¶¶49-114 above.

116.    The next day, October 16, 2009, Blankfein told reporters that: "Our business correlates with growth.  Once it starts to turn, we get very involved in that process.  We benefit from it. . . .  Behind that investment is wealth creation and jobs."  When asked about credit default swaps, Blankfein said, "I think they serve a real social purpose."  Blankfein's statement was materially false

and misleading because he purposefully concealed the fact that the SEC had already recommended

the filing of securities fraud charges in the Abacus transaction, which involved credit default swaps.

117.   Then in October 2009, when Goldman came under intense scrutiny about the more

than $16 billion in bonuses it was scheduled to pay to Goldman's executives and employees, the

Company embarked on a full-fledged public relations campaign to promote its reputation as the

preeminent Wall Street bank focused first and foremost on responsible business practice that placed

their clients needs paramount to all else.  This public relations blitz included highlighting that the

Company made a $200 million donation to promote education, while at the same time concealing the

Wells Notice, SEC investigation and Goldman's abusive conduct of making billions at the direct

expense of its clients.

118.   On November 4, 2009, Goldman filed its Third Quarter 2009 10-Q, which was signed

by defendant Viniar and included certifications by defendants Blankfein and Viniar.  The Form 10-Q

included a section entitled "Legal Proceedings."[6]  Goldman listed numerous legal proceedings and

referenced the IPO litigation and other ongoing proceedings, such as the specialists litigation and

treasury matters and mortgage-related matters, but omitted the SEC investigation and Wells Notice.

119.   Goldman's Third Quarter 2009 10-Q was materially false and misleading and also

violated Regulation S-K Item 103.  Goldman knew that the SEC had recommended the filing of

securities fraud charges, and thus knew that a securities fraud "legal proceeding" was being

"contemplated by governmental authorities."  Goldman's failure to disclose its receipt of the Wells

---

[6]   The Legal Proceedings section was represented to "amend[] our discussion set forth under Item 3 "Legal Proceedings" in our Annual Report on Form 10-K for the fiscal year ended November 28, 2008, as updated by our Quarterly Reports on Form 10-Q for the quarters ended March 27, 2009 and June 26, 2009."

Notice and SEC investigation prevented the public from discovering Goldman's fraudulent conduct, which when revealed on April 16, 2010 caused Goldman's stock to plummet, resulting in investors suffering billions in losses.  The above statements were also materially false and misleading for the reasons stated in ¶¶49-117.

120.    Only four days later, on November 8, 2009, the *Sunday Times* in London published an extensive interview with Blankfein which stated in part:

> We're very important . . . .  We help companies to grow by helping them to raise capital.  Companies that grow create wealth.  This, in turn, allows people to have jobs that create more growth and more wealth.  It's a virtuous cycle. . . . We have a social purpose.

> \*       \*       \*

> Call him what you will.  He is, [Blankfein] says, just a banker "doing God's work."

121.    On November 10, 2009, CEO Blankfein spoke at the Bank of America/Merrill Lynch Banking Financial Services Conferences and hid from investors Goldman's knowledge of the SEC's intent to recommend fraud charges against the Company for its fraudulent conduct of betting against its clients.  To the complete contrary, Blankfein highlighted that Goldman's reputation and past and continued commitment to its clients was, and remained, the key to Goldman's success:

> During our history, ***our Firm has been guided by three tenets*** – ***the needs and objectives of our clients***, attracting talented and long-term oriented people, ***and our reputation and client franchise***.

> \*       \*       \*

> [O]ur duty to shareholders, is to protect and grow ***this client franchise that is the lifeblood of Goldman Sachs***.

122.    Blankfein's statements were materially false and misleading.  He failed to disclose Goldman's receipt of the Wells Notice and the SEC investigation, which would have revealed Goldman's fraudulent conduct of subjugating its clients' interests below that of the Company, including, that Goldman had (i) identified toxic mortgage-backed securities and CDOs held on its

- 39 -

books that Goldman believed would significantly decline in value and cause the firm to lose billions;
(ii) packaged and sold these securities to Goldman's own clients at inflated prices; (iii) made
affirmative misrepresentations to its own clients in order to hide the fact that Goldman (or a favored
client) had bet against these securities; and (iv) made billions at its own clients' expense when the
value of these securities plummeted, just as Goldman anticipated they would.  The above statements
were also materially false and misleading for the reasons stated in ¶¶49-120.

<b>2.     The False and Misleading Statements in Response to the <i>New York Times</i> Article</b>

123.     On December, 24, 2009, the <i>New York Times</i> disclosed that Goldman had created and
sold mortgage related debts in CDOs, bet against these securities and made billions.  The article
referenced Goldman's series of Abacus CDOs and the Hudson CDO, but did not disclose Goldman's
fraudulent conduct in connection with those securities.

124.     On that same day, Goldman immediately issued a public denial defending its CDO
practices as necessary to meet "client demand," all the while again hiding the fact that the SEC had
already notified the Company that it intended to recommend securities fraud charges arising from its
role in the Abacus deal.  Goldman's press release stated:

> Background: The New York Times published a story on December 24th primarily
> focused on the synthetic collateralized debt obligation business of Goldman Sachs.
> In response to questions from the paper prior to publication, Goldman Sachs made
> the following points.
>
>      As reporters and commentators examine some of the aspects of the financial
> crisis, interest has gravitated toward a variety of products associated with the
> mortgage market.  One of these products is synthetic collateralized debt obligations
> (CDOs), which are referred to as synthetic because the underlying credit exposure is
> taken via credit default swaps rather than by physically owning assets or securities.
> The following points provide a summary of how these products worked and why
> they were created.
>
>      Any discussion of Goldman Sachs' association with this product must begin
> with our overall activities in the mortgage market.  Goldman Sachs, like other

- 40 -

financial institutions, suffered significant losses in its residential mortgage portfolio due to the deterioration of the housing market (we disclosed $1.7 billion in residential mortgage exposure write-downs in 2008). These losses would have been substantially higher had we not hedged. We consider hedging the cornerstone of prudent risk management.

Synthetic CDOs were an established product for corporate credit risk as early as 2002. With the introduction of credit default swaps referencing mortgage products in 2004-2005, it is not surprising that market participants would consider synthetic CDOs in the context of mortgages. Although precise tallies of synthetic CDO issuance are not readily available, many observers would agree the market size was in the hundreds of billions of dollars.

***Many of the synthetic CDOs arranged were the result of demand from investing clients seeking long exposure***.

Synthetic CDOs were popular with many investors prior to the financial crisis because they gave investors the ability to work with banks to design tailored securities which met their particular criteria, whether it be ratings, leverage or other aspects of the transaction.

The buyers of synthetic mortgage CDOs were large, sophisticated investors. These investors had significant in-house research staff to analyze portfolios and structures and to suggest modifications. They did not rely upon the issuing banks in making their investment decisions.

For static synthetic CDOs, reference portfolios were fully disclosed. Therefore, potential buyers could simply decide not to participate if they did not like some or all the securities referenced in a particular portfolio.

Synthetic CDOs require one party to be long the risk and the other to be short so without the short position, a transaction could not take place.

It is fully disclosed and well known to investors that banks that arranged synthetic CDOs took the initial short position and that these positions could either have been applied as hedges against other risk positions or covered via trades with other investors.

Most major banks had similar businesses in synthetic mortgage CDOs.

As housing price growth slowed and then turned negative, the disruption in the mortgage market resulted in synthetic CDO losses for many investors and financial institutions, including Goldman Sachs, effectively putting an end to this market.

125.    Goldman's false and misleading press release had its intended effect of negating any

impact from the *New York Times* article.  As a result, Goldman stock traded up that day, closing at

$163.97 up from $163.63 the prior day.

126.    The above statements were materially false and misleading because they failed to

disclose Goldman's receipt of the Wells Notice and the SEC investigation, which would have

revealed Goldman's fraudulent conduct of subjugating its clients' interests below that of the

Company; including that Goldman had (i) identified toxic mortgage-backed securities and CDOs

held on its books that Goldman believed would significantly decline in value and cause the firm to

lose billions; (ii) packaged and sold these securities to Goldman's own clients at inflated prices; (iii)

made affirmative misrepresentations to its own clients in order to hide the fact that Goldman had bet

against these securities; and (iv) made billions at its own clients' expense when the value of these

securities plummeted, just as Goldman anticipated they would.  The above statements were also

materially false and misleading for the reasons stated in ¶¶49-125.

### 3.    The False and Misleading Statements in SEC Filings from January 21, 2010 to March 1, 2010

127.    On January 21, 2010, Goldman reported its fourth quarter and year end December 31,

2009 results in a press release which emphasized the Company's commitment to its clients:

> Throughout the year, particularly during the most difficult conditions, Goldman Sachs was an active adviser, market maker and asset manager for our clients," said Lloyd C. Blankfein, Chairman and Chief Executive Officer.  "Our strong client franchise across global capital markets, along with the commitment and dedication of our people drove our strong performance.  That performance, as well as recognition of the broader environment, resulted in our lowest ever compensation to net revenues ratio.  Despite significant economic headwinds, we are seeing signs of growth and remain focused on supporting that growth by helping companies raise capital and manage their risks, by providing liquidity to markets and by investing for our clients.

The above statement was materially false and misleading for the reasons stated in ¶¶49-126, 148-306.

128.    On or about March 1, 2010, Goldman filed its Form 10-K for the year ended December 31, 2009, signed by Defendants Blankfein, Viniar and Cohn, which emphasized Goldman's client focus:

> In our client-driven businesses, FICC [Fixed Income, Currency and Commodities] and Equities strive to deliver high-quality service by offering broad market-making and market knowledge to our clients on a global basis.  In addition, we use our expertise to take positions in markets, by committing capital and taking risk, to facilitate client transactions and to provide liquidity.  Our willingness to make markets, commit capital and take risk in a broad range of fixed income, currency, commodity and equity products and their derivatives is crucial to our client relationships and to support our underwriting business by providing secondary market liquidity.

129.    Goldman did not disclose the SEC investigation and Wells Notice in its 2009 Form 10-K.  Instead, it vaguely mentioned that there are some unknown "investigations presently under way," and that it had received "requests" from "various governmental agencies."  In the preamble to the Legal Proceedings section of its 2009 Form 10-K, Goldman stated:

> We are involved in a number of judicial, regulatory and arbitration proceedings (including those described below) concerning matters arising in connection with the conduct of our businesses.  We believe, ***based on currently available information***, that the results of such proceedings, in the aggregate, ***will not have a material adverse effect on our financial condition***, but might be material to our operating results for any particular period, depending, in part, upon the operating results for such period.  Given the range of litigation and investigations presently under way, our litigation expense can be expected to remain high.

Then, despite the ten pages reporting Goldman's legal proceedings, in the subsection reporting Mortgage-Related Matters, Goldman stated only that:

> GS&Co. and certain of its affiliates, together with other financial services firms, have received ***requests for information from various governmental agencies*** and self-regulatory organizations relating to subprime mortgages, and securitizations, collateralized debt obligations and synthetic products related to subprime mortgages. GS&Co. and its affiliates are cooperating with the requests.

- 43 -

The Form 10-K also mentioned certain "inquiries" into derivatives:

> *Credit Derivatives*
>
> Group Inc. and certain of its affiliates have received inquiries from various governmental agencies and self-regulatory organizations regarding credit derivative instruments.  The firm is cooperating with the requests.

130.    The above statements were materially false and misleading and also violated Regulation S-K Item 103.  Goldman knew that the SEC had recommended the filing of securities fraud charges, and thus knew that a securities fraud "legal proceeding" was being "contemplated by governmental authorities."  Goldman's failure to disclose its receipt of the Wells Notice and SEC investigation prevented the public from discovering Goldman's fraudulent conduct, which, when revealed on April 16, 2010, caused Goldman's stock to plummet, resulting in investors suffering billions in losses.  The above statements were also materially false and misleading for the reasons stated in ¶¶49-127.

131.    As set forth in Section X, Goldman's materially false and misleading statements and omissions caused Goldman's stock to trade at artificially inflated levels during the Class Period. When the SEC filed its securities fraud complaint against Goldman on April 16, 2010, the market finally learned that, contrary to Goldman's public representations, the Company had known that since late July 2009 that the SEC intended to bring formal securities fraud charges based on Goldman's conduct in connection with Abacus.  Goldman's stock plummeted from $184.27 to $160.70 per share, causing over a $13 billion loss in shareholder value.

## VII.    FACTS SUPPORTING DEFENDANTS' FALSE AND MATERIAL MISSTATEMENTS AND OMISSIONS AND SCIENTER CONCERNING THEIR IMPROPER BUSINESS PRACTICES AND CLIENT CONFLICTS OF INTEREST RELATED TO ABACUS

132.    The second category of false and misleading statements consists of those by Goldman beginning on February 5, 2007, when Goldman filed its Form 10-K for the fiscal year ended

- 44 -

November 24, 2006, in which it reassured investors that it had extensive procedures and controls to avoid conflicts of interest with and among its clients.  At the same time, Goldman hid from its clients, investors, and its domestic and international regulators, the Company's improper business practices with respect to Abacus, including that Goldman had deliberately created client conflicts of interest by designing the Abacus deal from the outset to allow the Paulson hedge fund to short more than $1 billion worth of Abacus securities at the direct expense of its other clients to whom Goldman made false representations while recommending and selling those same securities.

133.    Goldman repeatedly made specific statements and omissions in its SEC filings indicating that its undisclosed fraudulent conduct was not occurring – when in fact it was.  Goldman warned its shareholders about the dangers posed by client conflicts of interest – all while the omitting the fact that the Company was engaged in pervasive conflicts of interest by selling its clients securities that were designed to fail and profiting at their clients' expense.

134.    In its Form 10-Ks throughout the Class Period, Goldman repeatedly reassured its shareholders that it had "extensive procedures and controls that are designed to [identify and] address conflicts of interest."  Goldman's Form 10-Ks for 2006 and 2007 filed on February 6, 2007 and January 29, 2008, respectively, stated:

> Conflicts of interest are increasing and a failure to appropriately deal with conflicts of interest could adversely affect our businesses.
>
> Our reputation is one of our most important assets.  ***As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interests of another client*** . . . .
>
> *         *         *
>
> ***We have extensive procedures and controls that are designed to [identify and] address conflicts of interest***, including those designed to prevent the improper sharing of information among our businesses.  However, appropriately [identifying

- 45 -

and] dealing with conflicts of interest is complex and difficult, and our reputation could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to [identify and] deal appropriately with conflicts of interest. ***In addition, potential or perceived conflicts could give rise to litigation or enforcement actions***.

135.    Goldman's Form 10-Ks for 2008, 2009, and 2010 filed on January 27, 2009, February 26, 2010 and February 28, 2011, respectively, stated:

> Conflicts of interest are increasing and a failure to appropriately deal with conflicts of interest could adversely affect our businesses.

