UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 21, 2012
```

-------------------------------------------------------------------X

Ilene Richman, *Individually and on behalf of all
others similarly situated,*                               :

                                                         :

                                         Plaintiffs      :     10 Civ. 3461 (PAC)

                                                         :

         -against-                                        :     OPINION & ORDER

                                                         :

Goldman Sachs Group, Inc, et al.,                          :

                                                         :

                                         Defendants.      :

-------------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

        Plaintiffs in this class action allege that Goldman Sachs & Co. ("Goldman"), Lloyd C.

Blankfein, David A. Viniar, and Gary D. Cohn (the "Individual Defendants," and collectively

with Goldman, the "Defendants") violated § 10(b) of the Exchange Act, and Rule 10b-5

promulgated thereunder (Count One); and § 20(a) of the Exchange Act (Count II).  Plaintiffs,

who are purchasers of Goldman's common stock during the period February 5, 2007 through

June 10, 2010, claim that Defendants made material misstatements and omissions regarding: (1)

Goldman's receipt of "Wells Notices" from the Securities and Exchange Commission ("SEC")

relating to Goldman's role in the synthetic collateralized debt obligation ("CDO"), titled

ABACUS 2007 AC-1 ("Abacus"); and (2) Goldman's conflicts of interest that arose from its role

in the Abacus, Hudson Mezzanine Funding 2006-1 ("Hudson"), The Anderson Mezzanine

Funding 2007-1 ("Anderson"), and Timberwolf I CDO transactions.

        Defendants move, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), to dismiss the

Consolidated Class Action Complaint (the "Complaint").  For the following reasons,

Defendants' motion with respect to the failure to disclose the Wells Notices is GRANTED, and

otherwise DENIED.

## BACKGROUND

### I.      Abacus and the SEC Investigation

On April 26, 2007, the Abacus synthetic CDO transaction closed.[1]  Goldman served as the underwriter or placement agent, the lead manager, and the protection buyer for the Abacus transaction.  (Compl. ¶ 50 & n.3.)  Plaintiffs claim that "the Abacus transaction [ ] was designed from the outset by [Goldman] to allow a favored client to benefit at the expense of Goldman's other clients."  (Id. ¶ 147.)  Specifically, Plaintiffs claim that Goldman allowed Paulson & Co., a hedge fund client, to "play[ ] an active and determinative role in the selection process," and knew that Paulson was picking assets that it "believed would perform poorly or fail."  (Id. ¶¶ 53, 64.)  Indeed, "Paulson had agreed to pay Goldman a higher fee if Goldman could provide Paulson with CDS contracts containing premium payments below a certain level."  (Id. ¶ 77.)  Rather than disclose Paulson's role in the asset selection process, Goldman "falsely identified ACA [Management LLC] as the only portfolio selection agent for the CDO."  (Id. ¶¶ 59-66.)  Goldman hid Paulson's role, because it "expect[ed] to leverage ACA's credibility and franchise to help distribute this Transaction."  (Id. ¶ 61 (quoting a Goldman internal memorandum)).  The Abacus transaction performed poorly, as Paulson intended; the investors lost approximately $1 billion, and Paulson, holding the sole short position, profited by this amount.  (Id. ¶ 81.)

In August 2008, the SEC notified Goldman that it had commenced an investigation into Abacus and served Goldman with a subpoena.  (Compl. ¶ 88.)  Goldman disclosed in its SEC

---

[1]  In a typical CDO, a special purpose vehicle ("SPV") issues notes and uses the proceeds to acquire a portfolio of assets, such as residential mortgage-backed securities ("RMBS").  The SPV makes payments to noteholders from the income generated by the underlying assets.  In a synthetic CDO, the SPV contains a CDO and credit default swap ("CDS").  The SPV obtains derivative exposure to a "reference" portfolio—which may be RMBS or CDOs—by entering into a CDS, pursuant to which counterparties agree to make periodic payments to the SPV in exchange for commitment by the SPV to make payments to the counterparties in the event that the reference securities experience adverse credit events.  (See Compl. ¶ 50 & n.3.)

filings that it had "received requests for information from various governmental agencies and self-regulatory organizations relating to subprime mortgages, and securitizations, collateralized debt obligations and synthetic products relating to subprime mortgages" and that Goldman was "cooperating with the requests."  (Id. ¶¶ 129, 130.)  On July 29, 2009, the SEC issued a Wells Notice to Goldman, notifying it that the SEC's Enforcement Division staff "intends to recommend an enforcement action" and providing Goldman with "an opportunity to respond concerning the recommendation."  (Id. ¶ 90.)  On September 10 and 25, 2009, Goldman provided written Wells submissions to the SEC.  (Id. ¶ 91.)  Goldman thereafter met with the SEC on numerous occasions.  (Id. ¶ 91.)  Plaintiffs claim that by failing to disclose its receipt of a Wells Notice, Goldman "hid its improper conduct of betting against" its clients, and caused its stock to trade at artificially inflated levels.  (Id. ¶¶ 49, 99.)

On September 28, 2009 and January 29, 2010, the SEC issued Wells Notices to Fabrice Tourre and Jonathan Egol, two Goldman employees involved in the Abacus transaction.  (Id. ¶¶ 93, 94.)  On April 16, 2010, the SEC filed a complaint against Goldman and Tourre—but not Egol—alleging securities fraud violations.  (Id. ¶ 83.)  As a result, Goldman's stock dropped from $184.27 to $160.70 per share, a drop of approximately 13%.  (Id. ¶ 99.)

On July 14, 2010, Goldman reached a $550 million settlement with the SEC, in which Goldman acknowledged that its marketing material was incomplete and that it had made a mistake:

> [T]he marketing material for the ABACUS 2001-AC1 transaction contained incomplete information.  In particular, it was a mistake for the Goldman marketing materials to state that the reference portfolio was "selected by" ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors.

(Id. ¶ 87.)

