UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                               :

In re GOLDMAN SACHS GROUP, INC.   :   Master File No. 1:10-cv-03461-PAC
SECURITIES LITIGATION          :
                               :   ECF Case

This Document Relates To:        :
                               :
     ALL ACTIONS             :
                               :
                               :
                               :
———————————————————— x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Richard H. Klapper *(klapperr@sullcrom.com)*
Theodore Edelman *(edelmant@sullcrom.com)*
Robert J. Giuffra, Jr. *(giuffrar@sullcrom.com)*
David M.J. Rein *(reind@sullcrom.com)*
Benjamin R. Walker *(walkerb@sullcrom.com)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs Group, Inc., Lloyd C. Blankfein, David A. Viniar and Gary D. Cohn*

April 6, 2015

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .....................................................................................1

BACKGROUND .............................................................................................................6

A.    The Alleged CDO Misconduct ....................................................................6

B.    The Remaining Alleged Misstatements .......................................................6

C.    Expert Testimony Confirming that the Challenged General, Aspirational
      Statements Never Impacted Goldman Sachs' Stock Price ..........................8

D.    The Alleged "Corrective Disclosures" .......................................................10

      1.    April 16, 2010 ..................................................................................10

      2.    April 26, 2010 ..................................................................................11

      3.    April 30, 2010 ..................................................................................12

      4.    June 10, 2010 ...................................................................................12

E.    Press Reports of Other Undisclosed Alleged Goldman Sachs Conflicts ..............13

CLASS CERTIFICATION STANDARD .....................................................................14

ARGUMENT ................................................................................................................15

I.    THE COURT SHOULD NOT CERTIFY A CLASS BECAUSE PLAINTIFFS
      CANNOT INVOKE THE *BASIC* PRESUMPTION OF CLASSWIDE RELIANCE. ...15

      A.    *Halliburton II* Confirms that Defendants Can Rebut the *Basic* Presumption With
            Evidence that the Challenged General, Aspirational Statements Did Not Impact
            Goldman Sachs' Stock Price ......................................................................15

      B.    There Is *No* Evidence that the Challenged General, Aspirational Statements,
            When Made, Had Any Impact on Goldman Sachs' Stock Price .........................18

      C.    There Is *No* Evidence that the Challenged General, Aspirational Statements Had
            Any Price Impact on Any Purported Corrective Disclosure Date ........................21

II.      THIS COURT ALSO SHOULD NOT CERTIFY A CLASS BECAUSE PLAINTIFFS' PURPORTED CLASSWIDE DAMAGES METHODOLOGY DOES NOT MEASURE DAMAGES ATTRIBUTABLE SOLELY TO THEIR THEORY OF INJURY ...................................................................................................................23

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Amgen Inc.* v. *Connecticut Retirement Plans & Trust Funds,*
    133 S. Ct. 1184 (2013) ................................................................................................15

*Aranaz* v. *Catalyst Pharmaceutical Partners Inc.,*
    302 F.R.D. 657 (S.D. Fla. 2014) ...................................................................16, 17, 20

*Basic* v. *Levinson,*
    485 U.S. 224 (1988) ......................................................................................... *passim*

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash,*
    506 F. App'x 32 (2d Cir. 2012) ..........................................................................3, 9-10

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC,*
    750 F.3d 227 (2d Cir. 2014)...............................................................................2-3, 10

*City of Livonia Employees' Retirement System* v. *Wyeth,*
    284 F.R.D. 173 (S.D.N.Y. 2012) .............................................................................18

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG,*
    752 F.3d 173 (2d Cir. 2014)...............................................................................2, 9, 19

*Comcast Corp.* v. *Behrend,*
    133 S. Ct. 1426 (2013) ...................................................................................... *passim*

*Curtis* v. *Extra Space Storage, Inc.,*
    No. 13 Civ. 0319 (WHA), 2013 WL 6073448 (N.D. Cal. Nov. 18, 2013).......................24-25

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009).................................................................................2, 10

*Erica P. John Fund, Inc.* v. *Halliburton Co.,*
    131 S. Ct. 2179 (2011) ............................................................................................16

*FindWhat Investor Group* v. *FindWhat.com,*
    658 F.3d 1282 (11th Cir. 2011) ...............................................................................20

*Fogarazzo* v. *Lehman Brothers,*
    263 F.R.D. 90 (S.D.N.Y. 2009) ...............................................................................17

*Halliburton Co.* v. *Erica P. John Fund, Inc.,*
    134 S. Ct. 2398 (2014) ...................................................................................... *passim*

*In re BP P.L.C. Securities Litigation,*
   No. 10 Civ. 2185 (KPE), 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ...............................25

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Securities Litigation,*
   250 F.R.D. 137 (S.D.N.Y. 2008) ...............................................................................20, 21

*In re Goldman Sachs Group, Inc. Securities Litigation,*
   No. 10 Civ. 3461 (PAC), 2014 WL 2815571 (S.D.N.Y. June 23, 2014) ................................5

 *In re Goldman Sachs Group, Inc. Securities Litigation,*
   No. 10 Civ. 3461 (PAC), 2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014).................................5

*In re Hydrogen Peroxide Antitrust Litigation,*
   552 F.3d 305 (3d Cir. 2008)..............................................................................................15

*In re IPO Securities Litigation,*
   471 F.3d 24 (2d Cir. 2006).................................................................................................18

*In re Moody's Corp. Securities Litigation,*
   274 F.R.D. 480 (S.D.N.Y. 2011) ...................................................................................3, 19

*In re POM Wonderful LLC,*
   No. 10 Civ. 2199 (DDP), 2004 WL 1225184 (C.D. Cal. March 25, 2014)...........................24

*In re U.S. Foodservice, Inc. Pricing Litigation,*
   729 F.3d 108 (2d Cir. 2013)............................................................... 15, 23-24, 25

*Local 703, International Brotherhood of Teamsters Grocery & Food Employees Welfare
   Fund* v. *Regions Financial Corp.,*
   No. 10 Civ. 2847 (IPJ), 2014 U.S. Dist. LEXIS 175126 (N.D. Ala. Dec. 18, 2014) .............20

*Local 703, International Brotherhood of Teamsters Grocery & Food Employees Welfare
   Fund* v. *Regions Financial Corp.,*
   762 F.3d 1248 (11th Cir. 2014) ........................................................................................20

*McIntire* v. *China MediaExpress Holdings, Inc.,*
   No. 11 Civ. 0804 (VM), 2014 WL 4049896 (S.D.N.Y. Aug. 15, 2014)  ..............................20

*Reese* v. *Bahash,*
   574 Fed. App'x 21 (2d Cir. 2014)........................................................................................3

*Richman* v. *Goldman Sachs Group, Inc.,*
   868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................................2, 5, 22

*Roach* v. *T.L. Cannon Corp.,*
   778 F.3d 401 (2d Cir. 2015)..............................................................................................25

*Schleicher* v. *Wendt*,
  618 F.3d 679 (7th Cir. 2010) ...............................................................18

