UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                     :

IN re GOLDMAN SACHS GROUP, INC.    :
SECURITIES LITIGATION                :
                                                     :
This Document Relates To:                :
                                                     :
    ALL ACTIONS                        :
                                                     :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 24, 2015

Master File No. 10 Civ. 3461 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

      The facts of this case are fully set forth in *Richman v. Goldman Sachs*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012), and summarized in the Court's order of June 23, 2014 denying Defendants' motion for reconsideration, *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *1-2 (S.D.N.Y. June 23, 2014).

      Lead Plaintiffs allege that Defendants violated section 10(b) and Rule 10b-5 promulgated thereunder, and section 20(a), of the Exchange Act by making misstatements about Goldman's conflicts of interest policies and business practices, revealed to be false by reports of government investigations into Goldman's conflicted role in certain collateralized debt obligation transactions.

      Lead Plaintiffs now seek to certify the following class: "All persons or entities who, between February 5, 2007, and June 10, 2010, purchased or otherwise acquired the common stock of The Goldman Sachs Group, Inc. ('Goldman' or the 'Company'), and were damaged thereby." Defendants object. Lead Plaintiffs also request that they be appointed as Class Representatives and that the Court approve the firms of Labaton Sucharow LLP and Robbins

Geller Rudman & Dowd LLP as Class Counsel.  For the following reasons, Plaintiffs' motions are granted.

## BACKGROUND

Lead Plaintiffs' current claims arise out of "material misstatements and omissions" Goldman made about its business practices and conflicts of interest.  *See Richman*, 868 F. Supp. 2d at 276-80.  Goldman made certain statements such as: "We have extensive procedures and controls that are designed to . . . address conflicts of interest;" "Our clients' interests always come first;" and "[W]e increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict . . . with the interest of another client."  Compl. ¶¶ 134, 154.  Plaintiffs assert that these statements were revealed as untrue when information regarding Goldman's conflicts in certain CDO transactions reached the marketplace through SEC and DOJ announcements of investigations and enforcement actions against Goldman with respect to these transactions.  *Id.* ¶¶ 324-37.  Plaintiffs allege that when these "corrective disclosures" were made, putative class members were injured by a decline in Goldman's stock price triggered by the revelation that those statements were false.  *Id.*

Plaintiffs allege four dates on which these alleged corrective disclosures took place.  On Friday, April 16, 2010, the SEC sued Goldman and Fabrice Tourre, a Goldman vice president, for fraud in the structuring and marketing of the Abacus CDO.  Finnerty Decl. ¶ 52.  In addition to an SEC Litigation Release, the New York Times published an article about the SEC complaint; analyst reports issued that same day commented on the SEC allegations; and Goldman committed to "vigorously contest[ing]" the charges.  Finnerty Decl. ¶¶ 53-60.  Plaintiffs' expert, Dr. Finnerty, found that Goldman's stock price decreased by 12.79% on that

day, from $184.27 to $160.70, and experienced an abnormal return[1] of -9.27%. *Id.* ¶¶ 62-63. Dr. Finnerty found that this was a statistically significant decline. *Id.* ¶ 63.

On Friday, April 23, 2010, after the market closed for the week, Reuters announced the filing of two shareholder lawsuits against Lloyd Blankfein, Goldman's CEO, and other Goldman officials for breach of fiduciary duties, failure to exercise oversight, and failure to "ensure that Goldman did not represent conflicting interests related to the Abacus CDO transactions." *Id.* ¶ 64. The following day, the Senate Subcommittee on Investigations released internal Goldman documents which indicated that "Goldman made money betting against the CDOs it sold to its clients." *Id.* ¶ 65. Dr. Finnerty found a stock price decline of 3.41% on Monday, April 26, 2010, when the market reopened, and an abnormal return of -1.68%, which is not statistically significant.[2] *Id.* ¶ 67.

On Thursday, April 29, 2010, after the market closed for the night, the Wall Street Journal announced that federal prosecutors were conducting a criminal investigation into whether Goldman had committed securities fraud in its mortgage trading. *Id.* ¶ 69. The article stated that the criminal investigation concerned different evidence than the SEC's case, but did not speak to which of Goldman's deals were being investigated. *Id.* Standard and Poor's, Bank of America, and Buckingham Research Group all downgraded Goldman's stock after this announcement. *Id.* ¶¶ 71-73. When the market opened on Friday, April 30, 2010, Goldman's

---

[1] An abnormal return "is the difference between the security's actual return and its expected return. A security's expected return is the return one would expect based on general stock market price movements and industry-related factors that are unrelated to the specific event that is being examined." Finnerty Decl. ¶ 32.

