UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x
                           :

In re GOLDMAN SACHS GROUP, INC.   :   Master File No. 1:10-cv-03461-PAC
SECURITIES LITIGATION            :
                           :   ECF Case

This Document Relates To:        :
                           :   ORAL ARGUMENT REQUESTED
      ALL ACTIONS           :
                           :
                           :
                           :
——————————————————— x


# DEFENDANTS' MEMORANDUM OF LAW IN
# SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Richard H. Klapper *(klapperr@sullcrom.com)*
Theodore Edelman *(edelmant@sullcrom.com)*
Robert J. Giuffra, Jr. *(giuffrar@sullcrom.com)*
David M.J. Rein *(reind@sullcrom.com)*
Benjamin R. Walker *(walkerb@sullcrom.com)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs
Group, Inc., Lloyd C. Blankfein, David A.
Viniar and Gary D. Cohn*

November 6, 2015

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 5

    A.    The Challenged Statements ................................................................. 5

    B.    Goldman Sachs' Conflicts Management Infrastructure ...................... 6

    C.    The Four CDOs ................................................................................. 6

            1.    Hudson, Anderson and Timberwolf ...................................... 7

            2.    ABACUS ................................................................................ 7

            3.    All Purchasers Expressly Agreed to Perform Their Own
                    Independent Analysis of the CDOs. ...................................... 7

    D.    The Alleged "Corrective Disclosures" ............................................... 8

ARGUMENT ............................................................................................................ 9

I.    THE DISCOVERY RECORD CONFIRMS THAT DEFENDANTS DID
    NOT MISREPRESENT ANYTHING TO GOLDMAN SACHS
    SHAREHOLDERS. ...................................................................................... 9

    A.    Goldman Sachs' Conduct in Structuring the Four CDOs Did Not Render
          the Challenged General, Aspirational Statements False. ..................... 10

            1.    Goldman Sachs Disclosed Its Short Position to Investors in
                    Hudson, Anderson and Timberwolf and Did Not Design These
                    CDOs to Fail. ........................................................................ 10

            2.    Goldman Sachs' Conduct in ABACUS Did Not Reflect Intentional
                    or Widespread Departure from Goldman Sachs' Conflict Controls
                    or Business Principles. .......................................................... 12

    B.    The Evidence Demonstrates that the Challenged Statements About
          Goldman Sachs' Conflicts Controls and Business Principles Were
          Accurate. ............................................................................................ 13

II.    THE DISCOVERY RECORD CONFIRMS THAT THE ALLEGED
    MISREPRESENTATIONS WERE NOT MATERIAL. ............................ 15

III.     THE DISCOVERY RECORD DEMONSTRATES THAT DEFENDANTS DID NOT INTEND TO DEFRAUD GOLDMAN SACHS SHAREHOLDERS. ................................................................................. 17

     A.     Plaintiffs Have Failed To Identify Any Evidence that the Individual Defendants Acted with Scienter. .......................................................... 18

     B.     Plaintiffs Have Failed to Identify Evidence of Goldman Sachs' Scienter. .......... 20

IV.     THE DISCOVERY RECORD DEMONSTRATES THAT THE CHALLENGED STATEMENTS DID NOT CAUSE SHAREHOLDERS' LOSSES. ............................................................................................................ 21

     A.     No Causal Connection Exists Between the Challenged Statements and the Alleged "Corrective Disclosures." ........................................................ 21

     B.     Announcements of Government Investigations Were Not a Materialization of Any Risk Concealed by the Challenged Statements. .................................... 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Atlantic Gypsum Co.* v. *Lloyds International Corp.*,
    753 F. Supp. 505 (S.D.N.Y. 1990) ................................................ 12

*Bondali* v. *Yum! Brands, Inc.*,
    -- F. App'x --, 2015 WL 4940374 (6th Cir. Aug. 20, 2015) ........................................ 13-14

*C.D.T.S.* v. *UBS AG*,
    No. 12-cv-4924 (KBF), 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013),
    *aff'd sub nom. Westchester Teamsters Pension Fund* v.
    *UBS AG*, 604 F. App'x 5 (2d Cir. 2015) ........................................... 10

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) .................................................... 21

*Central States* v. *Federal Home Loan Mortgage Corp.*,
    543 Fed. App'x 72 (2d Cir. 2013) ................................................ 22

*City of Brockton Retirement System* v. *Avon Products, Inc.*,
    No. 11-cv-4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ............................... 20

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014) .................................................... 15

*Dodona I, LLC* v. *Goldman Sachs & Co.*,
    -- F. Supp. 3d --, 2015 WL 5444110 (S.D.N.Y. Sept. 8, 2015) ................................... *passim*

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................. 16, 18

*Fogarazzo* v. *Lehman Brothers, Inc.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) .................................................. 16

*Gordon Partners* v. *Blumenthal*,
    293 F. App'x 815 (2d Cir. 2008) ................................................. 4

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ........................................................ 16

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund* v.
    *Royal Bank of Scotland Group, PLC*,
    783 F.3d 383 (2d Cir. 2015) .................................................... 14

*IKB International S.A.* v. *Bank of America Corp.*,
　584 F. App'x 26 (2d Cir. 2014) ................................................. 8

*In re Computer Sciences Corp. Securities Litigation*,
　890 F. Supp. 2d 650 (E.D. Va. 2012) .......................................... 20

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Securities Litigation*,
　250 F.R.D. 137 (S.D.N.Y. 2008) ............................................... 16

*In re Fannie Mae Securities Litigation*,
　892 F. Supp. 2d 59 (D.D.C. 2012) ......................................... 18, 20

*In re FBR Inc. Securities Litigation*,
　544 F. Supp. 2d 346 (S.D.N.Y. 2008) ......................................... 15

*In re Goldman Sachs Group, Inc. Securities Litigation*,
　No. 10-cv-3461 (PAC), 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) ....................... *passim*

*In re Lululemon Securities Litigation*,
　14 F. Supp. 3d 553 (S.D.N.Y. 2014),
　*aff'd*, 604 F. App'x 62 (2d Cir. 2015) ........................................ 15

*In re Molycorp, Inc. Securities Litigation*,
　No. 13-cv-5697 (PAC), 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ............................ 20

*In re Moody's Corp. Securities Litigation*,
　No. 07-cv-8375(GBD), 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) ............................ 22

*In re Omnicom Group, Inc. Securities Litigation*,
　541 F. Supp. 2d 546 (S.D.N.Y. 2008),
　*aff'd*, 597 F.3d 501 (2d Cir. 2010) ........................................... 23

*In re Omnicom Group, Inc. Securities Litigation*,
　597 F.3d 501 (2d Cir. 2010) .................................................. 25

*Jaramillo* v. *Weyerhaeuser Co.*,
　536 F.3d 140 (2d Cir. 2008) ................................................... 1

*Jensen* v. *Kimble*,
　1 F.3d 1073 (10th Cir. 1993) ................................................. 11

*Joffee* v. *Lehman Brothers Inc.*,
　209 F. App'x 80 (2d Cir. 2006) ............................................... 24

*Katyle* v. *Penn National Gaming Inc.*,
　637 F.3d 462 (4th Cir. 2011) ................................................. 22

*Loos* v. *Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................... 23, 25

