UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
                                                     :
In re GOLDMAN SACHS GROUP, INC.          :      Master File No. 1:10-cv-03461-PAC
SECURITIES LITIGATION                          :
                                                     :      ECF Case
This Document Relates To:                       :
                                                     :
    ALL ACTIONS                                 :
                                                     :
                                                     :
                                                     :
—————————————————————— x


**DEFENDANTS' SUPPLEMENTAL SUBMISSION IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Richard H. Klapper *(klapperr@sullcrom.com)*
Robert J. Giuffra, Jr. *(giuffrar@sullcrom.com)*
David M.J. Rein *(reind@sullcrom.com)*
Benjamin R. Walker *(walkerb@sullcrom.com)*
Jacob E. Cohen *(cohenja@sullcrom.com)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs
Group, Inc., Lloyd C. Blankfein, David A.
Viniar and Gary D. Cohn*

April 13, 2018

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 5

    A.    Defendants' Challenged General Statements ....................................... 5

    B.    Plaintiffs' Alleged "Corrective Disclosures" ....................................... 7

    C.    The Unrebutted Evidence That Defendants' General Statements Had No Impact on Goldman Sachs' Stock Price ................................. 8

        1.    Goldman Sachs' Stock Price Indisputably Did Not Increase When the Challenged Statements Were Made ............... 8

        2.    Goldman Sachs' Stock Price Indisputably Did Not Decline When the Press Reported on Goldman Sachs' Conflicts on 36 Separate Dates ........................................................ 8

        3.    Press Reports of Government Enforcement Actions Impacted Goldman Sachs' Stock Price on Plaintiffs' Three "Corrective Disclosure" Dates .................................. 10

        4.    Plaintiffs Have Presented No Evidence of Price Impact ......... 11

ARGUMENT ...................................................................................................... 12

I.    DEFENDANTS' EVIDENCE ESTABLISHES THAT THEIR CHALLENGED GENERAL STATEMENTS HAD NO PRICE IMPACT WHEN MADE OR ON PLAINTIFFS' THREE "CORRECTIVE DISCLOSURE" DATES ....................................... 12

    A.    Defendants' Undisputed Evidence Shows That Their Challenged General Statements Had No Price Impact When Made ................. 12

    B.    Defendants' Undisputed Evidence Shows That Goldman Sachs' Price Did Not Decline When the "Truth" Supposedly Was Revealed ............... 13

        1.    Plaintiffs Concede That Goldman Sachs' Stock Price Did Not Decline on 36 Separate Dates When the Market Learned That Goldman Sachs Had Client Conflicts ....................... 13

        2.    Plaintiffs Cannot Explain Away the Significance of Defendants' Undisputed Evidence That Goldman Sachs' Stock Price Did Not Decline on the 36 Separate Dates of Press Reports of Client Conflicts ................................... 14

3.    The Stock Price Declines on Plaintiffs' Three Alleged "Corrective Disclosure" Dates Were Caused Entirely By the Market Reacting to News of SEC and DOJ Enforcement Activity ...................................... 19

**II.    PLAINTIFFS' SPECULATIVE "PRICE MAINTENANCE" THEORY CANNOT OVERCOME DEFENDANTS' UNREBUTTED EVIDENCE OF NO PRICE IMPACT** ................................................................................ 22

**CONCLUSION** .................................................................................... 25

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Amgen Inc.* v. *Connecticut Retirement Plans & Trust Funds*,
    568 U.S. 455 (2013) ................................................................ 12

*Arkansas Teachers Retirement System* v. *Goldman Sachs Group, Inc.*,
    879 F.3d 474 (2d Cir. 2018) ...................................................... *passim*

*Bakalar* v. *Vavra*,
    619 F.3d 136 (2d Cir. 2010) ...................................................... 4

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988) .................................................................. *passim*

*Blank* v. *Jacobs*,
    No. 03-cv-2111 (JS) (MLO), 2009 WL 3233037 (E.D.N.Y. Sept. 30, 2009) ...... 24

*Boss* v. *Castro*,
    816 F.3d 910 (7th Cir. 2016) ..................................................... 23

*Bricklayers & Trowel Trades International Pension Fund* v.
    *Credit Suisse Securities (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ....................................................... 17

*Carter* v. *Westlex Corp.*,
    643 F. App'x 371 (5th Cir. 2016) ................................................ 22

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ...................................................... 13, 25

*Comcast Corp.* v. *Behrend*,
    569 U.S. 27 (2013) ................................................................... 13, 24

*Dodona I, LLC* v. *Goldman, Sachs & Co.*,
    132 F. Supp. 3d 505 (S.D.N.Y. 2015) ......................................... 7

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ...................................................... 23

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) ............................................... 14

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ............................................................. *passim*

*IBEW Local 90 Pension Fund* v. *Deutsche Bank A.G.*,
  No. 11-cv-4209 (KBF), 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) .................................. 2

*IBEW Local 98 Pension Fund* v. *Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ................................................................. 19

*International Gateway Exchange, LLC* v. *Western Union Financial Services, Inc.*,
  333 F. Supp. 2d 131 (S.D.N.Y. 2004) ..................................................... 23

*In re Goldman Sachs Group, Inc. Securities Litigation*,
  No. 10-cv-3461 (PAC), 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) ....................... *passim*

*In re Omnicom Group, Inc. Securities Litigation*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008),
  *aff'd*, 597 F.3d 501 (2d Cir. 2010) ...................................................... 18

*In re Omnicom Group, Inc. Securities Litigation*,
  597 F.3d 501 (2d Cir. 2010) ................................................................ 19

*In re Scientific-Atlanta, Inc. Securities Litigation*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007) ................................................... 25

*In re Vivendi, S.A. Securities Litigation*,
  838 F.3d 223 (2d Cir. 2016) ................................................................ 25

*Jones* v. *Department of Health & Human Services*,
  834 F.3d 1361 (Fed. Cir. 2016) ........................................................... 24

*Metropolitan Stevedore Co.* v. *Rambo*,
  521 U.S. 121 (1997) ........................................................................ 24

*Meyer* v. *Greene*,
  710 F.3d 1189 (11th Cir. 2013) ........................................................ 21-22

*Nathenson* v. *Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) .............................................................. 25

*Ostrowski* v. *Atlantic Mutual Insurance Companies*,
  968 F.2d 171 (2d Cir. 1992) ................................................................ 1

*Parko* v. *Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) ............................................................. 24

*Public Administrator of Queens County* v. *City of New York*,
  No. 06-cv-7099 (LBS), 2010 WL 4457312 (S.D.N.Y. Nov. 3, 2010) ..................... 23, 24

*Schleicher* v. *Wendt*,
  618 F.3d 679 (7th Cir. 2010) .............................................................. 25

*Strougo* v. *Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y 2015) ........................................................ 21

*Teachers' Retirement System of Louisiana* v. *Hunter*,
    477 F.3d 162 (4th Cir. 2007) .................................................................. 21

*United States* v. *Beard*,
    542 Fed. App'x 529 (7th Cir. 2013) ........................................................ 4

*United States* v. *Gigante*,
    94 F.3d 53 (2d Cir. 1996) ........................................................................ 1

