USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/14/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN re GOLDMAN SACHS GROUP, INC.
SECURITIES LITIGATION

This Document Relates To:

    ALL ACTIONS

------------------------------------------------------------X

Master File No. 10 Civ. 3461 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Lead Plaintiffs allege that Goldman Sachs Group, Inc. ("Goldman") and some of its senior executives (collectively, "Defendants") violated Section 10(b) and Rule 10b-5; and Section 20(a) of the Exchange Act by making misstatements about Goldman's conflicts of interest policies and business practices, revealed to be false by three reports of government investigations into Goldman's conflicted role in certain collateralized debt obligation ("CDO") transactions.

Previously, the Court (1) granted Defendants' motion to dismiss claims regarding their failure to disclose Goldman's receipt of Wells notices from the Securities and Exchange Commission ("SEC"), but (2) denied the motion with respect to claims that Goldman had made misstatements about its conflicts of interest. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012). The Court also denied the Defendants' motion for partial reconsideration of the motion to dismiss, *see In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571 (S.D.N.Y. Jun. 23, 2014), and to certify for interlocutory appeal the Court's denial of reconsideration, *see In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014). Subsequently, Plaintiffs moved for class certification, and on September 24, 2015, the Court certified the following class:

1

> All persons or entities who, between February 5, 2007, and June 10, 2010, purchased or otherwise acquired the common stock of The Goldman Sachs Group, Inc. ('Goldman' or the 'Company'), and were damaged thereby.

*See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *1 (S.D.N.Y. 2015).

Defendants took an interlocutory appeal. The Second Circuit agreed with the Court that Plaintiffs had satisfied the four requirements of Rule 23(a), and that Plaintiffs had "established the preliminary elements to invoke the *Basic* presumption of reliance." *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Arkansas Teachers*"), 879 F.3d 474, 482, 484 (2d Cir. 2018). The Second Circuit, however, vacated the class certification and remanded the case for further proceedings. The Second Circuit directed the Court to reconsider whether Defendants have rebutted the *Basic* presumption by a preponderance of the evidence and "encourage[d] the court to hold any evidentiary hearing or oral argument it deems appropriate under the circumstances." *Id.* at 485–86.[1]

On remand, both parties submitted supplemental briefs, and the Court held an evidentiary hearing and heard oral argument on July 24 and 25, 2018, respectively. At the evidentiary hearing, Defendants called two experts—Dr. Gompers and Dr. Choi—who testified that the alleged misstatements had no price impact and that the price declines following the alleged corrective disclosures were due entirely to the news of enforcement actions. Plaintiffs called one expert—Dr. Finnerty—who disputed the methods and conclusions of Defendants' experts.

Upon due consideration of arguments and evidence before the Court, the Court determines that Defendants have not rebutted the *Basic* presumption by a preponderance of the evidence. Accordingly, the motion for class certification is **GRANTED**.

---

[1] The Court assumes familiarity with the prior decisions on this matter. *Richman*, 868 F. Supp. 2d at 261; *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571; *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090; *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150; and *Arkansas Teachers*, 879 F.3d at 474.

## APPLICABLE LAW

Plaintiffs bringing a securities fraud claim under Section 10(b) of the Exchange Act must demonstrate that defendants made a material misrepresentation and that the plaintiffs relied on it. *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *3 (S.D.N.Y. 2018). Plaintiffs seeking class certification under Fed. R. Civ. P. 23(b)(3) must demonstrate: (i) that questions of law or fact common to class members predominate over any questions affecting only individual members, and (ii) that a class action is superior to other available methods.

Plaintiffs bringing a securities fraud claim as a class are entitled to a presumption (the "*Basic* presumption") that all plaintiffs relied on the defendants' misrepresentation—establishing commonality of the reliance element— "so long as [the misrepresentation] was reflected in the market price [of securities] at the time of [the] transaction." *Basic v. Levinson*, 485 U.S. 224, 247 (1988); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*"). The *Basic* presumption, however, can be rebutted at the class certification stage with evidence that the defendants' misrepresentation had no price impact. *Halliburton Co. v. Erica P. John Fund, Inc* ("*Halliburton II*"), 134 S. Ct. 2398, 2414 (2014). Defendants "bear the burden of persuasion to rebut the *Basic* presumption by a preponderance of the evidence." *Arkansas Teachers*, 879 F.3d at 478 (citing *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017)). Defendants "must demonstrate that the misrepresentation did not in fact affect the stock's price." *Id.* at 484.

