UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------X
                                                 :
IN re GOLDMAN SACHS GROUP, INC.                  :
SECURITIES LITIGATION                            :        Master File No. 10 Civ. 3461 (PAC)
                                                 :
This Document Relates To:                        :
                                                 :        OPINION & ORDER
    ALL ACTIONS                                  :
                                                 :
-----------------------------------------------------------X
```

After a prolonged interlocutory appeals saga that has prompted three decisions from the

Second Circuit, one from the Supreme Court, and untold pages of cumulative briefing, this Court

is again asked to resolve the parties' class certification dispute.

By now, the facts of this case are well-known, having been set forth in this Court's prior

opinions. *See, e.g., Richman v. Goldman Sachs*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012). In brief,

Lead Plaintiffs ("Plaintiffs") allege Goldman Sachs Group, Inc. and some of its senior executives

(collectively, "Defendants" or "Goldman") violated Section 10(b) of the Exchange Act, Rule 10b-

5 promulgated thereunder, and Section 20(a) of the Exchange Act. Specifically, they accuse

Defendants of making false and misleading statements pertaining to Goldman's conflict of interest

policies and business practices, which were later exposed as false through reports of Goldman's

conflicted role in certain collateralized debt obligation ("CDO") transactions.

Plaintiffs again seek to certify the following class: "All persons or entities who, between

February 5, 2007, and June 10, 2010, purchased or otherwise acquired the common stock of The

Goldman Sachs Group, Inc. ('Goldman' or the 'Company'), and were damaged thereby. . . ." *See*

Pls.' Class Cert. Mem. 1 n.1, ECF No. 136. Upon due consideration of all evidence before the

Court, and in light of the clarified guidance from the Supreme Court and Second Circuit, the Court

again concludes that Defendants have failed to rebut the *Basic* presumption by a preponderance of the evidence. Accordingly, the motion for class certification is **GRANTED**.

## BACKGROUND

Plaintiffs' claims fall within the inflation-*maintenance*, rather than the inflation-*introducing*, category of actionable misstatements: that is, Plaintiffs claim Defendants' false statements fraudulently maintained, rather than induced, an inflated share price.

Underlying Plaintiffs' claims is the charge that Goldman duped its investors into believing Goldman was aligned with their interests, and indeed had robust institutional systems to manage and mitigate conflicts of interest, while the company was in fact actively betting against the success of its investors' positions. Plaintiffs assert Goldman artificially maintained an inflated stock price through misrepresentations as to its conflicts of interest and internal conflict procedures, only for its stock price to plunge when the market learned the truth. The misstatements alleged in the Consolidated Class Action Complaint (the "Complaint") include, among others, the following:

> Our reputation is one of our most important assets. As we have expanded the scope of our business and our client base, we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client . . . .

> We have extensive procedures and controls that are designed to identify and address conflicts of interest . . . .

> Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow. . . .

> We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard. . . .

> Most importantly, and the basic reason for our success, is our extraordinary focus on our clients. . . .

> Integrity and honesty are at the heart of our business.

2

*See* Compl. ¶¶ 134, 154, ECF No. 68.

Defendants allegedly made these statements in a variety of settings, including Form 10-Ks, earnings calls, investor conferences, statements to the press, and Goldman's annual reports to shareholders (which contained "The Goldman Business Principles," from which some of the alleged misstatements originated). *See id.* ¶¶ 127, 154, 277. Taken together, Plaintiffs allege, these misstatements formed the foundation of Goldman's broader campaign to stoke its own value by "promot[ing] its reputation as the preeminent Wall Street bank focused first and foremost on responsible business practices that placed their clients' needs paramount to all else." *See id.* ¶¶ 13, 151–57, 271–306

The Court previously granted in part and denied in part Defendants' motion to dismiss. It dismissed claims arising from Defendants' alleged failure to disclose Goldman's receipt of Wells Notices from the Securities and Exchange Commission ("SEC"), but allowed claims arising from the alleged misstatements concerning Goldman's conflicts of interest to proceed. *See Richman*, 868 F. Supp. 2d at 280.[1]

Plaintiffs then moved for class certification. In 2015, the Court granted their motion, finding that Plaintiffs had satisfied the four requirements under Rule 23(a) and successfully invoked the *Basic* presumption, and that Defendants had failed to rebut this presumption. *See In re Goldman Sachs Grp., Inc. Sec. Litig.* ("*2015 Certification*"), 2015 WL 5613150, at *1 (S.D.N.Y. 2015). The Second Circuit vacated this order and, on remand, suggested the Court further develop the factual record to aid in reevaluating whether Defendants had rebutted the *Basic* presumption

---

[1] The Court then denied Defendants' subsequent motions for partial reconsideration and for certification of that denial for interlocutory appeal. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014).

by a preponderance of the evidence. *See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*ATRS I*"), 879 F.3d 474, 482, 484 (2d Cir. 2018). The Court then solicited supplemental briefing from the parties, held an evidentiary hearing, heard oral argument, and thereafter concluded that Defendants had failed to rebut the *Basic* presumption by a preponderance, and again certified the class. *See In re Goldman Sachs Grp., Inc. Sec. Litig.* ("*2018 Certification*"), 2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018).[2]

Defendants again appealed. This time, the Second Circuit affirmed, holding that this Court had correctly applied the inflation-maintenance theory, properly allocated the burden of rebutting the *Basic* presumption, and permissibly concluded that Defendants had failed to present evidence sufficient to carry that burden. *See Ark. Tchr. Ret. Sys.* ("*ATRS II*"), 955 F.3d at 271. The Second Circuit also rejected Defendants' argument, raised on appeal, that so-called "general" statements cannot, as a matter of law, impact share price. *Id.* at 267–68.

Defendants then petitioned for, and the Supreme Court granted, certiorari. Before the Supreme Court, Defendants abandoned their argument that what they now labeled "generic" statements could not impact stock price as a matter of *law*. *See Ark. Tchr. Ret. Sys.* ("*ATRS III*"), 11 F.4th at 142. Instead, they emphasized that the generic nature of a statement is relevant evidence of price impact as a matter of *fact*. *See id.* Plaintiffs conceded this point, and the Supreme Court enshrined it in its opinion: "[T]he generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification." *Goldman*, 141 S. Ct. at 1958. It then remanded to the Second Circuit because it was "unclear" whether the Second Circuit had done so, *id.* at 1963, and the Second Circuit remanded to this Court for the same reason.