*    *    *

> ***We have extensive procedures and controls that are designed to identify and address conflicts of interest***, including those designed to prevent the improper sharing of information among our businesses.  However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation, which is one of our most important assets, could be damaged and the willingness of clients to enter into transactions [with us] may be affected if we fail, or appear to fail, to identify, [disclose] and deal appropriately with conflicts of interest. ***In addition, potential or perceived conflicts could give rise to litigation or [regulatory] enforcement actions***.

136.    Indeed, Goldman specifically identified the precise risks posed by client conflicts of interest that subsequently materialized when Goldman was sued by the SEC.  Goldman stated in each of its Form 10-Ks during the Class Period that "conflicts could give rise to ***litigation or [regulatory[ enforcement actions***."  However, Goldman, in these same filings, reassured investors by stating that "***[w]e have extensive procedures and controls that are designed to [identify and] address conflicts of interest*** . . . ."

137.    Goldman's warnings to shareholders regarding potential conflicts of interest omitted the fact that it was aware of the existence of such conflicts at the time.  Unbeknownst to Goldman's clients and shareholders, at the behest of Goldman senior management, Goldman had designed the Abacus deal from the outset to allow the Paulson hedge fund to short more than $1 billion worth of

- 46 -

Abacus securities at the direct expense of its other clients to whom it had recommended and sold those same securities.

138.    The above statements were materially false and misleading because they failed to disclose that Goldman had deliberately created ***actual*** conflicts of interest by engaging in transactions that were designed from the outset by the Company to allow a favored client to benefit at the expense of its other clients.  The above statements were also materially false and misleading because they failed to disclose defendants' improper conduct with respect to Abacus.

139.    As discussed in Section VI.E.2., *supra*, on December, 24, 2009, the *New York Times* disclosed Goldman's role in creating and selling the Abacus securities, and Paulson's short position, but did not disclose Goldman's fraudulent conduct with respect to Abacus.

140.    On that same day, Goldman immediately issued a public denial defending its CDO practices as necessary to meet "demand from investing clients seeking long exposure."

141.    As alleged in Section VI.E.2., *supra*, and alleged here as a separate misrepresentation, Goldman's statement that its CDO practices were necessary to meet "client demand" was materially false and misleading because it failed to disclose Goldman's improper business practices in designing the Abacus deal from the outset in order to allow a favored client to benefit at the expense of its other clients.  Specifically, defendants failed to disclose that Goldman had designed the Abacus deal to allow the Paulson hedge fund to short more than $1 billion worth of Abacus securities at the direct expense of its other clients to whom it made false representations while recommending and selling to them those same securities.

142.    These statements were also materially false and misleading for the reasons stated in ¶¶49-141 above.

143.    A reasonable investor would have viewed the Company's improper conduct in Abacus and the Company's deliberate conflict of interests with its clients in Abacus as significant, material information in making an investment decision.

144.    As previously noted, on April 16, 2010, the SEC filed a complaint charging Goldman with securities fraud in connection with the Abacus deal.  In July 2010, Goldman settled that case for *$550 million*, the largest SEC penalty in history, and admitted that:

> [T]he marketing materials for the ABACUS 2007-AC1 transaction contained incomplete information.  In particular, it was a mistake for the Goldman marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.

145.    In addition, on June 10, 2011, Judge Barbara S. Jones issued an opinion denying in part Tourre's motion to dismiss the SEC's complaint against him based on the Abacus deal.  Judge Jones held that the SEC had adequately pled "all of the elements of a Section 10(b) and Rule 10b-5 violation," reasoning:

> Here, having allegedly affirmatively represented Paulson had a particular investment interest in ABACUS—that it was long—in order to both accurate and complete . . . , Goldman and Tourre had a duty to disclose Paulson had a different investment interest—that it was short. . . . Indeed, the crux of the SEC's allegation is that rather than being financially interested in ABACUS's success, as the SEC alleges Tourre represented to ACA . . . , Paulson, in fact, had financial interests and expectations that were diametrically opposed to ABACUS's success.

*SEC v. Tourre*, No. 10 Civ. 3229, 2011 WL 2305988, at *13 (S.D.N.Y. June 10, 2011) (internal quotations and citations omitted).

146.    ACA has also sued Goldman in New York state court, asserting state law claims for fraudulent inducement, fraudulent concealment and unjust enrichment against the Company.

147.    As set forth in Section X, Goldman's materially false and misleading statements and omissions caused Goldman's stock to trade at artificially inflated levels during the Class Period.

- 48 -

When the SEC filed its securities fraud complaint against Goldman on April 16, 2010, the market finally learned that, contrary to Goldman's public representations regarding its business practices, the Company had deliberately created *actual* conflicts of interest by engaging in the Abacus transaction that was designed from the outset by the Company to allow a favored client to benefit at the expense of Goldman's other clients.  In response, Goldman's stock plummeted from $184.27 to $160.70 per share, causing over a $13 billion loss in shareholder value.

## VIII.   FACTS SUPPORTING DEFENDANTS' FALSE AND MATERIAL MISSTATEMENTS AND OMISSIONS AND SCIENTER REGARDING GOLDMAN'S FAILURE TO DISCLOSE ITS CONFLICTS OF INTEREST WITH ITS CLIENTS AND THE IMPACT ON GOLDMAN'S CLIENT FRANCHISE AND REPUTATION

148.   In addition to Abacus, the Senate Subcommittee identified  Hudson Mezzanine Funding 2006-1 ("Hudson"), Anderson Mezzanine Funding 2007-1 ("Anderson") and Timberwolf I ("Timberwolf") as other Goldman CDOs in Fall 2006 through Summer of 2007, in which the Company engaged in clear conflicts of interest by packaging and selling poor quality mortgage-related securities, that were likely to lose value, to its clients at higher prices than the Company believed they were worth, and betting against those very securities – thereby allowing the Company to reap billions in profits at their clients' direct expense.

149.   The third category of false and misleading statements and omissions consist of those made by Goldman beginning in February 2007 in which the Company repeatedly told the public that its "best in class" franchise and continued success depended on the Company's reputation, honesty, integrity and commitment to put its clients' interests first above all else.  These statements failed to disclose Goldman's clear conflicts of interest with its own clients in connection with the Abacus, Hudson, Anderson and Timberwolf CDOs, whereby Goldman intentionally packaged and sold

billions of these securities that were designed to fail to its clients, while at the same time reaping billions for itself or its favored clients by taking massive short positions on these securities.

150.     During the Class Period, market analysts incorporated the value of Goldman's "best in class" franchise, reputation and purported commitment to its clients above all else into their estimates of revenues, earnings and stock price, without knowledge that Goldman profited handsomely by betting against its own clients.  Had Goldman disclosed these material facts, it would have suffered the severe damage to its franchise, reputation and stock price that it ultimately suffered when the truth was revealed between April 16, 2010 and June 2010.

A.     **Goldman's Financial Success Has Been Driven by Its Reputation, Client Franchise and Commitment to Put Its Clients First Above All Else**

151.     Goldman has been in existence since 1869, serving as a private investment bank, publicly traded corporation and now bank holding company.  The Company manages almost a trillion in assets.  Between 2007 and 2010 Goldman recorded a collective profit of over $35 billion.

152.     The key to Goldman's success and survival for 140 years has been its name and its reputation for placing its clients' interests paramount above all else.  As reported by the *New York Times*, "during the Great Depression, Goldman was caught up in a scandal involving the Goldman Sachs Trading Corporation.  The taint of the scandal drove away business for more than a decade and made the firm extremely focused on reputation."

153.     The Company has repeatedly publicly stressed and highlighted its "best in class" franchise and reputation and commitment to its clients, including during the Class Period.  At the very same time, Goldman purposefully concealed that it had sold toxic CDOs to its clients to reap huge profits at those clients' expense, and that the SEC had notified Goldman of its recommendation to file securities fraud charges relating to Abacus.

154.   Goldman's statements include:

- Goldman CEO Blankfein Statements at November 10, 2009 Bank of America/Merrill Lynch Banking Financial Services Conference

  During our history, *our Firm has been guided by three tenets* – *the needs and objectives of our clients*, attracting talented and long-term oriented people, *and our reputation and client franchise*.

  *   *   *

  [O]ur duty to shareholders, is to protect and grow *this client franchise that is the lifeblood of Goldman Sachs*.

- Goldman CEO Blankfein Statements at November 13, 2007 Merrill Lynch Banking and Financial Investor Conference

  *What drove performance was the quality of our client franchise*.  To me, franchise describes the extent to which *our clients come to us for help, advice, and execution.  From those relationships, business opportunities are brought to the firm*.

- Goldman CFO Viniar June 14, 2007 Statements on Goldman's 2d Quarter Investor Conference Call

  *Most importantly, and the basic reason for our success, is our extraordinary focus on our clients*.

- Goldman's Annual Report (each year from 2006-2010)

  Goldman Business Principles

  1 *Our clients' interests always come first*.  Our experience shows that if we serve our clients well, our own success will follow.

  2 Our assets are our people, capital and *reputation.  If any of these is ever diminished, the last is the most difficult to restore.  We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard*.

  *   *   *

  14 *Integrity and honesty are at the heart of our business*.

- 51 -

- Goldman's Form 10-Ks

Conflicts of interest are increasing and a failure to appropriately deal with conflicts of interest could adversely affect our businesses.

***Our reputation is one of our most important assets***.  As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest, ***including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interests of another client***, as well as situations where one or more of our businesses have access to material non-public information that may not be shared with other businesses within the firm.

*       *       *

***We have extensive procedures and controls that are designed to address conflicts*** of interest, including those designed to prevent the improper sharing of information among our businesses. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation, which is one of our most important assets, could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest.  In addition, potential or perceived conflicts could give rise to litigation or enforcement actions.

*       *       *

**Trading and Principal Investments**[7]

*       *       *

***We believe our willingness and ability to take risk to facilitate client transactions distinguishes us from many of our competitors and substantially enhances our client relationships.***

---

[7]     Goldman's Trading and Principal Investments segment is divided into three components: Fixed Income, Currency and Commodities ("FICC"); Equities; and Principal Investments.  FICC has five principal businesses: commodities; credit products; currencies; interest rate products, including money market instruments; and mortgage-related securities and loan products and other asset-backed instruments.  The Goldman employees that did the relevant deals were part of the mortgage business section.

- 52 -

*        *        *

We generate trading net revenues from our ***client [or customer]-driven*** businesses in three ways:

- First, in large, highly liquid markets, we undertake a high volume of transactions for modest spreads and fees.

- Second, by capitalizing on our strong relationships and capital position, we undertake transactions in less liquid markets where spreads and fees are generally larger.

- Finally, we structure and execute transactions that address complex ***client needs***.

155.   Indeed, Goldman continued to admit that its reputation, client franchise and commitment to its clients above all else was the key to the Company's success:

- <u>Goldman CEO Blankfein April 27, 2010 Testimony Before Congress</u>

  We have been a client-centered firm for 140 years and ***if our clients believe that we don't deserve their trust we cannot survive***.

156.   The investment community has consistently recognized that Goldman's past and continued success as the preeminent Wall Street investment bank is undeniably tied to its reputation, client franchise and purported commitment to its clients:

<u>April 11, 2007 Deutsche Bank Analyst Report</u>

***Goldman Sachs is set apart by its best-in-class franchise***.

*        *        *

***Reputation – the bar is higher***:  ***Because the firm probably benefits more from its reputation than any of its peers, it is also more vulnerable to high profile blow-ups***.  A company lawyer speaks to employees each year and says that each person has the potential to do more harm than good, in an effort to remind all of ***how much is at stake with the firm's reputation***.

<u>August 8, 2007 CIBC World Markets</u>

"***In the end, all you have is your word, your name, and your reputation***," *is what my granny would often say.  Goldman Sachs operates from the same playbook,*

- 53 -

*a point that cannot be overemphasized and what we believe to be the key to understanding Goldman Sachs*.

> *Reputation is everything when entering into a new market. Goldman's reputation is such that it has garnered it the most coveted sovereign relationships from China to the Middle East and beyond. . . . Due to this, we believe Goldman will dominate market share in this region for years to come*.

November 28, 2007 CIBC World Markets

[W]e met with CFO David Viniar, Head of IB David Solomon, and Co-President Gary Cohn at Goldman Sachs headquarters. ***Common to each meeting was the theme of communication amongst the organization and with clients. For this, GS maintains and grows its dominant market share.***

The message was direct: know what is going on everywhere inside GS at all times, manage risk, and ***put the client first in service***.

157.    In fact, as subprime mortgage backed securities and CDOs experienced drastic declines from summer 2007-2009, and Goldman's competitors took billions in mortgage-related writedowns, the investment community stressed that Goldman's reputation for acting in the best interest of its clients would – and did in fact allow – the Company to not only withstand, but in fact profit, from the subprime meltdown:

November 28, 2007 CIBC World Markets Research Analyst Report

> *Goldman's third quarter results stood out by a mile from many of its peers who took billions of dollars in credit writedowns. Was this a fluke? Each manager yesterday spoke to the value of Goldman's franchise specific to customer relationships when characterizing the third quarter*. While many investors focus on GS's bet being "short" mortgages, management stated that had GS earned half what it did in mortgages during the third quarter, results would not have differed materially. ***The true strength of the quarter as viewed by management was in what Gary Cohn described as "one call" transactions, deals in which Goldman was brought in as the sole advisor due to its reputation as a "can do" firm***. These transactions include Countrywide, Home Depot, and the Bank of England for Northern Rock. Client trading worked much in the same way as Goldman gained market share from its clients understanding that if a deal had any chance of getting done, Goldman could do it.

- 54 -

<u>September 18, 2008 HSBC Global Research Analyst Report</u>

> ***We have long held the opinion that much of the world worships at the altar of Goldman***.  Rating agencies, equity investors, debt investors, and political officials all seem to ***hold the institution in higher regard than any of its competitors***.  Its performance through the first stage of the credit bubble unwind reinforced those views.

<u>June 4, 2009 Bernstein Research Analyst Report</u>

***[W]e believe Goldman Sachs will be the ultimate winner during a FICC [Fixed Income Currency and Commodities] recovery as GS is unrelenting in maintaining its reputation*** as the largest, most successful institutional trading firm on Wall Street and will continue to seize "up for grabs" market share and take advantage of credit market opportunities.

*       *       *

Risks
> The biggest risk to any major broker-dealer is a loss of confidence in its name in the markets.

**B.      Goldman's Undisclosed Fraudulent Conduct in 2006-2007 in Connection with the Hudson, Anderson and Timberwolf CDOs**

158.     At the end of 2006 and throughout 2007, Goldman's senior management made a firm-wide decision to put Goldman's interests ahead of its own clients.  Seeking to avoid the impending economic downturn which led to the collapse of some of Goldman's competitors, including Bear Stearns and Lehman Brothers, Goldman unloaded billions of dollars of deteriorating toxic assets off its books and onto its own clients.  In addition to Abacus, the three CDO transactions detailed below demonstrate Goldman's fraudulent conduct in which Goldman took a substantial portion of the short side of each CDO, betting that the assets within the CDO would fall in value or not perform.  Goldman's short position was in direct opposition to the clients to whom it sold the CDO securities, yet Goldman failed to disclose that it had designed these deals to fail, and that it took massive short positions to allow the Company to rid itself of mortgage related assets on its books and profit handsomely.