On November 9, 2010, the Financial Industry Regulatory Authority ("FINRA") announced that it fined Goldman $650,000 for failing to disclose, within 30 days, that Tourre and Egol had received Wells Notices, in violation of National Association of Securities Dealers' ("NASD") Conduct Rule 3010 (which became FINRA Rule 2010, when FINRA succeeded NASD).  (Id. ¶¶ 100-102.)  In settling with FINRA, Goldman admitted that it violated these rules.  (Id. ¶¶ 101, 102.)

## II.     Hudson

Hudson was a synthetic CDO that commenced on or around December 5, 2006, which Goldman packaged and sold.  (Id. ¶¶ 148, 164.)  Plaintiffs allege that Goldman had "clear conflicts of interest" in the Hudson transaction because it knew that the reference assets were poor quality mortgage related securities which were likely to lose value, and yet, sold these products to its clients at higher prices than Goldman believed they were worth, while betting against those very securities, "thereby allowing the Company to reap billions in profits at their clients direct expense."  (Id. ¶ 148.)  Goldman had told investors that it "has aligned incentives with the Hudson program by investing in a portion of equity," without disclosing that it also held 100% of the short position at the same time.  (Id. ¶¶ 165, 171, 177.)  Goldman's incentive from holding $6 million in equity was substantially outweighed by its $2 billion short position.  (Id. ¶ 171.)  Further, Goldman had not disclosed that the assets had been taken directly from Goldman's inventory, and had been priced by Goldman's own personnel.  (Id. ¶¶ 174, 177.)

## III.    Anderson

Anderson was a synthetic CDO transaction that closed on March 20, 2007, for which Goldman served as the sole credit protection buyer and acted as an intermediary between the CDO and various broker-dealers.  (Compl. ¶¶ 190, 191, 202.)  Goldman was the source of 28 of

the 61 CDS contracts that made up Anderson, and held a 40% short position.  (Id. ¶¶ 189-191.)

Plaintiffs allege that Goldman developed misleading talking points for its sales force, which did

not adequately disclose the asset selection process and touted that Goldman would hold up to

50% of the equity tranche in the CDO, which was worth $21 million, without mentioning its

$135 million short position.  (Id. ¶¶ 204-207).

## IV.   Timberwolf I

Timberwolf I is a hybrid CDO squared transaction,[2] which closed in March 2007, that

Goldman constructed, underwrote, and sold.  (Id. ¶ 213.)  In its marketing booklet, Goldman

stated that it was purchasing 50% of the equity tranche, but failed to disclose that it was the

largest source of assets and held a 36% short position in the CDO.  (Id. ¶¶ 214, 216.)  Goldman

aggressively sold Timberwolf I without explaining its pricing methodology.  (Id. ¶ 255.)

Plaintiffs allege that Goldman knew it was selling poorly quality assets at inflated prices, and

profited from its short position.  (Id. ¶¶ 264-67.)

## LEGAL STANDARDS

Since Plaintiffs bring claims for security fraud, they must meet heightened pleading

requirements of Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act of 1995

("PSLRA").  ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir.2007); see also 15

U.S.C. § 78u–4(b)(1).

Section 10(b) of the Exchange Act prohibits any person from using or employing "any

manipulative or deceptive device or contrivance in contravention" of SEC rules.  15 U.S.C. §

78j(b).  Rule 10b-5, promulgated under Section 10(b), prohibits "any device, scheme, or artifice

to defraud" and "any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made . . . not misleading . . . ."  17 C.F.R. § 240.10b-5.

---

[2]  A CDO squared is backed by a pool of CDO tranches.

To state a claim in a private action under section 10(b) and Rule 10b–5, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission [or transaction causation]; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, L.L.C. v. Scientific–Atlanta, Inc., 552 U.S. 148, 157 (2008).

Defendants argue that the Complaint should be dismissed because: (1) Plaintiff failed to plead an actionable misstatement or omission; (2) Plaintiffs failed to allege facts giving rise to a strong inference of scienter; and (3) Plaintiffs failed to adequately allege loss causation.

## ANALYSIS

### I.  Goldman's Failure to Disclose Its Receipt of Wells Notices

#### A.  Disclosure Requirements and The Wells Notice Process

Under Section 13 of the Exchange Act, Regulation S-K Item 103, a company is required to "[d]escribe briefly any material pending legal proceedings . . . known to be contemplated by governmental authorities." 17 C.F.R. § 229.103. Section 240.12b-20 "supplements Regulation S–K by requiring a person who has provided such information in 'a statement or report ... [to] add[ ] such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.'" United States v. Yeaman, 987 F.Supp. 373, 381 (E.D.Pa. 1997).

The SEC provides a target of an investigation with a Wells Notice "whenever the Enforcement Division staff decides, even preliminarily, to recommend charges." In re Initial Public Offering Sec. Litig., No. 21 MC 92(SAS), 2004 WL 60290, at *1 (S.D.N.Y. Jan. 12. 2004). The party at risk of an enforcement action is then entitled, under SEC rules, to make a "Wells submission" to the SEC, "presenting arguments why the Commissioners should reject the

[Enforcement Division] staff's recommendation for enforcement."  WHX Corp. v. S.E.C., 362

F.3d 854, 860 (D.C. Cir. 2004) (citing 17 C.F.R. § 202.5(c)).  A party's entitlement to make a

Wells submission is "obviously based on recognition that staff advice is not authoritative."  Id.

Indeed, "[t]he Wells process was implemented so that the Commission would have the

opportunity to hear a defendant's arguments before deciding whether to go forward with

enforcement proceedings."  In re Initial Public Offering, 2004 WL 60290, at *1.  Accordingly,

receipt of a Wells Notice does not necessarily indicate that charges will be filed.

    "An investigation on its own is not a 'pending legal proceeding' until it reaches a stage

when the agency or prosecutorial authority makes known that it is contemplating filing suit or

bringing charges."  ABA Disclosure Obligations under the Federal Securities Laws in

Government Investigations—Part II.C.; Regulation S-K, Item 103: Disclosure of "Legal

Proceedings," 64 Bus. Law. 973 (2009).  A Wells Notice may be considered an indication that

the staff of a government agency is considering making a recommendation, id., but that is well

short of litigation.  Further, Plaintiffs conceded at oral argument that no court has ever held that a

company's failure to disclose receipt of a Wells Notice constitutes an actionable omission under

§ 10(b) or Rule 10b-5.  (May 21, 2012 Oral Arg. Tr. 22:17-22.)