*Silverman* v. *Motorola, Inc.*,
  798 F. Supp. 2d 954 (N.D. Ill. 2011) ..................................................20

*Turnbow* v. *Life Partners, Inc.*,
  No. 11 Civ. 1030 (BML), 2013 WL 3479884 (N.D. Tex. July 9, 2013) ...............................25

*Wal-Mart Stores, Inc.* v. *Dukes*,
  131 S. Ct. 2541 (2011) ................................................................ 14-15

## RULES

Fed. R. Civ. P. 23 .................................................................................*passim*

Defendants The Goldman Sachs Group, Inc. (together with its affiliates, "Goldman Sachs" or the "Firm"), Lloyd C. Blankfein, David A. Viniar and Gary D. Cohn (collectively, "Defendants") respectfully submit this memorandum of law in opposition to the motion by Plaintiffs Arkansas Teachers Retirement System, the West Virginia Investment Management Board, and Plumbers and Pipefitters National Pension Fund (collectively, "Plaintiffs") to certify a putative class of investors in Goldman Sachs' stock between February 5, 2007 and June 10, 2010 (the proposed "Class Period").

## PRELIMINARY STATEMENT

To certify a class, Plaintiffs recognize that they must invoke the "fraud on the market" presumption of classwide reliance, articulated in *Basic* v. *Levinson*, 485 U.S. 224 (1988), to show that common issues predominate over individual ones.  Last Term, in *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*"), the Supreme Court held that a defendant can rebut the *Basic* presumption by demonstrating that the defendant's purported misrepresentations "did not actually affect the market price of the stock."  *Id.* at 2417.  Here, that rebuttal is incontrovertible:  there is no evidence that Defendants' general, aspirational statements about Goldman Sachs' business principles and conflict of interest controls impacted its stock price, either when those statements were made or when the "truth" about the accuracy of those statements supposedly was revealed.  Thus, the proposed class cannot be certified.

It is not coincidental that Plaintiffs' remaining claims present a paradigmatic case to rebut the *Basic* presumption under *Halliburton II*.  In 2010, when Plaintiffs filed this action, their primary theory focused on Goldman Sachs' non-disclosure of an SEC "Wells notice" in connection with a potential SEC enforcement action over the Firm's handling of a 2007 collateralized debt obligation ("CDO") transaction, ABACUS 2007-AC1 ("Abacus").  Plaintiffs claimed that non-disclosure of the Wells notice inflated Goldman Sachs' stock price, and that the

price correspondingly declined after the SEC filed its widely publicized enforcement action over Abacus.  Given this Court's rejection of the Wells notice as a predicate for a securities fraud action, *see Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2012), Plaintiffs have refocused their claims on Defendants' general, aspirational statements about Goldman Sachs' business principles and conflict controls.

Plaintiffs cannot, in seeking to certify a class, end-run this Court's dismissal of their claims based on the non-disclosure of the Wells notice by now claiming that Goldman Sachs' stock price declined because investors reacted, not to the SEC lawsuit, but to alleged "corrections" of those general statements.  As the Supreme Court held in *Halliburton II*, in deciding whether to certify Plaintiffs' proposed class, this Court must evaluate whether the remaining challenged statements *themselves* had any impact on the Firm's stock price.  134 S. Ct. at 2416.  But, for the same reasons that the Second Circuit has consistently made clear that such general statements about business principles and internal controls are not "sufficiently specific for an investor to reasonably rely on [such] statement[s] as a *guarantee of some concrete fact or outcome*,"[1] the record evidence here thoroughly refutes that the market price of Goldman Sachs' stock moved in response to Defendants' statements or their purported "correction."

---

[1]     *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG* ("*UBS*"), 752 F.3d 173, 185 (2d Cir. 2014) (emphasis added); *see also id.* at 182-83, 186 (bank's statements that it "complie[s] with all applicable laws" are "too general to cause a reasonable investor to rely on them," and statements that it prioritized "avoidance of undue concentrations" are "too open-ended and subjective to constitute a guarantee that UBS would not accumulate a $100 billion RMBS portfolio"); *ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) ("*JP Morgan*") (bank's general statements about its integrity and risk management are immaterial as a matter of law, because "a reasonable investor would not depend on [such statements] as a guarantee that [the bank] would never take a step that might adversely affect its reputation"); *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 235-36 (2d Cir. 2014) ("*Barclays*") (affirming District Court's recognition that "generalizations about a company's business practices and integrity" are

In fact, Defendants' general, aspirational statements about business principles and conflict controls went unnoticed by stock analysts and the press when they were made, and Plaintiffs concede that none of those statements caused Goldman Sachs' stock price to increase. (*See* Pl. Br. at 16.)  Instead, Plaintiffs speculate that the statements somehow "confirmed" earlier statements about those principles and controls.  (*Id.*)  But Plaintiffs impermissibly do not identify those earlier statements, much less establish that they impacted Goldman Sachs' stock price when they were made.  *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492-93 (S.D.N.Y. 2011) (Daniels, J.) (rejecting plaintiffs' bare assertion that statements did not have a price impact because they "reflected the status quo").

To support their claim of market impact resulting from the purported "correction" of Defendants' alleged misstatements, Plaintiffs point to stock price declines on four dates in April and June 2010 when the SEC filed its lawsuit and the press reported on further government investigations of Abacus and three additional CDOs.  The record demonstrates, however, that the stock price declines on those dates were not caused by some revelation about the accuracy of Defendants' general, aspirational statements about Goldman Sachs' business principles and conflict controls, which the market had ignored when initially made:

---

immaterial as a matter of law and statements that "minimum control requirements had been established for all key areas of identified risk" are too general to be actionable); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) ("*Boca Raton I*") (credit rating agency's "generic, indefinite" statements about its internal processes are inactionable, because "no reasonable purchaser . . . would view statements such as these as meaningfully altering the mix of available information about the company"); *Reese* v. *Bahash*, 574 Fed. App'x 21, 23 (2d Cir. 2014) ("*Boca Raton II*") (statements about the "independence" and "integrity" of ratings "are too general to cause a reasonable investor to rely upon them as a guarantee that ratings would not be made without regard to profits, market share, or client feedback").

- In reporting on the SEC lawsuit and other government investigations of Goldman Sachs, no stock analyst or reporter mentioned any of Defendants' general statements about business principles or conflict controls, much less attributed the market's reaction to the SEC lawsuit and related investigations to a revelation that those statements were false.

- Before the SEC lawsuit and the other supposed corrective disclosures, the press reported on allegations that Goldman Sachs had failed to manage conflicts of interest in various transactions, including in connection with the CDOs at issue here.  As Defendants' expert, Dr. Paul Gompers of the Harvard Business School, has demonstrated, none of these prior allegations of undisclosed conflicts impacted Goldman Sachs' stock price.  This evidence confirms that the market reacted negatively to the SEC lawsuit and related investigations themselves, not to some recognition that Goldman Sachs' alleged conflicts in connection with four CDOs had rendered false Defendants' general statements about the Firm's business principles and conflict controls.