[2] Plaintiffs appear to have abandoned their assertion that a corrective disclosure was made on April 26, 2010. *See* Reply at 2 (referring to April 16, April 30, and June 10, 2010 as the operative disclosure dates).

stock decreased 9.39% from $160.24 to $145.20, and experienced an abnormal return of -7.75%, which Dr. Finnerty found statistically significant. *Id.* ¶¶ 74-75.

After the market closed on June 9, 2010, it was revealed that an Australian hedge fund had sued Goldman for $56 million it had lost on the Timberwolf CDO and for $1 billion in punitive damages. *Id.* ¶ 76. Also that same evening, reports surfaced that Goldman's Hudson CDO was the target of an SEC investigation. *Id.* ¶ 77. Dr. Finnerty found that Goldman's stock price decreased 2.21% on Thursday, June 10, 2010, and experienced an abnormal return of -4.25%, which Dr. Finnerty found to be statistically significant. *Id.* ¶¶ 79-80.

Plaintiffs allege that these declines occurred, at least in part, because Goldman's conflicts and business practices statements were revealed to be untrue on these dates.

## **APPLICABLE LAW**

Before certifying a class, a district court "must first ascertain whether the claims meet the preconditions of Rule 23(a)." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). This requires an analysis of four elements: (1) whether the class is so numerous that joinder of all members is impracticable; (2) whether there are questions of law or fact common to the class; (3) whether the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) whether the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a).

Once these requirements have been met, a party seeking certification under Fed. R. Civ. P. 23(b)(3) must demonstrate both that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for adjudicating the controversy. The party seeking class

4

certification has the burden to establish by a preponderance of the evidence that the Rule 23 requirements have been met. *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). The Court may not make a merits determination at the certification stage, but may consider merits issues "only to the extent" that they relate to the Rule 23 requirements. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1194 (2013).

## ANALYSIS

### I.     Rule 23(a)

Defendants' opposition to certification is based solely on whether Plaintiffs have demonstrated predominance. Nonetheless, the Court has rigorously analyzed whether Rule 23(a)'s requirements have been satisfied. *See Simmons v. Author Sols., LLC*, 2015 WL 4002243, at *7 (S.D.N.Y. July 1, 2015) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). The Court determines that the putative class meets the requirements of Rule 23(a): the class members are numerous; there are common questions of law and fact; the claims of the representative parties are typical of the class; and the representative parties will fairly and adequately protect the interests of the class.

### II.    Rule 23(b)(3)

#### A. Applicable Law on Predominance and Price Impact

The Court turns now to the heart of the parties' dispute: does the proposed class meet the predominance requirement of Rule 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), and the Court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citations omitted).

"[A]s is typical with private securities fraud claims predicated on public statements, whether common issues predominate in this case depends on whether the issue of reliance will require individualized proof." *Aranaz v. Catalyst Pharms. Partners Inc.*, 302 F.R.D. 657, 667 (S.D. Fla. 2014). In a securities class action, plaintiffs are entitled to a presumption of reliance where they can demonstrate that "the alleged misrepresentations were publicly known . . . , that the stock traded in an efficient market, and that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248 n.27 (1988)). The Court can presume that an investor relied "on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Id.* at 2186.

The presumption, however, is rebuttable. "[A] securities-fraud defendant can 'defeat the [fraud-on-the-market] presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price.'" *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 434 (S.D.N.Y. 2014) (alterations in original) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2414 (2014)). Proving a lack of price impact differs from proving a lack of materiality—price impact refers to the circumstance where "a misrepresentation was reflected in the market price at the time of the transaction," and the burden of proving a lack of price impact falls on the defendant. *Halliburton*, 134 S. Ct. at 2416-17 (citation and internal quotation marks omitted). Where a defendant puts forth evidence[3] "that severs the link between the alleged misrepresentation and . . . the price," *City of Livonia*

---

[3] Defendants must demonstrate a lack of price impact by a preponderance of the evidence. *See Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 670 (S.D. Fla. 2014) (citing *Basic*, 485 U.S. at 248); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 490 (S.D.N.Y. 2011).

6

*Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012) (alteration in original) (citations and internal quotation marks omitted), a plaintiff may not invoke the presumption of reliance.