*Major League Baseball Properties, Inc.* v. *Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) .................................................................... 10-11

*Meyer* v. *Greene*,
710 F.3d 1189 (11th Cir. 2013) .............................................................. 23, 25

*Meyer* v. *Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ........................................................................ 13

*Richman* v. *Goldman Sachs Group, Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................... *passim*

*Scott* v. *Harris*,
550 U.S. 372 (2007) .................................................................................... 10

*SEC* v. *Biovail Corp.*,
No. 08-cv-2979 (LAK), 2010 WL 2465482 (S.D.N.Y. June 16, 2010) ............... 18

*SEC* v. *Texas Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968) (*en banc*) ........................................................ 11

*SEC* v. *Tourre*,
No. 10-cv-3229 (KBF), 2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ..................... 13

*Shenk* v. *Karmazin*,
868 F. Supp. 2d 299 (S.D.N.Y. 2012) .......................................................... 17

*Southland Securities Corp.* v. *INSpire Insurance Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004) ...................................................................... 20

*Teachers' Retirement System of Louisiana* v. *Hunter*,
477 F.3d 162 (4th Cir. 2007) ...................................................................... 24

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) ................................................................... 20, 21

## RULES

Federal Rule Civil Procedure 56 .................................................................. 5

## PRELIMINARY STATEMENT

After years of discovery, including 36 depositions and production of more than seven million pages of documents, Plaintiffs cannot prove that Defendants defrauded Goldman Sachs' shareholders by making general, aspirational statements about the Firm's efforts to comply with its business principles and conflicts controls.[1]  Plaintiffs claim that these aspirational statements were false because, in structuring four collateralized debt obligation ("CDO") transactions in late 2006 and 2007,[2] the Firm supposedly put its (or one client's) economic interests ahead of those of highly sophisticated institutional investors.  The Court should grant summary judgment to Defendants for four independently sufficient reasons.

*First*, no triable issue of material fact exists over whether Goldman Sachs failed to comply with its business principles and conflicts controls in connection with the four CDOs.  In denying Defendants' motion to dismiss, the Court "[a]ccept[ed] Plaintiffs' allegations as true" that Goldman Sachs did not "disclos[e] [the Firm's] substantial short positions" in Hudson, Anderson and Timberwolf, and omitted "[Paulson & Co.'s ("Paulson")] role in the asset selection process" for ABACUS.  *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278-80 (S.D.N.Y. 2012).  At summary judgment, Plaintiffs can no longer rest on allegations.  Instead, Plaintiffs "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial."  *Jaramillo* v. *Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

The offering materials for Hudson, Anderson and Timberwolf expressly disclosed that

---

[1] Defendants are The Goldman Sachs Group, Inc. (together with its affiliates, "Goldman Sachs" or the "Firm"), Lloyd C. Blankfein, David A. Viniar and Gary D. Cohn (collectively, the "Individual Defendants," and together with Goldman Sachs, "Defendants").  Citations to "Ex. __" refer to exhibits to the Declaration of Jacob E. Cohen, dated November 6, 2015.

[2] The four CDOs are Hudson Mezzanine Funding 2006-1, Anderson Mezzanine Funding 2007-1, Timberwolf I and ABACUS 2007 AC-1.

certain Goldman Sachs affiliates would own short positions in these CDOs.   Moreover, the premise for Plaintiffs' claimed "conflict"—that Goldman Sachs had nonpublic information about the mortgage market's future direction and shifted its (or Paulson's) risk to unsuspecting clients—has no record support.   Less than two-months ago, Judge Marrero granted Goldman Sachs summary judgment in a securities action brought by Hudson investors because no "relevant evidence show[s that] Defendants possessed and failed to disclose some material, non-public information."   *Dodona I, LLC* v. *Goldman Sachs & Co.*, 2015 WL 5444110, at *8 (S.D.N.Y. Sept. 8, 2015).   Judge Marrero's reasoning applies equally to all four synthetic CDOs, about which the Firm had no nonpublic information and fully disclosed to investors the reference portfolios and its affiliates' short positions.

The record also contains no triable issue of material fact that Goldman Sachs abandoned its business principles or suffered a firm-wide failure in its conflicts controls.   Plaintiffs allege (without support) that the purported conflicts of interest in the four CDOs reflected a firmwide failure, but the Mortgage Department contributed only 1% of the Firm's revenue in 2007, when the transactions occurred.   Isolated instances of alleged non-compliance cannot render false general statements that did not guarantee perfect firm-wide compliance and, indeed, expressly warned about potential non-compliance.   And, even if the Firm should have disclosed Paulson's involvement in selecting the ABACUS reference securities, no evidence exists that this mistake in connection with a single transaction reflected the Firm's intentional or widespread failure to abide by its conflicts controls or business principles.

*Second*, although the Court questioned at the pleading stage whether the challenged aspirational statements "would be so obviously unimportant to a reasonable investor," *Richman*, 868 F. Supp. 2d at 280, the evidence conclusively shows that these statements were in fact

immaterial. Defendants' experts demonstrated that (i) the challenged statements did not provide information bearing on Goldman Sachs' future financial performance or value, (ii) contemporaneous analyst reports never discussed the statements, and (iii) the statements did not impact Goldman Sachs' stock price, either when made or after the press reported on Goldman Sachs' purported conflicts with its clients, including in connection with the four CDOs. At the class certification stage—where materiality was *not* at issue—the Court credited Plaintiffs' allegations that the challenged statements "served to maintain an already inflated stock price," and that prior media reports of Goldman Sachs conflicts revealed "different forms and degrees of misstatements" than those revealed on the purported "corrective disclosure" dates. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *6 (S.D.N.Y. Sept. 24, 2015). But on summary judgment Plaintiffs must support their speculative "price maintenance" theory with evidence, and their expert, Dr. Finnerty, has conceded that if the challenged statements were "material," then public reports of violations of the Firm's conflicts controls and business principles should have caused "a negative stock price reaction . . . *regardless of whether the violation related to the four CDOs*." (Ex. 87 at 254:15:255:7 (emphasis added).)

*Third*, no triable issue of material fact exists that the Individual Defendants acted with scienter in making any of the challenged aspirational statements. In deciding the motion to dismiss, the Court accepted "as true" Plaintiffs' allegations "that each Individual Defendant actively monitored the status of Goldman's subprime assets and subprime deals," which, the Court reasoned, plausibly supported the "inference that the Individual Defendants knew that Goldman was making material misstatements in the [four] CDOs." *Richman*, 868 F. Supp. 2d at 283. But discovery has shown that Plaintiffs cannot connect the Individual Defendants— Goldman Sachs' most senior executives at the time—to the alleged CDO conduct that

supposedly rendered the challenged statements false, or otherwise demonstrate that those executives knew of undisclosed conflicts in any of the four CDOs.  To the contrary, just a small number of employees in the Firm's Mortgage Department, which contributed only a small fraction of the Firm's revenues, structured and sold these CDOs.  Because no evidence shows that the Individual Defendants knew of undisclosed conflicts in the four CDOs, Plaintiffs cannot establish their or Goldman Sachs' scienter.