*United States* v. *Singer*,
    152 Fed. App'x 869 (11th Cir. 2005) ...................................................... 22

*Waggoner* v. *Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ............................................................ 12-13, 21

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011) ................................................................................ 24

*Waste Management Holdings, Inc.* v. *Mowbray*,
    208 F.3d 288 (1st Cir. 2000) .................................................................. 24

## RULES

Federal Rule of Civil Procedure 23 ....................................................... 23-24

## OTHER AUTHORITIES

Jonathan R. Macey, et al., *Lessons From Financial Economics*,
    77 Va. L. Rev. 1017 (1991) .................................................................. 13

## PRELIMINARY STATEMENT

Under *Halliburton II*, the pivotal question on class certification remains whether Defendants' challenged general statements about Goldman Sachs' business principles and conflicts policies impacted the Firm's stock price.  Defendants may show the absence of stock price impact either when the statements were made or on the three dates when Plaintiffs claim the truth was revealed—that the Firm had not acted in conformity with those principles and policies.  The Second Circuit has now clarified the evidentiary standard applicable to resolving this question and directed that the Court examine the full record, including Defendants' critical evidence that Goldman Sachs' stock price did not move on 36 dates, *prior to* Plaintiffs' so-called "corrective disclosure" dates, when the press reported that the Firm had acted contrary to its clients' interests.  *See Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018).[1]

*First*, the Second Circuit has made clear that the governing standard for assessing whether Defendants have rebutted the *Basic* presumption of reliance under *Halliburton II* is the "preponderance of the evidence."  *Id.* at 485.  The preponderance standard is "the lowest standard of proof," and "no more than a tie-breaker."  *United States* v. *Gigante*, 94 F.3d 53, 55-56 (2d Cir. 1996).  Defendants have thus met their burden in rebutting the *Basic* presumption if, in evaluating the evidence relevant to price impact, "the scales tip, however slightly, in favor of" Defendants.  *Ostrowski* v. *Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992).

*Second*, the Second Circuit held that the empirical analysis of the 36 prior disclosures by Defendants' expert, Dr. Paul Gompers—rather than being offered in support of a "truth on the

---

[1] Defendants are The Goldman Sachs Group, Inc. (with its affiliates, "Goldman Sachs" or the "Firm"), Lloyd C. Blankfein, David A. Viniar and Gary D. Cohn (with Goldman Sachs, "Defendants").  Citations to Exhibits or "Ex. __" refer to exhibits to the Declaration of Jacob E. Cohen, dated April 13, 2018.

market" defense—"has everything to do" with "price impact," because this evidence may "show that [Defendants'] statements about Goldman's efforts to avoid conflicts of interest 'did not actually affect the stock's market price.'" *Goldman*, 879 F.3d at 486.  Under Plaintiffs' theory, these press reports of Goldman Sachs' client conflicts, including in the ABACUS and other CDO transactions, on 36 separate dates *before* Plaintiffs' three "corrective disclosure" dates should have had a statistically significant impact on the Firm's stock price.  Instead, those reports had no price impact.

*Third*, recognizing that this Court previously ruled without holding an evidentiary hearing, the Second Circuit "encourage[d]" this Court "to hold any evidentiary hearing or oral argument it deems appropriate under the circumstances."  *Id*.  Given the centrality of the parties' expert evidence to the price impact question before the Court, Defendants continue to believe that a hearing would indeed assist the Court in gauging the experts' "credib[ility]," "consisten[cy]," "responsive[ness]," and "quality and depth of reasoning."  *IBEW Local 90 Pension Fund* v. *Deutsche Bank A.G.*, 2013 WL 5815472, at *7, *10 (S.D.N.Y. Oct. 29, 2013) (Forrest, J.) (ordering evidentiary hearing on class certification).

Regardless of whether or not the Court conducts an evidentiary hearing, Defendants have established by a preponderance of the evidence that their challenged statements had no price impact either when made *or* on Plaintiffs' three "corrective disclosure" dates.  Defendants' expert evidence stands undisputed:  Goldman Sachs' stock price did not react (1) when Defendants made the challenged statements, and (2) in response to press reports of client conflicts on 36 separate dates (as summarized in Exhibits 1 and 2) *prior to* Plaintiffs' three "corrective disclosure" dates.

For example, there was no market reaction when:

- on December 6, 2009, *The New York Times* detailed the core ABACUS allegations: "Mr. Paulson persuaded Goldman Sachs . . . to put together [CDOs] which were filled with nasty mortgages that he could then short.  Of course, nobody told the suckers—er, investors—who bought these C.D.O.'s . . . ."  (Ex. 38.)

- on December 14, 2007, a front page *Wall Street Journal* article described "Goldman's success at wringing profits out of the subprime fiasco," and asked, "[w]hy did Goldman continue to peddle CDOs to customers early this year while its own traders were betting that CDO values would fall?"  (Ex. 23.)

Defendants have also supplemented the record with further empirical analysis from Dr. Stephen Choi in response to the Court's observation that Dr. Choi did not show that reports of enforcement activity "cause[d] the entirety of the decline that occurred here."  *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *7 (S.D.N.Y. Sept. 24, 2015) (Crotty, J.). Since then, Dr. Choi has conducted an additional empirical analysis, based on a review of *all* SEC enforcement actions against public companies (117) *over a five-year period*, and found that the reports of SEC and DOJ enforcement activity explain the *entire* decline in Goldman Sachs' stock price on Plaintiffs' three "corrective disclosure" dates—(i) April 16, 2010, when the SEC filed a lawsuit against Goldman Sachs over conflicts in the ABACUS CDO; (ii) April 30, 2010, when the press reported that the DOJ was conducting a criminal investigation of the Firm over unspecified mortgage-related matters; and (iii) June 10, 2010, when the press reported that the SEC was investigating the Firm's alleged conflicts in the Hudson CDO.  Dr. Choi's analysis is corroborated by a study of 880 analyst reports on Goldman Sachs, none of which supports Plaintiffs' unsupported theory that investors cared about the Firm's statements about its general business principles and conflicts policies, or its alleged failure to comply with those principles and policies in all instances.

Critically, in the face of this overwhelming evidence, Plaintiffs offer *no price impact evidence at all*. Instead, Plaintiffs merely criticize Defendants' evidence and speculate, with no supporting analysis, "that the misstatements simply served to maintain an already inflated stock price." *Id.* at *6. Such a "price maintenance theory" is not legally sustainable unless the defendant made an overly optimistic statement intended to stop a price decline or to convey that the company had met market expectations when it had not. Even if those circumstances existed here (they do not), evidence—not criticism or conjecture—is what the Court must weigh, and Plaintiffs' "scenarios, based on pure speculation, do not constitute findings by a preponderance of the evidence." *Bakalar* v. *Vavra*, 619 F.3d 136, 151 (2d Cir. 2010); *see United States* v. *Beard*, 542 Fed. App'x 529, 530 (7th Cir. 2013) ("[W]hen a dispute will be decided based on a preponderance of the evidence . . . a party who shuns the opportunity to present evidence is almost assured of losing.").