## DISCUSSION

There is no dispute "that [P]laintiffs [have] established the preliminary elements to invoke the *Basic* presumption of reliance." *Arkansas Teachers*, 879 F.3d at 484. The parties "also agree that [Defendants] may submit rebuttal evidence of a lack of price impact at the class

certification stage," *id.*; but Defendants "bear the burden of persuasion to rebut the *Basic* presumption by a preponderance of the evidence," *id.* at 478. The question for the Court then is rather simple and straight forward: have Defendants demonstrated, by a preponderance of the evidence, that the alleged misstatements had no price impact? For the reasons set forth below, the Court concludes that Defendants have not rebutted the *Basic* presumption by a preponderance of the evidence.

I. **Evidence of Price Impact**

Plaintiffs claim that the alleged misstatements had impact on Goldman's stock price. Although the misstatements themselves did not inflate the stock price, they allegedly served to maintain an already inflated stock price. The inflation was demonstrated on three dates, when the falsity of the misstatements was revealed: (i) April 16, 2010, when the SEC filed a lawsuit against Goldman for sponsoring the ABACUS CDO without disclosing to potential CDO investors that a hedge fund, Paulson & Co. Inc., "played an active and determinative role in the asset selection process," Compl. ¶¶ 63–65, 307; (ii) April 30, 2010, when the press reported that the Department of Justice ("DOJ") was investigating Goldman's mortgage-related matters, *id.* ¶¶ 318, 319, 334; and (iii) June 10, 2010, when the press reported that the SEC was investigating Goldman's alleged conflicts in the Hudson CDO, *id.* ¶¶ 322, 335.[2] Dr. Finnerty, Plaintiffs' expert, stated that the price declines following these corrective disclosures were caused by the news of Goldman's conflicts. ECF 193-11 ("1/30/2015 Finnerty Decl.") ¶¶ 52–63, 68–80.

---

[2] The alleged misstatements and the corresponding corrective disclosures are detailed in the Court's September 24, 2015 order. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *1–*2.

## II. Defendants' Rebuttal Evidence

Defendants label the Plaintiffs' price impact theory "preposterous." Tr.[3] at 232:9. According to Defendants, (1) the lack of stock price movement on 36 dates when published reports commented on Goldman's conflicts—all before the three corrective disclosures—demonstrates that the alleged misstatements did not cause any price inflation; and (2) the price declines following three alleged corrective disclosures were due *entirely* to the news of enforcement actions, not the reports of Goldman's conflicts.

Defendants' arguments rely heavily on two experts who testified at the July 24, 2018 evidentiary hearing: Drs. Paul Gompers and Stephen Choi. Dr. Gompers reported that Goldman's stock price did not move in response to articles published on 36 dates regarding Goldman's conflicts, including the ABACUS, Hudson and other CDO deals, all of which occurred before the three corrective disclosure dates. *See* ECF 193-4 ("4/6/2015 Gompers Decl.") ¶¶ 48–60, Exs. 5 & 6; ECF 193-6 ("7/2/2015 Gompers Decl.") ¶¶ 48–76, Exs. 2 & 3. This lack of price movement supposedly proves that the misstatements had no price impact. 4/6/2015 Gompers Decl. ¶¶ 48–60. It also allegedly proves that the revelation of client conflicts did not contribute to the stock price declines that followed the three corrective disclosures. *Id.* ¶¶ 61–95; ECF 193-5 ("6/23/2015 Gompers Decl.") ¶¶ 13–18; 7/2/2015 Gompers Decl. ¶¶ 80–124.