---

[2] *Aff'd sub nom. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020), *vacated and remanded*, 141 S. Ct. 1951 (2021), *and vacated and remanded sub nom. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138 (2d Cir. 2021).

*See ATRS III*, 11 F.4th at 143. Upon remand, the Court solicited from the parties two rounds of supplemental briefing to aid its application of the clarified standards set forth above.[3] *See* ECF No. 249.

## DISCUSSION

### I.     Applicable Law

#### a.   The *Basic* Presumption

To prevail on a claim under Section 10(b) of the Exchange Act, "a private plaintiff must prove, among other things, a material misrepresentation or omission by the defendant and the plaintiff's reliance on that misrepresentation or omission." *Goldman*, 141 S. Ct. at 1958. As to reliance, plaintiffs may invoke the "*Basic* presumption"—a rebuttable presumption "that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011); *see also Basic v. Levinson*, 485 U.S. 224, 247 (1988). Plaintiffs invoking the *Basic* presumption must show that the alleged misstatements were (1) publicly known and (2) material,[4] (3) that the stock was traded in an efficient market, and (4) that the plaintiffs in fact traded the stock between the time of the alleged misrepresentations and subsequent corrective disclosures. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

The *Basic* presumption has "particular significance" at the class certification stage. *See*

---

[3] Upon reviewing the record, the Court determined both parties had already submitted evidence that fully addressed the factual issues raised in the remand orders, including the extent to which the alleged misstatements were too generic to influence Goldman's stock price. It therefore did not invite the parties to supplement the substantial evidentiary record already in place from the 2018 and 2015 class certification proceedings. *See* ECF No. 249.

[4] Because the *Basic* presumption's materiality requirement "does not bear on Rule 23's predominance requirement" and therefore "should be left to the merits stage," plaintiffs need not show materiality at the class certification stage. *Goldman*, 141 S. Ct. at 1959 (citing *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466–68 (2013)).

*Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 462 (2013). This is because plaintiffs seeking class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure must show, *inter alia*, that "questions of law or fact common to class members predominate over any questions affecting only individual members."[5] Fed. R. Civ. P. 23(b)(3); *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997) ("Rule 23(b)(3)'s predominance requirement . . . tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."). Absent the *Basic* presumption, therefore, questions as to each individual plaintiff's reliance "ordinarily would defeat predominance" and, by extension, class certification. *Goldman*, 141 S. Ct. at 1959.

Although it eases plaintiffs' class certification efforts, the *Basic* presumption is not a blank check. It may be rebutted at the class certification stage through a showing that the alleged misstatements in fact had no impact on stock price. *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Defendants must show a complete lack of price impact by a preponderance of the evidence. *Goldman*, 141 S. Ct. at 1963 (adding that "[t]he defendant's burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise"). In sum, at the class certification stage, "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.*

### b. Inflation-Maintenance Theory

Price impact may arise from misstatements taking either of two forms: (1) those that

---

[5] As the Court has already held, and as Defendants do not contest, the four prerequisites under Rule 23(a)—numerosity, commonality, typicality, and adequacy—are satisfied in this case. *See* Fed. R. Civ. P. 23(b)(3); *2015 Certification*, 2015 WL 5613150, at *2–3, *vacated on other grounds, ATRS I*, 879 F.3d 474 (2d Cir. 2018).

fraudulently introduce inflation into the stock price ("inflation introduction"), or (2) those that fraudulently maintain an already inflated stock price ("inflation maintenance"). *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 257 (2d Cir. 2016). Where, as here, the misstatements are not alleged to have introduced additional inflation, price impact is measured by "the amount that the stock's price would have fallen without the false statement." *See Goldman*, 141 S. Ct. at 1961.[6] Importantly, for inflation-maintenance claims, "once a company chooses to speak, the proper question for purposes of our inquiry into price impact is not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*." *Vivendi*, 838 F.3d at 258 (emphasis in original).

### c. Supreme Court and Second Circuit Guidance

In its review of the Second Circuit's order affirming this Court's 2018 Certification, the Supreme Court offered several "clarifications of the legal standard" governing class certification. *See ATRS III*, 11 F.4th at 143 (characterizing *Goldman*, 141 S. Ct. at 1958–63). These included confirmation of the Second Circuit's prior holding that a *Basic*-rebutting defendant is subject to a preponderance of the evidence standard. *See Goldman*, 141 S. Ct. at 1963.

The Supreme Court also offered additional "new ideas," *see ATRS III*, 11 F.4th at 143, to apply upon remand.

*First*, it held that, as a matter of *fact*, the "generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification . . . regardless whether the evidence is also relevant to a merits question like materiality." *Goldman*, 141 S. Ct.

---

[6] The Supreme Court offered this characterization of the inflation-maintenance theory, but declined to express any view as to its "validity," or its "contours." *See Goldman*, 141 S. Ct. at 1959 n.1. Unlike the Supreme Court, this Court is of course bound by the Second Circuit's inflation-maintenance jurisprudence as set forth in *Vivendi* and progeny. *See* 838 F.3d 223.

at 1958. It also cautioned that, although courts must not misconstrue this overlap as grounds to "refuse to consider" evidence relevant to both materiality and price impact at the class certification stage, they must "resist[] the temptation" to allow merits issues, "including materiality," to slither into their price impact analysis. *Id.* at 1961 n.2 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 608–09 (7th Cir. 2020)).

*Second*, the Supreme Court offered guidance as to how such genericness interacts with the inflation-maintenance theory's central inference—that "front-end inflation" maintained through alleged misstatements corresponds to "back-end price drop" when subsequent corrective disclosures evaporate that inflation. *Goldman*, 141 S. Ct. at 1961. It held that this narrative "starts to break down" where more generic misstatements are set against more specific corrective disclosures. *Id.* Such a "mismatch," the Supreme Court explained, would tend to undermine the inference that "the specific disclosure actually corrected the generic misrepresentation," and therefore make it less likely that "back-end price drop" in *fact* equals "front-end inflation." *Id.*

*Third*, the Supreme Court reiterated that district courts should be "aided by a good dose of common sense" as they consider all evidence probative of price impact. *Goldman*, 141 S. Ct. at 1960 (internal quotation marks and citations omitted).