- 55 -

### 1.    Hudson CDO

159.    By mid-2006, Goldman's Mortgage Department had a predominantly pessimistic view of the U.S. subprime mortgage market. According to Michael Swenson, head of the Mortgage Department's Structured Products Group: "[D]uring the early summer of 2006 it was clear that the market fundamentals in subprime and the highly levered nature of CDOs [were] going to have a very unhappy ending."

160.    By August 2006, Goldman management had decided that the upside for RMBS and CDOs linked to the ABX Index[8] had "run its course," and directed the Mortgage Department's Asset Backed Securities ("ABS") Desk to sell off its billions of dollars of ABX long holdings that Goldman accumulated throughout 2005 and 2006.  After several weeks of effort, however, the ABS Desk was unable to find many buyers, and its ABX assets referencing mezzanine subprime RMBS securities, which were dropping in value, were losing hundreds of millions and began to pose a disproportionate risk to both Goldman's Mortgage Department and the firm as a whole.

161.    In September 2006 Mortgage Department head Daniel Sparks and his superior, Jonathan Sobel, initiated a series of meetings with Swenson, head of the Structured Products Group ("SPG"), and Birnbaum, the Mortgage Department's top trader in ABX assets, to discuss the Department's long mortgage-related securities holdings.  In those meetings, they discussed whether the Asset Backed Security (ABS) Trading Desk within SPG should get out of its existing positions or "double down."

---

[8]    The ABX index is a key point of reference for securities backed by home loans issued to borrowers with weak credit.  The index is comprised of a series of credit-default swaps based on 20 bonds that consist of subprime mortgages.

162.    In simple terms, if the Mortgage Department's existing long positions could be transferred off SPG's books by finding a "structured place to go with the risk," the ABS Trading Desk would then be free to "double down" by taking on new positions and risk.

163.    That same month, September 2006, the ABS and CDO Desks reached agreement on constructing a new CDO to provide the ABS Desk with a "structured exit" from some of its existing investments.  The CDO was called Hudson Mezzanine Funding 2006-1.  Goldman designed Hudson from its inception as a way to transfer the risk of loss associated with assets from Goldman's inventory to the Goldman clients that invested in Hudson.  In fact, Goldman admitted to the Senate that Hudson was "initiated by the firm as the most efficient method to reduce long ABX exposures," and was an "exit for our long ABX risk."

164.    Hudson was a $2 billion static synthetic CDO that was structured and began to be marketed by Goldman in or around late 2006.  The actual offering of the Hudson CDO securities commenced on or about December 5, 2006, and was led by Goldman employees, Peter Ostrem (who headed the desk that originated CDOs for Goldman) and Darryl Herrick ("Herrick") (who eventually became the Hudson deal captain).

165.    Goldman used the Hudson CDO to short $1.2 billion in ABX Index assets from Goldman's own inventory and to short another $800 million in single name CDS contracts referencing subprime RMBS securities.  By holding 100% of the short position at the same time it solicited clients to buy the Hudson securities, Goldman created and hid an egregious conflict of interest with its clients.

166.    The Hudson transaction allowed Goldman to profit directly from its clients' losses – while misleading those clients about the source of the reference assets and Goldman's position on the short side.  When the Hudson securities declined in value, Goldman made a $1.35 billion profit

on its proprietary short position at the expense of the clients to whom it had sold the Hudson securities.

167.    According to Goldman's contemporaneous records and its responses to Senate Subcommittee questions, 100% of the CDS contracts included in Hudson were supplied by Goldman's Mortgage Department.  Because Hudson contained only CDS contracts, it was entirely "synthetic"; it contained no loan pools or RMBS securities that directed actual cash payments to the CDO.  Instead, the only cash payments made to Hudson consisted of the cash paid by investors making initial purchases of the Hudson securities and the premiums that Goldman paid into Hudson as the sole short party.

168.    After establishing its basic characteristics and selecting the CDS assets to be included in Hudson, Goldman began to look for investors.  A key development took place early on, when near the end of September 2006, Morgan Stanley's proprietary trading desk committed to entering into a CDS agreement with Goldman referencing the "super senior" portion of Hudson, meaning the CDO's lowest risk tranche that would be the first to receive payments to the CDO." Morgan Stanley agreed to take the long side of a CDS that represented $1.2 billion of the $2 billion CDO.  Goldman failed to disclose the fact that it would be the sole short party in the entire $2 billion CDO.

169.    After getting the commitment from Morgan Stanley, Goldman turned its focus to selling the remaining Hudson securities.  Goldman's CDO marketing strategy typically involved its sales personnel sending clients a marketing booklet outlining different features of a particular CDO. Herrick drafted the marketing booklet for Hudson, and circulated it for review to Ostrem and other members of the CDO Origination Desk including Benjamin Case and Matthew Bieber.  The executive summary of the marketing booklet described Goldman's Hudson CDO program generally and Hudson Mezzanine Funding 2006-1 in particular:

- 58 -

Goldman Sachs developed the Hudson CDO program in 2006 to create a consistent, programmatic approach to invest in attractive relative value opportunities in the RMBS and structured product market[.]

\*       \*       \*

Goldman Sachs has aligned incentives with the Hudson program by investing in a portion of equity and playing the ongoing role of Liquidation Agent.

170.    The marketing booklet also described the Hudson assets, and the selection process for those assets:

The portfolio composition of Hudson Mezzanine Funding 2006-1 will consist of 100% CDS on RMBS.

– 60% of the RMBS will be single name CDS on all 40 obligors in ABX 2006-1 and ABX 2006-2.

– 40% of the RMBS will consist of single name CDS on 2005 and 2006 vintage RMBS . . .
Goldman Sachs' portfolio selection process:

– Assets sourced from the Street. Hudson Mezzanine Funding is not a Balance Sheet CDO
– Goldman Sachs CDO desk pre-screens and evaluates assets for portfolio suitability
– Goldman Sachs CDO desk reviews individual assets in conjunction with respective mortgage trading desks (Subprime, Midprime, Prime, etc.) and makes decision to add or decline[.]

171.    Goldman's statement that "Goldman Sachs has aligned incentives with the Hudson program by investing in a portion of equity," was false and misleading.  Goldman did, in fact, purchase approximately $6 million in Hudson equity.  However, that $6 million equity investment was outweighed 300 times over by Goldman's $2 billion short position in Hudson, which made Goldman's interest adverse to, rather than aligned with, the Hudson investors.  Neither the marketing booklet nor other offering materials disclosed to investors the size or nature of Goldman's short position in Hudson.

172.    The marketing booklet also stated that Hudson's assets were "sourced from the Street," and that it was "not a Balance Sheet CDO," even though all of the CDS contracts had been

- 59 -

produced and priced internally by Goldman and $1.2 billion of the contracts offset Goldman ABX holdings.  The plain meaning of the phrase, "sourced from the Street," is that the Hudson assets were purchased from several broker-dealers on Wall Street.

173.    The Senate Subcommittee asked several Goldman employees involved in Hudson to explain their understanding of the phrase:

(a)    A former Goldman salesperson, Andrew Davilman, who sold Hudson securities to investors, told the Senate Subcommittee that he thought "sourced from the Street" referred to *assets being acquired from a variety of different broker-dealers at the best prices*, and was surprised to learn that all of the Hudson assets had been provided by Goldman's ABS Desk;

(b)    Herrick, who drafted the Hudson marketing booklet, stated that "sourced from the Street" meant the assets were "*sourced from a street dealer at street prices*";

(c)    Ostrem stated that "sourced from the Street" referred to the fact the *underlying RMBS securities were not originated or underwritten by Goldman*; and

(d)    Deeb Salem, a Goldman mortgage trader who selected 40% of the assets in Hudson, described "the Street" as simply "*short hand for all broker-dealers*."

174.    By using the phrase, "sourced from the Street," Goldman misled investors into thinking that the referenced assets had been purchased from several broker-dealers and obtained at arms-length prices, rather than simply taken directly from Goldman's inventory and priced by its own personnel. Moreover, this phrase hides the fact that Goldman had an adverse interest to investors and was seeking to transfer unwanted risk from its own inventory to the clients it was soliciting. By claiming it was "not a Balance Sheet CDO," Goldman also misled investors into believing that Goldman had little interest in the performance of the referenced assets in Hudson, rather than having selected the assets to offset risks on its own books.

- 60 -

175.    In addition to the Hudson marketing booklet, in December 2006, Goldman issued an Offering Circular which it distributed to potential investors.  The Offering Circular contained the statement that no independent third party had reviewed the prices at which the CDS contracts were sold to Hudson.  This purported disclosure was incomplete.   In addition to lacking third-party verification, no external counterparty had participated in any aspect of the CDS contracts.  All of the CDS contracts had been produced, signed, and priced internally by two Goldman trading desks which exercised complete control over the Hudson CDO.

176.    Internally, while Hudson was being constructed, Goldman personnel acknowledged that they were using a novel pricing approach.  At one point, Swenson sent an email to Birnbaum, raising questions about how they could explain some of the pricing decisions.  Swenson wrote that he was: "concerned that the levels we put on the abx cdo for single-a and triple-bs do not compare favorably with the single-a off of a abx 1 + abx 2 trade," telling Birnbaum "[w]e need a goo[d] story as to why we think the risk is different."  The prices that Goldman established for the CDS contracts that Hudson "bought" affected the value of the CDO and the Hudson securities Goldman sold to investors, but the Offering Circular failed to disclose the extent to which Goldman had single-handedly controlled the pricing of 100% of the CDOs assets.

177.    Goldman also failed to disclose the fact that it would be the sole short party in the entire $2 billion CDO.  The Goldman materials told investors that an affiliate, GSI, would be the "credit protection buyer" or initial short party for the Hudson CDO.  It was common practice for underwriters to act as the initial short party in a CDO, acting as an intermediary between the CDO vehicle and broker-dealers offering competitive bids in order to short the assets referenced in the CDO.  The disclosure provided by Goldman contained boiler plate language suggesting that would be the role played by GSI in the Hudson transaction.  Goldman never disclosed that it had provided

- 61 -

all of Hudson's assets internally, GSI was not acting as an intermediary, and GSI would not be passing on any portion of the short interest in Hudson to any other party, but would be keeping 100% of the short position.  The Hudson disclosures failed to state that, rather than serving as an intermediary, Goldman was making a proprietary investment in the CDO which placed it in a direct, adverse position to the investors to whom it was selling the Hudson securities.

178.    The Offering Circular also contained a section entitled, "Certain Conflicts of Interest," which included a subsection entitled, "The Credit Protection Buyer and Senior Swap Counterparty," in which Goldman could have disclosed its short position.  Rather than disclose that short position, however, Goldman stated in part:

> GSI and/or any of its affiliates may invest and/or deal, for their own respective accounts for which they have investment discretion, in securities or in other interests in the Reference Entities, in obligations of the Reference Entities or in the obligors in respect of any Reference Obligations or Collateral Securities (the "Investments"), or in credit default swaps (whether as protection buyer or seller), total return swaps or other instruments enabling credit and/or other risks to be traded that are linked to one or more Investments.

This disclosure indicates that GSI or an affiliate "may invest and/or deal" in securities or other "interests" in the assets underlying the Hudson CDO, and "may invest and/or deal" in securities that are "adverse to" the Hudson "investments."   The Offering Circular, however, misrepresented Goldman's investment plans.  At the time it was created in December 2006, Goldman had already determined to keep 100% of the short side of the Hudson CDO and act as the sole counterparty to the investors buying Hudson securities, thereby acquiring a $2 billion financial interest that was directly adverse to theirs.

179.    Consistent with both industry and Goldman practice, customers learning of GSI's role as the initial sole counterparty in Hudson would have assumed that GSI planned to sell its initial short position to other parties.

180.    Goldman placed a priority on selling Hudson securities, delaying the issuance of other CDOs in order to facilitate Goldman's own proprietary short position in Hudson.  Goldman sales representatives reported that clients expressed skepticism regarding the quality of the Hudson assets, but Goldman continued to promote the sale of the CDO as if its interests were truly aligned with its clients' interests.

181.    Once it constructed the Hudson CDO, Goldman personnel were focused on completing and selling the Hudson securities as quickly as possible.  Goldman senior executives closely followed Hudson's development and sale.  Hudson was discussed, for example, at five different Firmwide Risk Committee meetings attended by senior Goldman executives and chaired by CFO David Viniar.  Mortgage Department executives also sent progress reports to the senior executives on Hudson.  On October 25, 2006, for example, Sobel sent an email to COO Gary Cohn and Viniar alerting them to Hudson sales efforts and the pricing of its securities.

182.    The Goldman sales force sold most of the Hudson securities prior to the CDOs closing in December 2006, and continued its sales efforts after the closing as well.  Overall, Goldman sold Hudson securities to 25 investors.  Morgan Stanley made the largest investment, taking $1.2 billion of the super senior portion of the CDO.  Other investors included National Australia Bank, which purchased $80 million worth of the AAA rated securities; Security Benefit Mutual, which bought $10 million of the AA rated securities; and Bear Stearns, which bought $5 million of the equity tranche.

183.    On October 30, 2006, after Hudson was presented to investors and pre-sold most of its securities, Peter Ostrem, the head of the CDO Origination Desk, sent a celebratory email to the ABS and CDO teams with Hudson highlights. He wrote: "Goldman was the sole buyer of protection on the entire $2.0 billion of assets," meaning Goldman had kept 100% of the short position.  By

- 63 -

shorting Hudson, Goldman had transferred $1.2 billion worth of risky ABX assets Goldman wanted off its books, and shorted another $800 million in RMBS securities.

184.    Over the next year, Goldman pocketed nearly $1.7 billion in gross revenues from Hudson, all at the direct expense of the Hudson investors.  Goldman collected $1.393 billion in gains from its short of the assets referencing its ABX inventory and collected another $304 million in gains due to its short of the other $800 million in single name CDS contracts included in Hudson.

185.    Goldman also received substantial fees from the roles it played in underwriting and administering Hudson, including $31 million in underwriting fees and $3.1 million for serving as the liquidation agent.  ***Overall, Goldman recorded a profit from Hudson of more than $1.35 billion.***

186.    In contrast to Goldman, Hudson investors suffered substantial losses. In March 2007, less than three months after the issuance of the Hudson securities, when asked to analyze how a holder of Hudson securities could hedge against a drop in their value, a Goldman trader wrote: "their likelihood of getting principal back is almost zero."  Six months later, the credit rating downgrades began.  In September 2007, Moody's downgraded several Hudson securities and followed with additional downgrades in November 2007.  S&P began downgrades of Hudson in December 2007, and by February 2008, had downgraded even the AAA rated securities.