    In addition to Regulation S-K, Item 103, FINRA Rule 2010, and NASD Conduct Rule

3010 explicitly require financial firms to report an employee's receipt of a Wells Notice to

FINRA within 30 days.  (Compl. ¶ 100.)

    In this case, the Defendants disclosed, as early as January 27, 2009, that there were

governmental investigations into, inter alia, Goldman's synthetic CDO practices.[3]  Goldman

---

[3]  Plaintiffs' Complaint cites to the 2009 10-K concerning "requests for information from various
governmental agencies" regarding, inter alia, synthetic CDOs.  (Compl. ¶ 129.)  Both parties refer to
this statement as notice of governmental "investigations."  (See e.g., Pl. Opp. 4.)  Defendants attached
SEC filings going back to at least January 27, 2009 that contain an identical disclosure.  (See Walker

never disclosed the Wells Notices that it and its employees received on July 29, 2009, September 28, 2009, and January 29, 2010.  (Compl. ¶¶ 90-94, 129.)

An omission is actionable where (1) the omitted fact is material; and (2) the omission is (a) "in contravention of an affirmative legal disclosure obligation"; or (b) needed "to prevent existing disclosures from being misleading."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010).  Plaintiffs argue (1) that Defendants had to disclose their receipt of Wells Notices in order to prevent their prior disclosures about government investigations from being misleading, and (2) that Defendants had an affirmative legal obligation to disclose their receipt of Wells Notices under Regulation S-K, Item 103, FINRA and NASD Rules.

### B.   A Duty to Be Accurate and Complete in Making Disclosures

Plaintiffs' primary argument is that Defendants' disclosures about governmental investigations triggered a duty to disclose Goldman's subsequent receipt of Wells Notices. Specifically, Plaintiffs argue that by failing to disclose that the government inquiries resulted in Wells Notices, Defendants misled the public into "erroneously" concluding that "no significant developments had occurred which made the investigation more likely to result in formal charges."  (Pl. Opp. 6.)

When a corporation chooses to speak—even where it lacks a duty to speak—it has a "duty to be both accurate and complete."  Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002). A corporation, however, "only [has to reveal] such [facts], if any, that are needed so that what was revealed would not be so incomplete as to mislead."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F.Supp.2d 148, 160 (S.D.N.Y. 2008) (citation omitted).  The federal securities laws "do not require a company to accuse itself of wrongdoing."  In re Citigroup, Inc. Sec. Litig., 330

---

Decl. Ex. J.)  While these materials were not attached to the Complaint, the Court can take judicial notice of SEC filings.  See Finn v. Barney, No. 11–1270–CV, 2012 WL 1003656, at *1 (2d Cir. Mar. 27, 2012).

F.Supp.2d 367, 377 (S.D.N.Y. 2004) (citing In re Am. Express Co. Shareholder Litig., 840

F.Supp. 260, 269-70 (S.D.N.Y. 1993)); see also Ciresi v. Citicorp, 782 F.Supp. 819,

823 (S.D.N.Y. 1991) (dismissing Exchange Act claims in part because "the law does not impose

a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement").  Moreover,

"defendants [a]re not bound to predict as the 'imminent' or 'likely' outcome of the investigations

that indictments of [the company] and its chief officer[s] would follow, with financial disaster in

their train."  Ballan v. Wilfred Am. Educ. Corp., 720 F.Supp. 241, 248 (E.D.N.Y. 1989).

       In In re Citigroup, plaintiffs' 10(b) claims premised on Citigroup's failure to disclose

"litigation risks associated with its Enron-related, analysis/investment banking and reporting

activities" were dismissed because "Citigroup was not required to make disclosures predicting

such litigation"; plaintiffs did not allege that litigation "was substantially certain to occur"; and

the SEC filings at issue contained some "discuss[ion of] pending litigation."  330 F.Supp.2d at

377.  Similarly, here, Plaintiffs do not allege that litigation was substantially certain to occur, and

concede that Defendants provided some notice about ongoing governmental investigations in

their SEC disclosures.  Indeed, Plaintiffs cannot claim that a Wells Notice indicated that

litigation was "substantially certain to occur" because Jonathan Egol, a Goldman employee,

received a Wells Notice regarding the Abacus transaction and ultimately was not sued by the

SEC.  While Goldman and Tourre were sued, the Defendants were not obligated to predict

and/or disclose their predictions regarding the likelihood of suit.  See Ballan, 720 F.Supp. at 248.

       Moreover, revealing one fact about a subject does not trigger a duty to reveal all facts on

the subject, so long as "what was revealed would not be so incomplete as to mislead."  In re

Bristol Myers, 586 F.Supp.2d at 160 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st

Cir. 1990)).  Plaintiffs have not shown that Defendants were required to disclose their receipt of

Wells Notice to prevent their prior disclosures from being inaccurate or incomplete, as their receipt of Wells Notices indicated that the governmental investigations were indeed ongoing. While Plaintiffs claim to want to know about the Wells Notices, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  In re Time Warner Sec. Litig, 9 F.3d 259, 267 (2d Cir. 1993).  At best, a Wells Notice indicates not litigation but only the desire of the Enforcement staff to move forward, which it has no power to effectuate.  This contingency need not be disclosed.

Plaintiffs also argue that Defendants' statements in response to a December 24, 2009 New York Times Article (the "Article") triggered a duty to disclose the Wells Notices.  The Article, which mentioned other investment companies but focused on Goldman, stated that the SEC, Congress, and FINRA are scrutinizing "[h]ow these disastrously performing [synthetic CDO] securities were devised."  (Walker Decl. Ex. O at 1.)[4]  In response, Goldman released a one-page press release addressing answers to questions the Times had asked prior to publication, but which had not been included in the Article.  Goldman explained how synthetic CDOs worked and why they were created.  (Compl. ¶ 124.)  Goldman's response did not address or mention the existence of governmental investigations.  Accordingly, Goldman's press release contained nothing concerning the investigations that could be considered inaccurate or incomplete.