- Plaintiffs' own expert, Dr. John Finnerty, concedes that there was no statistically significant movement in the Firm's stock price on April 26, 2010, one of the dates when Plaintiffs claim that news reports of government investigations of Goldman Sachs purportedly "corrected" the alleged misstatements.

- As shown by Dr. Gompers and Defendants' other expert, Dr. Stephen Choi of the New York University Law School, any stock price movement on the remaining three alleged "corrective disclosure" dates had nothing to do with investors learning that Goldman Sachs' general statements about its business principles and conflict controls, made years earlier,  were false.  Instead, those price declines were caused by investor concerns over the potential impact of the SEC lawsuit and related investigations *and* would have occurred even absent the challenged disclosures about the Firm's conflict controls and business principles.

This case bears no resemblance to the typical securities fraud case, where a company's overstatement of its financial results or projections caused its stock price to increase, and the later revelation of its true financial condition caused its stock price to decline.  Here, the record demonstrates why the Second Circuit has repeatedly held that general, aspirational statements

about business principles and internal controls are not actionable:  because no investor would have relied on Defendants' statements about business principles and conflict controls in making an investment decision, the Firm's stock price did not move when these statements were made, nor did the price decline as a result of later "correction" of the statements.  Thus, even though this Court declined to find Defendants' general, aspirational statements immaterial as a matter of law,[2] *Halliburton II* bars Plaintiffs from invoking the *Basic* fraud-on-the-market presumption with respect to those statements.  This Court therefore cannot certify Plaintiffs' proposed class, because individual issues about whether any investors relied on the challenged general statements would predominate over any common ones.

Finally—and for a related reason—the proposed class cannot be certified on the separate ground that Plaintiffs' proposed "methodology" for determining classwide damages, presented in a single paragraph of their expert report, does not disaggregate investor losses stemming from market concern about the SEC's lawsuit and related investigations from losses supposedly caused by the market's purported realization that Defendants' general, aspirational statements about business principles and conflict controls were false.  Under the Supreme Court's decision in *Comcast Corp.* v. *Behrend*, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.  If the model does not even

---

[2]     *See Richman*, 868 F. Supp. 2d at 279-80 (allowing Plaintiffs' claims based on Defendants' general statements about Goldman Sachs' business principles and conflict controls to proceed to discovery, because the Court determined that it could not conclude on a motion to dismiss that the statements would be "obviously unimportant to a reasonable investor"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *4-6 (S.D.N.Y. June 23, 2014) (declining to reconsider ruling after *UBS* and other Second Circuit decisions, citing "strong presumption against amendment of prior orders"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090, at *3 (S.D.N.Y. Oct. 7, 2014) (denying Defendants' subsequent motion to certify the Court's decision for interlocutory appeal, because the required "exceptional circumstances" were absent).

attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 133 S. Ct. 1426, 1433 (2013).

## BACKGROUND

### A.   The Alleged CDO Misconduct

The centerpiece of Plaintiffs' Complaint is Abacus, a CDO transaction that closed on April 26, 2007.  (Compl. ¶¶ 36, 50, 78.)  Plaintiffs allege that Goldman Sachs structured Abacus to permit a "favored" client, Paulson & Co. Inc. ("Paulson"), at the expense of sophisticated institutional long investors, "to short multiple [mortgage] securities" that Paulson "believed would perform poorly or fail," and secretly allowed Paulson to "play[] an active and determinative role in the asset selection process" for Abacus.  (Compl. ¶¶ 51, 53, 64, 67.) Plaintiffs also claim that Goldman Sachs misled the sophisticated investors in three other CDOs—Anderson Mezzanine Funding 2007-1 ("Anderson"), Hudson Mezzanine Funding 2006-1 ("Hudson") and Timberwolf I ("Timberwolf")—by concealing from those investors that the Firm supposedly took "short" positions in connection with those CDO transactions.  (Compl. ¶¶ 165, 170, 177, 190, 198, 199, 214, 216.)[3]

### B.   The Remaining Alleged Misstatements

Plaintiffs did not invest in any of the Abacus, Anderson, Hudson or Timberwolf CDOs. Instead, Plaintiffs claim that the alleged undisclosed conflicts in connection with the four CDOs were inconsistent with, and therefore rendered false and misleading, Defendants' general public

---

[3]      Plaintiffs ignore that the respective CDO offering circulars repeatedly made clear that Goldman Sachs would hold the "short" side of the CDOs, and that each offering circular expressly stated that Goldman Sachs' role created "potential and actual conflicts of interest." (Stokes Ex. 33 at 56; Ex. 34 at 49; Ex. 35 at 57.)

statements about Goldman Sachs' business principles and conflict controls made on 18 dates between February 2007 and April 2010.  (*See* Compl. ¶¶ 18, 21, 49, 138; Finnerty Ex. 8.)

The challenged statements about conflict controls appeared in the "Risk Factors" section of Goldman Sachs' annual 10-K filings with the SEC between 2007 and 2010.  The disclosures warned investors that "***[c]onflicts of interest are increasing***," and that, while the Firm had "extensive procedures and controls that are ***designed to address*** conflicts of interest . . . . , ***appropriately dealing with conflicts of interest is complex and difficult***."   (Compl. ¶ 134 (emphasis added).)   Accordingly, Goldman Sachs cautioned that its conflicts controls could "fail," which "***could give rise to litigation or enforcement actions***."  (*Id.*)

These general disclosures—which even Plaintiffs' representative characterized as "fairly generic" (Stokes Ex. 5 at 262:16-17)—did not reference any particular transaction, or even a specific business line, nor did they guarantee that Goldman Sachs appropriately managed all conflicts.   To the contrary, the point of these *risk* disclosures was to warn explicitly that Goldman Sachs' conflict controls might not work, and that the Firm could suffer serious consequences if that happened.

Plaintiffs also challenge statements of the Firm's general business principles, first enunciated in the 1960s, that appeared in Goldman Sachs' Annual Reports to shareholders between 2007 and 2010.  Those statements include:

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard."

- "Integrity and honesty are at the heart of our business."

- "Our clients' interests always come first.  Our experience shows that if we serve our

clients well, our own success will follow."[4]

Plaintiffs claim that the alleged undisclosed CDO conflicts rendered these statements of aspirational principles false and misleading, but none of the statements guaranteed that every Goldman Sachs employee would comply with those principles at all times.   Indeed, notwithstanding Goldman Sachs' "dedication" to compliance with the law, the Annual Report explicitly warned about "significant legal risks" facing the Firm, and the possibility that "[s]ubstantial legal liability or a significant regulatory action against Goldman Sachs could have material adverse financial effects or cause significant reputational harm to Goldman Sachs, which in turn could seriously harm our business prospects."  (Stokes Ex. 15 at 33; *see also* Stokes Ex. 16 at 43, Ex. 17 at 24, Ex. 18 at 38.)