### B. Expert Evidence

Plaintiffs have submitted the report and rebuttal report of their expert, Dr. Finnerty. *See* Dkt. 137, 154. In his opening report, Dr. Finnerty examined the efficiency of the market for Goldman's common stock during the class period. Finnerty Decl. He concluded that the market was "open, developed, and efficient during the Class Period," based on the five factors set out in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and the supplemental tests outlined in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). *Id.* ¶¶ 11-89. He performed additional tests, such as the put-call parity test and the random walk test, to gain further insight on the efficiency of the market, *id.* ¶¶ 90-105, and ran statistical sign tests, *id.* ¶¶ 106-08, and parametric tests, *id.* ¶¶ 109-15. He also submitted his methodology for the calculation of economic loss per share, which he asserts will directly calculate each class member's loss by means of a common methodology. *Id.* ¶¶ 116-17.

Defendants have submitted reports of three experts, Drs. Paul Gompers and Steven Choi, and Charles Porten, C.F.A. Dkts. 144, 145, 146. Dr. Gompers evaluated whether the alleged misstatements impacted Goldman's stock price, whether Dr. Finnerty's efficient market determination was reliable, and whether Dr. Finnerty's proposed damages methodology would effectively calculate classwide damages. *See* Gompers Decl. Dr. Gompers asserts that the alleged misrepresentations had no impact on Goldman's stock price when made, that the corrective disclosures had no negative impact on the stock price, that Dr. Finnerty's market efficiency conclusion was flawed, and that Dr. Finnerty's damages methodology is unreliable

and incomplete, chiefly because it fails to account for inflation from the alleged misstatements. *Id.* Dr. Gompers applied his own regression model for determining price impact.[4]  *Id.* ¶ 25.

Dr. Choi examined the connection between the stock price and the "regulatory activities disclosed on the three alleged corrective disclosure dates."  Choi Decl. ¶ 14.  Dr. Choi determined that the April 16, 2010 announcement regarding the SEC's enforcement action negatively impacted Goldman's stock price "due to the heightened market expectations of the direct costs of resolving the enforcement action, the increased risks and exposure to penalties, the stigma associated with facing a highly visible and unusually severe action, the signal of future regulatory changes which would have a disproportionate impact on Goldman's business, and the possibility of future civil and regulatory actions."  *Id.* ¶ 66; *see also id.* ¶¶ 24-54.  Dr. Choi's analysis determined that characteristics of the enforcement action against Goldman were associated with larger decreases in stock price, and that similar enforcement actions "are associated with" a decline of 8.07%, which is "consistent with the observed price decline of Goldman's stock price" on April 16, 2010, which Dr. Finnerty found was 9.27%.  *Id.* ¶ 47.

Dr. Choi then determined that the decline on April 30, 2010 was due to "the increase in the perceived likelihood of criminal charges, heightened risks and exposure to penalties, signal of wider governmental resolve to target Goldman, anticipation of shifts in regulation with a disproportionate impact on Goldman's business, and the expectation of direct costs of resolving the possible DOJ investigation."  *Id.* ¶ 67, *see also id.* ¶¶ 55-60.  He also determined that the June 10, 2010 decline following the report of an SEC investigation into the Hudson transaction occurred because of "additional risk and exposure to penalties, the compliance costs associated

---

[4] Dr. Gompers found slightly different abnormal returns on the three alleged corrective disclosure dates, but the differences in these numbers are insignificant.  Gompers Decl. ¶¶ 64, 79, 89.

8

with the investigation, as well as the increased perceived likelihood of future regulations with a disproportionate impact on Goldman compared to its peers," as well as the implication of "a wider scope of expected additional regulatory and civil actions against Goldman." *Id.* ¶ 68.

Charles Porten examined securities analyst commentary to determine whether the misstatements impacted Goldman's stock price during the class period. *See* Porten Decl. He asserts that information that has an impact on a company's stock price will be discussed in analyst reports, that no analyst discussed Goldman's misstatements, and that analysts typically do not comment on the type of misstatements alleged here. *Id.* ¶ 12. Because of this finding, he concludes that the misstatements had no impact on Goldman's stock price. *Id.* ¶ 62.

Dr. Finnerty submitted a rebuttal declaration responding to Defendants' experts. Dr. Finnerty determined that, taking into account their criticisms and reevaluating his previous examination, the market for Goldman's stock was efficient and the company's common stock was artificially inflated during the class period and dropped on the corrective disclosure dates because of Defendants' false and misleading statements. Rebuttal Decl. ¶ 3. He also argues that Dr. Gompers failed to show the absence of price impact because he relied on Dr. Choi's allegedly incomplete opinion; failed to consider contemporaneous market commentary discussing Goldman's conflicts of interest and breaches of business practices; and failed to consider that the extent of Goldman's misconduct was not known to investors until April 16, 2010. *Id.* ¶¶ 176-84. Dr. Finnerty also asserts that Dr. Choi did not "investigate the price impact of the revelation of Goldman's fraudulent conduct on the three alleged corrective disclosure dates," and that he was "unable to separate the stock price impact of the announcement of any of the three regulatory actions from the impact of the disclosure of the underlying allegedly fraudulent behavior." *Id.* ¶ 188. Finally, Dr. Finnerty argues that Mr. Porten applied an

unreliable methodology to his examination. *Id.* ¶¶ 196-01. He also asserts that his own proposed damages methodology is reliable, because he will estimate the amount of inflation when he submits a damages report. *Id.* ¶¶ 207-08.