*Fourth*, no triable issue of material fact exists showing that the supposed revelation of the "truth" about the challenged aspirational statements caused shareholder losses.  In certifying a class, the Court held that Defendants did not "conclusively" "demonstrate that no part of the decline was caused by the corrective disclosure."  *Goldman*, 2015 WL 5613150, at *7.  At summary judgment, Plaintiffs must demonstrate that a triable issue of material fact exists over whether "the decline in the market price was due to the fraud, as opposed to other market factors, such as . . . the actualization of the company's risks, or other conditions."  *Gordon Partners* v. *Blumenthal*, 293 F. App'x 815, 817 (2d Cir. 2008).  But Plaintiffs have never even attempted to carry their burden of showing that revelations about client "conflicts"—as opposed to news of government enforcement activity—caused Goldman Sachs' share price to decline on their three "corrective disclosure" dates.  Instead of evidence, Dr. Finnerty impermissibly speculates that news of client conflicts and government enforcement actions were "inextricably tied" together. (Ex. 87 at 296:17-20.)  But his speculation is refuted by the fact that there was *no* news of a government enforcement action and *no* statistically significant price decline on one of the purported "corrective disclosure" dates (April 26, 2010), while on another (April 30, 2010) a statistically significant price decline followed news of enforcement activity alone.  Defendants have conclusively shown that none of the "corrective disclosures" revealed new information

about Goldman Sachs conflicts that the market did not already know.

As in *Dodona*, this Court should grant summary judgment because there is "no genuine dispute as to any material fact,"  Fed. R. Civ. P. 56, and the extensive discovery record categorically refutes Plaintiffs' fraud theory.

## BACKGROUND

### A.    The Challenged Statements

Plaintiffs challenge Defendants' statements about Goldman Sachs' compliance with its conflict controls and business principles made on 18 dates between February 2007 and April 2010.  (*See* Compl. ¶¶ 18, 21, 138.)   The conflicts controls statements appeared in the "Risk Factors" section of Goldman Sachs' annual Form 10-K filings with the SEC, and disclosed that:

> ***Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.***
>
> Our reputation is one of our most important assets. As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest. . . .
>
> *     *     *
>
> We have extensive procedures and controls that are designed to identify and address conflicts of interest, including those designed to prevent the improper sharing of information among our businesses. ***However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or enforcement actions***.

(56.1 ¶¶ 2-6 (first emphasis in original; second emphasis added).)

Plaintiffs also challenge Goldman Sachs' compliance with certain aspects of its "Business Principles," in its Annual Reports to shareholders between 2007 and 2010, including:

- "Our clients' interests always come first.  Our experience shows that if we serve our clients well, our own success will follow."  (Compl. ¶ 154 (quoting Business Principles));

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and

ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard." (*Id.*);

- "Integrity and honesty are at the heart of our business." (*Id.*);

- "Most importantly, and the basic reason for our success, is our extraordinary focus on our clients." (*Id.* (quoting Mr. Viniar's statements on an investor conference call); and

- "Our reputation is one of our most important assets." (*Id.* (quoting Form 10-K filing).)

These general, aspirational statements parallel those of many other companies.  (56.1 ¶ 9.)

### B.    Goldman Sachs' Conflicts Management Infrastructure

As detailed in ¶¶ 97-113 of the 56.1 Statement, the record demonstrates that Goldman Sachs had "extensive procedures and controls that are designed to . . . address conflicts of interest"  (Compl. ¶¶ 134, 154), including (i) robust policies and procedures addressing appropriate treatment of clients and potential conflicts of interest, (ii) compliance training, (iii) departments dedicated to control functions, a Business Selection and Conflicts Group, and (iv) an extensive committee structure for approving transactions, including CDOs, and oversight.

### C.    The Four CDOs

The Complaint's underlying premise is that Goldman Sachs "failed to disclose Goldman's clear conflicts of interest" in the four CDOs structured by its Mortgage Department.[3] (Compl. ¶ 149.)  The Individual Defendants—the most senior executives at Goldman Sachs— were not part of the Mortgage Department, did not structure CDOs, did not draft or approve offering materials for CDOs and did not market CDOs to potential investors.  (56.1 ¶¶ 114-31.) Far from representing a large portion of the Firm's business, in 2007, the Mortgage Department's

---

[3] A CDO is a security backed by a portfolio of assets (individually, "Reference Obligations," collectively, the "Reference Portfolio"), such as residential mortgage-backed securities ("RMBS").  The four CDOs at issue here were "synthetic":  rather than buying the underlying Reference Obligations, the CDOs acquired identical economic exposure through contracts called credit default swaps.  (56.1 ¶¶ 17-19.)

revenues from residential mortgage-related products, including CDOs and RMBS, contributed approximately 1% of Goldman Sachs' overall revenues.  (56.1 ¶¶ 94-95.)

### 1.     Hudson, Anderson and Timberwolf

Hudson, Anderson and Timberwolf were synthetic CDOs that closed on December 5, 2006, March 20, 2007 and March 27, 2007, respectively.  (56.1 ¶¶ 20-21, 35-36, 48-49.)  Each offering circular listed the Reference Obligations and disclosed that a Goldman Sachs affiliate was taking the short position with respect to the entire Reference Portfolio, which "may create certain conflicts of interest."  (*Id.* ¶¶ 26, 31-33, 38, 43-45, 51, 56-58.)  The offering circulars also warned that Goldman Sachs may have "interests different from or adverse to" those of the note holders by virtue of its active participation in the mortgage markets.  (*Id.*)

### 2.     ABACUS

ABACUS was a synthetic CDO transaction that closed on April 26, 2007.  (*Id.* ¶¶ 61-62.)  ACA served as the Portfolio Selection Agent for ABACUS and had exclusive contractual responsibility and authority to select the Reference Portfolio.  (*Id.* ¶¶ 72-73, 76.)  The offering circular fully disclosed the Reference Portfolio, warned that "[v]arious potential and actual conflicts of interest may . . . arise," and listed some of these conflicts.  (*Id.* ¶¶ 64, 71.)  Plaintiffs do not contend that Goldman Sachs took a net short position in ABACUS; in fact Goldman Sachs suffered substantial losses on its net long position.  (*Id.* ¶ 85.)  Although Plaintiffs allege that ACA mistakenly believed that Paulson planned to take a long position in ABACUS, an ACA employee who worked on ABACUS was told in a recorded telephone conversation just weeks before ACA invested in ABACUS that Paulson had a "doomsday scenario" trading strategy, was "one of the biggest shorts in the market," and had "yet to take a long position."  (Ex. 111.)