The Supreme Court has made plain that "*any showing* that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2415 (2014) (*Halliburton II*) (emphasis added). This is because where "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock" the "fraud-on-the-market theory and presumption of reliance collapse." *Id.* at 2414. Defendants' evidence establishes exactly that: the challenged statements had no price impact when made, and the price declines on Plaintiffs' three "corrective disclosure" dates were caused by investors learning of SEC and DOJ enforcement activity, not, as Plaintiffs speculate, that Goldman Sachs had not always followed its business principles and conflicts policies.

Plaintiffs' response consists of little more than what exists in every securities fraud complaint: alleged misstatements and subsequent stock price drops.  Applying the preponderance standard to the full evidentiary record, the Court should find that the challenged general statements had no price impact, and, therefore, that no class can be certified here because Defendants have rebutted the *Basic* presumption.

## BACKGROUND

### A.    Defendants' Challenged General Statements

This case bears no resemblance to the typical securities fraud case where plaintiffs challenge a company's statements regarding its financial condition.  Instead, Plaintiffs' claims rest solely on Defendants' general statements from 2007 to 2010 describing Goldman Sachs' efforts to comply with its "conflicts of interest policies and business practices" across nearly 100 separate businesses around the world.  *Goldman*, 2015 WL 5613150, at *1.[2]  Defendants' challenged statements about conflicts controls appeared in the "Risk Factors" section of each of Goldman Sachs' annual Form 10-K filings with the SEC from 2007 to 2010, and warned that:

> *Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.*
>
> Our reputation is one of our most important assets.  As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest. . . .
>
> We have extensive procedures and controls that are designed to identify and

---

[2] In remanding, the Second Circuit expressed no view on whether these general statements are actionable under its series of holdings dismissing claims against other financial institutions over analogous statements, reasoning that "[P]laintiffs need not prove the materiality of [D]efendants' misstatements at the class certification stage," as opposed to on summary judgment or at trial. *Goldman*, 879 F.3d at 481 n.6.  Defendants respectfully continue to submit that the challenged statements are not actionable and hence could not have impacted Goldman Sachs' stock price as a matter of law.  (*See infra* at note 8.)

address conflicts of interest, including those designed to prevent the improper sharing of information among our businesses.

(*E.g.*, Ex. 71 at 28 (emphasis in original).)

Plaintiffs also challenge Goldman Sachs' compliance with aspects of its aspirational "Business Principles" published in its Annual Reports to shareholders from 2007 to 2010:

- "Our clients' interests always come first."  (Compl. ¶ 154 (quoting Business Principles));

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard."  (*Id.*); and

- "Integrity and honesty are at the heart of our business."  (*Id.*)

None of Defendants' challenged statements referred or related to any line of business, much less mentioned mortgages, CDOs or any particular transaction.  Nor did those statements guarantee that Goldman Sachs would always successfully resolve client conflicts, or promise that none of the Firm's tens of thousands of employees ever would violate its business principles.  To the contrary, the challenged statements about client conflicts expressly warned investors:

However, appropriately identifying and dealing with conflicts of interest *is complex and difficult*, and our reputation *could be damaged* and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest.  In addition, potential or perceived conflicts *could give rise to litigation or enforcement actions*.

(*E.g.*, Ex. 71 at 28 (emphasis added).)

Plaintiffs allege that the challenged statements were false because they purportedly were inconsistent with Goldman Sachs' allegedly undisclosed conflicts in connection with four CDO transactions (out of many thousands of other transactions) structured by Goldman Sachs' Mortgage Department in 2006 and 2007 and sold to a small number of highly sophisticated

-6-

institutional investors in arm's-length transactions.  (Compl. ¶¶ 148-50.)[3]

**B.      Plaintiffs' Alleged "Corrective Disclosures"**

In seeking to certify a class, Plaintiffs claim that three "corrective disclosures" in 2010 revealed the purported falsity of Defendants' general statements about Goldman Sachs' efforts to comply with its business principles and policies to address the risk of increasing client conflicts:

- *April 16, 2010:  The SEC ABACUS Lawsuit.*  During the trading day on April 16, 2010, the SEC abruptly filed a highly publicized enforcement action alleging that the Firm and one of its employees committed fraud in sponsoring the ABACUS CDO by not disclosing to potential CDO investors that a hedge fund, Paulson & Co. Inc., "played an active and determinative role in the asset selection process."  (*Id.* ¶¶ 63-65, 307.)

- *April 30, 2010:  Reports of a DOJ Criminal Investigation.*  Plaintiffs allege that after the market closed "[o]n April 29, 2010 . . . *The Wall Street Journal* reported that Goldman was the subject of a criminal investigation by the Department of Justice" into unspecified mortgage-related matters.  (*Id.* ¶ 334.)  The article mentioned no transactions, conflicts or alleged misconduct, but speculated that "[t]he investigation is centered on different evidence than the SEC's civil case."  (Ex. 61.)

- *June 10, 2010:  Reports of an SEC Investigation of the Hudson CDO.*[4]  Plaintiffs allege that "[o]n June 10, 2010," the press "reported that the SEC was investigating whether in connection with the Hudson CDO, Goldman profited by ridding itself of mortgage backed securities . . . on Goldman's books that it knew were going to decline by selling these securities to Goldman's clients."  (Compl. ¶ 322.)

---

[3]  The four CDOs are ABACUS 2007-AC1, Hudson Mezzanine Funding 2006-1, Anderson Mezzanine Funding 2007-1 and Timberwolf I.

[4]  Hudson and a related CDO were the subject of a class action against Goldman Sachs on behalf of the CDOs' investors.  Judge Marrero granted summary judgment for defendants, finding that no material evidence supported plaintiffs' allegations that the Firm "structured the Hudson CDOs with the expectation that they would fail, or that Defendants were particularly aware of an undisclosed risk of Plaintiffs' investing in the RMBS market."  *Dodona I, LLC* v. *Goldman, Sachs & Co.*, 132 F. Supp. 3d 505, 510 (S.D.N.Y. 2015).

Plaintiffs have "abandoned" their claim based on a fourth "corrective disclosure" on April 26, 2010.  *Goldman*, 879 F.3d at 480 n.2.  Plaintiffs had alleged that on April 26, 2010, the U.S. Senate Permanent Subcommittee on Investigations "released Goldman internal emails further detailing that Goldman made billions by betting against the CDOs it sold to its clients." (Compl. ¶ 316.)  Tellingly, unlike Plaintiffs' other three alleged "corrective disclosures," the April 26 disclosure "did not contain news of government enforcement activities and caused no statistically significant movement in the price of Goldman's stock."  *Goldman*, 879 F.3d at 480 n.2.; *see* Ex. 5 ¶¶ 11-12; Ex. 6 ¶ 33.

### C.    The Unrebutted Evidence That Defendants' General Statements Had No Impact on Goldman Sachs' Stock Price

#### 1.    Goldman Sachs' Stock Price Indisputably Did Not Increase When the Challenged Statements Were Made.

As this Court has found, the challenged general statements "had no impact on [Goldman Sachs'] stock price when made."  *Goldman*, 2015 WL 5613150, at *6; *see* Ex. 4 ¶¶ 27-47; Ex. 6 ¶ 35.  Plaintiffs' expert, Dr. John Finnerty, concedes that "the market did not react" when the challenged statements were made.  (Ex. 12 ¶ 204.)