Dr. Choi builds off of Dr. Gompers' opinion and provides an alternative explanation for the stock price declines that followed the three corrective disclosures. Since the conflicts were reported on 36 separate occasions with no price movement, *see* 4/6/2015 Gompers Decl. ¶¶ 48–60, the three price drops must have been due exclusively to the news of enforcement activities. ECF 193-8 ("7/2/2015 Choi Decl.") ¶¶ 24–56, 66–81. The basis for Dr. Choi's opinion is an

---

[3] Tr. refers to the transcript of the evidentiary hearing and oral argument held on July 25 and 26, 2018.

event study[4] he conducted concerning the first corrective disclosure on April 16, 2010: the ABACUS enforcement action. The ABACUS enforcement action was purportedly unusual because it: (1) was not accompanied by concurrent resolution (usually SEC complaints are settled at the time of announcement of the enforcement action); (2) included scienter-based charges; and (3) charged not only Goldman itself, but also an individual (Mr. Tourre). *See id.* ¶ 30. Dr. Choi used these characteristics (which he denominated as the "severity factors") to identify four other enforcement events (from a group of 117) that are similar to the ABACUS enforcement action, and concluded that the *average* price decline of -8.07% following these four enforcement events[5] was driven entirely by the "severity factors" specifically tied to the news of enforcement events. *Id.* ¶¶ 31–38. Further, because the average price decline of -8.07% is not statistically different from the price decline of -9.27% that Goldman experienced following the ABACUS enforcement action, Dr. Choi concluded that the entirety of the -9.27% price drop was due to the news of the enforcement event itself, rather than the revelation of Goldman's client conflicts. *Id.* ¶¶ 24–42.

### III. Insufficient Evidence of Lack of Price Impact

Under *Barclays* and *Arkansas Teachers*, the *Basic* presumption can be rebutted by Defendants' demonstration, by a preponderance of the evidence, that the alleged misstatements did not contribute to any of the price declines that followed the three corrective disclosures, that is, the statements had no price impact.

---

[4] An event study is a standard statistical technique that is used to test whether a security's price reaction to a news announcement (or some other event) is statistically significant. *See* 1/30/2015 Finnerty Decl. ¶ 32.
[5] The price declines associated with the four enforcement events had large variance: -3.34%, -3.73%, -8.13%, and -17.09%. The average of -8.07% could only be achieved by including an outlier enforcement event that had a price drop of -17.09%.

Upon due consideration of the parties' briefs, expert reports, their testimony, and oral argument, the Court concludes that Defendants have failed to establish, by a preponderance of the evidence, that the alleged misstatements had no price impact. Defendants have failed to tip the scale in their favor on this issue.

### *Link between News of Goldman's Conflicts and Stock Price Declines*

The Court accepts Dr. Finnerty's opinion that the news of Goldman's conflicts on the three corrective disclosure dates negatively impacted Goldman's stock price. *See* 1/15/2015 Finnerty Decl. ¶¶ 62, 63, 74, 75, 79, 80. It is only natural that "economically significant negative news," such as these, would at least contribute to the stock price declines. *Id.* ¶ 62. Defendants attempt to undermine Dr. Finnerty's opinion, claiming in part that the underlying damages model is "completely made up." Tr. 233:20. That overstates the matter. Dr. Finnerty's model, at the very least, establishes a link between the news of Goldman's conflicts and the subsequent stock price declines. That is sufficient.

### *Lack of Price Movement Following 36 Reports of Conflicts*

Defendants' attempts to demonstrate the misstatements' complete lack of price impact are not persuasive. Dr. Gompers claims, and Dr. Finnerty concedes, that Goldman's stock price did not move on any of the 36 dates on which the falsity of the alleged misstatements was revealed to the public. 4/6/2015 Gompers Decl. ¶¶ 48–60; 8/7/2015 Finnerty Decl. ¶ 19; Tr. at 209:22–210:6. According to Defendants, this lack of price movement demonstrates that: (1) the alleged misstatements did not support any price inflation; and (2) the price declines following the three corrective disclosures could not have been caused by the news of Goldman's conflicts.