## II. Evidence of Price Impact

The parties have presented the Court with extensive evidence concerning price impact, through multiple rounds of briefing and supplemental briefing, numerous expert reports, and a two-day proceeding involving both an evidentiary hearing and oral argument.

Because Plaintiffs' claims fall within the inflation-maintenance, rather than the inflation-introduction, strain of Rule 10(b) claims, any price impact must be measured via stock price decreases occurring after the alleged misstatements were revealed to be false. *See, e.g.*, *Pearlstein*

*v. BlackBerry Ltd.*, No. 13-CV-7060 (CM), 2021 WL 253453, at \*17–18 (S.D.N.Y. Jan. 26, 2021);

*see also ATRS II*, 955 F.3d at 264–65 (contrasting price impact analysis in inflation-maintenance

contexts from the "classic" inflation-introduction scenario).

### a.  Plaintiffs' Evidence

Plaintiffs have submitted evidence of three such occurrences.[7]  *First*, they cite a 12.79%

decrease (or -9.27% abnormal return)[8] in Goldman's stock price on April 16, 2010 following a

public disclosure accusing Goldman of sponsoring a synthetic CDO (the "ABACUS CDO")

without disclosing that the hedge fund Paulson & Co. Inc. had played a "significant role" in its

portfolio selection process, chosen risky mortgages it "believed would perform poorly or fail," and

then shorted (bet against) the ABACUS CDO's success. *See* 1/30/2015 Finnerty Decl. ¶¶ 52–63,

ECF No. 193-11; Compl. ¶¶ 53, 64, 81, 307.

*Second*, Plaintiffs cite a 9.39% decrease (or -7.75% abnormal return) in Goldman's stock

price on April 30, 2010 following public reports that Goldman had committed securities fraud in

its mortgage trading practices. *See* 1/30/2015 Finnerty Decl. ¶¶ 68–75.

*Third*, Plaintiffs cite a 2.21% decrease (or -4.52% abnormal return) in Goldman's stock

price on June 10, 2010 following public reports of Goldman's alleged conflicts surrounding

another CDO (the "Hudson CDO"). *See* 1/30/2015 Finnerty Decl. ¶¶ 76–81.

Plaintiffs' expert, Dr. John Finnerty, opined that all three price decreases were statistically

---

[7] Plaintiffs initially alleged four corrective disclosures. *See* Compl. ¶¶ 316–17, 333. At the evidentiary hearing, however, they presented only three such price declines, abandoning the fourth, which Dr. Finnerty had concluded was not statistically significant. *See* July 25, 2018 Tr. 43, 180–81, ECF No. 233; *see also* Pls. Remand Mem. 9 n.8, ECF No. 253.

[8] "Abnormal return" refers to the difference between a stock's actual return and its expected return "based on general stock market price movements and industry-related factors that are unrelated to the specific event that is being examined, as reflected in the changes in the prices of stocks of firms in the same industry." 1/30/2015 Finnerty Decl. ¶ 32.

significant, and that each was caused by the public disclosure of news concerning Goldman's conflicts. *See* 1/30/2015 Finnerty Decl. ¶¶ 43–45, 52–63, 68–80. From his analysis, Dr. Finnerty attributed the pre-disclosure inflation in Goldman's stock price to the company's failure to (1) disclose and manage its conflicts of interest, (2) comply with its own stated business principles, and (3) disclose the resulting reputational risks. July 25, 2018 Tr. 196. He further testified that the alleged misstatements maintained this inflation by omitting "information which, if it had been disclosed, would have caused the inflation to come out of [Goldman's] stock sooner than it did." *Id.* at 199.

### b. Defendants' Rebuttal Evidence

#### *Dr. Gompers and Dr. Choi*

At the 2018 evidentiary hearing, Defendants called two experts, Dr. Paul Gompers and Dr. Stephen Choi, who opined that the alleged misstatements had no price impact, and instead ascribed the entirety of Plaintiffs' cited price drops to news spotlighting enforcement actions against Goldman. Dr. Gompers reviewed news reports from 36 earlier dates[9] that he testified had contained "largely the same information about the CDO mortgage business and those conflicts as were embedded in the Abacus complaint or the rumored Hudson investigation." July 25, 2018 Tr. 59–69, ECF No. 233. From his analysis, Dr. Gompers concluded that news of Goldman's conflicts did not affect its stock price on any of these 36 dates (*see* 4/6/2015 Gompers Decl. ¶¶ 48–60, ECF No. 193-4) and played no role in the three stock declines cited by Plaintiffs (*see id.* at ¶¶ 61–95), and therefore that the alleged misstatements had no impact on Goldman's stock price during the Class Period (*see* 7/2/2015 Gompers Rep. ¶¶ 80–124, ECF No. 193-6).

---

[9] Dr. Gompers initially identified 34 dates, and later incorporated two additional articles into his analysis. *See* Defs.' Supp. Mem. 8 n.5, ECF No. 192.

Dr. Choi opined that Plaintiffs' three cited price drops were attributable exclusively to news of enforcement activities against Goldman, irrespective of the underlying allegations. He reached this conclusion by way of an event study centered around the April 16, 2010 post-ABACUS disclosure price decline. *See* 7/2/2015 Choi Decl. ¶¶ 24–56, 66–81, ECF No. 193-8. He did not conduct event studies for the other two price declines. July 25, 2018 Tr. 116–17, 119–20.

In his study, Dr. Choi compiled a dataset of 117 enforcement actions from 2010–14, from which he identified a total of just four other actions that shared three unusual characteristics with the ABACUS enforcement action. 7/2/2015 Choi Decl. ¶¶ 31–38. These traits, which he dubbed "severity factors" (*see* July 25, 2018 Tr. 100–01) included: (1) the fact that the announcement of the ABACUS enforcement action, unlike most SEC actions, was not accompanied by a concurrent announcement that the action had been resolved (i.e., settled); (2) the SEC's charges against Goldman included fraud or scienter-based charges; and (3) the ABACUS enforcement action included charges against an individual (employee Fabrice Tourre), in addition to those brought against the company as a whole. 7/2/2015 Choi Decl. ¶ 30. Per Dr. Choi, these three traits were typical of the more severe enforcement actions in his dataset. *See* 7/2/2015 Choi Decl. ¶ 46.[10] Averaging the four qualifying data points, Dr. Choi calculated an expected abnormal return for enforcement events sharing these three severity factors, and then used a two-sample t-test to calculate the difference between this control value and the actual post-ABACUS disclosure abnormal return, which he concluded was not statistically significant. 7/2/2015 Choi Decl. ¶¶ 24– 42; July 25, 2018 Tr. 176–77. Accordingly, he credited the entirety of the post-ABACUS disclosure price decline to news of the enforcement action itself, rather than to the underlying

---

[10] The first severity factor alone implicated "four of the six actions in the entire 117 enforcement action dataset with the largest negative abnormal returns." 7/2/2015 Choi Decl. ¶ 46.