187.    Morgan Stanley, the largest Hudson investor, lost $930 million.  As other investors incurred increasing losses, they sold their securities back to Goldman at rock bottom prices.  In September 2007, for example, nine months after the Hudson securities were first issued, Goldman repurchased $10 million worth of Hudson securities from Greywolf Capital at a price of five cents on the dollar; in October 2007, another hedge fund sold $1 million in Hudson securities back to Goldman at a price of 2.5 cents on the dollar.  In November 2008, Hudson was completely liquidated by Goldman.  Today, Hudson securities are worthless.

- 64 -

188.    In sum, Goldman constructed Hudson as a way to transfer its ABX risk to the investors who bought Hudson securities.  When marketing the Hudson securities, Goldman misled investors by claiming its investment interests were aligned with theirs, when it was the sole short party and was betting against the very securities it was recommending.  Goldman also implied that Hudson's assets had been purchased from outside sources, and failed to state that it had selected the majority of the assets from its own inventory and priced the assets without any third party participation. ***By holding 100% of the short position at the same time it solicited clients to buy the Hudson securities, Goldman created a conflict of interest with its clients, concealed the conflict from them, and profited at their expense***.

### 2.    Anderson

189.    In the summer of 2006, Goldman began work on Anderson, a $500 million synthetic CDO whose assets were single name CDS contracts referencing subprime RMBS securities with mezzanine credit ratings.  To execute the Anderson CDO, Goldman partnered with GSC, a New York hedge fund founded by a former Goldman partner.  Goldman personnel working on the CDO included Peter Ostrem, head of the CDO Origination Desk, and Matthew Bieber, a CDO Origination Desk employee assigned to be deal captain for the Anderson CDO.

190.    GSC and Goldman participated together in the selection of assets for Anderson. Anderson was designed to be a synthetic CDO whose assets would consist solely of CDS contracts referencing RMBS securities whose average credit ratings would be BBB or BBB-.

191.    Anderson's assets were purchased from 11 different broker-dealers from September 2006 to March 2007.  Goldman was the source of 28 of the 61 CDS contracts in Anderson, and Goldman retained the short side.  Goldman also served as the sole credit protection buyer to the

- 65 -

Anderson CDO, acting as the intermediary between the CDO and the various broker-dealers selling it assets.

192.    By February 2007, the Anderson warehouse account contained $305 million out of the intended $500 million worth of single name CDS, many of which referenced mortgage pools originated by New Century, Fremont, and Countrywide-subprime lenders known within the industry for issuing poor quality loans and RMBS securities.  Approximately 45% of the referenced RMBS securities contained New Century mortgages.

193.    During the same time period in which the Anderson single name CDS contracts were being accumulated, Goldman was becoming increasingly concerned about the subprime mortgage market, was reacting to bad news from the subprime lenders it did business with, and was building a large short position against the same types of BBB rated RMBS securities referenced in Anderson. By February 2007, the value of subprime RMBS securities was falling, and the Goldman CDO Origination Desk was forced to mark down the value of the long single name CDS contracts in its CDO warehouse accounts, including Anderson.

194.    In February 2007, Goldman CEO Lloyd Blankfein personally reviewed the Mortgage Department's efforts to reduce its subprime RMBS whole loan, securities, and residual equity positions, asking Montag: "[W]hat is the short summary of our risk and the further writedowns that are likely[?]" After a short report from Montag, Blankfein replied:

> [Y]ou refer to losses stemming from residual positions in old deals. Could/should we have cleaned up these books before and are we doing enough right now to sell off cats and dogs in other books throughout the division?

195.    Sparks also made increasingly dire predictions about the decline in the subprime mortgage market and issued emphatic instructions to his staff about the need to get rid of subprime loans and other assets. On February 8, 2007, for example, Sparks wrote:

- 66 -

Subprime environment – bad and getting worse. Everyday is a major fight for some aspect of the business (think whack-a-mole). . . . [P]ain is broad (including investors in certain GS issued deals).

196.    On February 14, 2007, Sparks exchanged emails with Goldman's Co-President Jon Winkelried about the deterioration in the subprime market:

Mr. Winkelried:  Another downdraft?

Mr. Sparks: Very large – it's getting messy . . . .  Bad news everywhere. Novastar bad earnings and 1/3 of market cap gone immediately.  Wells [Fargo] laying off 300 subprime staff and home price appreciation data showed for first time lower prices on homes over year broad based.

197.    On February 26, 2007, when Montag asked him about two CDO² transactions being assembled by the CDO Origination Desk, Timberwolf and Point Pleasant, Sparks expressed his concern about both:

Mr. Montag: cdo squared–how big and how dangerous

Mr. Sparks: Roughly 2bb, and they are the deals to worry about

198.    Goldman was also aware that its longtime customer, New Century, was in financial distress. On February 7, 2007, New Century announced publicly it would be restating its 2006 earnings, causing a sharp drop in the company's share price.  On February 8, 2007, Goldman's Chief Credit Officer Craig Broderick sent Sparks and others a press clipping about New Century and warned:

[T]his is a materially adverse development.  The issues involve inadequate [early payment default] provisions and marks on residuals. . . . [I]n a confidence sensitive industry it will be ugly even if all problems have been identified. . . . We have a call with the company in a few minutes (to be led by Dan Sparks).

199.    On some occasions, Sparks addressed negative news about New Century in the same email he discussed liquidating assets in warehouse accounts for upcoming CDOs.  On March 8, 2007, for example, Sparks noted in an email to senior executives: "New Century remains a problem"

- 67 -

due to loans experiencing early payment defaults, and informed them that the Mortgage Department

had "liquidated a few deals and could liquidate a couple more."

200.    On February 23, 2007, Sparks sent an email to senior Goldman executives estimating

that Goldman had lost $72 million on the holdings in its CDO warehouse accounts, due to falling

prices.  He directed Mortgage Department personnel to liquidate rather than securitize the assets in

certain warehouse accounts.   Two days later, on February 25, 2007, Sparks informed senior

executives of his intention to liquidate Anderson:

> [T]he CDO business liquidated 3 warehouses for deals of $530mm (about half risk
> was subprime related). . . .   One more CDO warehouse may be liquidated this week –
> approximately $300mm with GSC as manager.

201.    After Sparks relayed this decision, Ostrem and Bieber began to strategize ways to

convince Sparks to reverse his decision.  Ostrem and Bieber assembled a list of likely buyers of the

Anderson securities to present to Sparks, and brainstormed about other CDOs that could potentially

buy Anderson securities for their asset pools.  Ostrem also proposed allowing a hedge fund to short

assets into the deal as an incentive to buy the Anderson securities, but Bieber thought Sparks would

want to "preserve that ability for Goldman."

202.    At some point, Sparks changed his mind and decided to go forward with underwriting

the Anderson CDO.  The Anderson CDO closed on March 20, 2007.  As finally constructed, 100%

of its assets were CDS contracts referencing $307 million in mezzanine subprime RMBS securities,

meaning RMBS securities carrying BBB or BBB- credit ratings.  About 45% of the subprime

mortgages in the referenced RMBS securities were issued by New Century.  Another 8% were

issued by Countrywide, and almost 7% were issued by Fremont.  Goldman took about 40% of the

short side of the Anderson CDO.

- 68 -

203.    During March 2007, selling Anderson securities became a top priority for Goldman. Goldman even put another deal on hold, the Abacus 2007-AC 1 deal with the Paulson hedge fund, to promote Anderson.  As Egol advised Goldman personnel: "Given risk priorities, subprime news and market conditions, we need to discuss side-lining [Abacus 2007-AC1] in favor of prioritizing Anderson in the short term."

204.    On March 13, 2007, Goldman issued internal talking points for its sales force on the Anderson CDO.  Among the points highlighted were:

> Portfolio selected by GSC. Goldman is underwriting the equity and expects to hold up to 50%.  . . .  Low fee structure[.]  . . .  No reinvestment risk.

The talking points described Goldman as holding up to 50% of the equity tranche in the CDO – worth about $21 million, without mentioning that Goldman would also be holding 40% – about $135 million – of the short side of Anderson, placing its investment interests in direct opposition to the investors to whom it was selling Anderson securities.  Goldman also did not disclose to potential investors that it had almost canceled the CDO, due to its assets' falling values.

205.    Of particular concern for investors was the concentration of New Century mortgages in Anderson.   On March 13, 2007, a potential investor, Rabobank, asked Goldman sales representatives: "how did you get comfortable with all the new centu ry [sic] collateral in particular the new century serviced deals – con sidering [sic] you are holding the equity and their servicing may not be around is that concerning for you at all?"  Goldman and GSC prepared a list of talking points with which to respond to the investor:

- Historically New Century has on average displayed much better performance in terms of delinq[uency] and default data

- Prepayments have tended to be higher lowering the extension risk

- Losses and REO [Real Estate Owned by a lender taking possession of a property] are historically lower than the rest of the market

- 69 -

- Traditionally the structures have strong enhancement/subordination.

206.    The talking points did not disclose that, in fact, Goldman, too, was uncomfortable with New Century mortgages.  On March 8, 2007, five days before receiving the investor's inquiry, Sparks had reported to senior Goldman executives, including Co-President Gary Cohn and CFO David Viniar, that New Century mortgages "remain[ed] a problem on [early payment default]."  On March 13, the same day as the investor inquiry, Goldman personnel completed a review of New Century mortgages with early payment defaults that were on Goldman's books and found fraud, "material compliance issues," and collateral problems.  The review found that "62% of the pool has not made any pmts [payments]" and recommended "putting back 26% of the pool" to New Century for repurchase "if possible."  Goldman also did not disclose to the investor that it was shorting 40% of the Anderson CDO.

207.    Some Goldman clients also had questions about GSC's involvement in Anderson.  An Australian sales representative wanted "more color on asset selection process, especially with respect to GSC involvement."  This clarification was necessary, because although GSC's role was mentioned in numerous internal Goldman documents, the official Anderson marketing materials did not mention GSC's role in asset selection.  In previous drafts of the marketing materials, for example, Goldman stated that "Goldman Sachs and GSC Group ("GSC") co-selected the assets"; "GSC pre-screens and evaluates assets for portfolio suitability"; the CDO was "co-sponsored by Goldman Sachs and GSC Eliot Bridge Fund"; and "Goldman Sachs and GSC ha[ve] aligned incentives with Anderson Funding by investing in a portion of equity."  But all of the references to GSC were removed from the final documents.

208.    Despite the poor reception by investors, Goldman continued "pushing the axe" with its sales force to sell Anderson securities.  Bieber identified and monitored potential investors and

attempted to sell Anderson securities to pension funds and place Anderson securities in other Goldman CDOs as collateral securities.  On March 20, 2007, when Bieber reported selling $20 million in Anderson securities, his supervisor, Ostrem, responded with the single word: "Profit!"  In a separate email a week later, Ostrem told Bieber he did an "[e]xcellent job pushing to closure these deals in a period of extreme difficulty."

209.    After several months of effort, Goldman sold approximately $102 million of the $307 million in Anderson securities.

210.    Goldman profited from holding 40% of the short position on certain Anderson assets, which produced a $131 million gain at the direct expense of the investors to whom Goldman had sold the Anderson securities.  Goldman was also paid $200,000 for serving as the liquidation agent, and collected $2 million in CDS premiums while it warehoused Anderson assets.

211.    Anderson's investors suffered substantial losses.  Seven months after its issuance, in November 2007, Anderson securities experienced their first ratings downgrades.  At that point, 27% of the assets underlying Anderson were downgraded below a B- rating.  Within a year, Anderson securities that were originally rated AAA had been downgraded to BB.  In the end, the Anderson investors were wiped out and lost virtually their entire investments.

212.    In sum, Goldman constructed the Anderson CDO using CDS contracts referencing subprime RMBS securities, the majority of which were issued by subprime lenders like New Century who were known for issuing poor quality loans.  When potential investors asked how Goldman was able to "get comfortable" with the New Century mortgage pools referenced in Anderson, Goldman attempted to dispel concerns about the New Century loans, withheld information about its own discomfort with New Century, and withheld that it was taking 40% of the short side of the CDO, essentially betting against the very securities it was selling to its clients.

Instead, Goldman instructed its sales force to tell potential investors that Goldman was buying up to 50% of the equity tranche.  Goldman also did not disclose to potential investors that it had almost cancelled the CDO due to the falling value of its assets.

### 3.    Timberwolf I

213.    Timberwolf I was a $1 billion hybrid CDO[9] transaction that Goldman constructed, underwrote, and sold.[9]  It contained or referenced A rated CDO securities which, in turn, referenced primarily BBB rated RMBS securities.  The assets in Timberwolf were selected by Greywolf Capital Management (a registered investment adviser founded by former Goldman employees), with the approval of Goldman.  Greywolf served as the collateral manager of the CDO.  Goldman effectively served as the collateral put provider.  Timberwolf was initiated in the summer of 2006, and closed in March 2007.

214.    Timberwolf's single name CDS and CDO securities were acquired from 12 different broker-dealers.  Goldman was the single largest source of assets, providing 36% of the assets by value, including $15 million in single name CDS contracts naming Abacus securities.  As a result, Goldman held 36% of the short interest in Timberwolf.

215.    Altogether, Timberwolf contained 56 different assets, of which 51 were single name CDS contracts referencing CDO securities and five were cash CDO securities.  The 51 single name CDS contracts referenced both CDO and CDO[9] securities, and each CDO or CDO[9] security contained or referenced its own RMBS, CMBS, or CDO securities or other assets.  In total, Timberwolf had over 4,500 unique underlying securities and a grand total of almost 7,000 securities.  This process was further complicated by the fact that the CDO assets in Timberwolf were privately

---

[9]    A collateralized debt obligation squared (CDO[9]) is backed by a pool of CDO tranches.

issued and often had little or no publicly available information on the underlying assets they contained.

216.     Goldman's marketing booklet for Timberwolf stated that Goldman was purchasing 50% of the equity tranche, and that Greywolf was purchasing the other 50%.  However, the booklet failed to disclose that Goldman's equity investment was far outweighed by its short investment.

217.     By the time Greywolf and Goldman were nearing completion of the acquisition of the Timberwolf assets in the spring of 2007, Goldman was becoming increasingly concerned about the deteriorating subprime mortgage market and the falling value of the assets in its CDO warehouse accounts.  In February 2007, Sparks, the Mortgage Department head, and Goldman senior executive Thomas Montag exchanged emails about the warehouse risk posed by Timberwolf and another pending CDO² called Point Pleasant.  Montag asked Sparks: "cdo squared–how big and how dangerous""  Sparks responded: "[R]oughly 2 bb [billion], and they are the deals to worry about." Sparks also told Montag that, due to falling subprime prices, the assets accumulated in the warehouse account for the $1 billion Timberwolf CDO had already incurred significant losses, those losses had eaten through all of Greywolf's portion of the warehouse risk sharing agreement, and any additional drops in value would be Goldman's exclusive obligation.

218.     In March 2007, due to the falling values of subprime RMBS and CDO securities, Goldman decided against completing several CDOs under construction, and liquidated the assets in their warehouse accounts.  Goldman decided, in contrast, to accelerate completion of Timberwolf.