In sum, Plaintiffs have not shown that Defendants' nondisclosure of their receipt of Wells Notices made their prior disclosures about ongoing governmental investigations materially misleading; or that Defendants breached their duty to be accurate and complete in making their disclosures.

---

[4] Since Plaintiffs obviously relied on this Article in drafting their Complaint, the Court can consider it here.  Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)

### C.   A Regulatory Duty To Disclose

Plaintiffs also argue that Defendants had an affirmative legal obligation to disclose their receipt of Wells Notices under Regulation S-K, Item 103, FINRA and NASD Rules.  There is nothing in Regulation S-K, Item 103 which mandates disclosure of Wells Notices.  Item 103 does not explicitly require disclosure of a Wells Notices, and no court has ever held that this regulation creates an implicit duty to disclose receipt of a Wells Notice.  When the regulatory investigation matures to the point where litigation is apparent and substantially certain to occur, then 10(b) disclosure is mandated, as discussed above.  Until then, disclosure is not required.  Moreover, even if Goldman had such a duty here, "[i]t is far from certain that the requirement that there be a duty to disclose under Rule 10b–5 may be satisfied by importing the disclosure duties from [an] S–K [regulation]."  In re Canandaigua Sec. Litig., 944 F.Supp. 1202, 1210 (S.D.N.Y. 1996) (addressing S-K regulation 303).

With respect to FINRA Rule 2010 and NASD Conduct Rule 3010, there is no dispute that Goldman was bound by and violated these regulations by failing to disclose Tourre and Egol's receipt of Wells Notices within 30 days.  (Compl. ¶¶ 100-103.)  Courts, however, have cautioned against allowing securities fraud claims to be predicated solely on violations of NASD rules[5] because such "rules do not confer private rights of action."  Weinraub v. Glen Rauch Sec., Inc., 399 F.Supp.2d 454, 462 (S.D.N.Y. 2005); Tucker v. Janney Montgomery Scott, Inc., No. 96 Civ. 1923(LLS), 1997 WL 151509, at *3 (S.D.N.Y. Apr. 1, 1997); see also GMS Grp., LLC v. Benderson, 326 F.3d 75, 81-82 (2d Cir. 2003) ("arguably there is no right of action simply for a violation of NASD rules.").[6]

---

[5] This is applicable to FINRA rules, since FINRA is NASD's successor.

[6] A violation of Item 103 or NASD rules may nonetheless be relevant to a 10(b) and 10b-5 analysis.  See GMS Grp., 326 F.3d 75, 82 (NASD "violations may be considered relevant for purposes of § 10(b) unsuitability claims"); Clark v. John Lamula Investors, Inc., 583 F.2d 594, 601 (2d Cir. 1978).

Plaintiffs have not shown that Goldman had a regulatory duty, upon which a Section 10(b) or Rule 10b-5 claim can be based, to disclose its receipt of Wells Notices. Accordingly, Plaintiffs' claim premised on Defendants' failure to disclose receipt of Wells Notices fails.

### D. Scienter

While there was no duty to disclose, even if there was such a duty, Plaintiffs' claim would still fail because Plaintiffs have not adequately alleged scienter.

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5 is 'an intent to deceive, manipulate or defraud.'" In re GeoPharma, Inc. Sec. Litig., 411 F.Supp.2d 434, 441 (S.D.N.Y. 2006) (quoting Ganino v. Citizens Utils. Corp., 228 F.3d 154, 168 (2d Cir.2000)). Moreover, to satisfy Rule 9(b), a plaintiff must allege "facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). A plaintiff claiming fraud can plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006).

While Plaintiffs failed to raise a strong inference of motive and opportunity,[7] "they could raise a strong inference of scienter under the 'strong circumstantial evidence [of conscious misbehavior or recklessness]' prong, 'though the strength of the circumstantial allegations must

---

[7] Plaintiffs argue (in a footnote) that Defendants "had a motive to maintain [Goldman's] appearance of financial health . . . ." (Pl. Opp. 20-21 n.17 (quoting RMED Intern., Inc. v. Sloan's Supermarkets, Inc., 878 F.Supp. 16, 19 (S.D.N.Y. 1995).) In RMED Intern., the court found that Defendants had a motive to hide the existence of an FTC investigation in order to "maintain [Defendant's] appearance of financial health to both its existing shareholders and its potential investors." Id. This argument is made in Plaintiffs' opposition brief, but their Complaint does not allege that Defendants omitted any mention of Wells Notices in order to maintain the appearance of financial health. Even if Plaintiffs had made such an allegation, the Second Circuit has since held: "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high . . . do not constitute 'motive' for purposes of this inquiry." ECA, 553 F.3d at 198.

be correspondingly greater' if there is no motive."  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198-99 (2d Cir. 2009) (quoting Kalnit v. Eichler, 264 F.3d 131, 143-44 (2d Cir. 2001).  Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care."  Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir.1996) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir.1978)).  A strong inference of scienter may arise where a plaintiff alleges, inter alia, defendants "'knew facts or had access to information suggesting that their public statements were not accurate'; or [ ] 'failed to check information they had a duty to monitor.'"  Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

Plaintiffs argue that Defendants knew of the Wells Notices and admitted that their failure to disclose Tourre and Egol's receipt of Wells Notices violated FINRA and NASD rules.  As previously indicated, Defendants' failure to disclose receipt of Wells Notices did not make their prior and ongoing disclosures inaccurate.  Thus, Defendants "failure to disclose [their receipt of Wells Notices], by itself, can only constitute recklessness if there was an obvious duty to disclose that information."  In re GeoPharma, 411 F.Supp.2d at 446 (citing Kalnit, 264 F.3d at 143-44 )).  The requirement that the duty be "obvious" ensures that fraudulent intent will not be imputed to a company every time a public statement lacks detail.  See Bragger v. Trinity Capital Enter. Corp., No. 92 Civ. 2124(LMM), 1994 WL 75239, at *4 (S.D.N.Y. Mar. 7, 1994).