### C.   Expert Testimony Confirming that the Challenged General, Aspirational Statements Never Impacted Goldman Sachs' Stock Price

Plaintiffs' remaining claims are premised on the assertion in Plaintiffs' Complaint that Defendants' general, aspirational statements "artificially inflated Goldman's stock price." (Compl. ¶ 324.)  But Plaintiffs and their expert, Dr. Finnerty, now concede that these statements did not "cause a statistically significant stock price reaction" on any of the 18 dates when they were made.  (Pl. Br. at 17; *see also* Finnerty Ex. 8; Stokes Ex. 6 at 137:3-6 (Dr. Finnerty did not observe stock price increases on dates of the alleged misstatements).)

Defendants' expert, Dr. Gompers, found that, after adjusting for broader market factors unrelated to Goldman Sachs, the Firm's stock did not have a statistically significant price

---

[4]    The alleged misrepresentations also include a number of statements by Messrs. Viniar and Blankfein during the proposed Class Period, primarily on analyst conference calls, referring generally to the "strength," "depth" and "quality" of Goldman Sachs' "client franchise," and otherwise reiterating the Firm's general, aspirational business principles.  (*See* Finnerty Ex. 8.) Although the alleged misstatements are recounted in the Court's prior decisions, Appendix A contains a chronology of all of the challenged statements remaining at issue.

increase on 16 of the 18 dates.  (*See* Gompers ¶¶ 28-30.)  On the other two dates—November 13, 2007 and March 18, 2008—Dr. Gompers determined that positive news about Goldman Sachs unrelated to the statements caused the price increase.[5]   (*See* Gompers ¶¶ 31-47.)

That the market did not react to Defendants' general statements about Goldman Sachs' conflict controls and business principles is consistent with the reasoning of recent Second Circuit decisions holding that similar statements by other financial services companies are not actionable.  In *UBS*, for example, the Second Circuit held that the following statements (among others) were too general for reasonable investors to rely on them as a matter of law:

- UBS's "operational risk management and control systems and processes are designed to ensure that the risks associated with our activities . . . are appropriately controlled."

- UBS "protect[s] [its] reputation by managing and controlling the risks incurred in the course of its business, and for this reason it avoids concentrations of exposure."

- UBS goes "above and beyond what laws and regulations require."

*See UBS*, 752 F.3d at 185-86; *see also* Stokes Ex. 30 at 19, 284, 537.  In *Boca Raton I*, the Second Circuit similarly held that the following general statements by S&P were too general for reasonable investors to rely on them as a matter of law:

- S&P "endeavors to . . . ensure[] that the integrity and independence of [the credit ratings process] are not compromised by conflicts of interest, abuse of confidential information or other undue influence."

- "The integrity, reliability and credibility of S&P has enabled us to compete successfully in an increasingly global and complex market, and that is true today and we are confident

---

[5]       On November 13, 2007, Goldman Sachs stated that it did not anticipate significant subprime write-downs, and on March 18, 2008, Goldman Sachs announced financial results exceeding market expectations.  Press and analyst reports did not cite Goldman Sachs' statements about its business principles or conflict controls on either date.  (Gompers ¶¶ 31-47.)

it will be so in the future."

*See Boca Raton I*, 506 F. App'x at 34; *see also* Stokes Ex. 31 at 173-74, 260.[6]

Because these cases did not reach class certification, the plaintiffs never had to show a nexus between the statements and price movements. Here, it is clear that there is no such nexus.

### D.      The Alleged "Corrective Disclosures"

Unable to proffer any evidence that Defendants' general statements about business principles and conflict controls impacted the stock price of Goldman Sachs, Plaintiffs speculate that those statements "maintained" preexisting price inflation (Pl. Br. at 18), which "was dissipated through a series of partial disclosures of the truth that revealed that, contrary to its representations, [Goldman Sachs] had engaged in the abusive conduct of placing [its] interests above its own clients" (Compl. ¶ 330). Plaintiffs claim that these purported "disclosures of the truth" occurred on four dates: April 16, 26 and 30, 2010 and June 10, 2010. (*Id*. ¶¶ 331-35.)

### 1.      April 16, 2010

The SEC filed its Abacus-related lawsuit against Goldman Sachs during the trading day on April 16, 2010. (Compl. ¶ 83.) Plaintiffs' expert, Dr. Finnerty, concludes that Goldman

---

[6]      In *JP Morgan* and *Barclays*, the Second Circuit held that similar statements were too general for reasonable investors to rely on them, including JP Morgan's statement that it had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process," 553 F.3d at 205, and Barclays' statement that it was "commit[ted] . . . to promot[ing] . . . [h]onest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest." (Stokes Ex. 32 at ¶ 164); *see also Barclays*, 750 F.3d at 235-36. Other examples of similar statements by financial institutions are plentiful, including statements from the 2007 Form 10-K filing of Goldman Sachs' competitor, Morgan Stanley, that are virtually identical to statements at issue here: "Our reputation is one of our most important assets. As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest, including those relating to our proprietary activities. . . . We have procedures and controls that are designed to address various conflicts of interest." (Stokes Ex. 29 at 18.) Morgan Stanley has also been the subject of many post-financial crisis lawsuits and investigations.

Sachs' stock price dropped 12.79% (from $184.27 to $160.70) based on "negative news regarding the SEC's allegation of fraud."  (Finnerty ¶ 62.)  Notably, however, Dr. Finnerty does *not* conclude that the price decline was caused by the market's realization that Goldman Sachs' general statements about its conflict controls and business principles were false.  Indeed, none of the many analyst reports and news articles cited by Dr. Finnerty that comment on the stock price decline mentions those statements, notwithstanding Dr. Finnerty's acknowledgement that analyst reports reflect the "most significant" information about the Firm.  (Stokes Ex. 6 at 102:7.)

Defendants' expert, Dr. Choi, a law professor with a Ph.D in economics specializing in securities regulation, has studied the stock price impact of announcements of government investigations of public companies and has built a comprehensive dataset on SEC enforcement actions.  He determined that the price impact of an enforcement action or investigation is distinct from market reaction to the underlying alleged wrongful conduct.  (Choi ¶¶ 18, 22-23.)  Here, as both Dr. Choi and Dr. Gompers detail in their reports, the drop in Goldman Sachs' stock price on April 16, 2010 was caused by the potentially serious consequences of the SEC enforcement action itself—including anticipated resolution costs, potential loss of the Firm's broker-dealer license, an expectation of increased regulatory scrutiny and potential new regulatory restrictions—not the supposed revelation of information inconsistent with Defendants' general statements about business principles and conflict controls.  (Gompers ¶¶ 67-74; Choi ¶ 24-54.)

## 2.    April 26, 2010

Plaintiffs allege that, on April 26, 2010, the U.S. Senate Permanent Subcommittee on Investigations ("PSI") "released Goldman internal emails further detailing that Goldman made billions by betting against the CDOs it sold to its clients," and that "[u]pon the disclosure of this new information . . . on April 26, 2010, Goldman stock declined approximately 3.5% from $157.40 to $152.03."  (Compl. ¶¶ 316-17.)  Plaintiffs' expert, Dr. Finnerty, now concedes that

the portion of the decline that he attributes to the PSI's release of these emails was not statistically significant at a sufficient confidence level.  (Finnerty ¶ 67; *see also id.* ¶ 46; Stokes Ex. 6 at 195:5-9.)   Thus, even if the PSI release revealed anything about the accuracy of Defendants' general statements about business principles and conflict controls (and the PSI did not), Plaintiffs have not established that the release had any impact on the Firm's stock price.