Finally, Dr. Gompers submitted a reply to Dr. Finnerty's rebuttal, responding to Dr. Finnerty's criticisms of Defendants' experts and asserting that Defendants' experts have demonstrated that the alleged misstatements had no impact either when made or on the corrective disclosure dates. *See* Reply Decl. of Paul Gompers.

### C. Price Impact Analysis

Plaintiffs are correct that there is no real dispute concerning the market efficiency for Goldman's stock. Reply at 1 n.1. While Defendants take issue with Dr. Finnerty's evaluation of the fifth *Cammer* factor (the relationship between news events and stock price movements), Gompers Decl. ¶¶ 97-117, they do not otherwise suggest that the market for Goldman's stock was not efficient. The Court has reviewed Dr. Finnerty's examination of the *Cammer* factors, as well as his revised approach, and finds that he has adequately demonstrated that all five *Cammer* factors have been met. Goldman's stock experienced high weekly trading volumes, a large number of analysts reported on Goldman stock, a number of market makers traded in Goldman's stock, Goldman was eligible to file a Form S-3 registration, and Goldman's common stock reacted to new unexpected Goldman-specific information, all during the class period. *See Cammer v. Bloom*, 711 F. Supp. 2d 1264, 1286-87 (D.N.J. 1989).

The Court determines that Defendants have failed to demonstrate a complete lack of price impact. Defendants cannot show that the total decline in the stock price on the corrective disclosure dates is attributable simply to the market reaction to the announcement of enforcement actions and not to the revelation to the market that Goldman had made material misstatements

about its conflicts of interest policies and business practices.  First, that the misstatements had no impact on the stock price when made is insignificant.  Plaintiffs' argument is that the misstatements simply served to maintain an already inflated stock price.  Reply at 7-8; Rebuttal Decl. ¶¶ 204-05.  Price impact "can be shown by a stock price reaction either at the time of the statement or at the time of the corrective disclosure, [and] analysis of price impact usually focuses on stock price movement at the time the truth is disclosed," Pl. Mem. at 16 (emphasis omitted) (citing cases), and so the fact that there was no stock price increase when the statements were made does not suggest a lack of price impact.  *See, e.g., City of Livonia*, 284 F.R.D. at 182.

Next, Defendants' demonstration of 34 separate dates prior to April 16, 2010, which allegedly revealed that Goldman had acted against clients' interest and on which there was no movement in Goldman's stock price, does not show a lack of price impact.  This is because the argument is an inappropriate "truth on the market" defense, which attempts to demonstrate that the "'news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements,'" and is not appropriate at the class certification stage.  Reply at 5-6 (quoting *Amgen*, 133 S. Ct. at 1204) (citation omitted).  Defendants object to this characterization and argue instead that "the lack of investor reaction to prior allegations of Goldman Sachs' conflicts shows that there was no inflation to dissipate," Def. Sur Reply at 3 n.5, and that it demonstrates that "the market placed no detectable value on revelations that Goldman allegedly had conflicts of interest with its clients," Reply Decl. of Paul Gompers ¶ 4.  But this speaks to the statements' materiality and not price impact, and accordingly the Court will not consider this information at the current stage of the litigation.  Even if the Court were to consider it, the lack of stock price reaction on dates where different forms and degrees of misstatements were revealed does not

11

demand the conclusion that on the alleged corrective disclosure dates where there was a stock price reaction, it was due entirely to alternative causes.

Defendants argue that Dr. Gompers demonstrated the absence of price impact by analyzing the focus of market commentary on Goldman on the corrective disclosure dates and whether market commentary discussed the impact of revelations about misstatements on the stock price. But whether or not the market was focused to some degree on the impact the enforcement actions would have on the stock price does not mean that no decline in stock price is attributable to the revelation of misstatements. Dr. Gompers' analysis fails to demonstrate that no part of the decline was caused by the corrective disclosure.[5] Likewise, while Dr. Choi's report focuses on the fact that the announcements of enforcement actions would cause a level of decline, Dr. Choi fails to demonstrate that it would cause the entirety of the decline that occurred here. *See, e.g.*, *Aranaz*, 302 F.R.D. at 672 ("[E]ven assuming *arguendo* that [an important company announcement] was substantially more important than the alleged misrepresentation . . . , it does not follow that the misrepresentation did not account for any of the 42% spike in stock price.").