### 3.     All Purchasers Expressly Agreed to Perform Their Own Independent Analysis of the CDOs.

The four CDOs were offered privately without SEC registration and only to highly sophisticated, institutional investors. (56.1 ¶¶ 29, 41, 54, 67.) As a "sophisticated investor," each investor agreed that it "made its own investment decisions . . . based upon its own judgment . . . and not upon any view expressed by" Goldman Sachs. (*Id.* ¶¶ 30, 42, 55, 68.) The record reflects that investors could—and did—perform their own analyses of the CDOs and their fully disclosed Reference Portfolios in the context of their own economic and market outlooks. (*Id.* ¶¶ 77-79, 83, 86-92.) Investors had the same access as Goldman Sachs to detailed public performance data for the Reference Obligations, including information concerning default rates and credit quality. (*Id.*) Neither Goldman Sachs nor any other participant in structuring or underwriting the four CDOs had any material nonpublic information about the Reference Obligations or market direction, as Judge Marrero held in *Dodona*, 2015 WL 5444110, at *9.[4]

### D.     The Alleged "Corrective Disclosures"

Plaintiffs allege that three "corrective disclosures" in 2010 revealed the purported falsity of the challenged statements about Goldman Sachs' efforts to comply with its business principles and conflicts controls. (*See* Compl. ¶ 330.)[5]

---

[4] Goldman Sachs did not originate any of the underlying mortgages, and issued and underwrote only a small percentage of the Reference Obligations. (56.1 ¶¶ 27, 39, 52, 65.) In Anderson, Goldman Sachs did not issue or underwrite (and thus performed no due diligence on) 98% of the Reference Obligations. (*Id.* ¶ 39.) Although Plaintiffs alleged that Defendants somehow "knew that the reference assets were poor quality mortgage related securities which were likely to lose value," *Richman*, 868 F. Supp. 2d at 270-71, they have failed to identify any "contemporaneous [due diligence] reports containing inconsistent information," much less any reports containing material, nonpublic information about the Reference Obligations. *IKB Int'l S.A.* v. *Bank of Am. Corp.*, 584 F. App'x 26, 28 (2d Cir. 2014); *see also Dodona*, 2015 WL 5444110, at *8.

[5] Plaintiffs have abandoned their allegation that a corrective disclosure was made on April 26, 2010, when the U.S. Senate Permanent Subcommittee on Investigations (the "Senate Subcommittee") released Goldman Sachs emails. (Compl. ¶¶ 316-17, 333.) Plaintiffs now concede that no statistically significant price decline took place in response to that disclosure. (56.1 ¶ 159; Ex. 10 ¶ 103.) In contrast with the other three alleged "corrective disclosures," no

*April 16, 2010:  The SEC Files the ABACUS Lawsuit.*  During the trading day on April 16, 2010, the SEC abruptly and without prior notice filed a civil complaint accusing Goldman Sachs and its employee Fabrice Tourre of securities fraud in the ABACUS CDO.[6]  The marketplace learned on April 16, 2010 that the SEC was adopting a "new aggressive stance by filing charges rather than working out a settlement with Goldman."  (Ex. 57.)

*April 30, 2010:  The Reported Criminal Investigation.*  Plaintiffs allege that, "[o]n April 29, 2010 [after the market closed] . . . the *Wall Street Journal* reported that Goldman was the subject of a criminal investigation by the Department of Justice."  (Compl. ¶ 334.)  The article mentioned no transactions, conflicts, or alleged misconduct, stating merely that "[t]he investigation is centered on different evidence than the SEC's civil case."  (56.1 ¶ 161.)

*June 10, 2010:  The Hudson SEC Investigation.*  Plaintiffs allege that "[o]n June 10, 2010," the media reported that "Goldman profited [in connection with the Hudson CDO] by ridding itself of mortgage backed securities . . . that it knew were going to decline by selling these securities to Goldman's clients."  (Compl. ¶ 322.)  Allegations of Goldman Sachs' purported conflicts in Hudson were not new:  on December 24, 2009, six months earlier, the front-page of *The New York Times* reported on those same allegations.  (*See* Ex. 41.)

## ARGUMENT

## I.    THE DISCOVERY RECORD CONFIRMS THAT DEFENDANTS DID NOT MISREPRESENT ANYTHING TO GOLDMAN SACHS SHAREHOLDERS.

---

news of government enforcement activities was released on April 26, 2010.  (Ex. 1 ¶ 95-101.)

[6] The abrupt filing prompted the SEC Office of Inspector General ("IG") to investigate and determine that, contrary to SEC policy, the SEC "did not notify Goldman of the impending filing of the complaint against them prior to its filing."  (56.1 ¶ 150.)  This Court previously held that Goldman Sachs, which warned shareholders generally about potential enforcement actions, had no obligation to disclose the SEC Staff's "Wells Notice."  *Richman*, 868 F. Supp. 2d at 275.

"A violation of Rule 10b-5 cannot occur unless an alleged material misstatement or omission was false at the time it was made."  *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013).  Here, Plaintiffs have no evidence of such falsity.

A.   **Goldman Sachs' Conduct in Structuring the Four CDOs Did Not Render the Challenged General, Aspirational Statements False.**

The record refutes Plaintiffs' allegations of CDO misconduct, the predicate for their theory that the challenged aspirational statements about Goldman Sachs' efforts to comply with its business principles and conflict controls were false by virtue of the alleged CDO "conflicts."

1.   **Goldman Sachs Disclosed Its Short Position to Investors in Hudson, Anderson and Timberwolf and Did Not Design These CDOs to Fail.**

At the pleading stage, the Court accepted as true Plaintiffs' allegations that Goldman Sachs failed to "disclos[e] its substantial short position" in Hudson, Anderson and Timberwolf. *Richman*, 868 F. Supp. 2d at 278.  But this core allegation is now "blatantly contradicted by the record."  *Scott* v. *Harris*, 550 U.S. 372, 380 (2007).  The offering circulars for those three CDOs made plain that Goldman Sachs was the "protection buyer" for each CDO and expressly disclosed that "[v]arious potential and actual conflicts of interest may arise from the overall activities of" Goldman Sachs and its affiliates.  (56.1 ¶¶ 33, 45, 58.)  As Judge Marrero held in *Dodona*, Goldman Sachs' disclosure that it was the "sole Credit Protection Buyer" "surely indicated to [Hudson investors] that a Goldman subsidiary stood to gain if there were an adverse credit event and a decrease in value of the securities."  *Dodona*, 2015 WL 5444110, at *9.[7]  That

---

[7] Plaintiffs' expert, Dr. Neuberger, asserts that these disclosures were insufficient because CDO investors "expect[ed] that [Goldman Sachs'] short positions on CDSs would be sold."  (Ex. 8 ¶¶ 86, 100.)  Dr. Neuberger cites nothing to support his *ipse dixit* theory and has no basis to speculate about CDO investors' beliefs because he has no experience related to CDOs.  (Ex. 88 at 31:10-13, 136:3-20.)  "An expert's opinions that are without factual basis and are based on speculation or conjecture" cannot be "consider[ed] on a motion for summary judgment."  *Major*

conclusion applies equally to the Anderson and Timberwolf CDOs, where the offering circulars also expressly disclosed that Goldman Sachs was the sole short investor in these CDOs.

There is no legal or record support for the claim of Plaintiffs' expert, Dr. Neuberger, that Goldman Sachs should have told CDO investors its "motivation[s]" for structuring the CDOs and purported "strong belief that the market will fail." (Ex. 9 ¶¶ 6, 42, 50.) "Defendants had no duty to disclose that they structured . . . CDOs as part of a strategy to reduce their long position." *Dodona*, 2015 WL 5444110, at *2.[8] Nor did Goldman Sachs have to disclose any "educated guesses or predictions" about how the CDOs would perform in the future, *SEC* v. *Tex. Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (*en banc*); the record does not support that the Firm held such a view (putting aside varying views of individual employees). Each CDO investor contractually agreed to invest "based upon [their] own judgment" and disclaimed reliance on "any view expressed by [Goldman Sachs]." (*Supra* at p. 8.) *See Jensen* v. *Kimble*, 1 F.3d 1073, 1078 (10th Cir. 1993) ("[A]ffirmative statements by [defendant] clearly notified [plaintiff] that [defendant] was not disclosing certain information.").