#### 2.    Goldman Sachs' Stock Price Indisputably Did Not Decline When the Press Reported on Goldman Sachs' Conflicts on 36 Separate Dates.

The Second Circuit found directly relevant to this Court's *Halliburton II* analysis evidence establishing that Goldman Sachs' stock price did not decline when the market learned on 36 dates[5]—*prior to* Plaintiffs' three "corrective disclosure" dates—that Goldman Sachs allegedly had conflicts with its clients, including with investors in the ABACUS, Hudson and other CDOs.  (Ex. 4 ¶¶ 48-60, Exs. 5 & 6; Ex. 6 ¶¶ 48-76, Exs. 2 & 3.)  These reports included

---

[5] Dr. Gompers analyzed news articles published on 34 dates in his initial class certification report.  At the merits stage, he located and analyzed two additional articles.  (Ex. 6 ¶¶ 48, 73.)

allegations regarding:

### The ABACUS CDO

- On **October 31, 2009**—more than five months *before* the SEC filed its enforcement action—*The Wall Street Journal* reported that "[Mr. Paulson] met with bankers at . . . Goldman Sachs[] and other firms to ask if they would create . . . CDOs . . . that Paulson & Co. could wager against. . . .   Goldman Sachs[] didn't see anything wrong with Mr. Paulson's request and agreed to work with his team."  (Ex. 34.)

- On **November 3, 2009**, Gregory Zuckerman's bestseller *The Greatest Trade Ever* was published.  The book described how "Paulson's team would pick a hundred or so mortgage bonds for the CDOs."  (Ex. 36 at 179.)  It continued:  "[A] senior Bear Stearns trader . . . worried that Paulson would want especially ugly mortgages for the CDOs . . . . Goldman Sachs[] didn't see anything wrong with Paulson's request and agreed to work with his team. . . .   [S]ome investors later would complain that they wouldn't have purchased the CDO investments had they known that some of the collateral behind them was chosen by Paulson and that he would be shorting it."  (*Id.* at 180-82.)

### The Hudson CDO

- On **December 24, 2009**, *The New York Times* reported on its front page that "Goldman kept a significant amount of the financial bets against securities in Hudson, so it would profit if they failed," thereby "put[ting] the firm[] at odds with [its] own clients' interests."  (Ex. 39.)

### Other CDO Conflicts

- On **December 14, 2007**, *The Wall Street Journal* detailed on its front page "Goldman's success at wringing profits out of the subprime fiasco," emphasizing that its "big bet that securities backed by risky home loans would fall in value generated nearly $4 billion of profits."  The article asked, "[w]hy did Goldman continue to peddle CDOs to customers early this year while its own traders were betting that CDO values would fall?"  (Ex. 23.)

As the Second Circuit reasoned, this evidence has "everything to do" with price impact, *Goldman Sachs*, 879 F.3d at 486, because if, as Plaintiffs claim, the SEC's lawsuit and reports of

other government investigations on their three "corrective disclosure" dates revealed to the market allegations of "abusive conduct of placing the [Firm's] interests above its own clients" that were "contrary to" Defendants' challenged general statements (Compl. ¶ 330), then these earlier press reports of client conflicts should have done so as well.  But it is undisputed that *none* of these prior press reports of client conflicts had *any* impact on the Firm's stock price. (Ex. 6 ¶¶ 48-76, Exs. 2 & 3.)

> ### 3.   Press Reports of Government Enforcement Actions Impacted Goldman Sachs' Stock Price on Plaintiffs' Three "Corrective Disclosure" Dates.

News of SEC and DOJ enforcement activity—not news about undisclosed client conflicts—explains the entirety of the declines in Goldman Sachs' stock price on Plaintiffs' three "corrective disclosure" dates.[6]  Dr. Stephen Choi has supplemented his prior opinions with additional empirical evidence buttressing his opinion that news of government investigations, not revelations of the alleged falsity of Defendants' statements about business principles and conflicts controls, fully explains those declines.

As Dr. Choi shows, Goldman Sachs' stock price declined on those three dates (in contrast to the 36 dates with reports of client conflicts but no news of enforcement activity), because investors feared the potentially serious consequences of SEC and DOJ enforcement activity. (Ex. 8 ¶¶ 24-56, 66-81.)  Building on his initial class certification report, Dr. Choi has now conducted an event study, which found that the decline on April 16, 2010 after the SEC filed its ABACUS complaint was not statistically significantly different from declines experienced by other companies in response to news of similar enforcement actions, including where, like here,

---

[6] *See* Ex. 4 ¶¶ 61-95; Ex. 5 ¶¶ 13-18; Ex. 6 ¶¶ 80-124; Ex. 7 ¶¶ 24-65; Ex. 8 ¶¶ 24-56, 66-81.

the underlying factual allegations were reported prior to the enforcement actions.  (*Id.* ¶¶ 24-42.)[7]

Dr. Choi's analysis is corroborated by Dr. Laura Starks' analysis of contemporaneous market analyst reports on Goldman Sachs.  As Plaintiffs' expert, Dr. Finnerty, has conceded, analysts distill "what . . . investors would regard is important."  (Ex. 67 at 101:3-102:20.)  Here, Dr. Starks found that Goldman Sachs' aspirational business principles and policies to address the risk of client conflicts "were not mentioned or referred to" in any of *880* market analyst reports on Goldman Sachs issued during the putative class period.  (Ex. 10 ¶¶ 52, 56, 61.)  Dr. Starks' analysis further revealed that following Plaintiffs' three "corrective disclosure" dates, market analyst reports on Goldman Sachs "discussed the SEC enforcement action and other enforcement activities in this time frame, . . . but did not attribute the enforcement activities to the [challenged] statements."  (*Id.* ¶ 61.)  This evidence thus confirms that the market was reacting to the news of SEC and DOJ enforcement activity on the three "corrective disclosure" dates, not to some sudden recognition that Defendants' general statements about Goldman Sachs' compliance with its business principles and conflict controls were false.

### 4.    Plaintiffs Have Presented No Evidence of Price Impact.

In response to Defendants' evidence showing the absence of price impact, Plaintiffs have elected to submit no evidence of price impact of any kind.  Instead, Plaintiffs speculate, with no evidentiary support whatsoever, "that the misstatements simply served to maintain an already inflated stock price."  *Goldman*, 2015 WL 5613150, at *6.  Plaintiffs presume that the stock price declines on their three "corrective disclosure" dates stemmed from the challenged statements made years earlier, but proffer no evidence to establish that link.  Tellingly, Dr. Finnerty agreed with Dr. Choi that "the market reacts negatively" if "a company is accused of fraud by a

---

[7] Plaintiffs "agreed that the Court should consider any new evidence of price impact . . . developed during the pendency of the appeal."  (Order at 1, Dkt. No. 189.)

regulatory body," and conceded that an enforcement action without a concurrent resolution (like the SEC's ABACUS lawsuit) has a statistically significant independent stock price impact because of the "uncertainty of a case hanging out there."  (Ex. 67 at 142:12-143:12, 147:16-148:13; Ex. 68 at 242:12-22.)  Nonetheless, Dr. Finnerty made no "attempt to measure this incremental impact" here.  (Ex. 68 at 307:3-6.)