The absence of price movement, however, in and of itself, is not sufficient to sever the link between the first corrective disclosure and the subsequent stock price drop. The first

7

corrective disclosure included new material information that had not been described in any of the 36 more generic reports on conflicts[6]. The first corrective disclosure (*i.e.*, the SEC's ABACUS complaint) detailed the nature and extent of Goldman's client conflicts for the first time. Although there had been reports and commentaries suggestive of Goldman's conflicts in the ABACUS deal, the ABACUS complaint was the first to detail it. *Compare S.E.C. v. Goldman Sachs & Co.*, Case No. 10 Civ. 3229, ECF 1 ("ABACUS Compl.") ¶¶ 15–51 *with* ECF 193-34; 193-36. The details, such as the manner in which Goldman engaged ACA to hide Paulson's role in asset selection, disclosed by a federal government agency, obviously rendered the ABACUS complaint more reliable and credible than any of the 36 media reports, especially in the presence of the denials and rebuttals that accompanied some of the reports. 5/15/2015 Finnerty Decl. ¶¶ 183–86.

Moreover, the ABACUS complaint was the first to expose hard evidence of Goldman's client conflicts. It included direct quotes from damning emails between Mr. Tourre (a former Goldman employee) and others, and from Goldman's internal memoranda, disclosing hard evidence that Goldman had indeed engaged in conflicts to its own advantage. *See* ABACUS Compl. ¶¶ 17, 18, 21, 23, 24, 28–34, 43. This was the first time that any hard evidence of Goldman's conflicts was reported. *See, e.g.*, Tr. at 82:6–7 (Dr. Gompers testifying: "I am unaware of any of those e-mails being public prior to the publication or the filing of the SEC

---

[6] The Court notes that the tenor and quality of 36 reports vary significantly. Some of the reports suggest possible or theoretical conflicts. *See, e.g.*, ECF 193-21 ("But there is no evidence that Goldman did wrong by ... conversing with Mr. Paulson about financial conditions, if it actually did the latter."). But others appear to be a *cri de coeur* from sworn enemies. *See, e.g.*, ECF 193-30 ("The world's most powerful investment bank is a great vampire squid wrapped around the face of humanity, relentlessly jamming its blood funnel into anything that smells like money."). Still others were not damaging or revelatory, but rather commendatory: they praised Goldman for managing its conflicts and still outperforming competitors. *See, e.g.*, ECF 193-20 (an article entitled "Goldman's risk control offers right example of governance"); ECF 193-26 ("Goldman's happier outcome was not only a matter of being on the right side of the trade. It is generally conceded that the firm had a better handle on its risk than most other investment banks.").

complaint."). Neither Dr. Gompers nor Dr. Choi credibly explains how such hard evidence did not contribute to the price decline following the first corrective disclosure.[7]

*Dr. Choi's Event Study*

Defendants put a significant emphasis on Dr. Choi's opinion that the stock price declines following the three corrective disclosures were due entirely to the news of enforcement actions.

As a threshold matter, Dr. Choi's conclusion is not supported by his event study. Yes, Dr. Choi performed an event study concerning the stock price decline following the first corrective disclosure (the "first price decline"). But he has performed no event study concerning stock price declines following the second and third corrective disclosures (the "second price decline" and the "third price decline", respectively).[8] There is no good reason to extend Dr. Choi's findings on the first price decline to those second and third price declines; Dr. Choi's opinion should be limited to the first price decline that he actually analyzed.

Dr. Choi's opinion, even with respect to the first price decline, may not be reliable. It is wholly predicated on the premise that the first price decline is *consistent* with price declines that four other companies previously experienced upon the news of similar enforcement events. This observation of consistency is unreliable for four reasons.