revelations concerning Goldman's conflicts. 7/2/2015 Choi Decl. ¶¶ 24–42.

*Dr. Starks*

Although they did not call Dr. Starks to testify at the evidentiary hearing, and only briefly

cited to her work in their 2018 supplemental briefing as a buttress for Dr. Choi's analysis (*see*

Defs.' Supp. Mem. 11, 20, ECF No. 192), Defendants have once again changed course; they now

shift considerable weight onto Dr. Laura Starks' expert submission.  In her report, which was

submitted and reviewed prior to the 2018 Certification, Dr. Starks opined that in her experience

investors do not find "general" and "aspirational" statements regarding a company's business

principals, client franchise quality, reputation, or management of conflicts of interest "to be

pertinent to making investment decisions."  Starks Rep. ¶¶ 19, 27–47, ECF No. 193-10.  Because,

in Dr. Starks' view, Goldman's alleged misstatements fell into this category of statements

inapposite to "a company's future financial performance and value"—and because they echoed

similar statements from over 30 other prominent corporations, including several Goldman

competitors—they did not "contain information that can be used in investment decision-making."

*Id.* at ¶¶ 19, 27–47, 80, Ex. 6.

Dr. Starks attempted to reinforce these opinions through analysis of 880 contemporary

analyst reports, initially compiled by a prior expert in this litigation. *See* Starks Rep. ¶ 52.[11] From

---

[11] Dr. Starks' analysis derived in part from the work of Charles Porten, CFA, Defendants' earlier expert whose reports were presented to the Court prior to its 2015 Certification. *See* Porten Decl., ECF No. 146.  Mr. Porten also did not appear at the 2018 evidentiary hearing, and Defendants have not relied on his analysis or conclusions in either their 2018 or 2021 briefing. Nonetheless, the Court has reviewed his work, which closely tracked Dr. Starks' subsequent methodology: Mr. Porten also compiled and reviewed the same 880 pre- and post-disclosure securities analyst commentary. *See id.* at ¶¶ 20–24; Starks Rep. ¶ 52 n.70 (noting that Dr. Starks excluded four of Mr. Porten's original 884 reports).  He similarly concluded (1) that, because these reports "did not discuss the alleged misstatements," the misstatements had no price impact (Porten Decl. ¶¶ 12, 24–51); and (2) that based on his experience, analysts "typically do not comment on the types of statements at issue in this matter, which are generic in nature . . . and

her review, she determined none of these reports—neither those published prior to the alleged corrective disclosures, nor those published after the ABACUS disclosure—referred to the alleged misstatements. *Id.* at ¶¶ 48–79. Thus, she reasoned, the alleged misstatements could not "have been utilized for investment decision-making during the Class Period." *Id.* at ¶¶ 19, 80.

### c. Plaintiffs' Surrebuttal Evidence

Plaintiffs' expert, Dr. Finnerty, offered several critiques of his counterparts' opinions.

#### *Dr. Gompers and Dr. Choi*

Addressing Dr. Gompers' analysis, Dr. Finnerty attributed the lack of abnormal price movement on the 36 cited dates to his observation that the prior reports either contained other information (such as credible denials by Goldman or commentary that the conduct described was proper) or *lacked* the kind of information (such as specific details or hard evidence) subsequently found "for the first time" in the alleged corrective disclosures. July 25, 2018 Tr. 157–67, 169–71. He then criticized Dr. Choi's attempts to distinguish the enforcement actions from the underlying conduct that was, in Dr. Finnerty's view, "inextricably tied" to those actions. *Id.* at 174; *see* Finnerty Rebuttal Rep. ¶¶ 105–16, ECF No. 193-14. He further dismissed Dr. Choi's four-action sample as "too small," too noisy, and too factually distinct from Goldman's situation to be reliable. Finnerty Rebuttal Rep. ¶¶ 93–104.

#### *Dr. Starks*

As to Dr. Starks' opinion that investors do not rely upon purportedly generic misstatements concerning conflicts and business principles when making investment decisions, Dr. Finnerty countered that this assertion takes for granted investors' belief that companies are in fact adhering to those principles in the first place. Finnerty Rebuttal Rep. ¶ 125. "[O]nce investors learn of a

---

are not unique to Goldman Sachs" (*id.* at ¶¶ 12, 52–61).

company's violation of its business principles or its failure to manage its conflicts of interest effectively," he explained, investors would certainly find *that* information relevant. *Id.* at ¶ 127. He added that Dr. Starks failed to account for this dynamic with respect to the other companies she cited as having made similar statements. *Id.* at ¶ 128.

Dr. Finnerty also criticized the "unreasonably narrow scope" of Dr. Starks' methodology. Finnerty Rebuttal Rep. ¶¶ 129–32. Not only did Dr. Starks limit her review to securities analysts' reports, ignoring articles from *The Wall Street Journal* and the *Associated Press* along with other prominent market commentary, but she was also too restrictive in her search criteria—limiting her hunt to direct quotations and explicit attributions while neglecting remarks that paraphrased the alleged misstatements or made reference to their subject matter. *Id.* As a result, Dr. Finnerty observed, Dr. Starks' analysis failed to acknowledge the significant esteem and weight many of these analyst reports ascribed to Goldman's conflicts infrastructure and reputation.[12]  These included, *inter alia*, a CIBC analyst report that "Goldman is very careful about the conflicts or perceived conflicts that emerge, and actually has a full time partner monitoring conflicts" (*see* Exhibit 19, ECF No. 201-5, at 77), a Merrill Lynch analyst report that "we believe that Goldman has actually tended its customer-oriented business carefully, which explains . . . the absence of major conflict problems" (*see* Exhibit 21, ECF No. 201-7, at 3), and a Wachovia report that

---

[12] Defendants did not call Dr. Starks as a witness, and she therefore was not subject to cross-examination at the 2018 evidentiary hearing.  Plaintiffs have included in their subsequent briefing soundbites from her deposition, in which they claim she gave testimony that "seriously undermined" her work, including admissions that analysts whose reports she reviewed often discussed the underlying "subject matter" of the alleged misstatements, and that these issues were "important" to investors, who would have "reacted if Goldman had told the truth" about those issues. *See* Pls' Reply Mem. 2–3, ECF No. 256 (apparently quoting Dr. Starks' deposition).  Because the Court again deems the existing record, which does not contain the relevant deposition transcripts, sufficient to resolve the instant motion, it declines to consider these statements.