219.     At the same time, on March 3, 2007, Sparks memorialized the following remarks after a telephone call: "Things we need to do . . . Get out of everything."  On March 7, 2007, Sparks again reported to Goldman's Firmwide Risk Committee on accelerating problems in the subprime mortgage market:

- 73 -

- "Game Over" – accelerating meltdown for subprime lenders such as Fremont and New Century.

- The Street is highly vulnerable, . . . .   Current strategies are to "put back" inventory, . . . or liquidate positions.

- The Mortgage business is currently closing down every subprime exposure possible.

220.   On March 8, 2007, Sparks emailed several senior executives, including Viniar and Cohn about "Mortgage risk":  "we are trying to close everything down, but stay on the short side."

221.   On March 8, 2007, in an email to senior management, Sparks listed a number of "large risks I worry about."  At the top of the list was "CDO and Residential loan securitization stoppage – either via buyer strike or dramatic rating agency change."  Sparks was referring to the possibility that Goldman would be unable to securitize and sell its remaining subprime mortgage related inventory by repackaging it into RMBS and CDOs for sale to customers.

222.   Despite Goldman's internal concerns of the CDO market, the Company proceeded with Timberwolf I and the offering closed on March 27, 2007, approximately six weeks ahead of schedule.  The final CDO had $1 billion in cash and synthetic assets, including $960 million in single name CDS referencing CDO securities, and $56 million in cash CDO securities.

223.   Not surprisingly, selling Timberwolf securities was a high priority for Goldman. Sparks worked with senior sales managers to review ideas, telling them: "I can't overstate the importance to the business of selling these positions and new issues."

224.   On March 9, 2007, Sparks emailed a call for "help" to Goldman's top sales managers around the world to "sell our new issues – CDOs and RMBS – and to sell our other cash trading positions."  The Goldman sales manager for Europe and the Middle East suggested that Sparks focus the CDO sales efforts abroad, because the clients there were not involved in the U.S. housing market and therefore were "not feeling pain."

- 74 -

225.    During the spring and summer of 2007, the Goldman Syndicate emailed the CDO sales force a list of "Senior CDO Axes" or sales directives on a weekly and sometimes daily basis, many of which placed a priority on selling Timberwolf securities.  As early as February, the Goldman sales force developed "broader lists" of clients to target for Timberwolf sales.  After exhausting those initial lists, Goldman sales personnel began to target "non-traditional" buyers' as well as clients outside of the United States.  The sales force had some early successes.  On March 28, 2007, for example, the Syndicate included a note in one of the axe sheets:

> Great job Cactus Raazi trading us out of our entire Timberwolf Single-A position – $16mm. Sales – Good job over the last two weeks moving over $66mm of risk off the axe sheet.  Please stay focused on trading these axes.

226.    As sales began to flag in April, Sparks sent emails reminding Goldman sales personnel that Timberwolf "is our priority."  On one occasion, on April 19, 2007, Sparks suggested to a sales manager offering "ginormous credits" as an incentive to sell Goldman's CDO securities: "for example, let's double the current offering of credits for [T]imberwolf."  Sparks was informed in response: "[W]e have done that with timberwolf already."

227.    On March 9, 2007, Harvey Schwartz, a senior executive at Goldman Sachs, expressed concern to Sparks and others about what Goldman sales personnel were telling clients: "Seems to me . . . one of our biggest issues is how we communicate our views of the market – consistently with what the desk wants to execute."  Sparks responded by outlining several concerns and the need for the sales team and traders to work together.  He wrote:

> 3 things to keep in mind:
>
> (1)    The market is so volatile and dislocated that priorities and relative value situations change dramatically and constantly.
>
> (2)    Liquidity is so light that discretion with information is very important to allow execution and avoid getting run over.
>
> (3)    The team is working incredibly hard and is stretched.

- 75 -

He concluded:  Priority 1 – sell our new issues and our cash positions.

228.    Despite the urgency communicated by Goldman management, Timberwolf sales slowed.  By May 11, 2007, only one Timberwolf sale had taken place in the previous several weeks. Goldman personnel also knew that the value of the Timberwolf securities, and the value of their underlying assets, were falling.

229.    On May 11, 2007, Sparks notified Goldman senior executives that marking down the value of the unsold CDO securities would indicate to the firm that their current market value had become a "real issue":

> Cdo positions and market liquidity and transparency have seized.  I posted senior guys that I felt there is a real issue. . . .  We are going to have a very large mark down – multiple hundreds.  Not good.

That same evening, David Lehman sent out a "Gameplan" to colleagues in the Mortgage Department announcing that Goldman was going to undertake a detailed valuation of its $CDO^2$ securities using three different valuation methods, and would also take "a more detailed look" at the values of the assets in the CDO warehouse accounts and in Goldman's own inventory.  Using the three valuation methods, the presentation estimated that the loss in value and the total writedowns required for the firm's CDO assets were between $237 and $448 million.

230.    Also on May 11, Chief Credit Officer Craig Broderick sent an email to his team to set up a survey of Goldman clients who might encounter financial difficulty if Goldman lowered the value of the CDO securities they had purchased.  As explained earlier, some Goldman clients had purchased their CDO securities with financing supplied by Goldman that required them to post more cash margin if the financed securities lost value.  Other clients had invested in the CDO securities by taking the long side of a CDS contract with Goldman and also had to post more cash collateral if the

- 76 -

value of the CDO securities declined.  All of these clients would also have to record a loss on their books due to the lowered valuations.

231.    With respect to the CDO securities that had yet to be sold, Goldman senior executive Harvey Schwartz raised another issue related to lowering the values of the CDO securities Goldman was selling to clients: "[D]on't think we can trade this with our clients andf [sic] then mark them down dramatically the next day. . . .  Needs to be a discussion if that risk exists."  In an email to Sparks, Montag, and Schwartz, Goldman senior executive Donald Mullen acknowledged concerns "about the representations we may be making to clients as well as how we will price assets once we sell them to clients."  The executives also agreed, however, not to "slow or delay" efforts to sell Timberwolf securities if they got "strong bids."

232.    The CDO valuation project generated many comments on how to price the firm's unsold CDO securities, including Timberwolf.  One Goldman employee, who was applying Goldman's most common valuation method to Timberwolf, wrote that the price should be dramatically lower:

> Based on current single-A CDO marks, the A2 tranche of Timberwolf would have a price of 72 cents on the dollar.

He also noted:

> Based on a small sample of single-A CDOs for which we have complete underlier marks, we believe that the risks of the RMBS underliers are frequently not fully reflected in the marks on the CDOs. If the trends in this small sample are extrapolated, the fair spread on the CDOs could even be double where they are marked now; if that were the case, the price of the A2 tranche of Timberwolf would actually be 35-41 cents on the dollar, depending on the correlation.

Several days later, in preparation for a meeting with senior executives on the valuation issue, the same Goldman employee calculated that, for the A2 tranche of Timberwolf, the "price based on

- 77 -

CDO marks" was 66 cents on the dollar, while the "price based on RMBS marks" was 24 cents on the dollar.

233.    Throughout the valuation process, senior management, including Co-President Gary Cohn, was kept posted on how the Mortgage Department planned to value the firm's CDO assets. On Sunday, May 20, 2007, the Mortgage Department presented its findings in a 9:00 p.m. conference call with CFO David Viniar and others.   The presentation's executive summary expressed concern about valuing a range of CDO assets, including unsold securities from Goldman-originated CDOs.   The presentation stated: "[T]he desk is most concerned about the CDO^2 positions, comprised of the recent Timberwolf and Point Pleasant transactions.  The lack of liquidity in this space and the complexity of the product make these extremely difficult to value."

234.    The presentation recommended unwinding and selling the assets in the CDO warehouse accounts and using "independent teams" to continue to value the unsold CDO securities from Goldman originations.  It also recommended switching to a targeted sales effort for the unsold CDO² securities, focused on four hedge fund clients: Basis Capital, Fortress, Polygon, and Winchester Capital.  The Goldman sales force apparently felt those four hedge funds were the clients most likely to buy the CDO² securities, and two of them, Basis Capital and Polygon, did subsequently purchase Timberwolf securities.  An appendix to the presentation identified another 35 clients for targeted sales efforts and provided an assessment of the CDO sales efforts for each. Several of those clients later purchased Timberwolf securities.

235.    The CDO valuation project undertaken in May provided clear notice to Goldman senior management at the highest levels that its CDO assets had fallen sharply in value, and that despite their lower value, the Mortgage Department planned to aggressively market them to customers.

- 78 -

236.     Despite Goldman's internal analysis that the value of the Timberwolf securities was in rapid decline, the Company did not lower the prices at which it marketed the securities to clients. Instead, Goldman took substantial writedowns on the value of its own CDO inventory on May 25, 2007.  For example, Goldman marked down the AAA rated Timberwolf A2 securities to a value of $80.  At the same time, Goldman continued to market them at inflated prices, selling Timberwolf A2 securities to clients at $87.00 on May 24, at $83.90 on May 30, and at $84.50 on June 11.  On May 25, Goldman also marked the AA rated Timberwolf B securities to an internal value of $65.00.  Over a month later, Goldman sold $9 million of those AA rated securities to Bank Hapoalim at a price of $78.25, but by then Goldman's internal valuation had fallen to $55, a difference of more than 30% of the market value.

**Timberwolf Sales to Basis Capital**

237.     A couple of weeks before the CDO valuation project, Goldman's Australia sales representative, George Maltezos, announced he had found a potential Australian buyer for a Goldman CDO being constructed by the Correlation Desk: "I think I found white elephant, flying pig and unicorn all at once."  This "white elephant, flying pig and unicorn" would later be identified at Basis Capital.

238.     Maltezos began pressing Basis Capital to buy the securities.  On May 22, Maltezos urged Basis Capital to consider buying the securities before the end of the quarter:

> I appreciate you are flat chat [busy] at the moment, but pls [please] keep in mind GS is an aggressive seller of risk for QTR [quarter] end purposes (last day of quarter is this Friday).  We would certainly appreciate your support, and equally help create something where the return on invested capital for Basis is over 60%.

At the same time Maltezos was claiming that a Timberwolf investment could provide over a 60% return on invested capital, Goldman's internal marks were showing that Timberwolf was continuing to fall in value.

239.     Basis Capital indicated that it was interested in the Timberwolf securities, but had several issues it needed to work through.  First, Basis Capital indicated that Goldman would have to help it find financing for the purchase price.  Second, Basis Capital was concerned about the value of its existing CDO$^2$ investment with Goldman.  On April 19, 2007, Basis Capital had purchased BBB rated Point Pleasant securities at a price of $81.72.  Goldman had provided the financing for this purchase.  Two weeks later, Goldman had marked down the value of the securities to $76.72, and asked Basis Capital to post additional cash collateral totaling $700,000.  When Basis Capital asked how the value of the security had fallen $5 in just two weeks, Goldman responded that the price had gone back up to $81.72, and no additional cash was required.

240.     In May and June 2007, Maltezos worked to convince Basis Capital to purchase $100 million in Timberwolf securities.  At one point Basis Capital pressed for a lower sales price, but was told by Maltezos: "I don't think the trading desk shares the sentiment with regard to such spread levels [lower prices]."  During the negotiations over the Timberwolf sale, on June 12, 2007, Goldman again marked down the value of the Point Pleasant securities to $75, and again asked Basis to post more cash collateral.  When Basis Capital asked Maltezos to justify the lower value, Maltezos wrote:

> [T]here has certainly been further softening in the market since the Point Pleasant trade was put on 8 weeks ago.  We have infact [sic] traded some Point Pleasant BBBs at this level in the last 2 weeks.

In fact, no such sales had taken place, and the lower value could not be justified by any sales transactions.  The lower mark was instead related to Goldman's CDO valuation project in May, which had concluded that its CDO$^2$ securities had lost significant value.

241.     Stuart Fowler at Basis Capital brought up the valuation issue in the context of the Timberwolf securities, and asked Maltezos: "I need to be very clear on this and are we going to see a

similar problem on [T]imberwolf?"  Maltezos responded: "Stuart – I assure you no foul here," and offered to set up some "1-on-1 time with the trading desk" to discuss pricing.

242.    On June 13, 2007, Lehman reported that Goldman had reached agreement on $100 million in Timberwolf sales to Basis Capital.  The sale consisted of the hedge fund taking the long side of a CDS contract with Goldman, referencing $50 million in AAA rated Timberwolf securities and $50 million in AA rated Timberwolf securities.  Lehman told Montag that the CDS premiums that Basis Capital had agreed to accept implied a cash price of $84 for the AAA securities and $76 for the AA securities.  Montag asked what Goldman's internal mark was for the Timberwolf AA securities, and Lehman responded:  "$65."

243.    The Timberwolf sale to Basis Capital was finalized on June 18, 2007.  Goldman provided the financing.  Just two weeks later, Goldman informed Basis Capital that the Timberwolf securities had lost value and required the hedge fund to post additional cash collateral.

244.    Eight days later, on July 12, Goldman again marked down the value of the Timberwolf securities to prices of $65 and $60, after having sold them to Basis Capital one month earlier at $84 and $76.  This repricing resulted in a $37.5 million movement in the value of the securities, and required Basis Capital to post substantially more cash collateral with the firm.  On July 13, 2007, Basis Capital told Goldman that one of its funds was "in real trouble."  On July 16, Goldman again marked down Basis Capital's securities to prices of $55 for AAA and $45 for AA. These prices matched Goldman's internal valuations.  By the end of July, Basis Capital was forced to liquidate its hedge fund.

**Other Timberwolf Sales**

245.    At the conclusion of the CDO valuation project, which found that Timberwolf and Goldman's other CDO securities had lost significant value, the Mortgage Department resumed its

efforts to push Timberwolf sales.  On May 24, 2007, a Goldman sales associate told Lehman and

Sparks that he wanted more information to send to a European hedge fund that was "not experts in

this space at all but [I] made them a lot of money in correlation dislocation and will do as I suggest.

Would like to show stuff in today if possible."  Lehman told the sales associate that he was available

to get on the telephone with the clients, and forwarded him the Timberwolf offering circular and

marketing materials.

246.    On June 5, 2007, Goldman trader Benjamin Case emailed Lehman with a

"[g]ameplan for distribution" or sales of Goldman's remaining $CDO^2$ securities.  The plan was to

target "institutional buyers that can take larger bite size than traditional CDO buyers . . . for example,

Asian banks and insurance companies."  Case also noted that Goldman was shorting "51 CDO

names in the two portfolios [Timberwolf and Point Pleasant] and we have been aggressively

sourcing further protection in the CDS market on names in the two portfolios recently."

247.    In early June, Goldman targeted a Korean insurance company called Hungkuk Life

for Timberwolf sales.  According to a Goldman employee in the Japan sales office, Jay Lee, "the

largest hurdle from the client's perspective is whether or not they can get the mandate to buy

something backed by synthetically sourced CDO's [sic], as they have never bought CDO^2 before."