Plaintiffs failed to show that Defendants had an obvious duty to disclose their receipt of Wells Notices.  Regulation S-K, Item 103 and FINRA and NASD Rules do not create an obvious duty to disclose, sufficient for Section10(b) and Rule 10b-5 purposes; no court has ever held otherwise.  Since "the duty to disclose . . . was not so clear," Defendants' "recklessness cannot be inferred from the failure to disclose."  Kalnit, 264 F.3d at 143 (holding that since "this case

does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not

provide *strong* evidence of conscious misbehavior or recklessness."); <u>see</u> <u>also</u> <u>In re GeoPharma</u>,

411 F.Supp.2d at 446-47 (holding that defendants had no "obvious duty to disclose [the contents

of an] FDA letter" given "what defendants *did* disclose" in their press release).

In sum, Plaintiffs failed to satisfy both the duty and scienter requirements to state a

Section 10(b) and Rule 10b-5 claim.  Accordingly, Defendants' motion to dismiss Plaintiffs'

claims premised on Defendants' failure to disclose their receipt of Wells Notices is GRANTED.

## II.  Goldman's Alleged Conflicts of Interest

Plaintiffs claim that Goldman made material misstatements and omissions concerning

Goldman's business practices and conflicts of interest, which are actionable in light of

Goldman's misstatements and fraudulent conduct in the Abacus, Hudson, Anderson, and

Timberwolf I CDO transactions.  Plaintiffs are Goldman's own shareholders—not investors in

the Abacus, Hudson, Anderson, and Timberwolf I CDO transactions.  Accordingly, to state a

claim, Plaintiffs have to show that Goldman made material misstatements and omissions with the

intent to defraud its own shareholders.  <u>See</u> <u>In re Sadia, S.A. Sec. Litig.</u>, 643 F.Supp.2d 521,

532 (S.D.N.Y. 2009) (distinguishing acts that deceive a company's *own* shareholders, which can

give rise to shareholders' securities fraud claims, from those that deceive investors in the

securities of other companies, which are not actionable when raised by the company's own

shareholders).

### A.  Actionable Misstatements and Omissions

Plaintiffs claim that Goldman's conduct in the Abacus, Hudson, Anderson, and

Timberwolf I CDO transactions made the following disclosures materially misleading:

- "[W]e increasingly have to address potential conflicts of interest, including
  situations where our services to a particular client or our own proprietary

investments or other interests conflict, or are perceived to conflict, with the interest of another client . . . ."  (Compl. ¶  134 (Form 10-K));

- "We have extensive procedures and controls that are designed to . . . address conflicts of interest" (Compl. ¶¶ 134, 154 (Form 10-K));

- "Our clients' interests always come first.  Our experience shows that if we serve our clients well, our own success will follow."  (Compl. ¶ 154 (Goldman Annual Report));

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard."  (Compl. ¶ 154 (Goldman Annual Report));

- "Integrity and honesty are at the heart of our business"  (Compl. ¶ 289 (Goldman Annual Report));

-  "Most importantly, and the basic reason for our success, is our extraordinary focus on our clients" (Compl. ¶ 154 (Viniar's Statements on Goldman's Investor Conference Call));

- "Our reputation is one of our most important assets" (Compl. ¶ 154 (Form 10-K)).

Defendants argue that these statements are non-actionable statements of opinion, puffery, or mere allegations of corporate mismanagement (Def. Br. 20-21); and that Goldman's conflict of interest disclosures foreclose liability (Def. Reply Br. 8-10).[8]

"Expressions of puffery and corporate optimism do not give rise to securities violations." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted).  "Likewise, allegations of corporate mismanagement without an element of deception or manipulation are not actionable."  Lapin v. Goldman Sachs Grp., Inc., 506 F.Supp.2d 221, 239 (S.D.N.Y. 2006) (citing In re Citigroup, Inc. Sec. Litig., 330 F. Supp.2d 36, 375-76 (S.D.N.Y. 2004)).  "The important limitation on these principles is that optimistic statements may be actionable upon a

---

[8]  Goldman's arguments in this respect are Orwellian.  Words such as "honesty," "integrity," and "fair dealing" apparently do not mean what they say; they do not set standards; they are mere shibboleths.  If Goldman's claim of "honesty" and "integrity" are simply puffery, the world of finance may be in more trouble than we recognize.

showing that the defendants did not genuinely or reasonably believe the positive opinions they

touted (i.e., the opinion was without a basis in fact or the speakers were aware of facts

undermining the positive statements), or that the opinions imply certainty." Id. (citing cases).

Moreover, by putting the "topic of the cause of its financial success at issue, [a company] then [ ]

is 'obligated to disclose information concerning the source of its success, since reasonable

investors would find that such information would significantly alter the mix of available

information." In re Van der Moolen Holding N.V. Sec. Litig., 405 F.Supp.2d 388, 400-

01 (S.D.N.Y. 2005) (quoting In re Providian Fin. Corp. Sec. Litig., 152 F.Supp.2d 814, 824-25

(E.D.Pa. 2001).

Additionally, disclaimers do not always shield a defendant from liability.  For example,

"[c]autionary words about future risk cannot insulate from liability the failure to disclose that the

risk has transpired." Rombach, 355 F.3d at 173.  Indeed, "under certain circumstances,

cautionary statements can give rise to Section 10(b) liability." In re Van der Moolen, 405

F.Supp.2d at 400.  "[T]he disclosure required by the securities laws is measured not by literal

truth, but by the ability of the material to accurately inform rather than mislead prospective

buyers." McMahan v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990).

With respect to the Abacus transaction, Plaintiffs argue that Goldman's conduct "involved

both client conflicts and outright fraud."  (Pl. Opp. 15).  Plaintiffs allege that Goldman

knowingly allowed Paulson to select the assets for the Abacus CDO, and knew that Paulson was

selecting assets that it believed would perform poorly or fail.  (See, e.g., Compl. ¶¶ 59-66.)  To

compound this absence of transparency, Goldman hid Paulson's role, and disclosed only ACA's

role in the asset selection process, in order to "leverage ACA's credibility and franchise to help

distribute this Transaction."  (Id.)  Plaintiffs have thus plausibly alleged that Goldman made a

material omission regarding Paulson's role in the asset selection process when it spoke about this topic.  See Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002) (holding that corporations have a "duty to be both accurate and complete" in their disclosures).  Investors on the long side of this offering, the ratings agencies, and ACA were kept in the dark.