### 3.   April 30, 2010

Plaintiffs allege that, on April 30, 2010, "the *Wall Street Journal* reported that Goldman was the subject of a criminal investigation by the Department of Justice," and that "[u]pon the disclosure of this news . . . Goldman suffered an approximate 9.5% stock price decline from $160.24 to $145.20."  (Compl. ¶¶ 318-19.)  Plaintiffs' expert acknowledges that this vague press report contained no new allegations of undisclosed conflicts that could have revealed any further "truth" about the challenged statements and, thus, cannot demonstrate that those statements had any price impact.  (Finnerty ¶ 69.)  Plaintiffs have submitted no other evidence that the DOJ was actually conducting a criminal investigation of Goldman Sachs.

As Dr. Choi and Dr. Gompers conclude, any stock price movement caused by the rumored DOJ investigation was attributable to the potential consequences of the purported investigation, not what this report supposedly revealed about Defendants' general statements about Goldman Sachs' business principles or conflict controls.  (Gompers ¶ 82; Choi ¶¶ 57-60.)

### 4.   June 10, 2010

Plaintiffs allege that "[o]n June 10, 2010, it was reported that the SEC was investigating whether in connection with the Hudson CDO, Goldman profited by ridding itself of mortgage backed securities . . . on Goldman's books that it knew were going to decline by selling these securities to Goldman's clients . . . ."  (Compl. ¶ 322.)  Plaintiffs' expert claims that Goldman Sachs' stock declined on this date by 2.21% from $136.80 to $133.77, because of this

"announcement regarding the second SEC probe of Goldman concerning the Hudson CDO" (Finnerty ¶ 79), but he makes no attempt to disaggregate the price impact of the investigation (including the consequences of a potential second enforcement action) from any supposed impact resulting from the purported inconsistency with Defendants' general statements.

### E.   Press Reports of Other Undisclosed Alleged Goldman Sachs Conflicts

Underscoring the fatal flaws in Plaintiffs' theory, the press widely reported during the Class Period, but long before the four alleged corrective disclosures, that Goldman Sachs allegedly had failed to manage conflicts in a variety of transactions.  If, as Plaintiffs claim, the SEC's lawsuit and reports of other CDO investigations on the four corrective disclosure dates revealed to the market allegations of "abusive conduct of placing the [Firm's] interests above its own clients" that was "contrary to" Defendants' general statements about Goldman Sachs' business principles and conflict controls (Compl. ¶ 330), these earlier press reports revealed such allegations before April 2010.   But Dr. Gompers demonstrates that none of those reports impacted Goldman Sachs' stock price.  (*See* Gompers ¶¶ 48-50; Gompers Ex. 2.)

For example, the press reported on November 11, 2008 that Goldman Sachs "urged some of its big clients to place investment bets against California bonds this year despite having collected millions of dollars in fees to help the state sell some of those same bonds," and quoted a Columbia professor as concluding that the Firm had "a conflict of interest and [was] acting against the interest of [its] customers."  (Stokes ¶¶ 4-5, Ex. 1 at 1-2.)  Under Plaintiffs' theory, these allegations should have disclosed the purported falsity of Defendants' general statements about business principles and conflict controls in the same manner as the alleged corrective disclosures, but this report had no impact on Goldman Sachs' stock price.  (*See* Gompers Ex. 2.)

Similarly, a November 19, 2009 report alleged, like Plaintiffs here, that Goldman Sachs had engaged in an "obvious fraud" by "packaging and selling toxic derivatives" to investors

-13-

while "betting against those very products."  (Stokes ¶¶ 6-7, Ex. 2 at 2.)  This report did not

impact Goldman Sachs' stock price (*see* Gompers Ex. 2); and neither did a December 30, 2009

report alleging that Goldman Sachs engaged in 148 Cayman Islands deals that were "riddled with

conflicts of interest," because "Goldman created the companies that oversaw the deals, selected

many of the securities to be peddled, including mortgages it had securitized, and in several

instances placed huge bets against similar loans."  (Stokes ¶¶ 10-11, Ex. 4 at 4; Gompers Ex. 2.)

Moreover, the press reported on Goldman Sachs' purported conflict in working with

Paulson before the SEC Abacus lawsuit and the other "corrective disclosures."  For example, an

October 31, 2009 *Wall Street Journal* article alleged that Goldman Sachs had agreed to work

with Paulson to "sell[] deals to investors, without telling them that [Paulson's] bearish hedge

fund was the impetus for the transaction [while at the same time] helping Mr. Paulson wager

against the deals . . . . "  (Gompers ¶ 59.)  Goldman Sachs' stock price did not react to this report,

further confirming that the price declined on the corrective disclosure dates because of investor

concerns about the implications of the government actions, not anything that those actions

revealed about Defendants' prior statements about the Firm's business principles and conflict

controls.  (*Id.* ¶ 60.)

## CLASS CERTIFICATION STANDARD

The Supreme Court has "made clear that plaintiffs wishing to proceed through a class

action must actually *prove*—not simply plead—that their proposed class satisfies each

requirement of Rule 23, including (if applicable) the predominance requirement of

Rule 23(b)(3)."  *Halliburton II*, 134 S. Ct. at 2412.   Thus, in addition to satisfying the

requirements of Rule 23(a), Plaintiffs must demonstrate that "questions of law or fact common to

class members predominate over any questions affecting only individual members, and that a

class action is superior to other available methods for fairly and efficiently adjudicating the

-14-

controversy." *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2558 (2011).

In considering Plaintiffs' motion, this Court "must 'make a definitive assessment of [these] requirements, notwithstanding their overlap with merits issues, . . . must resolve material factual disputes relevant to each Rule 23 requirement,' and must find that each requirement is established by at least a preponderance of the evidence." *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (quoting *Brown* v. *Kelly*, 609 F.3d 467, 476 (2d Cir. 2010)). The Court should "probe behind the pleadings" and must not grant certification unless satisfied, "after a rigorous analysis," that Plaintiffs have demonstrated that the prerequisites of Rule 23 are met. *Comcast*, 133 S. Ct. at 1432 (quotation marks omitted); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008) ("the potential for unwarranted settlement pressure" coincides with the court's obligation to conduct a "rigorous analysis" of whether a plaintiff has demonstrated conformance with Rule 23).[7]

## ARGUMENT

**I.   THE COURT SHOULD NOT CERTIFY A CLASS BECAUSE PLAINTIFFS CANNOT INVOKE THE *BASIC* PRESUMPTION OF CLASSWIDE RELIANCE.**

**A.   *Halliburton II* Confirms that Defendants Can Rebut the *Basic* Presumption With Evidence that the Challenged General, Aspirational Statements Did Not Impact Goldman Sachs' Stock Price.**

The Supreme Court held in *Basic* that securities fraud plaintiffs can invoke the "fraud on the market" presumption of classwide reliance and thus avoid the need to prove direct reliance

---

[7]     Although "proof [of materiality] is not a prerequisite to class certification," *Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013), class certification presupposes that the claims at issue are actionable. Given the Court's prior rulings as to the actionability of the general statements at issue, we do not address actionability further in the present context. Defendants respectfully reserve the right, however, to raise the actionability of the challenged statements as part of any appeal to the Second Circuit arising from this Court's ruling on this motion or otherwise.

by each class member by showing: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II,* 134 S. Ct. at 2408 (citing *Basic*, 485 U.S. at 248 n.27). "*Basic*'s fundamental premise [is] that an investor presumptively relies on a misrepresentation so long as it *was reflected in the market price at the time of his transaction*." *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) (emphasis added) ("*Halliburton I*").