Finally, Defendants argue that Plaintiffs "have produced no evidence . . . *linking* the challenged statements to the April and June 2010 declines on Goldman Sachs' stock price." Def. Sur Reply at 2. This is incorrect. Dr. Finnerty demonstrated that, on the corrective disclosure dates, information revealing the misstatements to the market was released, and the stock price dropped. The link is obvious, and Defendants have failed to conclusively sever this link. Defendants' attempt to demonstrate a lack of price impact merely marshals evidence which

---

[5] Defendants repeatedly argue that the statements at issue are not actionable as a matter of law. Def. Mem. at 2-3 n.1, 18-19; Def. Sur. Reply at 1 n.3. This argument is inappropriate at the class certification stage and in any event has been previously rejected by the Court.

12

suggests a price decline for an alternate reason, but does not provide conclusive evidence that no link exists between the price decline and the misrepresentation. *See Aranaz*, 302 F.R.D. at 672 ("Because Defendants have the burden of showing an absence of price impact, they must show that price impact is *inconsistent* with the results of their analysis. Thus, that an absence of price impact is consistent with their analysis is insufficient.") (emphasis in original). *Halliburton II* grants Defendants the right to rebut Plaintiffs' invocation of *Basic*'s presumption of reliance at the class certification stage. But here, where Defendants cannot demonstrate a complete absence of price impact, and where Plaintiffs have demonstrated an efficient market, the *Basic* presumption applies, and Plaintiffs have demonstrated classwide reliance and predominance.

### D.  Damages Methodology

Defendants argue that certification is inappropriate because "Plaintiffs' proffered classwide damages methodology does not measure damages resulting solely from Plaintiffs' theory of classwide injury." Def. Mem. at 23. Relying on the Supreme Court's decision in *Comcast*, 133 S. Ct. 1426 (2013), Defendants assert that Dr. Finnerty's proposed damages methodology "does not explain how Plaintiffs would measure damages caused solely by their current theory of classwide injury—general statements about Goldman Sachs' business principles and conflict controls—as opposed to the SEC's lawsuit and related investigations." *Id.* at 24.

But at the class certification stage, Plaintiffs must only show that their damages model "actually measure[s] damages that result from the class's asserted *theory* of injury." *Roach*, 778 F.3d at 407 (emphasis added). Plaintiffs' model does that. The possibility that Defendants could prove that some amount of the price decline is not attributable to Plaintiffs' theory of liability does not preclude class certification. *Comcast* speaks to measuring damages stemming from the

13

accepted theory of liability, and not the extent to which that liability can be proven.  Moreover, any failure of the methodology to "disaggregate the losses purportedly attributable to disclosures about government enforcement activities from those that Plaintiffs attribute to the challenged statements," Def. Sur Reply at 5, would not defeat the class's predominance because it would affect all class members in the same manner.  Finally, Dr. Finnerty asserts that his methodology will be able to account for any so-called inflation from the enforcement actions, Rebuttal Decl. ¶ 208, and Defendants have not suggested that such disaggregation would be impossible to determine.

### III.    Rule 23(g)

Lead Plaintiffs also move for Labaton Sucharow and Robbins Geller to be appointed class counsel under Rule 23(g) and for Lead Plaintiffs to be appointed Class Representatives.  The Court must assess "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A) (internal numerals omitted).  Thus far, counsel have satisfied these requirements.  *See In re Crude Oil Commodity Futures Litig.*, 2012 WL 569195, at *2 (S.D.N.Y. Feb. 14, 2012) (appointing co-lead counsel to address complexities of litigation yet keep costs to a minimum).

Accordingly, Labaton Sucharow and Robbins Geller are approved as class counsel, and Lead Plaintiffs are appointed Class Representatives.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for class certification. The Court certifies a class of: "All persons or entities who, between February 5, 2007 and June 10, 2010, purchased or otherwise acquired the common stock of The Goldman Sachs Group, Inc. . . . and were damaged thereby." Labaton Sucharow LLP and Robbins Geller Rudman & Dowd LLP are approved as Class Counsel, and Lead Plaintiffs Arkansas Teacher Retirement System, Plumbers and Pipefitters National Pension Fund, and West Virginia Investment Management Board are appointed Class Representatives.

The Clerk of the Court is directed to close out the pending motion at Docket 135.

Dated: New York, New York  
       September 24, 2015

SO ORDERED

*[signature]*  
PAUL A. CROTTY  
United States District Judge