Nor is there record support for the premise to the purported "conflict" based on the non-disclosure of the short positions. As in *Dodona*, Plaintiffs alleged that Goldman Sachs "structured the [] CDOs with the (undisclosed) knowledge and purpose that the value of the underlying [reference obligations] would substantially decrease." *Dodona*, 2015 WL 5444110, at *10. Judge Marrero found no factual basis for the allegation that Goldman Sachs had material nonpublic information concerning the future direction of the market, and Plaintiffs have

---

*League Baseball Properties, Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

[8] Dr. Neuberger agreed that "it wasn't practice at the time in those markets for people to share their positions." (Ex. 88 at 111:12-16; *see also* Ex. 4 ¶ 19.)

produced none here.[9]

> **2.      Goldman Sachs' Conduct in ABACUS Did Not Reflect Intentional or Widespread Departure from Goldman Sachs' Conflict Controls or Business Principles.**

Because the evidentiary record conclusively disproves Plaintiffs' theory of misconduct in the Hudson, Timberwolf and Anderson CDOs, Plaintiffs' theory that the statements about the Firm's business principles and conflicts controls were false rests entirely on ABACUS, where the Firm held an unprofitable net long position.  Plaintiffs have no evidence supporting the claim that this one transaction reflected a systemic departure from the principles set forth in the challenged statements.

The SEC's complaint against Goldman Sachs and Fabrice Tourre alleged that because the offering materials for ABACUS disclosed that ACA had selected the Reference Portfolio, Goldman Sachs should also have disclosed that Paulson, which intended to take a large short position in ABACUS, was also involved in selecting the Reference Portfolio.  (Ex. 117 ¶ 2.)  The SEC did not allege that, absent Paulson's involvement in selecting the Portfolio, the law required disclosure of either Paulson's or Goldman Sachs' investment strategies or motives in entering into the transaction.  *See Dodona*, 2015 WL 5444110, at *5.  Nor is there any evidence that Paulson had nonpublic information about the Reference Obligations, or any information that the only two investors in ABACUS—ACA and IKB—did not also have.

Given the novel and untested theory on which the SEC relied, the jury did not find Mr. Tourre liable under Rule 10b-5(b), which was the only claim that required the jury to find

---

[9] To the contrary, in February and March 2007, Goldman Sachs invested in billions of dollars of RMBS, including many of the reference obligations underlying the at-issue CDOs.  (*See* Ex. 4 ¶ 124.)  It "defies economic reason" that Goldman Sachs would take billions of dollars in long positions in securities that it supposedly believed were doomed, as Plaintiffs allege.  *Atl. Gypsum Co.* v. *Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990).

that Mr. Tourre intentionally made a materially false or misleading statement.  *See SEC* v. *Tourre*, 2014 WL 61864, at *1-2 (S.D.N.Y. Jan. 7, 2014) (describing the jury's verdict).[10]   Both ACA and IKB expressly agreed to base their investment decisions on their own independent evaluation of the Reference Portfolio, and the record demonstrates that as experienced CDO portfolio managers they undertook that evaluation.  (56.1 ¶ 68, 73-79, 83-84.)  ACA, which Plaintiffs claim did not know that Paulson was taking a short position, knew of Paulson's "doomsday scenario" trading strategy, which was also widely reported in the media at the time. (Ex. 111; 56.1 ¶ 80.)  Although not disclosing Paulson's involvement in selecting the ABACUS Reference Portfolio was a "mistake"—as Goldman Sachs conceded—that isolated "mistake" was not an intentional, much less widespread, failure to abide by Goldman Sachs' conflicts controls or business principles, let alone sufficient to render false general statements about the Firm's business principles and conflicts controls across a four-year period.

    **B.**    **The Evidence Demonstrates that the Challenged Statements About Goldman Sachs' Conflicts Controls and Business Principles Were Accurate.**

Summary judgment should be granted on the independent ground that no triable issue of material fact exists over the truth of the challenged aspirational statements.  By their terms, the challenged statements about conflicts controls and business principles did not guarantee that Goldman Sachs would always successfully resolve client conflicts or that no employee would ever violate the Business Principles, and no reasonable investor would construe these statements as such.  *See Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("reasonable investors . . . know" that descriptions of company's internal controls "d[o] not guarantee 100% compliance 100% of the time"); *Bondali* v. *Yum! Brands, Inc.*, 2015 WL 4940374, at * 6 (6th

---

[10] Mr. Tourre did not appeal, so the SEC's theory was not tested in the Second Circuit.

Cir. Aug. 20, 2015) ("a code of conduct is not a guarantee that a corporation will adhere to everything set forth in its code of conduct").  The evidence demonstrates that Goldman Sachs had extensive procedures designed to address conflicts of interest, including a dedicated group responsible for assessing potential conflicts, detailed policies and procedures, and an extensive transaction-approval and oversight structure.  (*See* 56.1 ¶¶ 97-113.)  Similarly, no evidence supports a finding that the business principles were widely disregarded, and Goldman Sachs witnesses testified that they sought to comply with these  principles.  (56.1 ¶ 8.)

In opposing the motion to dismiss, Plaintiffs argued that the "sale of subprime RMBS products [was] a core operation for Goldman," and the Firm's alleged misconduct in the four CDOs reflected "pervasive conflicts of interest," and "a firm-wide decision to put Goldman's interests ahead of its own clients."  (Dkt. No. 77 at 3, 16, 18-19, 26; Compl. ¶ 158.)  Accepting the truth of those allegations, the Court denied the motion to dismiss, relying on cases where "pervasive conflicts" existed and defendants had "woefully inadequate or non-existent credit risk procedures."  *Richman*, 868 F. Supp. 2d at 279-80.  But the record now indisputably refutes Plaintiffs' premise that the "sale of subprime RMBS products constituted a 'core business' for Goldman."  (Dkt. No. 77 at 26.)  The Mortgage Department's revenues from residential mortgage-related products, including CDOs and RMBS, contributed barely 1% of Goldman Sachs' overall revenues.  (56.1 ¶¶ 94-95.)  No court has held that general descriptions of a company's internal controls or code of conduct become materially false based on a few instances of non-compliance in a business segment that contributed approximately 1% of the firm's revenue.  *See IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund* v. *Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 390-91 (2d Cir. 2015) ("a misstatement relat[ing] to less than 5% of a financial statement" item is presumed immaterial as a matter of law).  If that were so, "any

company that has a compliance program and discloses that program in even the most austere terms would be required, *ipso facto*, to disclose any possible deviation that came to its attention." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578, 580 (S.D.N.Y. 2014) (product defects did not render statements about "quality control" practices false).