## ARGUMENT

I. **DEFENDANTS' EVIDENCE ESTABLISHES THAT THEIR CHALLENGED GENERAL STATEMENTS HAD NO PRICE IMPACT WHEN MADE OR ON PLAINTIFFS' THREE "CORRECTIVE DISCLOSURE" DATES.**

Under the fraud-on-the-market presumption established in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), "courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.'"  *Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 462 (2013).  In *Halliburton II*, the Supreme Court confirmed that defendants, in opposing class certification, may rebut the *Basic* presumption by showing that *either* "*the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock.*"  134 S. Ct. at 2414 (emphasis added).

A. **Defendants' Undisputed Evidence Shows That Their Challenged General Statements Had No Price Impact When Made.**

Defendants have demonstrated, and Plaintiffs have conceded, that none of Defendants' challenged statements caused any increase in Goldman Sachs' stock price when those statements were made.  (*See supra* at 8.)  The Supreme Court made clear in *Halliburton II* that "appropriate evidence" for rebutting the *Basic* presumption at class certification includes evidence that "the asserted misrepresentation" had no price impact when made.  134 S. Ct. at 2414.  Thus, even if a court does not "abuse[] its discretion" in ruling that "the lack of price movement on the dates of

-12-

the alleged misrepresentations does not," standing alone, "rebut the *Basic* presumption," *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017), such evidence is relevant and must be weighed, along with other price impact evidence, in determining price impact.[8]

**B.    Defendants' Undisputed Evidence Shows That Goldman Sachs' Stock Price Did Not Decline When the "Truth" Supposedly Was Revealed.**

      **1.    Plaintiffs Concede That Goldman Sachs' Stock Price Did Not Decline on 36 Separate Dates When the Market Learned That Goldman Sachs Had Client Conflicts.**

As the Court previously recognized, and as Dr. Finnerty concedes, "Goldman's stock price" did "no[t] move[]" on any of 36 "separate dates" prior to the alleged "corrective disclosures" when the press reported that the Firm had conflicts with its clients, including specifically in connection with the four CDOs. *Goldman*, 2015 WL 5613150, at *6; *see* Ex. 13 at Ex. 3; Ex. 14 ¶ 19; *supra* at 8-10.   These press reports included allegations that Goldman Sachs had client conflicts in connection with CDOs—including ABACUS and Hudson—and in other business lines.   The Second Circuit found this analysis relevant because if news of Goldman Sachs' conflicts on the three "corrective disclosure" dates revealed the challenged statements to be false, then reports of conflicts on these 36 earlier dates also should have done so.   Dr. Gompers' empirical analysis shows that Goldman Sachs' stock price did not decline in response to the reports on any of these 36 dates, a fact that Plaintiffs do not challenge.

---

[8] That the challenged statements had no impact on Goldman Sachs' stock price when made is consistent with their general nature. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 185-86 (2d Cir. 2014).   The generality of the challenged statements heightens the need for the Court to conduct a "rigorous analysis" of the price impact evidence here. *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013); *see* Jonathan R. Macey, et al., *Lessons From Financial Economics*, 77 Va. L. Rev. 1017, 1021 (1991) ("[I]f plaintiffs are unable to show that a misstatement was material—that it affected the security price—then the fraud-on-the-market theory presumption of reliance should not apply.").

Dr. Gompers' analysis is a quintessential example of the type of "event study" that *Halliburton II* expressly contemplated could be used to "show[] no price impact with respect to the specific misrepresentation[s] challenged in the suit." 134 S. Ct. at 2415. Thus, on remand from the Supreme Court in *Halliburton II*, defendants used an event study to demonstrate that the allegedly "corrective" information had "already [been] disclosed to the market . . . to no price reaction" before the alleged corrective disclosure. *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 309 F.R.D. 251, 271-73 (N.D. Tex. 2015) (denying class certification).

> **2.      Plaintiffs Cannot Explain Away the Significance of Defendants'
> Undisputed Evidence That Goldman Sachs' Stock Price Did Not
> Decline on the 36 Separate Dates of Press Reports of Client Conflicts.**

Plaintiffs proffer only speculative theories, not supported by any evidence, to try to explain away the significance of the absence of price impact in response to any of the 36 press reports of client conflicts. Plaintiffs raised these speculative theories on appeal,[9] but the Second Circuit did not endorse them, and this Court should not do so now.

*a. **Denials.*** Plaintiffs' expert speculates that the market did not react when the media reported alleged Goldman Sachs client conflicts, because on "13" of the 36 dates the Firm "denied that it engaged in any inappropriate conduct."  (Ex. 12 ¶ 184; Ex. 68 at 206:12-17.) From this, Dr. Finnerty simply "assum[es] [that] whatever negative information there was, was countered at least to some degree by these denials."  (Ex. 68 at 219:17-220:18.)  In doing so, he concedes that Goldman Sachs made no "denials" in the face of press reports of client conflicts on *23 of the 36 dates*, but there still was no price impact on those dates.  Dr. Finnerty provides only conjecture, not economic analysis, to explain why similar denials did not prevent statistically

---

[9] *See, e.g.*, Pl.-Appellees Br. at 46-47 (2d Cir. Dkt. No. 129).

significant declines in the Firm's stock price on Plaintiffs' three "corrective disclosure" dates.[10]

    ***b. Conflicts Unrelated to the Four CDOs.***   Dr. Finnerty also speculates that news of Goldman Sachs' client conflicts had no price impact because, on 33 of the 36 dates, the press reports were "not directly related" to the four CDO transactions.  (Ex. 12 at Ex. 6; Ex. 14 ¶¶ 31-37.)  But Dr. Finnerty ignores that on *21 of those 33 dates* the press did report on alleged "conflicts . . . related to Goldman's CDO and mortgage businesses" without any impact on the Firm's stock price.  (Ex. 6 ¶¶ 53-57, 68, 75, Ex. 3.)

    More fundamentally, Dr. Finnerty's criticism cannot be squared with Plaintiffs' theory of the case, which presumes that Goldman Sachs' stock price fell on their three "corrective disclosure" dates because investors reacted to learning that the Firm did not always act in conformity with Defendants' general statements about Goldman Sachs' business principles and conflicts controls across the Firm as a whole.  Under Plaintiffs' theory, public allegations of *any* conflicts with its clients should have revealed that Goldman Sachs lacked "extensive procedures and controls" for "address[ing] conflicts" and "was not 'dedicated to complying fully with the letter and spirit of the laws,' as its public statements had suggested."  *Goldman*, 879 F.3d at 479. Indeed, Dr. Finnerty has now conceded that he "would expect the market to react adversely to []

---

[10] Dr. Finnerty speculates that denials are effective at preventing price drops when they are "credible," but he offers no method for evaluating credibility.  (Ex. 68 at 210:13-23, 215:11-222:16, 228:23-232:18.)  Conveniently, he concludes that Goldman Sachs' denial when the SEC sued on April 16, 2010 was "ineffective," because "if the announcement is being made by a firm's primary securities regulator . . . that will give the disclosure a lot of credibility, which will outweigh whatever impact the denial might have."  (*Id.* at 228:23-231:6.)  Dr. Finnerty does not explain why reports on the front page of *The New York Times*, for example, would lack "credibility," or why investors would ignore six of the reports, which referenced investigations by the SEC, other regulators and Congress.  (*See* Exs. 27, 39, 42, 45, 48, 50.)  More fundamentally, Dr. Finnerty ignores the obvious conclusion—supported by Defendants' expert evidence—that the statistically significant price drops on Plaintiffs' three "corrective disclosure" dates were in response to news of SEC and DOJ enforcement activity.  (*See infra* at 19-22.)

disclosures" of "behavior [that] violates [the Firm's] conflicts of interest management statement[s or] business principles statements," "regardless of whether the violation related to the four CDOs."  (Ex. 68 at 254:15-255:13.)