*First*, Dr. Choi selected four enforcement events (from the pool of 117) using three arbitrary characteristics which he denominated as "severity factors." He concedes that he was the first person to use these "severity factors" together, and that these "severity factors" are not

---

[7] Dr. Gompers testified that "the internal e-mails [disclosed in the ABACUS complaint] didn't have a price impact" because the Senate's disclosure of additional internal e-mails on April 26, 2010 had no price impact. *See* Tr. at 92:17–93:4. The Court rejects this testimony. The Senate's disclosure of e-mails occurred on April 26, 2010, *after* the filing of the ABACUS complaint on April 16, 2010 and presumably *after* the dissipation of price inflation that had been sustained by the e-mail evidence in the ABACUS complaint. The lack of price movement subsequent to the Senate's e-mail disclosures has no bearing on whether the e-mails in the ABACUS complaint sustained inflation.
[8] Dr. Choi claimed that it was impossible to design a reliable event study for the second and third price declines. Tr. at 116:19–117:9; 119:17–120:7. His claim was not supported by any authority or literature.

9

generally accepted in the field. *See* Tr. at 142:6-143:11. Accordingly, his use of the "severity factors" casts doubt on his opinion, especially because the selected enforcement events (1) did not involve allegations concerning mismanagement of conflicts of interest, as here, and (2) did not involve companies that were similar to Goldman in terms of business operations and size. *See* ECF 193-14 ("8/7/2015 Finnerty Decl.") ¶¶ 95–97.

*Second*, Dr. Choi's event study does not account for the allegations of misconduct underlying the four selected enforcement events. Tr. at 137:10-138:4. Previously, he has stated that the underlying allegations would impact the stock price. *See* Choi, S., A. Wiechman, and A. Pritchard, *Scandal Enforcement at the SEC: The Arc of the Option Backdating Investigations*, 15 Am. L. & Econ. Rev., pp. 542–77 (2013) ("the market response to an announcement of an option backdating issue is less than the market response to an accounting issue").[9]

*Third*, Dr. Choi quantified the consistency of price declines by comparing the first price decline with the *average* price decline of *four* selected enforcement events. But it is well understood that an average is an unreliable metric when the average is computed based on a small number of samples and especially where the variance among the underlying samples is large, as here. *See* 8/7/2015 Finnerty Decl. ¶¶ 99–104.

*Fourth*, Dr. Choi compared the first price decline with the average price decline using a two-sample t-test. But "[a] *t*-test is not appropriate for small samples drawn from a population that is not normal." *Butt v. United Bhd. of Carpenters & Joiners of Am.*, 2016 WL 3365772, at *1 (E.D. Pa. June 16, 2016) (quoting Reference Manual on Scientific Evidence, Third Edition from the Federal Judicial Center). Dr. Choi fails to demonstrate that the *t*-test based on two samples is reliable, or that the samples were drawn from a population that follows a normal

---

[9] Available at https://ideas.repec.org/a/oup/amlawe/v15y2013i2p542-577.html (last visited Aug. 14, 2018).

distribution. *See* Tr. at 176:18–177:3.

As discussed above, the Second Circuit directed the Court to determine whether Defendants have demonstrated, by a preponderance of the evidence, that the alleged misstatements had no price impact. In view of Dr. Finnerty's opinion demonstrating the price impact of alleged misstatements, and the deficiencies inherent in the opinions of Drs. Gompers and Choi, the Court concludes that Defendants have failed to rebut the *Basic* presumption by a preponderance of the evidence. There is insufficient evidence to conclude otherwise. Accordingly, the motion for class certification is granted.

At various points, Defendants hint at previously rejected arguments: that the alleged misstatements are not actionable and that the loss causation cannot be demonstrated here. *See* ECF 192 at 5 n.2; Tr. at 232:2–11; 233:21–234:3; 251:11–252:11; 263:2–266:4. The Court rejects them again. *See Richman*, 868 F. Supp. 2d at 277–83; *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, *5–*6.

## CONCLUSION

For the reasons set forth above, the Court concludes that Defendants have failed to meet their burden of proof: the *Basic* presumption is not rebutted and the motion for class certification is granted. The Clerk of Court is directed to terminate the pending motion at ECF 135.

Dated: New York, New York  
August 14, 2018

SO ORDERED

/s/ Paul A. Crotty  
PAUL A. CROTTY  
United States District Judge