Goldman's "sterling reputation should allow the company to drive above-average profit growth, resulting in premium valuation over time" (*see* Pls.' Summary 4, ECF No. 215-2).[13]

From his own review of market commentary, Dr. Finnerty concluded Goldman's stock price inflation and subsequent price declines were "in fact related to the alleged misrepresentations concerning the conflicts of interest management, the business principles, and Goldman's reputation." July 25, 2021 Tr. 179. Conflict of interest management, he opined, was especially at the forefront of investors' minds. *Id.* at 168. Here, Dr. Finnerty relied upon, and presented to the Court, pre- and post-disclosure market commentary. This included, *inter alia*, some of the same market analysis discussed above, as well as other commentary from Merrill Lynch that "conflict management process is clearly taken extremely seriously" at Goldman, and that the company "manages conflicts, rather than simply avoiding them, in order to maximize the value of its franchise." Finnerty Presentation 15, ECF No. 215-1. It also included post-disclosure commentary foreboding "serious . . . reputational effects" for Goldman, questioning the company's ethos of "trust, integrity and putting clients' interests first," citing its "'14 Business Principles,' which preach an almost militant philosophy of putting the client before the firm," and observing "[n]ow, it's that very philosophy that has been questioned by the government." *Id.* at 25–28.

## III.    Analysis

### a.    The *Basic* Presumption

"The parties agree that plaintiffs established the preliminary elements to invoke the *Basic* presumption of reliance." *ATRS I*, 879 F.3d at 484. Their sole dispute at this stage of the litigation

---

[13] Dr. Starks did acknowledge analyst discussion of "reputational damage" to Goldman in the wake of the enforcement revelations, which she attributed to the "potential DOJ investigation and the negative sentiment against Wall Street," without reference to the underlying conduct that sparked the enforcement actions. *See* Starks Rep. ¶¶ 64, 73.

is whether Defendants have met their burden to rebut the presumption through showing, by a preponderance of the evidence, that the alleged misstatements had no price impact.

In its now-vacated 2018 Certification, the Court concluded Dr. Finnerty's model had "at the very least, establishe[d] a link between the news of Goldman's conflicts and the subsequent stock price declines," and that Defendants had failed to present evidence sufficient to sever that link. 2018 WL 3854757, at *4–6. The Supreme Court has since clarified that courts may not end their inquiry there. They must also evaluate whether the subsequent inference required for class certification under the inflation-maintenance theory—that back-end price drop corresponds with front-end inflation maintained through alleged misstatements—is fatally undermined by the generic nature of those misstatements, a "mismatch" in genericness between misstatement and corrective disclosure, or other common-sense factors. *Goldman*, 141 S. Ct. at 1958–63.

Accordingly, the Court revisits the evidence in light of this fresh guidance.

### b.  Plaintiffs' Persuasive Evidence of Price Impact

Plaintiffs have persuasively established a link between the public revelations concerning Goldman's conflicts of interest and the subsequent stock price declines. Through Dr. Finnerty, they have identified three statistically significant price drops immediately following public, damaging reports as to Goldman's questionable management of its conflicts, including credible allegations that it deliberately bet against its own clients. Unlike the pre-ABACUS disclosure reporting cited by Dr. Gompers, these disclosures were colored with inflammatory and granular detail, and substantiated with evidence from inside Goldman itself. Plaintiffs' expert, Dr. Finnerty, conducted a thorough analysis linking the stock price declines to news detailing "for the first time" (*see* July 25, 2018 Tr. 170–71) Goldman's purportedly problematic conflict management—that is, to the *conduct* underlying the reported enforcement actions, not merely the actions themselves.

16

*See ATRS II*, 955 F.3d at 272 (observing that allegations of Goldman betting against its own clients would reasonably prompt investors to "seriously reconsider trusting Goldman with their money," and that the resulting drag on Goldman's bottom line would "have nothing to do with the threat of enforcement actions, and everything to do with how Goldman managed its conflicts of interest"). Crucially, Dr. Finnerty's conclusions did not end there: he also convincingly linked these declines back to pre-disclosure inflation through his analysis of market commentary, and his critique that Dr. Starks' contrary conclusions, based on her own narrower review, assumed the very investor ignorance that the misstatements themselves propagated.

The Court credits Dr. Finnerty's conclusions, and finds that Plaintiffs have presented compelling evidence that the alleged misstatements in fact impacted Goldman's stock price.

### c.   Defendants' Failure to Rebut the *Basic* Presumption

#### i.   *Dr. Gompers and Dr. Choi*

Neither Dr. Gompers' nor Dr. Choi's analysis persuasively undermine these findings.  In its 2018 Certification, the Court declined to credit Dr. Gompers' opinion that the lack of abnormal movement in Goldman's stock price on any of the 36 pre-decline dates showed a lack of price impact attributable to the alleged misstatements.  *See 2018 Certification*, 2018 WL 3854757, at *4.  Since the updated direction from the Supreme Court and Second Circuit has no bearing on these factual findings, the Court here reiterates, and restates, its grounds only in brief: (1) importantly, although some of the prior reports had gestured at Goldman's conflicts surrounding the ABACUS deal, the first alleged corrective disclosure was the first public account to detail and document those conflicts with hard evidence, including incriminatory emails and memoranda authored by Goldman employees; (2) the underlying source of the disclosure—the SEC—lent extra credibility and gravitas unequaled in the prior reports; and (3) the disclosure was

unencumbered by any of the denials or mitigating commentary that had rendered prior reports less jarring.[14] The Court thus again declines to credit Dr. Gompers' conclusions.