Lee was also concerned that the value of the securities would drop soon after the office sold the

Timberwolf securities to the insurance company.  Lee stated:

> [T]he largest hurdle from a sales' perspective is MTM [mark to market].  It is
> an important client, and if the mark widens out more than 1pt immediately after
> selling the asset to them, sales cannot sell it.  Understanding that it is a volatile asset,
> sales wants to know that where we sell it to the client will not be more than 1pt less
> than where the mark would be, provided no new market information.

Despite Lee's concerns, on June 1, he reported that Hungkuk Life had purchased $36 million in

AAA rated Timberwolf securities.  Sparks responded "good job – keep going."

- 82 -

248.     Six days later, on June 7, 2007, the head of the Goldman Japan sales office, Omar

Chaudhary, contacted Sparks and Lehman about a possible additional sale of Timberwolf securities

to Hungkuk Life.  Chaudhary wrote that the head of Goldman's Korean sales office was "pushing on

our personal relationships" to make the sale and wanted to be assured he'd be paid more if he "got it

done":

> Jay and I spoke to the head of Korea Sales today.  He said that he feels like he
> can push for H[ungkuk] Life to increase their size from the 36mm of AAA's and
> wanted to see if we would pay more GC's [sales credits] if he got it done.  Told him
> that if we sell –45-50mm+ [$45-50 million more] that we would honor the 7.0% even
> if we trade at 84.5 dollar px [expected price].  Trust you will support this as we are
> pushing on our personal relationships to get this done.

Lehman and Sparks told Chaudhary to "go for it" and "[g]et `er done."  The Korean office did get it

done, and Goldman sold another $56 million in Timberwolf securities to Hungkuk Life at a price of

$84.50.  The sales representative was awarded the 7% sales credit.  Sparks wrote to the sales office:

"you boys are awesome and many people are noticing."  Montag, a senior Goldman executive

monitoring the Timberwolf sales, told the mortgage team it had done an "incredible job – just

incredible."

249.     On June 11, 2007, Lehman received an email from the Goldman Syndicate asking

whether the CDO axe sheet, which included directives to sell Timberwolf securities, could be sent to

the Japan sales office for re-distribution to sales representatives across Asia.  Lehman agreed: "let's

send to all Japan sales."  Two days later, on June 13, 2007, the Japan sales office reported over $250

million in new sales of Goldman's CDO securities, including Timberwolf.

250.     Montag continued to monitor the sales of Timberwolf as well as other CDO securities

in Goldman's inventory and warehouse accounts.  On June 22, 2007, Sparks reported to him on the

completion of a number of sales of CDO and RMBS securities that Goldman had purchased from the

two failed Bear Stearns hedge funds.  Montag asked Sparks to provide him with a "complete

rundown" on "what[']s left."  Sparks responded that the "main thing left" was $300 million in Timberwolf securities.  Montag responded: "***boy that timeberwo[ll]f was one shitty deal***."

251.     Despite Montag's assessment of Timberwolf, he continued to press for the sale of Timberwolf securities to Goldman clients.  On June 25, 2007, Sparks emailed Montag and others with another update on selling Goldman's remaining CDO assets.  Sparks informed the group that Goldman would probably have to lower the values of the CDO assets over the next few days, but that the net effect for Goldman would be positive, since its short position was larger than its long.  In fact, the Mortgage Department made $42.5 million that day.  Montag remained focused on Timberwolf, responding: "[h]ow are twolf sales doing?"

252.     On July 12, 2007, another Goldman sales representative, Leor Ceder, reported selling $9 million in Timberwolf securities to Bank Hapoalim at a price of $78.25.  Goldman trader Mitchell Resnick asked Lehman "to pay him well on this."  Ceder was paid an 8% sales credit.  That was Goldman's last Timberwolf sale, even though its Syndicate continued to list the CDO as a top sales priority for months afterward.

253.     Goldman ultimately sold about $853 million of the $1 billion in Timberwolf securities to about 12 investors.

**Limited Disclosures**

254.     Despite their aggressive sales efforts, Goldman sales personnel typically did not help potential investors analyze the Timberwolf securities and the 4,500 unique assets underlying the CDO.  One Goldman employee told his colleagues: "In terms of telling customers.  I prefer to give them the general idea of the trade.  Then give them the excel spread sheet with our info on ref obs [reference obligations] and let them draw their own conclusions."  Another Goldman employee, discussing a potential buyer of Timberwolf, warned:

- 84 -

> [H]e is going to want to look at the TWOLF trade on a fundamental basis with a lot
> of supporting runs to back up any additional mark downs we have – telling him we
> are busy when it comes to month end and we can't run that analysis because we are
> resource-constrained will not be good enough.

Still another Goldman employee stated with respect to Timberwolf and Point Pleasant: "The trickiest part about sharing this [pricing] analysis with custies [customers] is that it shows just how rudimentary our own understanding of these positions actually is."

255.   Goldman also in many instances refused to provide investors with its pricing methodology or specific prices or values for the CDO securities it was selling.  After its securities began to lose value, Basis Capital emailed George Maltezos, David Lehman, and others asking: "How many times do we have to request data points and scenarios by email.  These were read out to us on the call and it was agreed that GS would send them through.  I am getting weary of continually hearing about transparency and yet an obvious avoidance of 'putting things to paper.'"

256.   Similarly, when Hungkuk Life requested additional information about the underlying Timberwolf assets, Goldman sent an asset report, but only after removing all of its pricing and valuing information related to those assets.  In August 2007, Jay Lee from Goldman's Japan sales office told a sales associate who was seeking information about Goldman's marks for Tokyo Star Bank:

> [U]nder no circumstances are we going to be able to provide materials specific to
> Timberwolf  . . .  or even use the word "mark" in written materials. . . .  Everything
> will be described in general terms, and if what we provide is too vague or general,
> the medium for further clarification must be oral, not written.

Lehman added: "[W]e should be clear that the information we are providing is not our pricing methodology but rather some tho[ugh]ts on the current market."

257.     A Goldman salesperson in Taiwan sought help in explaining Goldman's markdowns to a bank whose CDO investment had been marked down from about 97 to about 45 cents on the dollar in a matter of weeks:

> [B]ank just bought the altius deal from gs [Goldman Sachs] 5 weeks ago and the mtm [mark-to-market] dropped over 50%. We understand the liquidity is thin but I really need some info to support this price. . . .  This is very important as this transaction has a lot to do with our reputation in Taiwan market. I understand that all deals are down and spread is trading wider now.  Unless the principal is at risk now, the mtm is not supposed to drop so quickly during such short period of time.

258.     Furthermore, as Goldman marked down the values in the summer of 2007, it began to decrease the volume of the securities it was willing to buy or sell at the prices it quoted to clients. Goldman was initially willing to buy or sell CDO securities in blocks of $10 million, but by July, it lowered the maximum size to $3 million for some securities and $1 million for others: "Given the current market environment, we would like our bid for size for CDO valuations to be MAX $3mm for AAA to AA, and $1mm for A and below.  No valuations should go out with a bid for $10mm."

**"A Day that Will Live in Infamy"**

259.     The Timberwolf securities issued by Goldman steadily lost money from the day they were issued.  Less than four months after they were issued, on July 16, 2007, Lehman instructed the Timberwolf deal captain, Bieber, to "create an 'unwind' spreadsheet . . . where we can input CDS spds [spreads]/prices and liability prices so we can determine if unwinding these deals makes sense." The analysis appeared to show that it would cost Goldman $140 million to unwind Timberwolf, and the conclusion was to "Hold Off."  Instead of unwinding, Goldman continued its sales push.

260.     In September 2007, Montag asked for data tracking the drop in prices for a Goldman CDO that experienced a dramatic fall in value, such as Timberwolf.  In response, a Goldman employee provided prices for the A2 tranche of the Timberwolf securities using a combination of Goldman's internal marks and the bids provided to investors, from the issuance of the CDO on

- 86 -

March 27, 2007 through September.  The data showed that, in six months, prices for Timberwolf's

AAA rated A2 security had fallen from $94 per security to $15, a drop of almost 80%:

| | |
|---|---|
| 3/31/07 | 94-12 |
| 4/30/07 | 87-25 |
| 5/31/07 | 83-16 |
| 6/29/07 | 75-00 |
| 7/31/07 | 30-00 |
| 8/31/07 | 15-00 |
| Current | 15-00 |

261.    After receiving this pricing history, Bieber, the Timberwolf deal captain, described

March 27, the Timberwolf issuance date, as "a day that will live in infamy."

262.    Between mid-June 2007 and early August 2007, the value of Timberwolf securities

dropped precipitously.  Indeed, Goldman personnel were aware of its falling value while selling the

securities to clients.  Goldman profited in part from Timberwolf's decline in value due to its 36%

short interest in the CDO.  In addition, June was the month that Goldman built its $13.9 billion big

short, which meant that the decline in most mortgage related assets translated into increasing profits

for Goldman.

263.    Timberwolf experienced its first credit rating downgrades in November 2007, just

eight months after the CDO closed and issued its securities.  The downgrades included the AAA

rated securities.  In March 2008, one year after Timberwolf was issued, its AAA securities were

downgraded to junk status.  In June 2008, a controlling class of debt investors voted to liquidate

Timberwolf, and the deal was terminated in October 2008.

264.    Goldman's 36% short position in Timberwolf produced about $330 million in

revenues at the direct expense of the clients to whom Goldman had sold the Timberwolf securities.

Goldman also made $3 million in interest while the Timberwolf assets were in Goldman's

warehouse account.

- 87 -

265.     Timberwolf's investors lost virtually their entire investments.  Basis Capital ended up declaring bankruptcy and has filed suit against Goldman.

266.     One Goldman salesperson expressed remorse over the impact on their customers of CDO sales followed by large markdowns within days or weeks of the client's purchase:

> Real bad feeling across European sales about some of the trades we did with clients. ***The damage this has done to our franchise is very significant.***  Aggregate loss for our clients on just . . . 5 trades alone is 1bln+.

267.     In sum, Goldman constructed Timberwolf using CDO assets that began to fall in value almost as soon as the Timberwolf securities were issued, yet solicited clients to buy the securities.  Timberwolf contained or referenced CDO assets with more than 4,500 unique mortgage related securities, but Goldman offered potential investors little help in understanding those securities, and targeted clients with limited or no experience in CDO investments.  When marketing Timberwolf, Goldman withheld its internal marks showing the securities losing value and did not mention its short position.  Senior Goldman executives knew the firm was selling poor quality assets at inflated prices.  Within six months of issuance, AAA Timberwolf securities lost almost 80% of their value.  Due to its overall short position in Timberwolf and other mortgage related assets, Goldman profited at the expense of the clients to whom it sold the Timberwolf securities.

### C.     The Findings of the Senate Subcommittee

268.     The Senate Subcommittee found that Goldman's undisclosed conduct in connection with Abacus, Hudson, Anderson and Timberwolf created a clear conflict of interest with Goldman's clients.  The Senate Subcommittee found:

> (2) **Magnifying Risk**.  Goldman Sachs magnified the impact of toxic mortgages on financial markets by re-securitizing RMBS securities in collateralized debt obligations (CDOs), referencing them in synthetic CDOs, selling the CDO securities to investors, and using credit default swaps and index trading to profit from the failure of the same RMBS and CDO securities it sold.

- 88 -

(3)   **Shorting the Mortgage Market**. As high risk mortgage delinquencies increased, and RMBS and CDO securities began to lose value, Goldman Sachs took a net short position on the mortgage market, remaining net short throughout 2007, and cashed in very large short positions, generating billions of dollars in gain.

(4)   **Conflict Between Client Interests and Proprietary Trading**. In 2007, Goldman Sachs went beyond its role as market maker for clients seeking to buy or sell mortgage related securities, traded billions of dollars in mortgage related assets for the benefit of the firm without disclosing its proprietary positions to clients, and instructed its sales force to sell mortgage related assets, including high risk RMBS and CDO securities that Goldman Sachs wanted to get off its books, and utilizing key roles in CDO transactions to promote its own interests at the expense of investors, creating a conflict between the firm's proprietary interests and the interests of its clients.

269.   Further, according to then-Senate Subcommittee Chairman Sen. Carl Levin:

Investment banks such as Goldman Sachs were not simply market-makers, they were self-interested promoters of risky and complicated financial schemes that helped trigger the [financial] crisis[.]  They bundled toxic mortgages into complex financial instruments, got the credit rating agencies to label them as AAA securities, and sold them to investors, magnifying and spreading risk throughout the financial system, and all too often betting against the instruments they sold and profiting at the expense of their clients.

270.   As set forth below, defendants' undisclosed fraudulent conduct rendered its statements from February 2007 – April 2010 false and misleading.

> **D.   Defendants' False and Material Misstatements and Omissions Which Failed to Disclose Goldman's Conflicts of Interest with Its Clients and the Impact on Goldman's "Best in Class Franchise"**

271.   On February 6, 2007, Goldman issued its Form 10-K for fiscal year ended November 24, 2006, which was signed by defendants CEO Blankfein and CFO Viniar and represented that:

**Trading and Principal Investments**

Trading and Principal Investments represented 68% of 2006 net revenues. . . .

\*        \*        \*

*We believe our willingness and ability to take risk to facilitate client transactions distinguishes us from many of our competitors and substantially enhances our client relationships*.

- 89 -

*      *      *

We generate trading net revenues from our customer-driven businesses in three ways:

- First, in large, highly liquid markets, we undertake a high volume of transactions for modest spreads and fees.

- Second, by capitalizing on our strong relationships and capital position, we undertake transactions in less liquid markets where spreads and fees are generally larger.

- Finally, we structure and execute transactions that address complex *client needs*.

272.    Goldman, in its 2006 Form 10-K, further stated that:

Conflicts of interest are increasing and a failure to appropriately deal with conflicts of interest could adversely affect our businesses.

*Our reputation is one of our most important assets*. As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interests of another client, as well as situations where one or more of our businesses have access to material non-public information that may not be shared with other businesses within the firm.

*      *      *

*We have extensive procedures and controls that are designed to address conflicts of interest*, including those designed to prevent the improper sharing of information among our businesses. However, appropriately dealing with conflicts of interest is complex and difficult, and *our reputation could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to deal appropriately with conflicts of interest*. *In addition, potential or perceived conflicts could give rise to litigation or enforcement actions*.

273.    In its 2006 Form 10-K, Goldman stressed the various committees that monitored the Company's business practices and purportedly ensured that Goldman conducted itself with the highest priority.  Specifically, Goldman represented that its "Business Practices Committee" assisted senior management in its oversight of compliance and operational risks and related *reputational*

- 90 -

concerns and that "the Business Practices Committee also reviews Goldman Sachs' business practices, policies and procedures for consistency with our business principles."

274.    Goldman also represented in its 2006 Form 10-K that a separate committee, the "Commitments Committee," reviewed and approved underwriting and distribution activities, primarily with respect to offerings of equity and equity-related securities, and "sets and maintains policies and procedures designed to ensure that legal, **reputational**, regulatory and business standards are maintained in conjunction with these activities."