Goldman's assertion that it "neither admitted, nor denied" that its Abacus disclosures were fraudulent is eviscerated by its concession that "it was a mistake for the Goldman marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors."  (Id. ¶ 144.)  Goldman paid a $550 Million settlement to the SEC—the largest SEC penalty in history—because of the "mistake" it acknowledged.  (Id.)  In the SEC action, District Court Judge Barbara S. Jones found Tourre's conduct fraudulent because: "having allegedly affirmatively represented Paulson had a particular investment interest in ABACUS—that it was long—in order to be both accurate and complete, Goldman and Tourre had a duty to disclose Paulson had a different investment interest—that it was short . . . [because it was] a fact that, if disclosed, would significantly alter the 'total mix' of available information."  S.E.C. v. Goldman Sachs & Co., 790 F.Supp.2d 147, 162-63 (S.D.N.Y. 2011) (internal citations and quotations omitted).

In the Hudson, Anderson, and Timberwolf I CDO transactions Goldman affirmatively represented that it held a long position in the equity tranches, without disclosing its substantial short positions.  Specifically, in the Hudson transaction, Goldman stated that it had "aligned incentives" with investors by "investing in a portion of equity," which amounted to $6 Million, without disclosing that it also held 100% of the short position at the same time, which amounted

to $2 Billion. (Compl. ¶¶ 148, 164, 165, 171, 174, 177.)[9]  Goldman's talking points in the

Anderson transaction touted that Goldman would hold up to 50% of the equity tranche, which

would be worth up to $21 Million, without mentioning its $135 Million short position.  (Id. ¶¶

204-207).  Goldman's marketing booklet for the Timberwolf I transaction stated that Goldman

was purchasing 50% of the equity tranche, without disclosing that it was the largest source of

assets and held a 36% short position in the CDO.  (Id. ¶¶ 214, 216.)  Thus, as with the Abacus

transaction, Plaintiffs have plausibly alleged that Goldman made material omissions in the

Hudson, Anderson, and Timberwolf I transactions because "having allegedly affirmatively

represented [Goldman] had a particular investment interest in [these synthetic CDOs]—that it

was long—in order to be both accurate and complete, Goldman . . . had a duty to disclose [it] had

a [greater] investment interest [from its] short [position]. . . . [because that was] a fact that, if

disclosed, would significantly alter the 'total mix' of available information."  S.E.C. v. Goldman

Sachs & Co., 790 F.Supp.2d at 162-163.

Plaintiffs plausibly allege that Goldman's material omissions in the Abacus, Hudson,

Anderson, and Timberwolf I transactions: (1) made its disclosures, to its own shareholders,

concerning its business practices materially misleading; and (2) conflicted with its shareholders'

interests, because fraudulent conduct hurts a company's share price, and concealing such conduct

caused Goldman's stock to trade at artificially high prices, as discussed below.  Given

Goldman's fraudulent acts, it could not have genuinely believed that its statements about

_____

[9]  Goldman's statements in the Hudson transaction were made before the beginning of the class period.
(Compl. ¶¶ 148, 164, 165, 171, 174, 177.)  While a defendant can be found "liable only for those
statements made during the class period," In re IBM Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998), a
prior misstatement does not require dismissal, if the prior statement is "relevant in determining whether
defendants had a duty to make a corrective disclosure during the Class Period."  In Re Quintel Entm't
Sec. Litig., 72 F. Supp. 2d 283, 290-291 (S.D.N.Y. 1999).  Here, it was Goldman's subsequent
statements regarding its business practices and conflicts of interest, which were made during the
relevant time period, that are alleged to be material misstatements when viewed in light of Goldman's
previous conduct in the Hudson transaction.  Accordingly, the Court need not dismiss such conduct.

complying with the letter and spirit of the law—and that its continued success depends upon it, valuing its reputation, and its ability to address "potential" conflict of interests were accurate and complete.  See Lapin, 506 F.Supp.2d at 240 (upholding securities law claims where the complaint "alleges that Goldman knew about the pervasive conflicts and the effect they had on its research reports and buy recommendations, allegedly one of its core competencies, yet, they allegedly failed to disclose such material information to its investors."); see also In re Sadia, S.A. Sec. Litig., 643 F.Supp.2d at 532  (upholding securities law claims where plaintiffs alleged that defendants materially misstated in their Sarbanes-Oxley certifications that there was not "any fraud" at the company, while "knowingly conceal[ing] that the Company had entered into substantial high-risk currency hedging contracts in violation of its internal hedging policy.")

Goldman must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the law, values its reputation, and is able to address "potential" conflicts of interest as mere puffery or statements of opinion.  Assuming the truth of Plaintiffs' allegations, they involve "misrepresentations of existing facts."  Freudenberg v. E*Trade Financial Corp., 712 F.Supp.2d 171, 190 (S.D.N.Y. 2010) (finding "statements touting risk management [that] were . . . juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent credit risk procedures" were actionable misstatements) (quoting Novak, 216 F.3d at 315).  Moreover, Goldman's allegedly manipulative, deceitful, and fraudulent conduct in hiding Paulson's role and investment position in Abacus transaction, and in hiding its own investment position in Hudson, Anderson, and Timberwolf I transactions takes Plaintiffs' claim beyond that of mere mismanagement.  See Lapin, 506 F.Supp.2d at 240 ("Goldman also misconstrues Plaintiff's allegations as merely stating it mismanaged its research business by allowing conflicts to proliferate[,] . . . . [when the complaint] actually alleges that Goldman knew

about the pervasive conflicts and the effect they had on its research reports and buy

recommendations, allegedly one of its core competencies, yet, they allegedly failed to disclose

such material information to its investors." ); see also Freudenberg, 712 F.Supp.2d at

193 ("Because Plaintiffs allege that Defendants intentionally misled the public, rather than

simply making bad business decisions, Plaintiffs have pled more than mere mismanagement.").