The Supreme Court confirmed in *Halliburton II* that a defendant can rebut the *Basic* presumption in opposing class certification by showing, as here, that "the asserted misrepresentation (or its correction) *did not affect the market price of the defendant's stock*," *i.e.*, "that the misrepresentation had *no* '*price impact*.'" *Halliburton II*, 134 S. Ct. at 2405, 2414 (emphasis added).[8]  The Supreme Court reasoned that, "[i]n the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse . . . . [because] there is no grounding for any contention that the investor indirectly relied on th[e] misrepresentation through his reliance on the integrity of the market price." *Halliburton II*, 134 S. Ct. at 2414 (quotation marks and alterations omitted).  "And without the benefit of the *Basic* presumption,

---

[8]     Quoting Justice Ginsburg's concurring opinion without attribution, Plaintiffs erroneously assert that "*the Court held*" in *Halliburton II* that the price impact requirement "should impose no heavy toll on securities-fraud plaintiffs with tenable claims."  (Pl. Br. at 15 (emphasis added).)  Chief Justice Roberts made clear, in his opinion for the Court, that "'*[a]ny showing* that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance.'"  *Halliburton II*, 134 S. Ct. at 2415 (quoting *Basic*, 485 U.S. at 248 (emphasis added)).  Plaintiffs' reliance (Pl. Br. at 16-17) on *Aranaz* v. *Catalyst Pharmaceutical Partners Inc.*, 302 F.R.D. 657 (S.D. Fla. 2014), is similarly flawed, because the court there described defendants' burden as "particularly onerous" where (unlike here) a "drastic spike" followed the misrepresentation, a "dramatic decline" followed the corrective disclosure, and "all agree[d]" that the misrepresentations and disclosure "caused those price swings." *Id.* at 673.

investors would have to prove reliance on an individual basis, meaning that individual issues would predominate over common ones." *Id.* at 2406.

Following *Halliburton II*, defendants may rebut the *Basic* presumption "through direct as well as indirect price impact evidence," *id.* at 2417, under a "preponderance of evidence" standard, *Aranaz*, 302 F.R.D. at 670 (applying *Halliburton II*); *see also Basic*, 485 U.S. at 248 ("*Any showing* that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff . . . *will be sufficient* to rebut the presumption of reliance." (emphasis added)); *Fogarazzo* v. *Lehman Bros.*, 263 F.R.D. 90, 103 (S.D.N.Y. 2009) (Scheindlin, J.) (applying "preponderance of the evidence" standard to *Basic* rebuttal pre-*Halliburton II*).

The factual considerations relevant to whether an "asserted misrepresentation (or its correction)" impacted the market price of stock plainly overlap with the considerations relevant to the merits issues of materiality (whether reasonable investors would consider the alleged misrepresentation significant) and loss causation (whether the alleged misrepresentation caused the stock price decline that resulted in plaintiff's loss). *Halliburton II*, 134 S. Ct. at 2414-15. The Supreme Court made clear in *Halliburton II* that "to maintain the consistency of the [*Basic*] presumption with the class certification requirements of Federal Rule of Civil Procedure 23, defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 2417. [9]  Thus, Defendants may show lack of price impact, and bar class

---

[9]      The Supreme Court explained that, although materiality and price impact overlap factually, "price impact differs from materiality in a crucial respect." 134 S. Ct. at 2416. "The fact that a misrepresentation was reflected in the market price at the time of the transaction—that it had price impact—is *Basic*'s fundamental premise." *Id.* (quotation marks and alterations

certification, through evidence that overlaps with merits evidence relevant to materiality and loss causation.  *See id.* at 2406 (defendant permitted to show that "class certification was inappropriate because . . . evidence . . . disprov[ing] loss causation also showed that none of [the] alleged misrepresentations had actually affected its stock price"); *see also In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (courts must conduct a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues").

The record makes clear that Defendants' general, aspirational statements about business principles and conflict controls—the only disclosures now at issue—did *not* impact Goldman Sachs' stock price, either when made or when supposedly corrected.

**B.    There Is *No* Evidence that the Challenged General, Aspirational Statements, When Made, Had Any Impact on Goldman Sachs' Stock Price.**

The parties agree that none of Defendants' general statements about Goldman Sachs' business principles or conflict controls "cause[d] a statistically significant stock price reaction" on any of the 18 dates when they were made.  (Pl. Br. at 17; Finnerty Ex. 8; Stokes Ex. 6 at 137:3-6; Gompers ¶ 27.)  Notably, as Defendants' experts found, no stock analyst or media report commented on any of the alleged misstatements when they were made, underscoring their insignificance to the market.  (Gompers ¶¶ 29-30, 38, 47; *see also* Porten ¶¶ 20-21.)  These findings are consistent with the Second Circuit's holdings in *UBS*, *Barclays*, *Boca Raton I*, *Boca*

---

omitted).  "It thus has everything to do with the issue of predominance at the class certification stage," because if the market did not react to the defendant's alleged misrepresentations, "the fraud-on-the-market theory underlying the presumption completely collapses, rendering class certification inappropriate."  *Id.*  Plaintiffs incorrectly rely (Pl. Br. at 17) on certain pre-*Halliburton II* decisions refusing to consider evidence that the challenged statement had no price impact in certifying a class.  *See, e.g.*, *Schleicher* v. *Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) (pre-*Halliburton II* decision permitting certification, "even though all statements turn out to have only trivial effects on stock prices"); *City of Livonia Emps.' Ret. Sys.* v. *Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012) (pre-*Halliburton II* decision treating evidence that price impact was caused by "confounding events" as "not appropriate at the class certification stage").

*Raton II* and *JP Morgan* that no reasonable investor would rely on a bank's general statements about its business principles and controls in making an investment decision.[10]  (*See supra*, n. 1.)