## II.   THE DISCOVERY RECORD CONFIRMS THAT THE ALLEGED MISREPRESENTATIONS WERE NOT MATERIAL.

At the pleading stage, the Court questioned whether the challenged statements "would be so obviously unimportant to a reasonable investor." *Richman*, 868 F. Supp. 2d at 280.[11]  After years of discovery, the record demonstrates that the challenged statements about the Firm's business principles and conflicts controls were immaterial to investors.[12]

As Defendants' expert, Dr. Laura Starks, explained, investors require hard information about a company—that is, information affecting "revenue, earnings, cash flows, dividends, and profitability." (Ex. 3 ¶¶ 16, 19, 23.)  Because the challenged statements "are so general in nature" and "do [not] provide any substantive information to which an investor can react," they "do not contain information that can be used in investment decision-making." (*Id.* ¶¶ 16, 19-25, 34, 41.)  Even Plaintiffs' class representative described the challenged statements as "fairly generic." (Ex. 85 at 262:16-17.)  Dr. Starks' analysis of contemporaneous analyst reports concerning Goldman Sachs—which Plaintiffs' expert, Dr. Finnerty, concedes distill "what . . .

---

[11] At class certification, Plaintiffs argued that "materiality should be left to the merits stage" (Dkt. No. 153 at 1); the Court agreed, holding that it "will not consider . . . the statements' materiality . . . at the current stage of the litigation." *Goldman*, 2015 WL 5613150, at *6.

[12] Defendants preserve for appeal their argument that the challenged statements are immaterial as a matter of law because the statements are "too general to cause a reasonable investor to rely upon them." *E.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 185-86 (2d Cir. 2014).

-15-

investors would regard as important" (Ex. 86 at 101:3-102:20)—confirms that "analysts focused on the themes of growth, management and strategy, profitability, financial position, and market conditions," and did not address the Firm's general statements about business principles and conflicts controls.[13] (Ex. 3 ¶¶ 54-57.)

The empirical evidence further confirms that "reasonable shareholders [did not] consider [the challenged statements] important." *JP Morgan*, 553 F.3d at 197. A "material misrepresentation will distort the price of stock traded in an efficient market." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014). A defendant thus can "demonstrate that the alleged misrepresentations were immaterial[] by showing that they did not lead to a distortion in price." *Fogarazzo* v. *Lehman Bros., Inc.*, 263 F.R.D. 90, 100 (S.D.N.Y. 2009).

Here, Plaintiffs' and Defendants' experts agree that the challenged statements "did not cause a reaction in Goldman's stock price when . . . made." (Ex. 1 ¶ 35; Ex. 87 at 152:9-16.) At class certification, placing the burden on Defendants to show the absence of price impact with "conclusive evidence," the Court held that the challenged statements could have "served to maintain an already inflated stock price." *Goldman*, 2015 WL 5613150, at *6-7. At summary judgment, where Plaintiffs now must show a triable issue of material fact, Plaintiffs offer only a "price maintenance theory" that is "patently deficient" because "it is based not on facts but on speculation." *In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 145 (S.D.N.Y. 2008).

---

[13] Although a handful of the more than 850 analyst reports issued during the class period mention Goldman Sachs' "reputation" (*e.g.*, Ex. 123), none indicates that the challenged statements influenced the market's understanding of Goldman Sachs' reputation. The Second Circuit rejected the notion that the importance of the subject matter of an alleged misstatement "renders a particular statement by a bank regarding [that subject] per se material." *ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

As further evidence that the challenged statements did not distort Goldman Sachs' stock price, Goldman Sachs' stock price did not suffer a statistically significant decline on any of the 36 dates during the Class Period when the media reported Goldman Sachs conflicts with its clients, including in CDOs.  (56.1 ¶¶ 136-37.)  At class certification, the Court described these disclosures as revealing "different forms and degrees of misstatements" from those revealed on the purported "corrective disclosure" dates.  *Goldman*, 2015 WL 5613150, at *6.  Plaintiffs' expert, Dr. Finnerty, has now conceded that if "violations of [Goldman Sachs'] conflicts of interest management statement[s or] business principles statements . . . are material," he "would expect to see a negative stock price reaction" when there are public disclosures of violations, "regardless of whether the violation related to the four CDOs."[14]  (Ex. 87 at 254:15:255:4.)  The undisputed evidence that Goldman Sachs' stock price did not respond to media reports revealing client conflicts confirms that the information was immaterial.

## III.   THE DISCOVERY RECORD DEMONSTRATES THAT DEFENDANTS DID NOT INTEND TO DEFRAUD GOLDMAN SACHS SHAREHOLDERS.

To prove scienter, Plaintiffs "must produce evidence (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Shenk* v. *Karmazin*, 868 F. Supp. 2d 299, 305 (S.D.N.Y. 2012).  The Court previously held that "Plaintiffs have plausibly alleged" scienter based on allegations that the Individual Defendants "actively monitored" subprime exposure, and knew that Goldman Sachs was "'trying to . . . stay on the short side.'"  *Richman*, 868 F. Supp. 2d

---

[14] Although Plaintiffs' expert asserted that the "corrective disclosure" dates revealed greater "severity" of alleged wrongdoing than the earlier allegations, he provided no economically recognized basis on which to assess "severity."  (*See* Ex. 87 239:15-240:16.)  Plaintiffs' expert's theory that Goldman Sachs "thwarted" stock price declines by its "denials" of some of the earlier allegations was similarly unscientific and could not explain why similar "denials" were ineffective on the "corrective disclosure" dates.  (*Id.*, 210:13-23, 215:11-222:16, 228:23-232:18.)

at 281, 283.  From these allegations, the Court "infer[red] that the Individual Defendants knew that Goldman was making material misstatements in the Abacus, Hudson, Anderson, and Timberwolf I CDOs."  *Id.* at 283.  This Court should now grant summary judgment because discovery shows that the Individual Defendants had no knowledge of any disclosures made in connection with the four CDOs, and that no other Goldman Sachs employee responsible for making the Firm's statements about conflicts or business principles had any role in these CDOs.

A.    **Plaintiffs Have Failed To Identify Any Evidence that the Individual Defendants Acted with Scienter.**

Absent evidence of motive,[15] proof of scienter through circumstantial evidence "must be correspondingly greater."  *Richman*, 868 F. Supp. 2d at 276.  The evidence must show that Defendants' conduct was "highly unreasonable and an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *SEC* v. *Biovail Corp.*, 2010 WL 2465482, at *1 (S.D.N.Y. June 16, 2010).  "The level of recklessness required is 'conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  *Id.*

Discovery has demonstrated that the emails and other documents selectively cherry-picked by Plaintiffs in their Complaint to try to plead the Individual Defendants' scienter show at most that the Individual Defendants knew that the Mortgage Department was attempting to reduce risk in an uncertain market environment.  *See In re Fannie Mae Sec. Litig.*, 892 F. Supp. 2d 59, 68 (D.D.C. 2012) (granting summary judgment where evidence indicated that CEO "was aware of certain transactions that affected earnings," but no evidence that he "believed any of these transactions were improper.").  For example, Plaintiffs relied on the following emails:

---

[15] Plaintiffs uncovered no evidence that the Individual Defendants "benefitted in some concrete and personal way from the purported fraud."  *JP Morgan*, 553 F.3d at 198.