Moreover, Plaintiffs have no explanation for why investors cared about allegations of conflicts in four CDOs structured and sold by Goldman Sachs' Mortgage Department (which contributed only approximately 1% of the Firm's revenues in 2007), but did not react to allegations of conflicts in Investment Banking, for example (which contributed approximately 16% of the Firm's revenues in 2007).  (*See* Ex. 78 at 96; Ex. 71 at 3, 6.)  In fact, Dr. Finnerty concedes that the "market reaction" should be greater if the alleged "misbehavior occurs" in "a larger business," such as Goldman Sachs' "very large" "investment banking business."  (Ex. 68 at 263:17-265:6.)  But Goldman Sachs' stock price did not decline upon reports that the Firm allegedly had client conflicts in investment banking and other major business lines.  (*See* Ex. 6 ¶ 52, Ex. 2.)

*c. **Conduct Characterized as Legal or Appropriate.***  Dr. Finnerty further speculates that news of client conflicts had no price impact because, on 12 of the 36 dates, the press purportedly "conveyed" that "Goldman's conduct was legal," "Goldman appropriately managed conflicts" or "Goldman did [not do] anything wrong."  (Ex. 12 at Ex. 6; Ex. 14 ¶¶ 34-35.)  As a threshold matter, as Dr. Gompers has shown, "Dr. Finnerty does not provide an accurate account of what these . . . reports supposedly 'conveyed.'"  (Ex. 5 ¶ 9.)[11]  In any event, Dr. Finnerty cannot explain why "multiple reports" on Plaintiffs' three "corrective disclosure" dates that similarly raised doubts as to whether Goldman Sachs' alleged misconduct was "actually illegal or

---

[11] For example, one article that Dr. Finnerty asserts "conveyed that Goldman appropriately managed conflicts" (Ex. 12 at Ex. 6), in fact states that a Goldman Sachs client was "considering severing ties with Goldman Sachs" because of a conflict (Ex. 52).

inappropriate" did not have the same effect of preventing its stock price from declining.  (*Id.* ¶ 10.)

    ***d. No New Information About the Four CDOs.***  Dr. Finnerty also speculates that the market did not react to reports of Goldman Sachs client conflicts on eight of the 36 dates because "no incremental factual information regarding" ABACUS and the three other CDOs was disclosed.  (Ex. 12 at Ex. 6.)  Dr. Finnerty identifies no "incremental factual information regarding" these CDOs revealed on two of the three "corrective disclosure" dates, and, as discussed below, the only new information he identifies for the third date (that ACA was the collateral manager for ABACUS) was immaterial to whether the challenged statements were false.  (Ex. 5 ¶ 8; *infra* at 18.)  Dr. Finnerty's acknowledgement that these eight reports described conflicts in the four CDOs further underscores that details of Goldman Sachs' alleged client conflicts in these CDOs were known to investors long before Plaintiffs' three "corrective disclosure" dates when the press reported on SEC and DOJ enforcement activity.

    ***e. New Information About CDO Conflicts Was Supposedly Revealed on the "Corrective Disclosure" Dates.***  "Plaintiffs allege[]" that on their three "corrective disclosure" dates, "the market *learned for the first time* that Goldman had created 'clear conflicts of interest with its own clients' by 'intentionally packag[ing] and s[elling] . . . securities that were designed to fail, while at the same time reaping billions for itself or its favored clients by taking massive short positions' in the same transactions."  *Goldman*, 879 F.3d at 479-80 (emphasis added).  In fact, as shown below, the press previously reported on virtually all of the factual allegations concerning Goldman Sachs' alleged CDO conflicts—with no stock price decline—prior to the press reports of SEC and DOJ enforcement activity.  This previously disclosed information, "under an efficient market theory, would have already been incorporated into [Goldman Sachs'] share

price" prior to the corrective disclosure dates, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 94 (1st Cir. 2014):

- ***April 16, 2010 (The SEC ABACUS Lawsuit)***:  Plaintiffs do not dispute that virtually all of the factual allegations about ABACUS in the SEC's complaint were prominently and extensively reported long before April 16, 2010, including the SEC's core theory that Goldman Sachs did not properly disclose to CDO investors that it "had collaborated with a favored client to design a portfolio of securities that would decline in value."  (Compl. ¶ 331; *see* Exs. 34, 36, 38.)  Instead, Plaintiffs claim that the "new information" learned by the market on April 16 was that "Goldman Sachs had misled ACA."  (Ex. 13 ¶ 71.) But the press had already reported the allegation that Goldman Sachs had misled investors in structuring ABACUS, and Plaintiffs cannot explain why the SEC's identification of ACA as the collateral manager—a fact irrelevant to whether the challenged statements were accurate—caused any part of the stock price drop on April 16.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) (Pauley, J.) ("corrective" disclosure need not "reflect every detail of an alleged fraud").

- ***April 30, 2010 (The Reported DOJ Criminal Investigation of Unspecified Conduct)***: As Dr. Finnerty concedes, the April 30, 2010 *Wall Street Journal* article did not identify "which of Goldman's deals were being scrutinized in the [DOJ] investigation" (Ex. 13 ¶ 117), nor did *The Journal* mention the business practices that the DOJ supposedly was investigating or reveal any new facts about alleged client conflicts (*see* Exs. 59, 61).

- ***June 10, 2010 (The Reported SEC Investigation of the Hudson CDO)***:  The market knew essentially all the allegations about Hudson well before the June 10, 2010 report of an SEC investigation of that CDO.  In December 2009, *The New York Times* reported on its front page that "Goldman kept a significant amount of the financial bets against securities in Hudson, so it would profit if they failed," thereby "put[ting] the firm[] at odds with [its] own clients' interests."  (Ex. 39.)  Dr. Finnerty fatally concedes that the *only* new thing the market learned about Hudson on June 10, 2010 was "that the SEC had reviewed the information and was going to investigate Goldman for that transaction as well [as] for possible fraud."  (Ex. 68 at 168:6-12, 287:14-288:3.)

As a result, any price decline on Plaintiffs' three "corrective disclosure" dates could not have been caused by the market learning about previously reported client conflicts, as opposed to newly announced SEC and DOJ enforcement activity.  *See IBEW Local 98 Pension Fund* v. *Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) ("common sense" that "statements add[ing] nothing to what was already public" had no price impact); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512-13 (2d Cir. 2010) (rejecting attempt to link stock decline to previously disclosed information because "[i]t runs squarely into . . . [plaintiff's] allegation that the market . . . promptly digested and reflected in its share price all public information").