The Court also again declines to place any significant weight on Dr. Choi's event study for reasons articulated in full in the 2018 Certification and unaffected by the updated direction from above. The Court found in 2018, and reiterates today, that Dr. Choi's methodology was novel, unreliable, and thoroughly outpaced by the conclusions he derived therefrom. *See 2018 Certification*, 2018 WL 3854757, at *5–6. Specifically, (1) Dr. Choi's choice of "severity factors," which he was the first to use and which are not generally accepted in his field, targeted enforcement events involving dissimilar companies and subject matters (i.e., allegations not involving conflicts of interest), while juicing his control average with many of the largest negative returns in his sample pool; (2) his model failed to account for the misconduct underlying the selected enforcement events; (3) his conclusions were founded upon an unreliable simple average among a small control sample with a wide variance in values; and (4) he failed to demonstrate his use of a two-sample t-test was appropriate or reliable in this context.[15] Further, by his own admission, Dr. Choi's methodology could not extend beyond the first of Plaintiffs' three corrective disclosures. *See* July 25, 2018 Tr. 116–17, 119–20. Therefore, while the Court accepts that the enforcement

---

[14] The Court before discounted, and again discounts today, Dr. Gompers' conclusion that "the internal e-mails [disclosed in the ABACUS complaint] didn't have a price impact" because, he reasoned, the Senate's subsequent disclosure of additional internal e-mails on April 26, 2010 had no statistically significant price impact. *See* July 25, 2018 Tr. 92–93. As the Court remarked in its 2018 Certification, at that point, news of the ABACUS complaint would presumably have already dissipated any portion of the overall price inflation vulnerable to email evidence of the ABACUS matter. *See* 2018 WL 3854757, at *5 n.1.

[15] The Court acknowledges Defendants' assertion that Dr. Choi was prepared, if allowed upon remand, to supplement his findings with five additional data points. *See* Defs.' Supp. Submission 11 n.5, ECF No. 254. But even assuming this change would have assuaged the Court's sample size concerns, Defendants do not claim that any of the study's other foundational flaws would have been addressed; indeed, they concede that Dr. Choi was prepared to deploy the "same severity factors" that the Court has already deemed novel and unreliable. *See id.*

actions themselves—divorced from the underlying conduct alleged therein—may have been a "contributing factor" to Goldman's price drops, it again declines to credit Dr. Choi's conclusion that the *entirety* of the decline is so attributable. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017) (affirming the district court's finding that the *Basic* presumption had not been rebutted where "*some* of the price reaction" was attributable to the "regulatory action itself") (emphasis in *Waggoner*) (internal quotation marks and citations omitted).

### ii.   *"Generic" Nature*

The Court turns next to the heart of the parties' post-appeal dispute: the extent of the alleged misstatements' generic nature, and any accompanying effect on the inference of price impact required for class certification.   Defendants now argue the alleged misstatements were "exceptionally generic," offering no "'specific, factual' or 'concrete' information" for reasonable investors to rely upon, and therefore that the statements "did not, and could not" influence Goldman's stock price. Defs.' Supp. Submission 2, 4, ECF No. 254 (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168, 170 (2d Cir. 2021) (affirming, in relevant part, a motion to dismiss claims founded upon a company's "generally optimistic opinions")).

As a preliminary matter, to the extent Defendants' contention that such statements "could not" exert any price impact revives the proposed "genericness"-as-a-matter-of-*law* test they had previously abandoned, the Court again rejects their argument.[16]

Turning to "genericness" as a matter of *fact*, the Supreme Court has instructed courts to

---

[16] This Court most recently rejected an earlier iteration of this argument in its now-vacated 2015 Certification. *See* 2015 WL 5613150 at *7 n.5. The Second Circuit rejected, in essence, the same argument in a portion of its now-vacated 2020 ruling that the Supreme Court did not discuss. *See ATRS II*, 955 F.3d at 267. Defendants then abandoned the argument at the Supreme Court. *See Goldman*, 141 S. Ct. at 1964 (Sotomayor, J., concurring in part) (agreeing with the Second Circuit that Defendants' abandoned genericness-as-a-matter-of-*law* test was "materiality by another name").

consider, in their review of all evidence probative of price impact, that "a more-general statement will affect a security's price less than a more-specific statement on the same question." *Goldman*, 141 S. Ct. at 1960 (internal quotation marks and citations omitted). Citing Dr. Starks' analysis, Defendants argue the alleged misstatements "did not provide information pertinent to the Firm's valuation or financial performance" and, because they therefore "contained no information that could be utilized in investment decision-making," they did not—as a matter of fact—have any price impact in this instance. Defs.' Supp. Submission 2 (internal quotation marks omitted).

The Court disagrees. The alleged misstatements were not so generic as to diminish their power to maintain pre-existing price inflation—and given the strong evidence of price impact discussed above, the Court finds that the statements *did* in fact maintain price inflation in this instance.

Importantly, despite Defendants' bid to paint them all with the same brush, some of the statements at issue are more generic than others. Although some may present as platitudes when read in isolation, others are significantly more substantive. In particular, the statements concerning Goldman's conflicts—for example, that "we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client" and that "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest"—are quite a bit more specific in form and focus than, say, assurances that "[i]ntegrity and honesty are at the heart of our business." *See* Compl. ¶¶ 134, 154. Further, even the more generic statements, when read in conjunction with one another (and particularly in conjunction with statements *specifically* concerning conflicts), may reinforce misconceptions about Goldman's business practices, and thereby serve to sustain an already-inflated stock price.

The Court credits Dr. Finnerty's opinion that this is, in fact, what happened here. *See* Finnerty Rebuttal Rep. ¶ 125 ("Goldman's repetition of these principles year after year led to the expectation that the company's behavior would conform to those statements.").

And while the Court credits Dr. Starks' testimony that some of the alleged misstatements here were unlikely, in a vacuum, to consciously influence investor behavior, it also credits Dr. Finnerty's common-sense critique of the limited usefulness of that testimony.    Naturally, statements pertaining to a company's business practices that *reinforce what investors already think* (and indeed expect) are unlikely to prompt investors to change their behavior in the moment. But this axiom relies upon the very misconception the alleged misstatements served to reinforce. Because the proper measure of inflation maintenance by a company that chooses to speak "is not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*," *Vivendi*, 838 F.3d at 258, the Court credits Dr. Finnerty's analysis that truthful, contrary substitutes for the alleged misstatements *would* have impacted investors' subsequent decision-making. And as Dr. Finnerty concluded, "[t]his is precisely what happened here when investors learned in April and June 2010 the details and severity of Goldman's misconduct, and Goldman's stock was devalued accordingly." Finnerty Rebuttal Rep. ¶ 127.