275.    Goldman further stated in its 2006 Form 10-K that's its "Structured Products Committee" reviewed and approved structured product transactions entered into with clients that "raise legal, regulatory, tax or accounting issues or present **reputational** risk to Goldman Sachs."

276.    The above statements were materially false and misleading because defendants failed to disclose Goldman's fraudulent conduct and conflicts of interest with its clients in connection with Hudson, Anderson, Timberwolf and Abacus, including that Goldman had (i) identified toxic mortgage-backed securities and CDOs held on its books that Goldman believed would significantly decline in value and cause the firm to lose billions; (ii) packaged and sold these securities to Goldman's own clients in order to shift the risks posed by those toxic assets from Goldman's books onto those of its clients, and not in response to client demand; (iii) made affirmative misrepresentations to its own clients in order to hide the fact that Goldman had bet against these securities; and (iv) made billions at its own clients' expense when the value of these securities plummeted, just as Goldman anticipated they would.  They also omitted the known fact that Goldman was engaged in direct conflicts of interest with its clients, while Goldman warned that such conflicts could only "potentially" arise.  These statements were further materially false and misleading because Goldman did not adequately monitor the business conduct of its employees.

Indeed, senior management openly instructed employees to shift the risks of toxic mortgage-backed securities from Goldman's books on to investors, which when ultimately disclosed caused severe *reputational* damage to Goldman's client franchise.  These statements were also materially false and misleading for the reasons stated in ¶¶148-270.

277.    On February 21, 2007 Goldman issued its 2006 Annual Report to Shareholders, which contained "The Goldman Sachs Business Principles," including:

> <u>1</u> ***Our clients' interests always come first.***  Our experience shows that if we serve our clients well, our own success will follow.
>
> <u>2</u>  Our assets are our people, capital and ***reputation.  If any of these is ever diminished, the last is the most difficult to restore.  We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard***.
>
> \*       \*       \*
>
> <u>14</u>  ***Integrity and honesty are at the heart of our business***.

278.    The above statements were materially false and misleading for reasons stated in ¶¶148-276 above.

279.    On March 13, 2007, Goldman held an investor conference call to discuss its first quarter 2007 results.  CFO Viniar told investors:  "[Our] record results for the first quarter, . . . reflects the depth of our client franchise and the diversity of our business mix."  The above statement was materially false and misleading for the reasons stated in ¶¶148-278 above.

280.    On June 14, 2007, Goldman held an investor conference call to discuss its second quarter 2007 results, Goldman CFO Viniar stressed that it was "another strong quarter" for the Company:

> Most importantly, and ***the basic reason for our success, is our extraordinary focus on our clients***.

The above statements was materially false and misleading for the reasons stated in ¶¶148-279 above.

- 92 -

281.   On November 13, 2007, Goldman CEO Blankfein told investors at the 2007 Merrill Lynch Banking and Financial Investor Services Conference that:

> *What drove performance was the quality of our client franchise*.  To me, franchise describes the extent to which *our clients come to us for help, advice, and execution.  From those relationships, business opportunities are brought to the firm*.

The above statements were materially false and misleading for the reasons stated in ¶¶148-280 above.

282.   On December 18, 2007, Goldman held an investor conference call to discuss fourth quarter 2007 results.  Goldman CFO Viniar highlighted that Goldman's client franchise and reputation allowed the Company to continue to flourish in the midst of the subprime meltdown unlike its main competitors:

> In light of the recently more challenging market conditions, *our record results demonstrate* the diversity of our business mix, the breadth of our global footprint and most importantly *the strength of the Goldman Sachs client franchise*.

> \*     \*     \*

> FICC produced another record year in arguabl[y] the most challenging mortgage and credit markets [we] have seen in almost a decade.  *At the core of fixed success is the strength of its clients franchise*.

The above statement was materially false and misleading for the reasons stated in ¶¶148-281 above.

283.   On January 29, 2008, Goldman issued its Form 10-K for fiscal year ended November 30, 2007 which was signed by defendants CEO Blankfein and CFO Viniar and represented that:

**Trading and Principal Investments**

Trading and Principal Investments represented 68% of 2007 net revenues.

> \*     \*     \*

> *We believe our willingness and ability to take risk to facilitate client transactions distinguishes us from many of our competitors and substantially enhances our client relationships*.

- 93 -

*        *        *

We generate trading net revenues from our ***customer-driven*** businesses in three ways:

- First, in large, highly liquid markets, we undertake a high volume of transactions for modest spreads and fees.

- Second, by capitalizing on our strong relationships and capital position, we undertake transactions in less liquid markets where spreads and fees are generally larger.

- Finally, we structure and execute transactions that address complex client needs.

284.    In its 2007 Form 10-K, Goldman further stated that:

Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.

***Our reputation is one of our most important assets***.  As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest, ***including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interests of another client***, as well as situations where one or more of our businesses have access to material non-public information that may not be shared with other businesses within the firm.

*        *        *

***We have extensive procedures and controls that are designed to identify and address conflicts of interest***, including those designed to prevent the improper sharing of information among our businesses. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and ***our reputation could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or enforcement actions***.

285.    In its 2007 Form 10-K, Goldman touted the various committees that monitored the

Company's business practices.  Specifically, Goldman represented in its annual SEC filings that its

"Business Practices Committee" assisted senior management in its oversight of compliance and

operational risks and related ***reputational*** concerns, in order to "ensure the consistency of our

policies, practices and procedures with our Business Principles."

- 94 -

286.    Goldman also represented in its 2007 Form 10-K that a separate committee, the "Commitments Committee," reviewed and approved underwriting and distribution activities, primarily with respect to offerings of equity and equity-related securities, and "sets and maintains policies and procedures designed to ensure that legal, *reputational*, regulatory and business standards are maintained in conjunction with these activities."

287.    Goldman further stated in its 2007 Form 10-K that's its "Structured Products Committee" reviewed and approved structured product transactions entered into with clients that "raise legal, regulatory, tax or accounting issues or present *reputational* risk to Goldman Sachs."

288.    The above statements were materially false and misleading for the reasons stated in ¶¶148-282 above.

289.    On March 7, 2008, Goldman issued its 2007 Annual Report to Shareholders which contained "The Goldman Sachs Business Principles," including:

> 1  *Our clients' interests always come first*.  Our experience shows that if we serve our clients well, our own success will follow.
>
> 2  *Our assets* are our people, capital and *reputation*.  *If any of these is ever diminished, the last is the most difficult to restore*.  *We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us*.  *Our continued success depends upon unswerving adherence to this standard*.
>
> *         *         *
>
> 14  *Integrity and honesty are at the heart of our business*.

290.    The above statements were materially false and misleading for the reasons stated in ¶¶148-288 above.

291.    On March 18, 2008, Goldman held an investor conference call to discuss first quarter results. CEO Viniar stated:

> However, given the significant weakness in the broader market environment during the first quarter, *we believe our results clearly demonstrate value of the Goldman*

- 95 -

*Sachs client franchise* and business model, as well as our culture of teamwork and risk management.

The above statement was materially false and misleading for the reasons stated in ¶¶148-290 above.

292.   On September 16, 2008 Goldman held an investor call to discuss its third quarter

2008 results.  CFO Viniar stated:

Through our financial performance as a public company, we have repeatedly demonstrated the benefits of having a deep and broad franchise.  It is this business model and franchise which, despite the challenging environment, generated a return on equity of nearly 19% over the past four quarters.

\*       \*       \*

While I cannot predict the near-term macro environment, *I can assure you that Goldman Sachs has never been closer to our clients* or better positioned to face tough markets and take advantage of profitable opportunities.  *We will continue to manage this firm with our focus utmost on protecting this valuable franchise*.

The above statements were materially false and misleading for the reasons stated in ¶¶148-291

above.

293.   On January 27, 2009, Goldman issued its Form 10-K for fiscal year ended November

30, 2008 which was signed by defendants CEO Blankfein and CFO Viniar and represented that:

**Trading and Principal Investments**

Trading and Principal Investments represented 41% of 2008 net revenues.

\*       \*       \*

*We believe our willingness and ability to take risk to facilitate client transactions distinguishes us from many of our competitors and substantially enhances our client relationships*.

\*       \*       \*

We generate trading net revenues from our client-driven businesses in three ways:

- First, in large, highly liquid markets, we undertake a high volume of transactions for modest spreads and fees.

- 96 -

- Second, by capitalizing on our strong relationships and capital position, we undertake transactions in less liquid markets where spreads and fees are generally larger.

- Finally, we structure and execute transactions that address complex client needs.

294.    Goldman, in its 2008 Form 10-K, further stated that:

Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.  As we have expanded the scope of our businesses and our client base, we increasingly must address potential conflicts of interest, *including situations where our services to a particular client or our own investments or other interests conflict, or are perceived to conflict, with the interests of another client*, as well as situations where one or more of our businesses have access to material non-public information that may not be shared with other businesses within the firm and situations where we may be a creditor of an entity with which we also have an advisory or other relationship.

*       *       *

*We have extensive procedures and controls that are designed to identify and address conflicts of interest*, including those designed to prevent the improper sharing of information among our businesses.  However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation, which is one of our most important assets, could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or enforcement actions.

295.    In its 2008 Form 10-K, Goldman also touted the various committees that monitored the Company's business practices.  Specifically, Goldman represented in its annual SEC filings that its "Business Practices Committee" assisted senior management in its oversight of compliance and operational risks and related *reputational* concerns, in order to "ensure the consistency of our policies, practices and procedures with our Business Principles."

296.    Goldman also represented in its 2008 Form 10-K that a separate committee, the "Commitments Committee," reviewed and approved underwriting and distribution activities, primarily with respect to offerings of equity and equity-related securities, and "sets and maintains

- 97 -

policies and procedures designed to ensure that legal, *reputational*, regulatory and business standards are maintained in conjunction with these activities."

297.    Goldman further stated in its 2008 Form 10-K that's its "Structured Products Committee" reviewed and approved structured product transactions entered into with clients that "raise legal, regulatory, tax or accounting issues or present *reputational* risk to Goldman Sachs."

298.    The above statements were materially false and misleading for the reasons stated in ¶¶148-292 above.

299.    On April 6, 2009 Goldman issued its 2008 Annual Report to Shareholders which contained "The Goldman Sachs Business Principles," including:

<u>1</u>  *Our clients' interests always come first*.  Our experience shows that if we serve our clients well, our own success will follow.

<u>2</u>  Our assets are our people, capital and *reputation.  If any of these is ever diminished, the last is the most difficult to restore.  We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard*.

\*      \*      \*

<u>14</u>  *Integrity and honesty are at the heart of our business*.

300.    The above statements were materially false and misleading for the reasons stated in ¶¶148-298 above.

301.    On July 14, 2009 Goldman held an investor conference call to discuss its second quarter 2009 results.  CFO Viniar stated:

For the past two years, we've operated in an extremely challenging environment.  *Our performance in this cycle has been guided by several principles, including putting our clients' needs first*, executing our stated strategy and acting as a good steward of the Firm.  *We adhere to these philosophies to enhance and preserve our franchise* and protect the interest of our shareholders.  These are long-standing principles, and we remain committed to them.

- 98 -

The above statements were materially false and misleading for the reasons stated in ¶¶148-300 above.

302.     Goldman, in its 2009 Form 10-K, which was issued on February 26, 2010, stated that:

**Trading and Principal Investments**

Trading and Principal Investments represented 76% of 2009 net revenues. . . .

***We believe our willingness and ability to take risk to facilitate client transactions distinguishes us from many of our competitors and substantially enhances our client relationships***.

\*         \*         \*

We generate trading net revenues from our ***client-driven*** businesses in three ways:

• First, in large, highly liquid markets, we undertake a high volume of transactions for modest spreads and fees.

• Second, by capitalizing on our strong relationships and capital position, we undertake transactions in less liquid markets where spreads and fees are generally larger.

• Finally, we structure and execute transactions that address complex ***client needs***.

303.     Goldman, in its 2009 Form 10-K, further stated that:

Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.  As we have expanded the scope of our businesses and our client base, we increasingly must address potential conflicts of interest, ***including situations where our services to a particular client or our own investments or other interests conflict, or are perceived to conflict, with the interests of another client***, as well as situations where one or more of our businesses have access to material non-public information that may not be shared with other businesses within the firm and situations where we may be a creditor of an entity with which we also have an advisory or other relationship. . . .

***We have extensive procedures and controls that are designed to identify and address conflicts of interest***, including those designed to prevent the improper sharing of information among our businesses. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and ***our reputation, which is one of our most important assets, could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts***

- 99 -

*of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions*.

304.    The above statements were materially false and misleading for the reasons stated in

¶¶148-301 above.

305.    On April 7, 2010, Goldman issued its 2009 Annual Report to Shareholders which

contained "The Goldman Sachs Business Principles," including:

1 *Our clients' interests always come first*.  Our experience shows that if we serve our clients well, our own success will follow.

2 Our assets are our people, capital and *reputation.  If any of these is ever diminished, the last is the most difficult to restore.  We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard*.

*                *                *

14 *Integrity and honesty are at the heart of our business*.

306.    The above statements were materially false and misleading for the reasons stated in

¶¶148-304 above.

## IX.    THE TRUTH REGARDING GOLDMAN'S FRAUDULENT CONDUCT IS REVEALED

307.    On April 16, 2010, shortly after the market opened, the SEC filed a complaint

charging Goldman with securities fraud in connection with the Abacus CDO.  The SEC alleged:

The Commission brings this securities fraud action against Goldman, Sachs & Co. ("GS&Co") and a GS&Co employee, Fabrice Tourre ("Tourre"), for making *materially misleading statements and omissions in connection with a synthetic collateralized debt obligation* ("CDO") GS&Co structured and marketed to investors.  This synthetic CDO, Abacus 2007AC1, was tied to the performance of subprime residential mortgage-backed securities ("RMBS") and was structured and marketed by GS&Co in early 2007 when the United States housing market and related securities were beginning to show signs of distress.  Synthetic CDOs like Abacus 2007-AC1 contributed to the recent financial crisis by magnifying losses associated with the downturn in the United States housing market.

GS&Co marketing materials for Abacus 2007-AC1 – including the term sheet, flip book and offering memorandum for the CDO – *all represented that the*

- 100 -

*reference portfolio of RMBS underlying the CDO was selected by ACA Management LLC* ("ACA"), a third-party with experience analyzing credit risk in RMBS.  *Undisclosed* in the marketing materials and *unbeknownst to investors*, a large hedge fund, Paulson & Co. Inc. ("Paulson"), with economic interests directly adverse to investors in the Abacus 2007-AC1 CDO, played a significant role in the portfolio selection process.  After participating in the selection of the reference portfolio, Paulson effectively shorted the RMBS portfolio it helped select by entering into credit default swaps ("CDS") with GS&Co to buy protection on specific layers of the Abacus 2007-AC1 capital structure.  Given its financial short interest, Paulson had an economic incentive to choose RMBS that it expected to experience credit events in the near future.  *GS&Co did not disclose Paulson's adverse economic interests or its role in the portfolio selection process in the term sheet, flip book, offering memorandum or other marketing materials provided to investors*.