Defendants also argue that the above statements were not material.  A complaint,

however, "may not properly be dismissed . . . on the ground that the alleged misstatements or

omissions are not material unless they are so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance."  ECA, 553 F.3d at 197

(quoting Ganino, 228 F.3d at 162).  Plaintiffs have sufficiently alleged that Goldman's

misstatements in the Abacus, Hudson, Anderson, and Timberwolf I transactions were material.

See S.E.C. v. Goldman Sachs, 790 F.Supp.2d at 162-63 (finding that Paulson's role was "a fact

that, if disclosed, would significantly alter the 'total mix' of available information.").  Accepting

Plaintiffs allegations as true at this juncture, as the Court must, the Court cannot say that

Goldman's statements that it complies with the letter and spirit of the law and that its success

depends on such compliance, its ability to address "potential" conflict of interests, and valuing its

reputation, would be so obviously unimportant to a reasonable investor.  See generally,

Lapin, 506 F.Supp.2d at 240-41 ("[I]t defies logic to suggest that, for example, an investor would

not reasonably rely on a statement, contained in . . . a list of Goldman's business principles, that

recognized Goldman's dedication to complying with the letter and spirit of the laws and that

Goldman's success depended on such adherence."); In re Citigroup Inc. Sec. Litig., 753

F.Supp.2d 206, 236 (S.D.N.Y. 2010).

Accordingly, Plaintiffs have sufficiently alleged that Goldman made material misstatements about its business practices and conflicts of interest, viewed in light of its role and conduct in the Abacus, Hudson, Anderson and Timberwolf I transactions.

B. Scienter

A strong inference of scienter can arise where defendants "knew facts or had access to information suggesting that their public statements were not accurate." Novak, 216 F.3d at 311.

With respect to Abacus, Goldman certainly knew that Paulson played an active role in the asset selection process. How else could Goldman admit that it was a "mistake" not to have disclosed such information. Goldman knew that Paulson's interests were adverse to investors as "Paulson had agreed to pay Goldman a higher fee if Goldman could provide Paulson with CDS contracts containing premium payments below a certain level." (Id. ¶ 77.) Goldman approached and enlisted ACA without disclosing Paulson's intended role as the sole short party. (Id. ¶ 61.) Goldman "expressed hope that ACA's involvement would improve sales" and "expect[ed] to leverage ACA's credibility and franchise to help distribute this transaction." (Id.) Rather than disclose Paulson's role or adverse interests, however, Goldman concealed its actions and put forward ACA as the sole asset selector. (Id. ¶ 66.) Plaintiffs have thus plausibly created a strong inference of scienter with respect to Goldman's knowledge of its material misstatements and omissions in the Abacus transaction. See S.E.C. v. Goldman Sachs & Co., 790 F.Supp.2d at 163.

With respect to the Hudson, Anderson, and Timberwolf I CDOs, Plaintiffs have plausibly alleged that Goldman knew that its statements about holding long positions and having aligned interest with investors were inaccurate due to its substantial short positions. Indeed, Plaintiffs have referenced a number of internal Goldman communications showing that Goldman believed that the "[s]ubprime environment" was "bad and getting worse," and wanted to make a

"structured exit" by "trying to close everything down, but stay on the short side." [10] (Compl. ¶¶ 195, 202.)  Goldman concealed its efforts to shut "everything down" and "stay on the short side" in the Hudson, Anderson, and Timberwolf I CDOs by claiming to have aligned interest with investors and disclosing only its long position.

Meanwhile, Goldman repeatedly reassured its own shareholders that it was complying with the letter and spirit of the law and that its "continued success depends upon unswerving adherence to this standard"; and that it had procedures in place to address "potential conflicts of interest."  (Compl. ¶¶ 134, 154).  Given Goldman's practice of making material misrepresentations to third party investors regarding its short position, or Paulson's short position, Goldman knew or should have known that its statements about complying with the letter and spirit of the law, and its disclaimers regarding "potential" conflicts of interest were inaccurate and incomplete.  See Lapin, 506 F.Supp.2d at 241-42 ; In re Citigroup Inc. Sec. Litig., 753 F.Supp.2d 206, 238 (S.D.N.Y. 2010) (finding Plaintiffs adequately alleged scienter by showing that "Citigroup was taking significant steps internally to address increasing risk in its CDO portfolio but at the same time it was continuing to mislead investors about the significant risk those assets posed.").  Accepting Plaintiffs allegations as true, there is a strong inference of scienter with respect to Goldman's conduct in the Hudson, Anderson and Timberwolf I transactions.

---

[10] "When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation."  In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) (citing Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation.")).  Accordingly, the scienter reflected in Goldman's Mortgage Department Head's statements can be attributed to Goldman.

C.  Loss Causation

Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA.  Rather, a "short and plain statement"—the standard of Rule 8(a)—"is all that is necessary at this stage of the litigation."  CompuDyne Corp. v. Shane, 453 F.Supp.2d 807, 828 (S.D.N.Y. 2006).

To survive a motion to dismiss, a plaintiff need only allege either: "(i) facts sufficient to support an inference that it was a defendant's fraud — rather than other salient factors —that proximately caused plaintiff's loss," Lentell v. Merrill Lynch & Co., Inc, 396 F.3d 161, 177 (2d Cir. 2005), or (ii) "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to . . . [the defendant's fraud]."  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007).  "[L]oss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant.  If that relationship is sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie."  Lentell, 396 F.3d at 174 (quotations and citations omitted).

A decline in stock price following a public announcement of "bad news" does not, by itself, demonstrate loss causation.  See Leykin v. AT & T Corp., 423 F.Supp.2d 229, 245 (S.D.N.Y. 2006).  A plaintiff may, however, "successfully allege loss causation by . . . alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."  In re Merrill Lynch & Co. Research Reports & Sec. Litig., No. 02 Civ. 9690(JFK), 2008 WL 2324111, at *5 (S.D.N.Y. June 4, 2008).  "[A] corrective disclosure need not take the form of a

single announcement, but rather, can occur through a series of disclosing events."   In re Bristol

Myers Squibb Co. Sec. Litig., 586 F.Supp.2d 148, 165 (S.D.N.Y. 2008) (citing cases).