Without evidence that the challenged statements about Goldman Sachs' business principles and conflict controls actually caused the Firm's stock price to increase when the statements were made, Plaintiffs are left to claim that these statements were somehow "confirmatory" of already existing "market expectations."  (Pl. Br. at 16-17.)  Thus, according to Plaintiffs, these general statements supposedly "artificially maintained" price inflation that Plaintiffs implicitly attribute to unspecified iterations of those statements sometime before the Class Period.  (*Id.* at 18.)  Plaintiffs do not even attempt to identify those pre-Class Period statements, much less demonstrate that any such statements ever had any price impact, confirming that investors do not rely on such general, aspirational disclosures in buying or selling stock.  (*See* Stokes Ex. 6 at 65:6-13, 68:14-22, 137:7-12 (Dr. Finnerty did not attempt to determine price impact of pre-Class Period statements).)

In *Moody's*, Judge Daniels rejected a similar effort to certify a class based on such a speculative theory.  There, plaintiffs, who, like Plaintiffs here, had no evidence of price impact on the dates of the supposedly false statements, claimed that "statements about the independence and integrity of [Moody's] ratings is what the market had come to expect and reflected the status quo," and "[t]herefore, one would not expect to observe a substantial change in value when these statements were made."  *Moody's*, 274 F.R.D. at 492-93 (quoting plaintiffs' expert).  Because the *Moody's* plaintiffs—like Plaintiffs here—submitted no evidence of "a material misrepresentation

---

[10]     Defendants' statements are important expressions of the high standards by which Goldman Sachs endeavors to conduct itself across the full spectrum of its global activities, but "while importance is undoubtedly a *necessary* element of materiality, importance and materiality are not synonymous."  *UBS*, 752 F.3d at 185 (emphasis in original).

that caused a statistically significant increase in the price," Judge Daniels rejected plaintiffs' argument as incompatible "with the premise of the fraud-on-the-market theory," which "is based upon the notion that the market was [fed] misinformation, absorbed that information and the stock price increased because of that misinformation." *Id.* at 493; *see also In re Credit Suisse First Boston Corp. Analyst Sec. Litig.*, 250 F.R.D. 137, 144-45 (S.D.N.Y. 2008) (rejecting argument that alleged misstatements were "confirmatory" and "maintained" stock price inflation because plaintiffs submitted no evidence to support their "price maintenance theory").

Every decision Plaintiffs cite (*see* Pl. Br. at 16-17) is readily distinguishable, either because evidence demonstrated that the defendant's statements, which all directly related to the company's financial performance, were linked to a specific, ascertainable price inflation or a subsequent corrective disclosure and resulting price decline, or because the decision did not address price impact at all.[11]   Plaintiffs cannot support their effort to certify a class by speculating that Defendants' alleged misstatements were "confirmatory" of unidentified but equally general prior statements of unspecified price impact, with no evidence linking any price

---

[11]      *See, e.g.*, *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund* v. *Regions Fin. Corp.*, 762 F.3d 1248, 1256, 1259 (11th Cir. 2014) (addressing only market efficiency; remanding to address price impact); *FindWhat Investor Group* v. *FindWhat.com*, 658 F.3d 1282, 1313-14 (11th Cir. 2011) (summary judgment appeal considering loss causation, not price impact, where plaintiffs' expert testified that the class misrepresentations maintained a 26.44% inflation in the stock price that was caused by similar misstatements prior to the class period); *Aranaz*, 302 F.R.D. at 672  (plaintiff identified a 42% spike in the stock price the day an alleged misstatement was made); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund* v. *Regions Fin. Corp.*, 2014 U.S. Dist. LEXIS 175126, at *2-4 (N.D. Ala. Dec. 18, 2014) (class notice motion not addressing price impact); *McIntire* v. *China MediaExpress Holdings, Inc.*, 2014 WL 4049896, at *13-14 (S.D.N.Y. Aug. 15, 2014) (Marrero, J.) (auditors' inaccurate certification of financial statements shown to have price impact based on evidence of stock price gain in anticipation of certification and decline on certification withdrawal); *Silverman* v. *Motorola, Inc.*, 798 F. Supp. 2d 954, 976 (N.D. Ill. 2011) (summary judgment decision addressing loss causation).

impact or subsequent price decline directly to the prior alleged misstatements.  *See Credit Suisse*, 250 F.R.D. at 145 (Rule 23 requires "facts" not "speculation").

> **C.      There Is *No* Evidence that the Challenged General, Aspirational Statements Had Any Price Impact on Any Purported Corrective Disclosure Date.**

In addition to the lack of evidence that Goldman Sachs' general, aspirational statements ever had any impact on Goldman Sachs' stock price when they were made, there is no evidence that those statements had any price impact when the "truth" supposedly was revealed to the market.  Plaintiffs rely on the impact of reports regarding the SEC's Abacus lawsuit and related investigations to try to show some price impact, even though the evidence is uncontroverted that these regulatory matters would have adversely impacted Goldman Sachs' stock price regardless of whether Defendants had ever made the challenged general, aspirational statements.

*April 26, 2010: No Statistically Significant Stock Price Impact.*  Plaintiffs' expert concedes that "there was not a statistically significant price impact on Goldman Sachs' stock" on April 26, 2010, caused by the alleged misstatements or anything else.  (Stokes  Ex. 6 at 195:5-9.) Because April 26, 2010 is the only purported corrective disclosure date involving any allegations about the Anderson and Timberwolf CDOs, this Court at a minimum cannot certify a class based on those transactions.

*April 16, April 30, and June 10, 2010: No Price Impact for Regulatory Enforcement Disclosures.*  On each of the three other disclosure dates identified by Plaintiffs—April 16, April 30 and June 10, 2010—there was no price impact attributable to a supposed revelation that Defendants' general statements about Goldman Sachs' business principles and conflict controls were false.  Plaintiffs originally sought to attribute the declines in Goldman Sachs' stock price on these dates to the Firm's failure to disclose the Wells notice.  (*See* Compl. ¶ 29.)  Plaintiffs switched tactics after this Court rightly ruled that such an omission is not actionable as a matter

of law, *see Richman*, 868 F. Supp. 2d at 273-74, but cite no law supporting their continued reliance on price impacts resulting from a non-actionable omission.  *See Halliburton II*, 134 S. Ct. at 2414 (price impact must be attributable to "the particular misrepresentation at issue").