- In a December 5, 2006 email, Dan Sparks informed David Viniar and Gary Cohn that the "[s]ubprime market [is] getting hit hard . . . Structured exits are the way to reduce risk." (Ex. 129.) That email does not discuss disclosures to CDO investors, much less indicate that Goldman Sachs misrepresented anything to CDO investors.

- In a February 11, 2007 email, Lloyd Blankfein wrote to the former head of the Firm's Securities Division, "you refer to losses stemming from residual positions in old deals. Could/should we have cleaned up these books before and are we doing enough right now to sell off cats and dogs in other books throughout the division." (Ex. 130.) This email does not discuss disclosures to CDO investors.[16]

- In a March 8, 2007 email, Dan Sparks informed David Viniar and Gary Cohn of "large risks" in the Mortgage Department, including a "CDO and Residential loan securitization stoppage," and stated that "we are trying to close everything down, but stay on the short side." (Ex. 131.) This email also does not discuss disclosures to CDO investors.

As in *Dodona*, these documents do not remotely demonstrate that the Individual Defendants knew "the [ ] CDOs were set up to fail," or that disclosures to CDO investors were deficient, which Plaintiffs must show to survive summary judgment. *Dodona*, 2015 WL 5444110, at *9. The relevant question—asked by this Court in allowing Plaintiffs' claims to proceed to discovery—is whether the Individual Defendants "knew that Goldman ma[de] material misstatements in the Abacus, Hudson, Anderson, and Timberwolf I CDOs." *Richman*, 868 F. Supp. 2d at 283. No such evidence exists.

The Individual Defendants were the most senior executives at Goldman Sachs. They had no role in structuring, drafting or approving offering materials for the four CDOs or marketing those CDOs to potential investors. (56.1 ¶¶ 114-131.) Nor did they have any involvement in the approval process for the four CDOs. (*Id.*) No witness testified that the Individual Defendants saw or reviewed the offering documents for the four CDOs, or that they instructed any Goldman Sachs employee to conceal information from, or make misrepresentations to, CDO investors.

---

[16] Mr. Blankfein testified that his reference to "cats and dogs" did not relate to mortgage-related products, but referred to "old residual positions . . . [in] other businesses like Leveraged Finance or the Credit business, things away from mortgages." (Ex. 78 at 184:7-187:19.)

(*Id.*)  No witness testified that the Individual Defendants knew of any supposed weaknesses in the Mortgage Department's controls for managing conflicts of interest in sales of CDOs.  *See City of Brockton Ret. Sys.* v. *Avon Products, Inc.*, 2014 WL 4832321, at *32 (S.D.N.Y. Sept. 29, 2014) (dismissing complaint where senior executives had no "reason to know that the compliance programs in place were inadequate").

There is simply no evidence that the Individual Defendants knew of or were involved with purported misrepresentations in the offering documents for four CDO transactions structured in one corner of a business unit that was itself a small part of the Firm.  *See Fannie Mae*, 892 F. Supp. 2d at 69 n.19 (summary judgment where "Plaintiffs fail to present the key evidence: evidence that [the former CEO] *knew* what he was saying was false"); *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) (Crotty, J.) (no allegations "directly tying [individual] defendants to knowledge of the falsity of financial statements").

### B.    Plaintiffs Have Failed to Identify Evidence of Goldman Sachs' Scienter.

To avoid summary judgment, Plaintiffs must do more than cite evidence that a Goldman Sachs employee somewhere within the organization knew of alleged misrepresentations to investors in four discrete CDOs.  *See In re Computer Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 665 (E.D. Va. 2012) ("regional managers with knowledge of accounting problems . . . not alleged to have made [the] false or misleading statements').  Plaintiffs must show that "someone whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements."  *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

Tellingly, Plaintiffs made no effort in discovery to identify who at Goldman Sachs was responsible for making the challenged statements.  The Complaint identifies only the Individual

Defendants as "participat[ing] in the issuance of [the] improper statements" (Compl. ¶¶ 38-40), but no evidence supports their scienter.  The Court previously held, based solely on the pleadings, that "the scienter reflected in Goldman's Mortgage Department Head's [*i.e.*, Dan Sparks'] statements can be attributed to Goldman." *Richman*, 868 F. Supp. 2d at 281 n.10.  The record, however, shows that Mr. Sparks had no role in formulating or making the challenged statements.  (*See* Ex. 119.)[17]  Because no evidence supports a finding that Mr. Sparks "was responsible for the [challenged] statements," his knowledge of the four CDOs provides no basis for his scienter or the Firm's.  *Dynex*, 531 F.3d at 196.[18]

## IV.     THE DISCOVERY RECORD DEMONSTRATES THAT THE CHALLENGED STATEMENTS DID NOT CAUSE SHAREHOLDERS' LOSSES.

To prove loss causation, Plaintiffs must establish either "(a) . . . that the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).[19]  Plaintiffs have failed to establish a triable issue as to either requirement.

### A.     No Causal Connection Exists Between the Challenged Statements and the Alleged "Corrective Disclosures."

In proving loss causation, Plaintiffs must do more than simply "demonstrate[] that, on the

---

[17] Mr. Sparks left Goldman Sachs in July 2008.  (56.1 ¶ 133.)  His scienter cannot be attributed to the Firm for the nine challenged statements made after that date.

[18] Mr. Sparks testified that he did not recall "reviewing the marketing materials" for CDO offerings.  (Ex. 80 at 100:2-10.)  Although Mr. Sparks knew of Goldman Sachs' (or Paulson's) short positions in the four CDOs, that does not support a finding that Mr. Sparks knew that the CDOs "were set up to fail." *Dodona*, 2015 WL 5444110, at *9.

[19] This standard fundamentally differs from the Court's standard for proving lack of price impact in opposing class certification, which imposed on Defendants the burden of showing with "conclusive evidence" that "no part of the decline was caused by the corrective disclosure." *Goldman*, 2015 WL 5613150, at *7.

corrective disclosure dates, information revealing the misstatements to the market was released, and the stock price dropped," which Plaintiffs purported to show at class certification. *Goldman*, 2015 WL 5613150, at *7.  "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Katyle* v. *Penn Nat'l Gaming Inc.*, 637 F.3d 462, 473 (4th Cir. 2011).  Nor can Plaintiffs escape summary judgment by arguing that Defendants did not "demonstrate that no part of the decline was caused by the corrective disclosure." *Goldman*, 2015 WL 5613150, at *7.  Instead, Plaintiffs must affirmatively "disaggregate competing causal events from economic loss." *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013).  Plaintiffs cannot meet this standard.

*First*, the allegations on the corrective disclosure dates that Goldman Sachs had "bet[] against its clients" were not "new" (Compl. ¶ 312), and thus not "corrective." *Cent. States* v. *Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x 72, 77 (2d Cir. 2013).  Plaintiffs allege that the SEC revealed Goldman Sachs' CDO misconduct when it filed its ABACUS action (on April 16, 2010), and when the media reported on a DOJ investigation of unspecified mortgage products and an SEC investigation of Hudson (on April 30, 2010 and June 10, 2010, respectively).  (*See supra* at p. 9.)  None of these disclosures were "corrective":

- ***April 16, 2010 (The SEC ABACUS Lawsuit)***:  Virtually all of the factual allegations about ABACUS in the SEC's complaint were prominently and extensively reported long before April 16, 2010, including the SEC's core theory that Goldman Sachs did not properly disclose Paulson's role in selecting the reference portfolio.  (*See* Exs. 36, 38, 40.)