*      *      *

In sum, as set forth in the chart contained in Exhibit 3—identifying which of Plaintiffs' various theories applies to which of the 36 days with press reports of Goldman Sachs' client conflicts—to try to explain away the absence of price impact across all 36 days, this Court would have to agree with almost all of Plaintiffs' speculative theories.

> **3.     The Stock Price Declines on Plaintiffs' Three Alleged "Corrective Disclosure" Dates Were Caused Entirely By the Market Reacting to News of SEC and DOJ Enforcement Activity.**

While the absence of price impact on any of the 36 dates when the press reported on Goldman Sachs' client conflicts is sufficient for Defendants to meet their burden under the preponderance standard, Defendants offer still more evidence of no price impact:  Dr. Choi has demonstrated empirically that the declines in Goldman Sachs' stock price on the three "corrective disclosure" dates were due entirely to the market's reaction to news of SEC and DOJ enforcement activity, not new reports that Goldman Sachs had client conflicts.

Although the Court previously observed in initially certifying a class that "Dr. Choi fail[ed] to demonstrate that [reports of enforcement actions] would cause the entirety of the decline that occurred here," *Goldman*, 2015 WL 5613150, at *7, Dr. Choi has now

unquestionably done so.  Dr. Choi found that the average stock price decline of 8.07% associated with news of SEC enforcement actions similar to the SEC action against Goldman Sachs is "not statistically different from" the 9.27% decline in the Firm's stock price on April 16, 2010.  (Ex. 8 ¶¶ 26-29.)  Dr. Choi's analysis is confirmed by Dr. Starks' analysis, which found that market analyst reports covering the alleged "corrective disclosures" highlighted the importance of the SEC lawsuit and related investigations, but made *no reference whatsoever* to Defendants' general statements about business principles and conflicts policies.  (*See* Ex. 10 ¶¶ 61-79.)

Rather than "attempt to measure [the] incremental impact" of the news of enforcement actions (Ex. 68 at 307:3-6), Plaintiffs limit themselves to nit-picking Dr. Choi's analysis.  According to Dr. Finnerty, Dr. Choi did not account for differences in the "alleged misconduct," "market capitalization," "stock price[]," and industry of the target companies.  (Ex. 14 ¶¶ 94-98.)  Dr. Finnerty's criticism is not grounded in any generally accepted theory or empirical analysis.  In any event, Dr. Choi *did* analyze the relationship between the price declines and the companies' alleged misconduct, market capitalization, stock price, and industry, and he found "no correlation."  (Ex. 69 at 170:16-172:10.)[12]

Dr. Finnerty also claims that Dr. Choi's analysis was based "on a sample of only four enforcement actions."  (Ex. 14 ¶ 93.)  To the contrary, Dr. Choi has made clear that his analysis is based on "the population of all [relevant] SEC enforcement actions from 2010 through 2014": 117 separate enforcement actions, not four.  (Ex. 69 at 450:4-15, 451:5-13.)  Dr. Choi's finding that news of SEC enforcement actions is associated with an average price decline that is not

---

[12] Dr. Finnerty also criticized Dr. Choi for using "the Standard & Poor's 500 Total Return Index" in his event study, rather than "the NYSE/AMEX/NASDAQ/AreaEx Composite Index" that Dr. Gompers used.  (Ex. 14 ¶ 99.)  Dr. Choi "redid" his event study using Dr. Finnerty's preferred index and "got quantitatively the same result[]."  (Ex. 69 at 170:9-12.)

statistically different from the April 16, 2010 decline in Goldman Sachs' stock price thus corroborates Dr. Gompers' conclusion that the declines in the Firm's stock price on Plaintiffs' three "corrective disclosure" dates were not caused by a "correction" of Defendants' challenged general statements, but by news of SEC and DOJ enforcement activity premised on allegations already known to the market.  (Ex. 8 ¶¶ 24-56, 66-81; Ex. 6 ¶¶ 80-124.)[13]  Defendants thus have established empirically that this is not a "mixed impact case" (Conference Tr. 8:24; Dkt. No. 190) and bears no resemblance to *Barclays*, where defendants' expert "concluded" only that "a portion" of the price declines "following the announcement of the [government's lawsuit] resulted from concerns about that action itself," 875 F.3d at 105.[14]

As other courts have held, where a company's stock price declines following the filing of an enforcement action premised on previously disclosed factual allegations, the decline "more

---

[13] Plaintiffs cannot explain why Goldman Sachs' stock experienced no statistically significant price decline on April 26, 2010—the "corrective disclosure" date formerly alleged by Plaintiffs that had no news of enforcement activity—but did decline on April 30, 2010, when the "corrective disclosure" comprised a newspaper reporting rumors of a DOJ criminal investigation without any revelation of new allegations about the Firm's conduct.  (*See* Ex. 5 ¶¶ 11-12.)

[14] Plaintiffs cannot argue that, like *Barclays*, government enforcement activity was "part of the alleged harm the Plaintiffs suffered" as a consequence of the challenged statements. 875 F.3d at 106. *First*, in *Barclays*, the Second Circuit *agreed* that defendants could rebut the *Basic* presumption with evidence that price declines on "corrective disclosure" dates were caused by "investor concern regarding regulatory action and potential fines." *Id.* at 105-06. *Second*, *Barclays* relied on the relationship between the alleged misstatements and a recent major scandal at Barclays: "[i]nvestors were concerned with lack of management honesty and control because, as had happened in the past following the LIBOR scandal, such problems would result in considerable costs related to defending a regulatory action, and ultimately, in the imposition of substantial fines." *Id.* at 106. Unlike the challenged statements here, the alleged misstatements in *Barclays* were part of the bank's "efforts to restore its reputation" following "past scandals." *Strougo* v. *Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y 2015) (Scheindlin, J.). Indeed, the Second Circuit accepted that Barclays' statements "address[ing] concerns that high-frequency traders may have been front-running" in its dark pool trading platform "maintained" an inflated stock price, 875 F.3d at 87-88, only after Judge Scheindlin dismissed plaintiffs' claims based on Barclays' general statements about "business practices and risk controls" similar to those challenged here, *see* 105 F. Supp. 3d at 343-44.

logically occurred because the market feared that [the] lawsuit" would harm the corporation. *Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007); *see Meyer* v. *Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("To be sure, stock prices may fall upon the announcement of an SEC investigation. . . .   That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent.").  Because the unrebutted evidence here demonstrates that Goldman Sachs' stock price did not react either when Defendants' challenged statements were made or on the 36 occasions when the press reported on the Firm's alleged client conflicts, the only plausible conclusion is that the news of SEC and DOJ enforcement activity caused the entirety of the price declines—not new reports of undisclosed conflicts.  Accordingly, this Court should find that Defendants' evidence rebuts the *Basic* presumption under *Halliburton II* by at least a preponderance of the evidence.

## II.   PLAINTIFFS' SPECULATIVE "PRICE MAINTENANCE" THEORY CANNOT OVERCOME DEFENDANTS' UNREBUTTED EVIDENCE OF NO PRICE IMPACT.