On this point, the evidence and common sense speak as one.  As a factual matter, the Court agrees with the Second Circuit that "[i]t is difficult to imagine that Goldman's shareholders would have been indifferent had Goldman disclosed its alleged failure to prevent employees from illegally advising clients to buy into CDOs that were built to fail by a hedge fund secretly shorting the investors' positions." *ATRS II*, 955 F.3d at 271.  Tellingly, Defendants have presented no evidence purporting to demonstrate, under the test set forth in *Vivendi*, that if Goldman had replaced the alleged misstatements with the alleged truth about its conflicts, its stock price would

have held fast. *See* 838 F.3d at 258; *see also ATRS II*, 955 F.3d at 271 ("[Under *Vivendi*] Goldman's burden is to show that the market would not have reacted had Goldman told the truth about its alleged failure to manage its conflicts."). At best, Defendants' evidence serves only to surface other complementary sources of price impact, such as the sticker shock of pending unresolved enforcement actions, and the foreboding of additional enforcement measures.

But Defendants' burden is not merely to prove that the alleged misstatements were one of several sources of price impact, nor even that other sources loomed larger. Defendants must show, by a preponderance, that the alleged misstatements had *no* price impact whatsoever. *Goldman*, 141 S. Ct. at 1963. Even applying the Supreme Court's updated guidance as to genericness, Defendants have not carried this burden.

### iii. "Generic" in Practice

Defendants also argue the alleged misstatements are effectively a rite of passage among companies of its ilk—that the practice of issuing statements of this kind is itself so generic as to nullify any price impact. *See* Defs.' Supp. Submission 5–6. Brandishing a quote from Plaintiffs' class representative that the alleged misstatements simply reaffirmed what "everybody expects" of institutions like Goldman, Defendants insist that such commonplace statements cannot have evoked reliance from investors. *See* Defs.' Supp. Submission 6. The crux of their argument: if everyone is saying these things, and everyone expects us to say these things too, how can it make any difference when we do so?[17]

---

[17] Both parties rely upon materiality and other merits decisions in support of their arguments concerning genericness. *See, e.g., ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). As the Supreme Court made clear, courts need not, and indeed must not, rule on materiality or other merits issues at the class certification stage, even as they also must not disregard evidence probative of price impact merely because the same evidence is also relevant to materiality. *See Goldman*, 141 S. Ct. at 1961 n.2. The Court thus considers this authority only to the extent it informs the Court's narrow mandate to

Here, Defendants again fall flat.  As a threshold matter, the fact that similar companies have made similar statements does not *per se* render a statement incapable of maintaining pre-existing price inflation.  But more fundamentally, Defendants' "strength-in-numbers" argument misconstrues the inflation-maintenance theory itself.  Inflation-maintenance claims do not hinge on whether such statements were consciously relied upon, in the moment, by investors evaluating Goldman.  *See Vivendi*, 838 F.3d at 257, 259 ("[S]ecurities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation.").  Nor must price inflation be introduced through fraud.  *See id.* at 256 ("Artificial inflation is not necessarily fraud-induced, for a falsehood can exist in the market (and thereby cause artificial inflation) for reasons unrelated to fraudulent conduct.") (citing *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 418 (7th Cir. 2015) (defining inflation as the "difference between the stock price and what the price would have been if the defendants had spoken truthfully," and remarking that fraud-induced inflation therefore "can increase even if the stock price doesn't change and that [inflation] must be zero before the first false statement").

Rather, such claims hinge on whether the statements *maintained* an already-inflated stock price.  *Vivendi*, 838 F.3d at 256.  Therefore, if Defendants are correct that investors already assumed, prior to the alleged misstatements, that Goldman had sufficient conflicts procedures in place (and thus overvalued Goldman's stock), it does not matter how they initially stumbled upon that misconception.  *See id.*  It matters only whether Goldman's alleged misstatements *reinforced* that misconception.  *See id.* at 256–59 ("We decline to erect a *per se* rule that, once a market is already misinformed about a particular truth, corporations are free to knowingly and intentionally

determine whether Defendants have demonstrated a lack of price impact by a preponderance of the evidence.

reinforce material misconceptions by repeating falsehoods with impunity.") (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1317 (11th Cir. 2011)).

On this point, the evidence and common sense again tilt comfortably in Plaintiffs' favor. Plaintiffs have presented evidence persuasively attributing the April and June 2010 price declines to circumstances that directly implicated the substance of the alleged misstatements. Here, the Court again credits Dr. Finnerty's analysis of the news coverage and commentary surrounding the alleged corrective disclosures, which convincingly links Goldman's post-disclosure plight back to the alleged misstatements. Dr. Starks' narrower review of analyst commentary, although not without any probative value as to the *extent* of the price impact, fails to negate the inference that the alleged misstatements had *some* price impact—particularly as closer inspection reveals that several reports she reviewed placed significant emphasis on Goldman's conflicts infrastructure.[18]

This point is buttressed by the common sense the Supreme Court has urged courts to exercise in these inquiries. This Court is hard-pressed to understand why statements such as those at issue here would have achieved such ubiquity in the first place were they incapable of influencing (including by maintaining) a company's stock price. Moreover, in a marketplace where, according to Defendants, dozens of Goldman competitors and other blue-chip corporations routinely make statements "indistinguishable" from some of the alleged misstatements, it seems

---

[18] Defendants argue the third-party commentary pertaining to the alleged misstatements cited by Dr. Finnerty is "legally irrelevant" because Goldman cannot be liable for third-party statements unless it "place[d] its "imprimatur" on them. Defs.' Supp. Reply Submission 3–4, ECF No. 255 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993)). But the instant inquiry of course does not concern any direct liability arising from third-party conduct, and the Court considers such statements only insofar as they constitute evidence probative of price impact attributable to Goldman's own statements, per the Supreme Court's directive. *See Goldman*, 141 S. Ct. at 1960. On that score, Defendants do not dispute the statements' significance, and in fact themselves argue that such statements are "a useful measure of the information that investors would deem most significant." Defs.' Supp. Submission 5–6.

unlikely that Goldman's conspicuous failure to conform—or indeed, under *Vivendi*, its conspicuous statements to the contrary—would be irrelevant to investors.