*   *   *

By engaging in the misconduct described herein, GS&Co and Tourre directly or indirectly engaged in transactions, acts, practices and a course of business that violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. §77q(a) ("the Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b)("the Exchange Act") and Exchange Act Rule 10b-5, 17 C.F.R. §240.10b-5.  The Commission seeks injunctive relief, disgorgement of profits, prejudgment interest, civil penalties and other appropriate and necessary equitable relief from both defendants.

308.    Upon this news, Goldman stock immediately declined, ultimately falling from $184.27 per share on April 15, 2010 to $160.70 per share on April 16, 2010, a decline of 13% on extremely high volume of 101.9 million shares.  Shareholders suffered a $13 billion dollar loss in the value.

309.    Market analysts estimated that the financial impact to Goldman of the SEC lawsuit was approximately  $1 billion, reflecting the potential penalties relating to the Abacus deal.

310.    The $13 billion loss in shareholder value in Goldman's stock on April 16, 2010, immediately following the filing of the SEC fraud suit grossly exceeded the $1 billion estimated "worst case" financial impact to Goldman from an unfavorable verdict in the SEC fraud suit.

311.    Despite this undeniable fact, on April 20, 2010, Goldman Co-General Counsel Gregory Palm told the public that Goldman's failure to disclose the fact that it knew as soon as July

- 101 -

2009 that the SEC intended to bring securities fraud charges was justified because Goldman did not

consider the Wells Notice to be material:

> [W]hat I would say about that is our policy has always been to disclose to our investors everything that we consider to be material.  And that would include investigations, obviously lawsuits, regulatory matters, anything.  Whether there is a Wells or not a Wells, if we consider it to be material we go ahead and disclose it and that is our policy.  To get to your question we do not disclose every Wells we get simply because that wouldn't make sense.  Therefore we just disclose it if we consider it to be material.

312.    Market commentary further confirmed what the $13 billion dollar loss in shareholder

value already established – that the financial impact to Goldman due to the SEC fraud charge was

obviously material and not limited to the potential penalties relating to Abacus.  Rather, when the

SEC's fraud charge revealed Goldman's undisclosed conduct of betting against its clients to make

billions, Goldman suffered severe harm and investors punished the stock accordingly.

313.    On April 16, 2010, Professor John Coffee, one of the leading and renowned defense

experts in the securities fraud area told *Dow Jones*:

> "These charges are far more severe than anyone had imagined," and suggest Goldman teamed with "the leading short-seller in the industry to design a portfolio of securities that would crash," said **John Coffee**, a securities law professor at Columbia Law School in New York.
>
> "***The greatest penalty for Goldman is not the financial damages – Goldman is enormously wealthy – but the reputational damage***," he said, adding that "it's not impossible" to contemplate that the case could lead to criminal charges.

314.    Market analysts agreed with Professor Coffee:

*   April 19, 2010 Macquarie (USA) Equities Research

> Normally, firms settle with the SEC to avoid the risk of losing in court, which would tee-up huge class-action wins.  However, in this case, the losses only total $1bn.  ***Typically, reputational damage, particularly in the institutional context, is a paper tiger.  However, in this case, the response by the media and Washington has been so severe***, that we believe management will want their day in court to prove the firm's innocence.  As a result, we may not see the typical settlement but a trial.

- 102 -

As for the direct financial impact, the worst-case scenario is probably $1.10/sh or 6% of our 2010 estimate while there were no material expectations for synthetic CDO revenue in forward estimates. **_As for reputation, Goldman clients are "eyes-wide-open"_**.

- April 22, 2010 the *Times (London)*

   **_There were signs yesterday that the scandal was costing Goldman business. BayernLB, one of Germany's biggest banks, said that it would stop dealing with Goldman with immediate effect_**.

315.    Moody's, one of the largest credit rating agencies, confirmed that the damage caused by the SEC lawsuit went well beyond the potential $1 billion penalty relating to Abacus:

   April 19, 2010 Moody's Weekly Credit Outlook Report:

   On Friday morning in a civil complaint, the SEC accused Goldman Sachs (A1, negative) of fraud in the marketing and origination of a synthetic collateralized debt obligation (CDO).  Later on Friday, Goldman Sachs denied the SEC's allegations.  **_This development is a credit negative for Goldman Sachs given the potential franchise implications and direct financial costs_**.

316.    Between April 16, 2010 and June 10, 2010, Goldman suffered additional significant stock price declines.  On April 25-26, 2010, the Senate Subcommittee released Goldman internal emails further detailing that Goldman made billions by betting against the CDOs it sold to its clients.

317.    Upon the disclosure of this new information relating to Goldman's fraudulent conduct, on April 26, 2010, Goldman stock declined approximately 3.5% from $157.40 to $152.03.

318.    On April 29, 2010, two days after ten Goldman executives, including CEO Blankfein, CFO Viniar, COO Cohn, and Mortgage Department Head Daniel Sparks testified before the Senate Subcommittee and vehemently denied that they had done anything wrong, the *Wall Street Journal* reported that Goldman was the subject of a criminal investigation by the Department of Justice.

319.    Upon the disclosure of this news on April 30, 2010, Goldman suffered an approximate 9.5% stock price decline from $160.24 to $145.20.

- 103 -

320.    Market commentary again confirmed that this new information caused Goldman's stock to decline.

321.    On May 5, 2010 Fitch Ratings lowered Goldman's "Ratings Outlook" from "Stable" to "Negative," stating:

> ***The Rating Outlook revision to Negative incorporates recent legal developments and ongoing regulatory challenges that could adversely impact Goldman's reputation and revenue generating capacity. Goldman's franchise and market position are potentially vulnerable to scrutiny by stakeholders, and like peers, may be affected by the industry's regulatory evolution***.

> Subsequent to civil fraud charges filed by the Securities and Exchange Commission (SEC) last month, it appears that the U.S. Attorney's Office in Manhattan is initiating a criminal probe in connection with Goldman's mortgage trading activity.  Given the level of recent public scrutiny, it is not surprising that other authorities outside of the U.S. have also expressed intentions to investigate select mortgage-related transactions conducted by Goldman.  At a minimum, ***Fitch believes the civil charges to date and the pending criminal investigation, coupled with a highly public hearing by the U.S. Senate's Permanent Subcommittee on Investigations, generate adverse publicity that tarnishes Goldman's reputation. And for financial services companies, particularly those dependent on the capital markets, reputation is critically important***.

322.    On June 10, 2010, it was reported that the SEC was investigating whether in connection with the Hudson CDO, Goldman profited by ridding itself of mortgage backed securities and related CDO's on Goldman's books that it knew were going to decline by selling these securities to Goldman's clients who suffered billions in losses.  Goldman stock fell over 2%, from $136.80 to $133.77.

323.    Market commentary again confirmed that the negative news which began with the filing of the SEC fraud suit on April 16, 2010 had caused severe damage to Goldman's stock price:

- June 11, 2010 *Reuters Hedgeworld (New York)*

    To date, the regulatory scandal, which began with the filing of the SEC lawsuit on April 16, has cost Goldman $25 billion in market capitalization.

- 104 -

- July 19, 2010 *Wall Street Journal Europe*

  ***The SEC's fraud accusations hurt Goldman in the battle for some plum assignments, people familiar with the matter said***.

  Investment bankers up and down Wall Street spent months courting General Motors Co. and the U.S. government to handle the auto maker's expected initial public offering later this year.

  Goldman President Gary D. Cohn flew to Washington to make the case that Goldman should be considered to lead the deal. ***But the firm couldn't overcome the black eye inflicted by the SEC's*** suit over Goldman's creation and sale of a mortgage-securities deal called **Abacus** 2007-AC1, according to people familiar with the discussions.

- June 23, 2010 *HedgeWorld Daily News*

  ***The firm has already taken some hits. Goldman didn't make the cut as a lead underwriter on a $300 million initial public offering for consulting firm Booz Allen Hamilton, said people familiar with the situation. The Carlyle Group, the private equity firm which acquired Booz Allen in a $2.54 billion buyout, was worried about the public perception of Goldman leading an IPO for a company with close ties to the U.S. Department of Defense***.

## X.  LOSS CAUSATION/ECONOMIC LOSS

324.   During the Class Period, defendants made numerous false and misleading statements and omissions of material facts necessary to render those statements not false or misleading, which artificially inflated Goldman's stock price.

325.   These include the three categories of Goldman's materially false and misleading statements and omissions made during the Class Period.

326.   First, from July 2009 until April 2010 Goldman concealed from its quarterly and year-end SEC filings, press releases and investor conference calls that the Company had been notified in July 2009, via a formal Wells Notice, that the SEC had recommended filing securities fraud charges relating to Goldman's conduct in connection with Abacus. By failing to disclose the Wells Notice, Goldman hid its improper conduct of betting against (or allowing a favored client to

bet against) the very toxic securities that Goldman designed to fail and packaged and sold to its clients.

327.    Second, from February 7, 2007 through April 2010, Goldman reassured investors that "*[w]e have extensive procedures and controls that are designed to [identify and] address conflicts of interest* . . . ."  Goldman's statements were false and misleading and omitted the fact that the Company was engaged in pervasive conflicts of interest, including that Goldman had designed Abacus to allow a favored client to benefit at the expense of Goldman's other clients.

328.    Third, Goldman repeatedly told the public that its client franchise and continued success depended on the Company's reputation, honesty, integrity and commitment to put its clients' interests first above all else, all while concealing that the Company had (i) identified toxic mortgage-backed and CDOs held on its books that Goldman believed would significantly decline in value and cause the firm to lose billions; (ii) created clear conflicts of interest by packaging and selling these securities to Goldman's own clients in order to shift the risk posed by these toxic assets from Goldman's books onto those of its clients; (iii) hid and made affirmative misrepresentations which obscured the fact that Goldman had bet against these securities; and (iv) made billions at its own clients' expense when the value of these securities; plummeted, just as Goldman anticipated they would.

329.    Lead Plaintiffs and investors purchased Goldman stock at these inflated prices and suffered damages when the price of Goldman stock declined upon the revelations of the truth, in contrast to earlier misstatements.

330.    The inflation in Goldman's stock was dissipated through a series of partial disclosures of the truth that revealed that, contrary to its representations, the Company had engaged in the abusive conduct of placing the Company's interests above its own clients.  The resulting significant

stock price declines upon release of truthful information were due to firm-specific fraud related disclosures, and not a result of market or industry. The following examples are not exhaustive because fact and expert discovery have yet to commence:

331.    On April 16, 2010 the SEC filed its securities fraud case against Goldman, which revealed that Goldman's had collaborated with a favored client to design a portfolio of securities that would decline in value, and sold this toxic portfolio to other Goldman clients. The SEC's fraud charge inflicted severe damage. Upon this news, Goldman stock immediately declined, ultimately falling from $184.27 per share on April 15, 2010 to $160.70 per share on April 16, 2010, a decline of 13% on extremely high volume of 102 million shares – while the S&P 500 was down only 1.6% and the S&P 500 financials was down only 3.9%. Shareholders suffered a $13 billion dollar loss in the value of Goldman stock.

332.    The $13 billion loss in shareholder value in Goldman's stock on April 16, 2010, immediately following the filing of the SEC fraud suit grossly exceeded the $1 billion estimated "worst case" financial impact to Goldman from an unfavorable verdict in the SEC fraud suit.

333.    On April 25-26, 2010, the Senate Subcommittee released Goldman internal emails further revealing that Goldman's practice of betting against the very securities it sold to its clients. Upon the disclosure of this new material information on April 26, 2010, Goldman stock declined approximately 3.5% from $157.40 to $152.03, while the S&P 500 was down only .4% and the S&P 500 financials was down only 1.7%.

334.    On April 29, 2010, two days after ten Goldman executives, including CEO Blankfein, CFO Viniar, COO Cohn, and Mortgage Department Head Daniel Sparks testified before the Senate Subcommittee and vehemently denied that they had done anything wrong or illegal whatsoever, the *Wall Street Journal* reported that Goldman was the subject of a criminal investigation by the

625194_1

Department of Justice.  Upon the disclosure of this new material information, on April 30, 2010, Goldman suffered an approximate 9.5% stock price decline from $160.24 to $145.20, while the S&P 500 was down only 1.7% and the S&P 500 financials was down only 2.5%.

335.   On June 10, 2010, it was reported that the SEC was investigating whether in connection with the Hudson CDO, Goldman profited by ridding itself of mortgage backed securities and related CDO's on Goldman's books that it knew were going to decline by selling these securities to Goldman's clients who suffered billions in losses.  Upon disclosure of this new material information, on June 10, 2010, Goldman stock fell over 2%, from $136.80 to $133.77, while the S&P 500 was up 2.9% and the S&P 500 financials was up 3.3%.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

336.   At all relevant times, the market for Goldman's common stock was an efficient market for the following reasons, among others:

(i)   Goldman stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(ii)   As a regulated issuer, Goldman filed periodic public reports with the SEC and the NYSE;

(iii)   Goldman regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(iv)   Goldman was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of

- 108 -

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

> (v)     Goldman's stock price reacted to the disclosure of firm specific news about the Company.

337.    As a result of the foregoing, the market for Goldman's common stock promptly digested current information regarding Goldman from all publicly available sources and reflected such information in Goldman's stock price.  Under these circumstances, all purchasers of Goldman's common stock during the Class Period suffered similar injury through their purchase of Goldman's common stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

338.    Lead Plaintiffs incorporate ¶¶1-337 by reference.

339.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

340.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a)     employed devices, schemes and artifices to defraud;

> (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Goldman common stock during the Class Period.

341.      Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Goldman common stock.  Lead Plaintiffs and the Class would not have purchased Goldman common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

342.      Lead Plaintiffs incorporate ¶¶1-341 by reference.

343.      The Individual Defendants acted as controlling persons of Goldman within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Goldman stock, the Individual Defendants had the power and authority to cause Goldman to engage in the wrongful conduct complained of herein.  Goldman controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding Lead Plaintiffs and the members of the Class damages, including interest;

C.      Awarding Lead Plaintiffs' reasonable costs and attorneys' fees; and

625194_1

       D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: July 25, 2011

LABATON SUCHAROW LLP

Thomas A. Dubbs
James W. Johnson
Louis Gottlieb
Thomas G. Hoffman
Jeffrey R. Alexander
140 Broadway, 34th Floor
New York, NY 10005
Tel: 212/907-0700
Fax: 212/818-0477

ROBBINS GELLER RUDMAN
    & DOWD LLP

Spencer A. Burkholz
Jonah H. Goldstein
Robert R. Henssler Jr.
Eric I. Niehaus
Danielle S. Myers
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619/231-1058
Fax: 619/231-7423

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Co-Lead Counsel for Lead Plaintiffs*

625194_1