Plaintiffs claim to have purchased Goldman stock at inflated values because they

purchased stock before Goldman's practice of making material misstatements and omissions

came to light.  (Compl. ¶ 329.)  They claim that Goldman's misstatements and conflicts of

interest came to light on: (1) April 16, 2010, when the SEC filed fraud charges related to the

Abacus transaction, which caused Goldman's stock to drop from $184.27 per share to $160.70

per share (a 13% drop); (2) April 25-26, 2010, when the Senate released Goldman's internal

emails reflecting its practice of betting against the securities it sold to investors, which caused a

stock drop from $157.40 per share to $152.03 per share (a 3% drop); and (3) June 10, 2010,

when the SEC announced it was investigating the Hudson CDO transaction, which caused a

stock drop from $136.80 per share to $133.77 per share (a 2% drop).  (Compl. ¶¶ 329-35.)

While Defendants argue that the lawsuits and investigations themselves cause the stock

decline, these suits and investigations can more appropriately be seen as a series of "corrective

disclosures," because they revealed Goldman's material misstatements—and indeed pattern of

making misstatements—and its conflicts of interest.  See In re Bristol Myers, 586 F.Supp.2d at

164 (finding that a "disclosure of the Justice Department investigation" was "more akin to a

corrective disclosure" because it revealed that Defendants had not complied with their obligation

to present accurate information to regulators which resulted in the investigation).  Plaintiffs'

allegations are thus sufficient at this juncture to show that Goldman's misstatements and

omissions caused, or at least contributed to, Plaintiffs' losses.  See id. at 164-66; see also

Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003)

(viewing the facts most favorably to plaintiff and finding allegations that defendants artificially

inflated the stock before "dumping" their own was adequate to allege loss causation).

### III. Individual Defendants

For the Individual Defendants "to be liable for securities fraud, these defendants must also be responsible for [Goldman's] misleading statements and omissions." In re Citigroup Inc. Sec. Litig., 753 F.Supp.2d 206, 239 (S.D.N.Y. 2010).  Each of the Individual Defendants is alleged to have helped prepare the SEC filings at issue.  (Compl. ¶ 38-40, 154.)

To show scienter, Plaintiffs allege that each of the Individual Defendants had knowledge of Goldman's synthetic CDO operations.  Specifically, Plaintiffs allege that in February 2007— before the Abacus, Anderson, and Timberwolf I CDOs closed, Blankfein reviewed the Mortgage Department's efforts to reduce its subprime RMBS positions and asked about:  "losses stemming from residual positions in old deals.  Could/should we have cleaned up these books before and are we doing enough right now to sell off cats and dogs in other books throughout the division." (Compl. ¶ 194.)  Viniar and Cohn were the recipients of the email from Goldman's Mortgage Department Head stating that Goldman was trying to make a "structured exit" from the subprime market by "trying to close everything down, but stay on the short side."  (Compl. ¶ 202.)  Cohn and Viniar were alerted to Hudson's sales efforts, and how the CDO assets were valued. (Compl. ¶ 181.)  Viniar was also alerted to how the CDOs were valued in general, Goldman's sales efforts with respect to CDOs, and even chaired multiple meetings on the CDO transactions at issue.  (Compl. ¶¶ 181, 233.)  "Although plaintiffs do not allege with specificity the matters discussed at these meetings, their mere existence is indicative of scienter: That defendants engaged in meetings concerning [Goldman's] CDO risks is inconsistent with the company's public statements" that they held equity positions and had interests that were aligned with the purchasers of the synthetic CDOs.  In re Citigroup, 753 F.Supp.2d at 238-239 (S.D.N.Y. 2010).

These allegations, taken as true, show that each Individual Defendant actively monitored the status of Goldman's subprime assets and subprime deals during the relevant time, and that each knew that Goldman was trying to purge these assets from its books and stay on the short side.  These allegations create a strong inference that the Individual Defendants knew that Goldman was making material misstatements in the Abacus, Hudson, Anderson, and Timberwolf I CDOs, when it sold poor quality assets to investors without disclosing its or Paulson's substantial short positions.  Given such knowledge, the Individual Defendants were in a position to know that Goldman's statements about complying with the letter and spirit of the law, valuing its reputation, and disclaimers regarding "potential" conflicts of interest were inaccurate and incomplete.

## IV. Section 20 Claims

To maintain a claim for control person liability pursuant to Section 20(a), a plaintiff must "allege facts showing (1) 'a primary violation by the controlled person,' (2) 'control of the primary violator by the targeted defendant,' and (3) that the 'controlling person was in some meaningful sense a culpable participant in the fraud perpetrated.'"  In re Citigroup, 753 F.Supp.2d at 248 (quoting In re Beacon Assocs. Litig., 745 F.Supp.2d at 411, 2010 WL 3895582, at *17).

The Individual Defendants do not contest their control person status; rather they argue that Plaintiffs have not alleged a primary violation by a controlled person.  For the reasons above, however, Plaintiffs have plausibly alleged § 10(b) and 10b-5 claims against Goldman. Moreover, for the reasons above, Plaintiffs have adequately alleged culpable participation with respect to the Individual Defendants, because "[a]llegations sufficient to plead scienter for the purposes of primary liability pursuant to Section 10(b) 'necessarily satisfy' the culpable

participation pleading requirement for Section 20(a) claims." <u>Id.</u> Accordingly, Defendants'

motion to dismiss Count Two is denied.

## CONCLUSION

In conclusion, Defendants' motion to dismiss is GRANTED with respect to Plaintiffs'

claim relating to Defendants' failure to disclose their receipt of Wells Notices, and DENIED in

all other respects. The Clerk of Court is directed to terminate this motion.

Dated: New York, New York
       June 21, 2012

SO ORDERED

PAUL A. CROTTY
United States District Judge

27