Moreover, as Dr. Gompers has shown, the news of the SEC lawsuit and related investigations were not the only public reports of allegations about Goldman Sachs' purported failure to manage conflicts during the proposed Class Period.  (*See* Gompers ¶ 48.)  Dr. Gompers identified 34 examples of prominent press reports alleging undisclosed Goldman Sachs conflicts during the proposed Class Period, each of which, crediting Plaintiffs' theory, should have exposed to the market the falsity of Defendants' general statements about the Firm's conflict controls and business principles *before* the disclosures that Plaintiffs allege here were corrective. (*See* Gompers ¶¶ 49-50.)  By contrast, Dr. Finnerty claimed not to have been aware of these reports.  (*See* Stokes Ex. 6 at 88:19-92:16, 256:10-17.)  Thus, Dr. Gompers' determination that none of those reports impacted Goldman Sachs' stock price demonstrates that the price movement on the three subsequent alleged corrective disclosure dates cannot be attributed to the Firm's general statements about business principles and conflict controls.  (*See* Gompers ¶ 50.)[12]

As Defendants' experts have shown, the price movements on April 16 and 30, 2010 and June 10, 2010 were attributable to the SEC's lawsuit and related investigations reported on those dates and would have occurred regardless of whether Defendants had previously made the alleged misstatements.  (*See* Gompers ¶ 63; Choi ¶¶ 54, 60, 64-65.)  Dr. Choi demonstrates that news of enforcement activity generally has a negative impact on the stock price of the

---

[12]     Similarly, Dr. Gompers demonstrates that even though as early as October 31, 2009, public reports alleged Paulson's undisclosed involvement with Goldman Sachs in structuring certain CDOs, the Firm's stock did not experience any price impact as a result of these disclosures.  (Gompers ¶¶ 59-60.)

investigated company.  (*See* Choi ¶ 32.)  Dr. Choi further explains that this negative impact would be particularly pronounced in the unusual circumstances here, where the SEC announced its charges during the trading day without any announcement of an accompanying agreement settling those charges.  (*See* Choi ¶¶ 22, 34-35, 39, 44-46.)  This finding is further confirmed by contemporaneous press and analyst reports highlighting the importance of the SEC lawsuit and related investigations, but making *no* reference to Defendants' prior statements about Goldman Sachs' business principles or conflict controls.  (*See* Gompers ¶¶ 67-74; Porten ¶¶ 35-38.)  Even Dr. Finnerty admitted that the fact of an SEC lawsuit can be significant separate and apart from what the lawsuit purportedly revealed about the underlying conduct.  (*See* Stokes Ex. 6 at 72:15-25; *see also id.* 147:10-148:13 (price impact differs depending on which regulator files enforcement action and whether it is filed as a settled or contested action).)

Where, as here, there is "direct, . . . salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price . . . the *Basic* presumption does not apply," *Halliburton II*, 134 S. Ct. at 2416, and putative class members must make individualized showings that they relied on the alleged misrepresentations.  Because such inquiries would overwhelm any common issues, this Court may not certify the proposed class.

## II.   THIS COURT ALSO SHOULD NOT CERTIFY A CLASS BECAUSE PLAINTIFFS' PURPORTED CLASSWIDE DAMAGES METHODOLOGY DOES NOT MEASURE DAMAGES ATTRIBUTABLE SOLELY TO THEIR THEORY OF INJURY.

Under the Supreme Court's decision in *Comcast*, class certification also should be denied because Plaintiffs' proffered classwide damages methodology does not measure damages resulting solely from Plaintiffs' theory of classwide injury.  133 S. Ct. at 1433; *see also In re U.S. Foodservice*, 729 F.3d at 123 n.8 ("In *Comcast*, the Supreme Court held that courts should examine the proposed damages methodology at the certification stage to ensure that it is

consistent with the classwide theory of liability and capable of measurement on a classwide basis."). Because Plaintiffs are "entitled only to damages resulting" from the alleged misstatements, "a model purporting to serve as evidence of damages in th[e] class action must measure *only* those damages." *Comcast*, 133 S. Ct. at 1433 (emphasis added). "If the model does not . . . , it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id*.

Plaintiffs claim that their expert's proposed damages methodology is "fully capable of adequately calculating damages on a class-wide basis at a later stage of the litigation." (Pl. Br. at 20 n.8.) But the conclusory outline of a methodology set forth in one paragraph of Dr. Finnerty's report (*see* Finnerty ¶ 116) does not explain how Plaintiffs would measure damages caused solely by their current theory of classwide injury—general statements about Goldman Sachs' business principles and conflict controls—as opposed to the SEC's lawsuit and related investigations. *See In re POM Wonderful LLC*, 2004 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (expert improperly "assumed that 100% of . . . price difference was attributable to Pom's alleged misrepresentations . . . . This damages 'model' does not comport with *Comcast*'s requirement that class-wide damages be tied to a legal theory").[13]

Plaintiffs thus have failed to meet their burden to "identif[y] a way to isolate damages resulting from [a viable theory] from damages resulting from nonviable theories." *Curtis* v.

---

[13]   Although Dr. Finnerty ostensibly conducted an event study covering the four corrective disclosure dates, he did nothing more than identify the dates on which Goldman Sachs' stock price purportedly experienced statistically significant "abnormal returns" and the supposedly "economically significant news" that was reported on those dates. (*See* Finnerty ¶ 45.) Dr. Finnerty did not attempt to disentangle the portion of any price decline attributable to the market's supposed realization that Defendants' alleged misstatements about Goldman Sachs' business principles and conflict controls were false from the decline that occurred because of the SEC lawsuit and other regulatory investigations. (*See* Gompers ¶ 125.)

*Extra Space Storage, Inc.*, 2013 WL 6073448, at \*4 (N.D. Cal. Nov. 18, 2013) (citing *Comcast*, 133 S. Ct. at 1431); *see In re BP P.L.C. Sec. Litig.*, 2013 WL 6388408, at \*15-17 (S.D. Tex. Dec. 6, 2013) (following *Comcast*, denying certification where plaintiffs did not explain how they "propose[d] to use an event study to calculate class members' damages, and how that event study w[ould] incorporate—and, if necessary, respond to—the various theories of liability").[14]

In short, Plaintiffs have not demonstrated how they will "clearly measure" the damages "resulting from the particular injury on which Plaintiffs' liability action is premised." *Turnbow* v. *Life Partners, Inc.*, 2013 WL 3479884, at \*15-17 (N.D. Tex. July 9, 2013); *see also In re U.S. Foodservice*, 729 F.3d at 123 n.8 (*Comcast* requires that the "proposed measure for damages [be] . . . *directly linked* with [Plaintiffs'] underlying theory of classwide liability.") (emphasis added). For this reason too, the Court should not certify a class here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny in full Plaintiffs' motion for class certification.

---

[14]     In *Roach* v. *T.L. Cannon Corp.*, the Second Circuit recently held that *Comcast* did not overrule prior Second Circuit decisions holding that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification," but rather is "one factor that we . . . consider in deciding whether issues susceptible to generalized proof outweigh individual issues." 778 F.3d 401, 404-05 (2d Cir. 2015) (quotation marks omitted). Nonetheless, as required by *Comcast*, the Second Circuit emphasized "that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Id.* at \*14.  Because Plaintiffs' methodology fails to do so here, *Comcast* bars certification.

Dated: April 6, 2015
      New York, New York

                                Respectfully submitted,

By: _____

Richard H. Klapper *(klapperr@sullcrom.com)*
Theodore Edelman *(edelmant@sullcrom.com)*
Robert J. Giuffra, Jr. *(giuffrar@sullcrom.com)*
David M.J. Rein *(reind@sullcrom.com)*
Benjamin R. Walker *(walkerb@sullcrom.com)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs
Group, Inc., Lloyd C. Blankfein, David A.
Viniar and Gary D. Cohn*