- ***June 10, 2010 (The Reported SEC Hudson Investigation)***:  The market knew virtually all the allegations about Hudson well before the June 10, 2010 report of an SEC investigation. A front page *New York Times* article reported in December 2009 that "Goldman kept a significant amount of the financial bets against securities in Hudson, so it would profit if they failed," thereby "put[ting] the firm[] at odds with [its] own clients' interests." (Ex. 41.)  The June 10 reports "revealed" nothing except that a government entity had initiated an "investigation"—which resulted in no charges of wrongdoing—into previously

alleged conduct of Goldman Sachs, which "is insufficient to constitute a corrective disclosure."[20]   *See Meyer* v. *Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *Loos* v. *Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (same).

- ***April 30, 2010 (The Rumored DOJ Investigation)***:   As Dr. Finnerty concedes, the April 30, 2010 article did not identify "which of Goldman's deals were being scrutinized in the [DOJ] investigation" (Ex. 10 ¶ 117), nor did it mention the business practices the DOJ was supposedly investigating.   (*See* 56.1 ¶¶ 160-62.)   The article does not say that the DOJ believed that Goldman Sachs had done anything wrong, and noted that "[m]any criminal investigations are launched that never result in any charges."[21]   This uncorroborated rumor of an investigation into unspecified conduct does not serve as a corrective disclosure.   *See Meyer*, 710 F.3d at 1201; *Loos*, 762 F.3d at 890.

*Second*, Plaintiffs have failed to disaggregate the losses caused by news of government enforcement actions from any purported "corrective disclosure."   Plaintiffs' expert recognized that "[w]hen enforcement actions are announced, they are almost always met with a strong negative reaction," irrespective of the underlying allegations, and that the severity of this stock price reaction varies depending on which regulator announces the action and their method of announcement.   (Ex. 87 at 232:6-8, 241:8-245:5.)   Despite Dr. Finnerty's promise "that his methodology will be able to account for any so-called inflation from the enforcement actions," *Goldman*, 2015 WL 5613150, at *8, he has now conceded that he had not disaggregated this effect here.   (Ex. 87 at 302:7-14.)   Because Plaintiffs never attempted to show that any of the decline in Goldman Sachs' stock resulted from the alleged misrepresentations, "there is simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss." *In re Omnicom Grp., Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary

---

[20] Dr. Finnerty conceded that the only thing the market learned about Hudson on June 10, 2010 "was the fact that the SEC had reviewed the information and was going to investigate Goldman for that transaction as well for possible fraud."  (Ex. 87 at 168:6-12, 287:14-288:3.)

[21] The DOJ later announced that after completing its investigation of the issues raised in the Senate Subcommittee report—including those concerning the four CDOs—it found no viable basis to bring a criminal prosecution against Goldman Sachs or its employees.  (Ex. 69.)

judgment).

Defendants, in contrast, have demonstrated that news of government enforcement actions and investigations caused the stock price drops on the "corrective disclosure" dates.  Defendants' experts have demonstrated using new event studies that the declines in Goldman Sachs' stock price on Plaintiffs' three alleged "corrective disclosure" dates were *entirely caused* by news of government enforcement actions and that *no decline* was attributable to the challenged statements.[22]  (*See* Ex. 1 ¶¶ 80-124; Ex. 2 ¶¶ 24-56, 66-81.)  Plaintiffs have no plausible explanation for why Goldman Sachs experienced no statistically significant price decline on April 26, 2010, which did not disclose an enforcement action, but did decline on April 30, 2010, which only disclosed rumors of a DOJ investigation.  (Ex. 1 ¶¶ 33, 99-100.)  Where stock price declines following the filing of an enforcement action had nothing to do with new facts disclosed in that suit but "more logically occurred because the market feared that [the] lawsuit" would harm the corporation, summary judgment should be entered.  *Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007).

### B.     Announcements of Government Investigations Were Not a Materialization of Any Risk Concealed by the Challenged Statements.

Plaintiffs cannot link the challenged statements about conflicts controls and business principles with losses following the announcement of the government investigations and lawsuits, because nothing about the challenged statements "concealed" from investors the risk of regulatory investigations or actions, or suggested that they were a remote possibility.  *See Joffe* v. *Lehman Bros. Inc.*, 209 F. App'x 80, 82 (2d Cir. 2006).  Goldman Sachs disclosed that

---

[22] Further, no analyst report during the class period referenced the challenged statements or attributed the stock price declines on the "corrective disclosure" dates to the supposed revelation of their falsity.  (56.1 ¶¶ 154-55, 165-66, 170-71; Ex. 3 ¶ 61; Ex. 1 ¶¶ 93, 112, 118.)

"regulators . . . have announced their intention to increase their scrutiny of potential conflicts of interest," and that, as a result, Goldman Sachs "may become subject to further litigation or regulatory scrutiny in the future in this regard."  (*E.g.*, Ex. 90 at 25-26.)  Plaintiff's expert, Dr. Finnerty, testified that Goldman Sachs' disclosure that "potential or perceived conflicts could give rise to litigation or enforcement actions" was an "appropriate recognition of th[e] risk" of "the consequences if it didn't manage its conflicts of interest properly."  (Ex. 87 127:19-128:13.)

Defendants could not have disclosed in advance that the SEC would bring an enforcement action, much less what the SEC would allege if it filed an action.  As Dr. Choi has explained—and Plaintiffs do not contest—the SEC's decision to bring an enforcement action and its precise form is inherently idiosyncratic and unpredictable.  (*See* Ex. 2 ¶¶ 58-65.)  The SEC's own IG Report concluded that it "did not comply with" its established procedures by failing to provide Goldman Sachs with proper notice of the ABACUS enforcement action.  (*See* Ex. 118 at 65.)  "Firms are not required by the securities laws to speculate about distant, ambiguous, and perhaps idiosyncratic reactions" by third parties.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 514 (2d Cir. 2010).  Goldman Sachs disclosed both that that conflicts of interest could give rise to regulatory enforcement and that the government was investigating the Firm's mortgage-related activities.  (*See* Ex. 93 at 36, 47.)  Goldman Sachs was not required to speculate that the SEC might bring an unprecedented enforcement action (based on conduct already known to the market) or that Goldman Sachs' mortgage-related activities might be subject to other governmental inquiries, which would result in a media frenzy and steep share price declines.  *See Loos*, 762 F.3d at 890; *Meyer*, 710 F.3d at 1200.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

Dated: New York, New York
      November 6, 2015

Respectfully submitted,

Richard H. Klapper (*klapperr@sullcrom.com*)
Theodore Edelman (*edelmant@sullcrom.com*)
Robert J. Giuffra, Jr. (*giuffrar@sullcrom.com*)
David M.J. Rein (*reind@sullcrom.com*)
Benjamin R. Walker (*walkerb@sullcrom.com*)
125 Broad Street
SULLIVAN & CROMWELL LLP
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs Group, Inc., Lloyd C. Blankfein, David A. Viniar and Gary D. Cohn*

-26-