To tip the scales in Plaintiffs' direction in response to Defendants' evidence, Plaintiffs were obliged to present affirmative evidence of price impact.[15]  Instead, Plaintiffs submit only Dr. Finnerty's unsupported speculation that the challenged general statements "maintained [an] already inflated price."  (Pl.-Appellees Br. at 9, 47 (2d Cir. Dkt. No. 129); Ex. 12 ¶ 206.)[16] Plaintiffs' theory boils down to pointing to three stock price drops and presuming that "price

---

[15] *See*, *e.g.*, *United States* v. *Singer*, 152 Fed. App'x 869, 876 (11th Cir. 2005) (government prevailed under preponderance standard when defendant merely argued that government's evidence "was not credible," but "presented no evidence to rebut" government's showing); *Carter* v. *Westlex Corp.*, 643 F. App'x 371, 375-76 (5th Cir. 2016) ("Defendants established, by a preponderance . . . the amount-in-controversy" when "Plaintiffs introduced no evidence of the amount in controversy themselves, and . . . only criticize[d] Defendants' evidence.").

[16] *See* Ex. 67 at 137:7-12 ("Q:  Prior to the class period did you look when the[] [challenged] statements were made to see if there was any [price increase] . . . ?  A:  Not prior to the class period."); *id.* at 65:6-13; 67:2-68:22.

maintenance" somehow connects those drops to general statements made years earlier about the Firm's business principles and conflicts controls. Plaintiffs' speculation cannot overcome Defendants' voluminous evidence for multiple reasons.

*First*, Plaintiffs' speculative criticisms of Defendants' evidence and empirical analysis are not evidence. *See Boss* v. *Castro*, 816 F.3d 910, 919 (7th Cir. 2016) ("speculation is not evidence" and cannot "counter" opposing party's evidence); *Int'l Gateway Exch., LLC* v. *W. Union Fin. Servs., Inc.*, 333 F. Supp. 2d 131, 142 (S.D.N.Y. 2004) (McMahon, J.) (same); *Pub. Adm'r of Queens Cty.* v. *City of N.Y.*, 2010 WL 4457312, at *9 (S.D.N.Y. Nov. 3, 2010) (Sand, J.) (stressing that "Plaintiff did not offer any evidence" to support its theory that the suspect "never had possession of [the police officer's] firearm" but merely "attack[ed]" "the credibility" of defendants' evidence).

Indeed, if Plaintiffs were correct that mere speculation could defeat the empirical and other evidence that Defendants have marshalled, no defendant could ever rebut the *Basic* presumption. To the contrary, the Supreme Court made clear in *Halliburton II* that "defendants *must be afforded* an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." 134 S. Ct. at 2417 (emphasis added). Plaintiffs' theory would render *Halliburton II* a dead letter in any securities fraud case in which a stock price drop followed government enforcement activity. Nearly all companies have made general statements about business principles and controls that arguably would be "corrected" by news of such government action. (*See* Ex. 10 ¶¶ 42-47 (finding that "*every* company [] examined" had made statements analogous to the challenged statements here).) If Plaintiffs' theory were accepted, class certification would be virtually automatic in cases involving these "routine representations." *ECA, Local 134 IBEW*

*Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

*Second*, under both Rule 23 and the preponderance standard, this Court must base its class certification decision on the evidence, not allegations and speculation. "Rule 23 does not set forth a mere pleading standard," *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011); rather, Plaintiffs must submit "evidentiary proof" to "satisfy . . . Rule 23(b)," *Comcast*, 569 U.S. at 33. The "[m]ere *assertion* by class counsel" that the challenged statements maintained an already inflated stock price "is not enough." *Parko* v. *Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014); *see Waste Mgmt. Holdings, Inc.* v. *Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) ("[A]rguments woven entirely out of gossamer strands of speculation and surmise [cannot] tip the decisional scales in a class certification ruling.").

The "preponderance of the *evidence*" standard requires a singular focus on the *evidence*, and the question before this Court is whether Defendants' *evidence* is "more convincing than the *evidence* which is offered in opposition to it." *Jones* v. *Dep't of Health & Human Servs.*, 834 F.3d 1361, 1367 (Fed. Cir. 2016) (emphasis added); *see Metro. Stevedore Co.* v. *Rambo*, 521 U.S. 121, 137 n.9 (1997) ("[T]he preponderance standard goes to how convincing the *evidence* in favor of a fact must be in comparison with the *evidence* against it before that fact may be found." (emphasis added)). Plaintiffs cannot satisfy that standard when they do "not offer any evidence" of their own, rely on "unwarranted assumptions and inferences" and "baseless speculation," and merely "question[] the credibility" of Defendants' evidence. *Pub. Adm'r*, 2010 WL 4457312, at *9; *see Blank* v. *Jacobs*, 2009 WL 3233037, at *5 (E.D.N.Y. Sept. 30, 2009) (preponderance not met when "Plaintiffs offer no evidence" and "merely attempt to refute [Defendants'] claims").

*Third*, no court has applied a price maintenance theory to general statements, like those challenged here about Goldman Sachs' business principles and conflicts controls, that are "too

-24-

open-ended and subjective" for "an investor to reasonably rely on [them] as a guarantee of some concrete fact or outcome." *UBS*, 752 F.3d at 185-86. Courts have permitted plaintiffs to proceed under a price maintenance theory only in "special circumstances," *Nathenson* v. *Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001), where either (i) defendants made "an unduly optimistic statement [to] stop[] a price from declining (by adding some good news to the mix)," *Schleicher* v. *Wendt*, 618 F.3d 679, 683 (7th Cir. 2010), or (ii) "the alleged fraudulent statement convey[ed] that the company has met market expectations, when in fact it ha[d] not," *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1340-41 (N.D. Ga. 2007).[17] Neither circumstance exists here. Plaintiffs do not allege that Defendants made the challenged general statements to slow or halt a stock price decline, nor did those statements confirm that the Firm met market expectations concerning its earnings or other financial information.

*Fourth*, even if Plaintiffs' speculative price maintenance theory were somehow valid, it would do them no good here. As Defendants have established by at least a preponderance of the evidence, the press reports of Goldman Sachs' client conflicts on the 36 dates preceding Plaintiffs' "corrective disclosure" dates should have dissipated any artificial inflation caused—or maintained—by Defendants' challenged general statements. (*See supra* at 13-19.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification.

---

[17] The Second Circuit held that a price maintenance theory applied when Vivendi "made numerous representations to the market suggesting that the course ahead for the company was smooth sailing"—including that "it anticipated maintaining a 'very comfortable . . . credit rating'"—when the company was actually just "months away from bankruptcy or insolvency." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 232, 235 (2d Cir. 2016).

Respectfully submitted,

Richard H. Klapper (*klapperr@sullcrom.com*)
Robert J. Giuffra, Jr. (*giuffrar@sullcrom.com*)
David M.J. Rein (*reind@sullcrom.com*)
Benjamin R. Walker (*walkerb@sullcrom.com*)
Jacob E. Cohen (*cohenja@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants The Goldman Sachs
Group, Inc., Lloyd C. Blankfein, David A.
Viniar and Gary D. Cohn*

April 13, 2018