    *iv.* *"Mismatch"*

Finally, Defendants contend that the alleged misstatements and subsequent corrective disclosures present a "glaring . . . informational mismatch" sufficient to defeat any inference of price impact. Defs.' Supp. Submission 8.

As an initial matter, the Court declines to adopt either party's slanted construction of the Supreme Court's guidance as to any "mismatch" in "genericness" between misstatement and corrective disclosure. For their part, Plaintiffs ask this Court to interpret the updated guidance as nothing more than a cosmetic rephrasing of pre-existing law—that the Supreme Court's use of the word "match" is simply a synonym for the same search for a causal "link" between misstatement and corrective disclosure this Court conducted in its previous certification orders. *See* Pls. Remand Mem. 8–10, ECF No. 253. Thus, Plaintiffs argue, because the Court has already found that such a "link" exists, it need not devote any additional thought to the matter. *See id.* Defendants, meanwhile, interpret the Supreme Court as having held that "if Plaintiffs' claimed corrective disclosures did not 'match' the alleged misstatements, they may not rely on the inflation-maintenance theory." Defs.' Supp. Submission 1.

The Court finds little merit in either view. The Supreme Court made itself perfectly clear: under the inflation-maintenance theory, the inference of price impact "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure" because, naturally, "[u]nder those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation." *Goldman*, 141 S. Ct. at 1961. This dynamic, the Supreme Court explained, may occur "when the earlier misrepresentation is generic (e.g., 'we

25

have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')" because, in such circumstances, "there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

Plaintiffs plainly err in suggesting this Court need not delve beyond its prior "link" analysis, which did not speak to the relative genericness of the two poles of Plaintiffs' price impact theory—a "new idea[]" of a vintage more recent than the Court's last ruling in this action. *See ATRS III*, 11 F.4th at 143.

Defendants hit only marginally nearer to the mark. They greatly overstate the Court's obligation to do away with any inflation-maintenance claims that rely on corrective disclosures whose degree of genericness does not precisely "match" the alleged misstatements' degree of genericness. Nothing in the Supreme Court's language purports to set forth such a restrictive rule. Phrases such as "*starts* to break down," "*less* likely," and "*less* reason," *Goldman*, 141 S. Ct. at 1961 (emphasis added), suggest a *sliding* scale intended to orient this Court's review of a particular evidentiary issue, rather than a forceful *tipping* of the scale in Defendants' favor. The Court operates under the assumption that the Supreme Court meant what it said, and said what it meant, which is that the inference of price impact becomes weaker—and at some point must fail—as misstatement and corrective disclosure diverge in genericness.

Applying this sliding-scale test, the Court finds the alleged misstatements are not so exceedingly more generic than the corrective disclosures that they vanquish the otherwise strong inference of price impact embedded in the evidentiary record. As the Court noted earlier, while some of the isolated alleged misstatements equate roughly, in terms of genericness, to the Supreme Court's prototype ("our fourth quarter earnings did not meet expectations"), others do not. *See Goldman*, 141 S. Ct. at 1961. In particular, the alleged misstatements concerning Goldman's

26

specific approach to conflicts management are substantially less generic than the Supreme Court's exemplar, both when read in isolation and certainly when read in conjunction with the other alleged misstatements. Meanwhile, the corrective disclosures, although somewhat more detailed and narrow in scope than the corresponding alleged misstatements, implicate these same conflicts and Goldman's infrastructure for managing them. Surely, they do not present *equivalent* levels of genericness. But Defendants offer no authority for the proposition—nor did the Supreme Court hold—that the *Basic* presumption can no longer withstand *any* differing levels of abstraction between misstatement and disclosure.[19] *Cf. Pearlstein*, 2021 WL 253453, at *18 (holding, at the class certification stage, that "there is no requirement that the corrective disclosure take a particular form or be of a particular quality, such that it be a mirror image" of the alleged fraud) (internal quotation marks and citations omitted); *see also Vivendi*, 838 F.3d at 261 ("Proof of loss causation requires demonstrating that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.") (emphasis in original) (internal quotation marks and citations omitted).[20]

---

[19] In addition to their arguments concerning a mismatch in generic *nature*, Defendants also discuss a mismatch in *scope*. They contend that because the alleged misstatements articulated "aspirational expectations" for all Goldman employees, and "did not promise, much less guarantee, that all 30,000 employees would always follow those principles," the statements "do not match" the corrective revelations of government enforcement actions concerning specific wrongdoing. Defs.' Supp. Submission 2–3, 9 (citing *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *6 n.6 (S.D.N.Y. Sept. 8, 2017) (remarking, in the motion to dismiss context, that "[t]he fact that a code of conduct prohibits certain conduct by employees is not a factual representation that those policies will always be followed by all employees or that they are 100% effective")). But here Defendants again apply the same warped reading of the Supreme Court's "mismatch" guidance, which does not purport to require such a precise "match," much less any sort of broken "promise" or "guarantee." *See Goldman*, 141 S. Ct. at 1961. Nor does it signal to courts weighing evidence of price impact that narrower corrective disclosures cannot poke targeted, meaningful holes in overarching impressions reinforced through broader prior statements—especially where, as here, there is compelling evidence of price impact.

[20] Although these cases were decided prior to the recent rulings in this action, the Court does not infer from the Supreme Court's updated guidance any intent to broadly upend this body of case

Thus, in light of the otherwise convincing evidence of price impact, the Court finds that the comfortable, though certainly not boundless, gap in genericness between the alleged misstatements and subsequent corrective disclosures fails to satisfy Defendants' burden to demonstrate a complete lack of price impact attributable to the alleged misstatements.

## CONCLUSION

Applying the fresh guidance from the Supreme Court and the Second Circuit, the Court's thorough review of all evidence probative of price impact reveals that the alleged misstatements had *some* impact on the price of Goldman's stock during the Class Period. Thus, because Defendants have failed to establish a lack of price impact by a preponderance of the evidence, Plaintiffs' motion for class certification is granted.

The Clerk of the Court is directed to terminate the motion at ECF No. 135.

Dated: New York, New York          SO ORDERED
      December 8, 2021

                                      *Paul A. Crotty*
                         HONORABLE PAUL A. CROTTY
                         United States District Judge

---

law. To the contrary, the Supreme Court explicitly disclaimed any comment as to the inflation-maintenance theory. *See Goldman*, 141 S. Ct. at 1959 n.1.